# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ZWICK PARTNERS, LP and APARNA RAO, individually and on behalf of all others similarly situated,<br><br>     *Plaintiffs*,<br><br>    v.<br><br>QUORUM HEALTH CORPORATION, COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH, THOMAS D. MILLER, and MICHAEL J. CULOTTA,<br><br>     *Defendants*. | Case No.: 3:16-cv-02475<br><br>Class Action<br><br>Judge Waverly D. Crenshaw Jr.<br>Magistrate Judge Joe B. Brown |

## CHSI AND QUORUM DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Brandon R. Keel (*pro hac vice*)
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com

James A. Haltom (BPRN 028495)
Nelson Mullins Riley & Scarborough, LLP
150 Fourth Avenue, North, Suite 1100
Nashville, Tennessee 37219
Telephone: (615) 664-5339
Facsimile: (615) 664-5399
james.haltom@nelsonmullins.com

*Counsel for Quorum Defendants*

Gary A. Orseck (*pro hac vice*)
William J. Trunk (*pro hac vice*)
Jack A. Herman (*pro hac vice*)
Wendy Liu (*pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
gorseck@robbinsrussell.com

Robert J. Walker (BPR No. 2498)
Jason W. Callen (BPR No. 26225)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Bob.walker@butlersnow.com
Jason.callen@butlersnow.com

*Counsel for CHSI Defendants*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

A.     CHSI Forms Quorum And Allocates To Quorum A Portion Of CHSI's Goodwill ........... 3

B.     CHSI's And Quorum's Financial Difficulties Are Well Known To The Market .............. 4

C.     CHSI And Quorum Complete The Spinoff ............................................................. 4

D.     CHSI And Quorum Report Impairment Charges To Little Fanfare ................................. 5

E.     The Second Amended Complaint ......................................................................... 7

ARGUMENT ................................................................................................................... 8

I.     THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE IS UNAVAILABLE BECAUSE PLAINTIFF CANNOT ESTABLISH THE NECESSARY "PRICE IMPACT" OF THE ALLEGED MISREPRESENTATIONS ................................................................................ 9

       A.     The "Triggering Factors" That Allegedly Called For A Pre-Spin Impairment Were Publicly Known Before Quorum's Stock Began Trading .............................. 10

       B.     When Quorum Announced Its Impairments, Market Analysts Shrugged; They Focused Instead On Quorum's Earnings Miss ................................................. 12

       C.     Neither Quorum's Nor CHSI's Stock Reacted To A Comparable Impairment Taken By CHSI Eight Days Earlier, Which Confirms The Lack of Back-End Price Impact .................................................................................................. 15

       D.     Similar Impairments Taken By Other Companies Confirm That Such Impairments Have No Price Impact ......................................................................... 17

II.    AT A MINIMUM, THE CLASS SHOULD EXCLUDE INVESTORS WHO DID NOT PURCHASE QUORUM STOCK AT A MARKET PRICE ................................................. 18

CONCLUSION ............................................................................................................... 19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)............................................................................................................ 10

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Group, Inc.*,
  879 F.3d 474 (2d Cir. 2018) ............................................................................... 12, 15, 16, 17

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...................................................................................................... passim

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975).......................................................................................................... 18

*Burges v. Bancorpsouth, Inc.*,
  No. 14-CV-1564, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...................................... 14

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ................................................................................................ 3

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014)................................................................................................... passim

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) .............................................................................................. 9

*In re BancorpSouth, Inc.*,
  No. 16-0505, 2016 WL 5714755 (6th Cir. Sept. 6, 2016)..................................................... 8

*In re BancorpSouth, Inc.*,
  No. 17-0508, 2017 WL 4125647 (6th Cir. Sept. 18, 2017) ................................................. 10

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. H-01-3624, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008)............................................ 18

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008)................................................................................................... 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
  284 F.R.D. 144 (S.D.N.Y. 2012) ....................................................................................... 18

*Ohio Public Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  No. 08-CV-0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)....................................... 14

ii

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Rikos v. Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015) ................................................................. 8

*Rose v. Arkansas Valley Envtl. & Util. Auth.*,
   562 F. Supp. 1180 (W.D. Mo. 1983) ..................................................... 18

*Sanderson v. H.I.G. P-XI Holding, Inc.*,
   No. 99-3313, 2000 WL 1042813 (E.D. La. July 27, 2000) ...................... 18

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ............................................................... 8, 9

*Wal-Mart v. Dukes*,
   564 U.S. 338 (2011) ........................................................................... 8

*Young v. Nationwide Mut. Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) ............................................................... 8

**Rules**

17 C.F.R. § 240.10 ................................................................................ 18

Fed. R. Civ. P. 23 ............................................................................... 8, 9

iii

## INTRODUCTION

Reliance is an essential element of a securities fraud claim. Class actions are no exception. For a securities class action to proceed, the plaintiff must establish a common basis for class-wide reliance. This is often done through the "fraud-on-the-market" theory, eponymously dubbed the "*Basic* presumption" of reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Where applicable, this theory permits a plaintiff to "invok[e] a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton Co. v. Erica P. John Fund, Inc.* 134 S. Ct. 2398, 2405 (2014) ("*Halliburton II*"). "In such a case, . . . anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements." *Id.*

But the theory does not always hold. A fundamental premise of the fraud-on-the-market theory is that the alleged misrepresentation influenced the market price of the security at issue— *i.e.*, that it had "price impact." *Id.* at 2414. If the misrepresentation did *not* have price impact, then an investor cannot be said to have "indirectly relied on that misrepresentation through his reliance on the integrity of the market price." *Id.* (quotation marks and alteration omitted). Accordingly, a defendant can rebut the presumption of reliance at the class-certification stage by adducing evidence that the "alleged misrepresentation did not actually affect the market price." *Id.* at 2417.

Lead Plaintiff Zwick Partners LP ("Plaintiff" or "Zwick") seeks to certify a class of investors who acquired Quorum stock in the weeks following Quorum's spinoff from CHSI. Plaintiff alleges that investors were duped into acquiring Quorum stock at inflated prices because Defendants knew, but failed to disclose, that Quorum's goodwill and long-lived assets were impaired prior to the spinoff. Plaintiff urges that because Quorum's stock traded in an efficient market it can establish class-wide reliance through the fraud-on-the-market theory.

1

Not so.   The fraud-on-the-market theory is unavailing here because there is overwhelming evidence that the alleged misrepresentations did *not* have price impact.   For starters, the very facts that Plaintiff claims necessitated an impairment charge—the so-called "impairment triggers"—were matters of public knowledge *before Quorum's stock began trading*. If Quorum's stock traded in an efficient market (as Plaintiff says), then Quorum's stock price, on the day trading began, would have reflected the need for impairment based on those alleged triggers (all plain for the world to see).

The evidence surrounding the alleged corrective disclosures, at the end of the alleged class period, confirms there was no price impact.   When Quorum announced impairment charges at the end of Q2 2016, market analysts ignored the impairments, focusing instead on Quorum's Q2 2016 results and reduced guidance for FY 2016 that were announced at the same time.   In fact, eight days earlier, CHSI had announced an impairment to *its* goodwill—presaging an analogous impairment by Quorum, given that both companies' goodwill had derived from the same source—and the market shrugged.   Neither Quorum's nor CHSI's stock price reacted to the CHSI impairment.[1]

---

[1] Defendants' expert, Lucy Allen, has submitted a report, in which she performs event studies and other empirical analyses confirming the lack of price impact.   Declaration of Gary O. Orseck ("Orseck Decl."), Ex. A ("Allen Rep.").   All exhibits referenced herein are attached to the Orseck Decl.

Defendants' respectfully request an evidentiary hearing for the Court to consider these data and the work of the parties' respective experts.

2

These facts demonstrate that the alleged misrepresentations had no price impact on Quorum's stock. This "severs the link between the alleged misrepresentation and the price [paid] by the plaintiff," rendering unavailable the fraud-on-the-market presumption. *Halliburton II*, 134 S. Ct. at 2415-16 (quotation marks and alteration omitted). Without that class-wide presumption of reliance, individual issues will predominate over common ones, and the class should not be certified. *Id.*

## BACKGROUND

### A.    CHSI Forms Quorum And Allocates To Quorum A Portion Of CHSI's Goodwill

In August 2015, CHSI announced its plan to spin off 38 hospitals and a hospital management company into Quorum, at that time an indirect, wholly owned subsidiary of CHSI. *See* Ex. B at 14 (Q1 2016 CHSI 10-Q).

In forming Quorum, CHSI allocated to Quorum a portion of CHSI's goodwill.[2] CHSI had approximately $9 billion of goodwill on its books as of December 31, 2015, the result of major corporate acquisitions in years past.[3] Ex. D, at 86. It allocated to Quorum a portion of its goodwill, which was intended to reflect the proportion of CHSI's goodwill associated with the assets that would be spun off into Quorum. *See* Ex. C, at Ex. 99.1, F-9 (9/4/2015 Quorum Form

---

[2] Goodwill is an intangible asset that represents "the future economic benefits arising from other assets acquired in a business combination . . . that are not individually identified and separately recognized." ASC 350-20-20.

[3] "When an acquisition occurs, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or excess purchase price." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).

3

10); Second Amended Complaint, Dkt. 92 ("SAC") ¶ 49.  In September 2015, Quorum reported approximately $535 million in goodwill.  *See* Ex. C at Ex. 99.1, 56 (9/4/2015 Quorum Form 10).

## B. CHSI's And Quorum's Financial Difficulties Are Well Known To The Market

In the months preceding the spinoff, CHSI and Quorum experienced well-publicized financial difficulties.  *E.g.*, SAC ¶ 10 (Barclays commentary).  On February 17, 2016, CHSI released its audited 2015 consolidated year-end financial statements.  *See* Ex. D at 95 (FY 2015 CHSI Form 10-K).  They disclosed that CHSI's net revenues, net income, hospital admissions, and adjusted EBITDA all were down from the same period in 2014.  *See* Ex. E at Ex. 99.1, 1-2 (2/16/16 CHSI 8-K).  Likewise, Quorum reported that its net income and adjusted EBITDA were down from the prior year.  *See* Ex. F at Ex. 99.1, 7-8 (3/7/16 Amended Form 10).

As is customary, CHSI and Quorum tested for impairments on an annual basis.  *See* ASC 350-20-35-28.[4]  Both CHSI and Quorum performed their annual goodwill impairment tests in Q4 2015, and neither found any impairment.  *See* Ex. D at 35 (FY 2015 CHSI Form 10-K); Ex. F at Ex. 99.1, 24-25 (3/7/2016 Amended Form 10).  But Quorum disclosed that if its "consolidated market capitalization trades below net carrying value for a period of time," then "a goodwill impairment could be indicated."  Ex. F at Ex. 99.1, 25 (3/7/2016 Amended Form 10).

## C. CHSI And Quorum Complete The Spinoff

On April 1, 2016, Quorum filed an amended Form 10 and Information Statement.  It contained audited financial information for Quorum through December 31, 2015.  *See* Ex. G at Ex. 99.1, 6-7 (4/1/16 Amended Form 10).  Quorum informed investors that it had last tested

---

[4] An impairment occurs when an asset's fair value falls below its carrying, or book, value.  *See* ASC 350-20-35-2 (goodwill); ASC 360-10-35-17 (long-lived assets).

4

goodwill in the fourth quarter of 2015 and again cautioned that "a goodwill impairment could be indicated" in the future. *Id*. at 24-25. Quorum also warned investors of other risks, including that its hospitals were largely in rural areas and therefore faced competition from hospitals in urban areas that provide more complex services. *Id.* at 22.

The spinoff was completed on April 29, 2016. *See* Ex. H at 1 (5/2/16 CHSI 8-K). CHSI stockholders received one share of Quorum stock for every four shares of CHSI stock they held. *See* Ex. I at 5 (1Q 2016 Quorum 10-Q). Quorum began trading on the New York Stock Exchange the next business day (May 2). *Id*.

### D. CHSI And Quorum Report Impairment Charges To Little Fanfare

On August 2, 2016, following another poor quarter, CHSI reported impairment charges of more than $1.6 billion, including a $1.4 billion impairment to goodwill. Ex. J at Ex. 99.1, 1 (8/2/2016 CHSI 8-K). Market watchers were impassive. None of the analysts covering Quorum, or the 21 analysts covering CHSI, asked a *single question* about the impairment charges during the next day's earnings call. Allen Rep. ¶¶ 68-70. Likewise, none of the 24 analyst reports published on CHSI following the August 2 announcement characterized the impairments as "surprising" or "disappointing"[5] information that negatively affected their valuations of Quorum's stock. *See id.* ¶ 68. No analysts covering Quorum so much as issued a report following CHSI's announcement, even though Quorum's goodwill and CHSI's goodwill were inextricably linked—and therefore, as one analyst later put it, Quorum's impairment should have "been obvious" following CHSI's announcement. *Id.* ¶ 69; *see* Ex. L (8/10/16 Mizuho Report).

---

[5] According to Plaintiff's expert, analysts use terms like "surprised" or "disappointed" to signal that a disclosure contains "*new information that would be impacting the price*." Ex. K (8/17/18 Deposition of Zachary Nye, Ph.D ("Nye Dep.")) 122:3-123:22 (emphasis added).

Nor did Quorum's or CHSI's stock react in response to CHSI's impairment.   Allen Rep. ¶¶ 51-62.  Defendants' expert, Lucy Allen, conducted an event study[6] for Quorum's stock using two different event study specifications, including the event study model used by Plaintiff's expert Dr. Zachary Nye.  *Id.* ¶ 58.  Based on both models, she concluded that "Quorum's stock price reaction after [CHSI's] August 2 announcement, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be statistically distinguished from zero."  *Id.* ¶ 60.  In other words, CHSI's announcement of a $1.4 billion goodwill impairment had no impact on Quorum's stock price.  *See id.*  Allen likewise concluded that there was no statistically significant reaction in CHSI's stock price following the announcement.  *Id.* ¶ 61.  (Notably, neither Plaintiff nor its expert makes mention of—much less grapples with—the CHSI impairment on August 2).

Quorum released its own second quarter earnings just over a week later, on August 10, 2016.  The results were disappointing.  *See* Ex. M at Ex. 99.1, 1-2 (8/10/16 Quorum 8-K). Quorum reduced its full-year net revenue guidance from a range of $2.20-$2.30 billion to a range of $2.15-$2.20 billion, and its full-year adjusted EBITDA guidance from a range of $265-$275 million to a range of $175-$200 million.  *See* Ex. N at Ex. 99.1, 10 (5/11/16 Quorum 8-K); Ex. M at Ex. 99.1, 3 (8/10/16 Quorum 8-K).  Quorum's stock price fell 49.8 percent, closing at $5.03 per share on August 11, 2016.  SAC ¶ 17.

Quorum also announced impairments to its goodwill ($200 million) and long-lived assets ($45 million).  Ex. O at 19, 46 (2Q 2016 Quorum 10-Q).  As with CHSI's comparable

---

[6] An event study "is a commonly accepted statistical analysis" that measures "the movement in a stock's price after an event or public announcement, adjusting for the movement in the overall market and/or industry."  Allen Rep. ¶ 57.

impairment, market watchers yawned at the announced impairments.  None of the analysts covering Quorum asked Quorum management a single question about the impairment charges during the earnings conference call held on August 11.  *See* Allen Rep. ¶ 65.  Of the eleven analyst reports published on Quorum following the impairment announcement, five made no mention whatsoever of the impairment.  *See id.*  And the six reports that *did* mention the impairment did so only in passing; none of them characterized the impairment as "surprising" or "disappointing" information that negatively affected their valuations of Quorum's stock.  Ex. R (8/10/16 Avondale Partners Report); Ex. S (8/11/16 Avondale Partners Report); Ex. T (8/10/16 Credit Suisse Report); Ex. U (8/11/16 Credit Suisse Report); Ex. L (8/10/16 Mizuho Report); Ex. V (8/10/16 RBC Capital Markets Report); *see* Allen Rep. ¶¶ 65-67.

Analysts focused instead on Quorum's poor Q2 2016 results and reduced guidance.  *See id.* ¶ 67.  As Plaintiff's expert frankly acknowledges, "[n]ews reports attributed Quorum's stock price decline on August 11, 2016 to the Company's earnings miss and reduced guidance"—not to its impairment of goodwill and long-lived assets.  Expert Report of Zachary Nye, Ph.D, Dkt. 163-1 ("Nye Rep."), Ex. 12 at 27 (collecting sources); Nye Dep. 194:12-195:10.

### E.    The Second Amended Complaint

On April 17, 2017, Plaintiff filed a Second Amended Complaint.  Plaintiff alleges that Defendants overstated Quorum's goodwill and long-lived assets in two distinct filings: (i) Quorum's (pre-spin) April 1, 2016 Form 10 and Information Statement, SAC ¶¶ 154-55; and (ii) Quorum's (post-spin) May 11, 2016 Form 10-Q, SAC ¶¶ 156-58.  Plaintiff claims that the representations in those documents about goodwill and long-lived assets were "materially false because Defendants knowingly or recklessly failed to properly account for impairments to [Quorum's] goodwill and long-lived assets based on facts known or reasonably available to them."  SAC ¶ 1.

Plaintiff seeks to certify a class of "[a]ll persons and entities who purchased or otherwise acquired [Quorum] common stock" between May 2, 2016, the first day Quorum's stock began trading, and August 10, 2016, the day Quorum released its Q2 2016 earnings. Pl. Mem. 1. In support of its class-certification motion, Plaintiff argues that "reliance will be established on a common basis under the 'fraud-on-the-market' theory." Pl. Mem. 10.[7]

## ARGUMENT

"To be certified, a class must satisfy all four of the Rule 23(a) prerequisites— numerosity, commonality, typicality, and adequate representation—and fall within one of the three types of class actions listed in Rule 23(b)." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012). "The party seeking class certification has the burden to prove the Rule 23 certification requirements," *id.*, and "affirmatively demonstrate his compliance with the Rule," *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011).

"Class certification is appropriate if the district court finds, after conducting a rigorous analysis, that the requirements of Rule 23 have been met." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) (quotation marks and alteration omitted). "A district judge may not duck hard questions by observing that each side has some support . . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *In re BancorpSouth, Inc.*, No. 16-0505, 2016 WL 5714755, at *1 (6th Cir. Sept. 6, 2016) (quotation marks omitted).

---

[7] Plaintiff does not argue that class-wide reliance can be established in any other way. Notably, the *Affiliated Ute* presumption of reliance is unavailable here in any event because Plaintiff's claims relate to misrepresentations, not omissions. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 95-96 (2d Cir. 2017) (discussing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)).

8

## I. THE FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE IS UNAVAILABLE BECAUSE PLAINTIFF CANNOT ESTABLISH THE NECESSARY "PRICE IMPACT" OF THE ALLEGED MISREPRESENTATIONS

Plaintiff hopes to invoke the *Basic* presumption to satisfy Rule 23(b)(3)'s predominance requirement. Pl. Mem. 10. As explained above, that rebuttable presumption permits a plaintiff to satisfy the "reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements." *Halliburton II*, 134 S. Ct. at 2405.

But the *Basic* presumption is just that—a presumption. *Id.* at 2414. At the class-certification stage, defendants may "defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 2417.[8] If defendants can show that the alleged misrepresentations did not "actually affect the market price," *id.* at 2408, then "there is no grounding for any contention that the investor indirectly relied on that misrepresentation through his reliance on the integrity of the market price," id. at 2414 (quotation marks and alteration omitted).

Here, neither Plaintiff nor its expert has made any effort to demonstrate that the alleged misrepresentations had the slightest effect on Quorum's stock price. And there is overwhelming evidence that the alleged misrepresentations regarding Quorum's goodwill and long-lived assets had *no* price impact. "[P]rice impact may be demonstrated either at the time that the alleged misrepresentations were made [front-end], or at the time of their correction [back-end]." *In re*

---

[8] It is an open question in this Circuit whether defendants bear the burden of production or persuasion on this issue. *Compare IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (production) *with Waggoner*, 875 F.3d at 103 (persuasion). This Court need not resolve that question, however, because Defendants satisfy either standard.

9

*BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at \*1 (6th Cir. Sept. 18, 2017).[9]  Plaintiff flunks both tests.  As explained below, there was no front-end price impact—*i.e.*, the alleged misrepresentations did not inflate Quorum's stock price in the first place—because all of the facts Plaintiff says required an impairment were publicly known before Quorum's stock began trading.  Nor is there any back-end price impact—*i.e.*, the alleged corrective disclosure did not cause the stock price to fall—because the market was wholly indifferent to the impairment, just as it was to CHSI's comparable impairment eight days earlier.  That separately confirms that the alleged misrepresentations did not affect Quorum's stock price in the first place.

Plaintiff has offered no evidence to the contrary.  Plaintiff therefore cannot invoke the *Basic* presumption of reliance, and the proposed class thus cannot be certified because, without the presumption, the individualized inquiries into whether class members relied on the alleged misrepresentations "would overwhelm questions common to the class."  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 462-63 (2013).

### A.     The "Triggering Factors" That Allegedly Called For A Pre-Spin Impairment Were Publicly Known Before Quorum's Stock Began Trading

The thrust of Plaintiff's case is that Defendants misled the market into believing that Quorum's goodwill was not impaired prior to the spinoff.  Plaintiff charges that Defendants must have known that Quorum's goodwill was impaired because red flags existed, suggesting the need for impairment.  It points to numerous "indicators or triggering factors . . . that indicated to Defendants" that Quorum's goodwill and long-lived assets were impaired.  SAC ¶ 5.  In particular, Plaintiff attributes the impairment to: a sustained decrease in share price (*id*. ¶ 6); a

---

[9] Defendants do not concede that they must establish the absence of back-end price impact in order to rebut the fraud-on-the-market presumption. But in any event, Defendants have established it here.

10

decline in overall financial performance (*id*. ¶¶ 9-11); the underperformance of Quorum's hospitals (*id*. ¶ 12); a deterioration in the industry in which Quorum and CHS operate (*id*. ¶ 5); and that Quorum experienced "increased competition from larger hospitals" (*id*. ¶ 12).

But all of those factors (as well as the accounting rules Plaintiff cites) were publicly known before the spinoff, and consequently before Quorum's stock first began trading (on May 2, 2016). *See* Allen Rep. ¶¶ 23-62. In particular:

- *"Sustained Decrease" in Stock Price*: The market was well aware of the "sustained decrease" in CHSI's stock price by the time of the spinoff. *See id.* ¶¶ 26-30. Indeed, as Plaintiff's expert concedes, financial information about a publicly traded company is "readily available to investors," and "investors have access to trading prices and volumes throughout the trading day." Nye Rep. ¶ 16; Nye Dep. 206:15-207:15.

- *Decline in "Overall Financial Performance"*: Both CHSI and Quorum reported their financial results in periodic filings with the SEC and other communications with investors. Accordingly, the "decline in 'overall financial performance' of CHSI and Quorum in the quarters prior to the spin-off" was public information. Allen Rep. ¶¶ 31-35; Nye Dep. 210:25-211:11.

- *Relative Underperformance of Quorum Hospitals*: The financial results of CHSI, as well as the results of the Quorum hospitals, were publicly available. Analyst reports published prior to the spinoff confirm that "the market was aware that the Quorum hospitals were less profitable than the average CHS hospital." Allen Rep. ¶¶ 36-40; *see also* Nye Dep. 214:10-20.

- *"Deterioration" In The Hospital Management Industry*: The underwhelming performance of hospital management companies was public information. Again, analyst reports published prior to the spinoff confirm that "the market was aware that hospital management companies were underperforming expectations." Allen Rep. ¶¶ 41-44; Nye Dep. 218:14-22.

- *Increased Competition From Larger Hospitals*: Analyst commentary and Quorum's own disclosures prior to the spinoff make plain that Quorum's rural hospitals were facing stiffer competition from larger urban hospitals. Allen Rep. ¶¶ 45-50; *see also* Nye Dep. 215:4-216:6

In short, each of these facts—the "triggering factors" that Plaintiff alleges required an impairment—was plain for the world to see before Quorum's stock began trading. This refutes

11

any claim of price impact.  If the alleged misrepresentations affected Quorum's stock price, it must have been (at the earliest) on May 2, 2016, because there *was* no Quorum stock price prior to that date.  But, by that date—to hear Plaintiff tell it—all of the alleged impairment triggers were matters of public knowledge.  If the market for Quorum's stock was efficient (as Plaintiff says), then Quorum's stock price from and after May 2, 2016, would have reflected the impairments that Plaintiff claims existed.   Which is another way of saying the alleged misrepresentations had no price impact on the front-end; a statement cannot "actually affect the market price of the stock" if the stock price *already reflects* the true state of affairs.  *See Halliburton II*, 134 S. Ct. at 2417.[10]

### B.   When Quorum Announced Its Impairments, Market Analysts Shrugged; They Focused Instead On Quorum's Earnings Miss

Just as Plaintiff cannot demonstrate front-end price impact, neither can it demonstrate back-end price impact.  Plaintiff claims that investors first "learn[ed] the truth" when, on August 10, 2016, Quorum issued its Q2 2016 report and announced impairments to its goodwill and long-lived assets.  Pl. Mem. 4.  Plaintiff alleges that Quorum's share price fell by 49.8 percent "as a result" of those impairment disclosures.  SAC ¶¶ 159-60.  According to Plaintiff, this shows that it was the alleged misrepresentations regarding goodwill and long-lived assets that inflated Quorum's stock price in the first place.

---

[10] Unlike the "truth on the market" defense, the question of price impact is ripe for resolution at the class certification stage.  Here, Defendants are not "attack[ing] the timing of the plaintiffs' purchase of shares," but instead are demonstrating that the alleged misrepresentations "did not actually affect the stock's market price."  *See Arkansas Teachers Retirement System v. Goldman Sachs Group, Inc.*, 879 F.3d 474, 485-86 (2d Cir. 2018) (quoting *Halliburton II*, 134 S. Ct. at 2416) (distinguishing between the two doctrines).

12

But that does not work, either.  The stock price decline was *not* caused by the impairment announcements (which, as explained above, revealed nothing of consequence that was not already publicly known).  Rather, market analysts uniformly attributed the stock price decline to announcements unrelated to the alleged fraud.  Allen Rep. ¶ 72.  In particular, on August 10, 2016, Quorum announced an array of financial results and earnings guidance that were below the market's expectations.  *See* Ex. M at Ex. 99.1, 1-2 (8/10/16 Quorum 8-K).

The market evidence confirms that Quorum's impairments do not support a finding of price impact.  In fact, not a single analyst covering Quorum so much as *mentioned* the impairment charges during the earnings call following the August 10 announcement, let alone inquired about it.  Allen Rep. ¶ 65; *see* Ex. P (8/11/2016 Transcript).[11]  Of the eleven analyst reports issued after the August 10 announcement, five did not bother even to mention the impairment.  Allen Rep. ¶ 65.  The other six reports mentioned it only in passing, and did not characterize the impairment as a new or surprising development that negatively affected their valuations of Quorum's stock.  *See id.* ¶¶ 65-66.[12]  Notably, Plaintiff's expert reviewed and summarized six analyst reports to evaluate the reason for Quorum's stock price decline in August 2016.  *See* Nye Rep., Ex. 12 at 18-28.  Not one of those summaries breathes a word about Quorum's impairment charges.  *Id.*; *see also* Allen Rep. ¶ 75.  On the contrary, they uniformly

---

[11] The review of analyst reports is a standard and generally accepted methodology for assessing whether a disclosure had price impact.  *See* Allen Rep. ¶ 20.

[12] One analyst remarked that that Quorum's operating results were "negatively impacted" by the impairments.  *See* Allen Rep. ¶ 66.  But that analyst was simply reporting the fact of the impairment and, notably, did not describe it as any sort of surprise.  Indeed, the same analyst used the same language to describe CHSI's impairment charge which, as discussed below, was the same type of announcement as the alleged corrective disclosure and "did not cause any statistically significant reaction in either CHSI's or Quorum's stock price."  *Id.*

13

attribute the stock price decline to Quorum's disappointing financial results and reduced EBITDA guidance. *See*, *e.g.*, Nye Rep., Ex. 12 at 21 (Credit Suisse cut price target based on "'sharply lower'" EBITDA guidance); *id.* at 22 (UBS cut price target due to results that fell short "'across the board'" and because Quorum "'[r]educed [s]ubstantially'" its earnings guidance); *id.* at 25 (Morgan Stanley regarded EBITDA as "'well below'" expectations). What's more, analysts consistently used metrics for Quorum's financial performance that expressly *excluded* the effects of the impairment charges. *See* Allen Rep. ¶¶ 72-74; *see also* Nye Dep. 202:2-20. Even Plaintiff's expert was constrained to acknowledge that "[n]ews reports attributed Quorum's stock price decline on August 11, 2016, *to the Company's earnings miss and reduced guidance*." Nye Rep., Ex. 12 at 27 (emphasis added); Nye Dep. 194:12-23.[13]

In short, the absence of any price impact coincident to the alleged corrective disclosure demonstrates that the alleged misstatements regarding goodwill and long-lived assets did not affect Quorum's stock price in the first place. And this lack of price impact is *not* to be confused with loss causation. *See Burges v. Bancorpsouth, Inc.*, No. 14-CV-1564, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) ("Loss causation is not price impact."). "Expert testimony on back-end price impact," including evidence surrounding the alleged corrective disclosure(s), is "admissible and directly relevant at the class certification stage." *Ohio Public Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 08-CV-0160, 2018 WL 3861840, at *13 (N.D. Ohio Aug. 14, 2018). To be sure, back-end price impact and loss causation overlap to some degree. But a court may not, at the class-certification stage, "put blinders on as to an issue simply because it

---

[13] Indeed, Plaintiff's expert has separately opined that, "[g]iven public awareness of goodwill accounting standards," a goodwill impairment in itself "provide[s] no new information" to the market. Ex. Q ("Kinross Rep.") ¶¶ 95-96.

14

implicates the merits of the case." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008); *see also Halliburton II*, 134 S. Ct. at 2416-17 (price impact evidence permitted at class-certification stage even though "such proof is also highly relevant at the merits stage").

For that reason, it is not enough for Plaintiff merely to rest on Quorum's stock drop as evidence of price impact. In the *Arkansas Teachers* case, the Second Circuit rejected the notion that *prima facie* allegations that a company's stock price declined at the time of a corrective disclosure are sufficient to establish price impact. *See* 879 F.3d at 486. There, the court reversed the district court for erroneously regarding defendants' price-impact arguments as merits issues inappropriate for resolution at the class-certification stage. *Id*. at 485. And even though the company's stock price had plummeted by nearly 25% following the alleged corrective disclosures (*id*. at 479), the Second Circuit held that the district court was required, at the class-certification stage, to consider the defendant's evidence that the stock price did not decline in connection with other corrective disclosures and so the alleged misrepresentations nevertheless did *not* have price impact. *Id*. at 485-86. So too here. The happenstance that Quorum announced an impairment at the same time it announced other news does not suffice to establish price impact.

### C.     Neither Quorum's Nor CHSI's Stock Reacted To A Comparable Impairment Taken By CHSI Eight Days Earlier, Which Confirms The Lack Of Back-End Price Impact

On August 2, 2016—eight days before Quorum announced its impairments—CHSI announced a $1.6 billion impairment charge, including a $1.4 billion impairment to its goodwill. Ex. J at Ex. 99.1, 1 (8/2/2016 CHSI 8-K). CHSI's goodwill impairment foretold a similar impairment by Quorum; after all, both companies' goodwill derived from the same source (CHSI's pre-spinoff acquisitions) and Plaintiff alleges that each company's goodwill became

15

impaired due to the same factors. *See* Allen Rep. ¶¶ 51-55.[14]  As one analyst put it, Quorum's goodwill impairment should "have therefore been obvious" following CHSI's announcement. Ex. L at 1 (8/10/16 Mizuho Report).

Yet neither Quorum's nor CHSI's stock price budged in response to the August 2 announcement.   On the contrary, "Quorum's stock price reaction after the August 2 announcement, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be statistically distinguished from zero."  Allen Rep. ¶ 60.  So too with CHSI's stock price.  *Id.* ¶ 61.

The chatter among analysts further reflects that the market was interested in Quorum's actual performance—not the company's mechanical adjustment to its goodwill.  During the earnings call following CHSI's announcement, no analysts—not one—asked a question about the impairment charges.  *See id.* ¶ 68.  None of the analysts covering CHSI characterized the impairment charges as surprising or disappointing information that had negatively impacted their valuations of CHSI's stock.  *See id.* (collecting sources).  Further, none of the analysts covering Quorum so much as issued a report in response to the August 2 announcement, even though the goodwill was from the same source.  *Id.* ¶ 69.

If the alleged misrepresentations had affected Quorum's stock price, one would expect a negative reaction when "corrective" information—here, CHSI's comparable impairment— entered the market.   *See, e.g., Arkansas Teachers*, 879 F.3d at 485-86 (remanding to district court to consider, as part of the price-impact inquiry at the class-certification stage, evidence that

---

[14] Plaintiff agrees that Quorum's goodwill impairment was foreshadowed by CHSI's like impairment. *See* SAC ¶ 165.

16

the market did *not* react on earlier days during the class period when the same alleged "corrective disclosure" information was revealed).  There was no such reaction.  This further confirms that the alleged misrepresentations did not have price impact.  *See* Allen Rep. ¶ 62.

### D.    Similar Impairments Taken By Other Companies Confirm That Such Impairments Have No Price Impact

To corroborate her findings, Allen performed a comprehensive review of goodwill and long-lived asset impairments announced from 2015 to 2017.  *Id.* ¶ 78.  She examined circumstances where the market reaction to the impairment could be disaggregated from any confounding news.  *Id.* ¶ 79.  Of the 68 impairment announcements in Allen's sample, *not one* had a statistically significant effect on the company's stock price.  *Id.* ¶ 81.

This is not surprising.  After all, a goodwill impairment is a mechanical accounting entry that does not itself reveal anything about the financial prospects or earning potential of the enterprise.  As Plaintiff's expert put it—at least when he was separately retained to opine that goodwill impairments do *not* themselves have stock-price impact: "Given public awareness of goodwill accounting standards," a goodwill impairment in itself "provide[s] no new information" to the market.  Kinross Rep. ¶¶ 95-96.  That is why (as Plaintiff's expert concedes) "[n]ews reports attributed Quorum's stock price decline on August 11, 2016 to the Company's earnings miss and reduced guidance."  Nye Ex. 12 at 27; *see* Nye Dep. 194:12-23; Allen Rep. ¶ 76.

\* \* \* \* \*

In short, there is ample evidence demonstrating that the alleged misrepresentations did not affect the market price of Quorum stock.  *Arkansas Teachers*, 879 F.3d at 486.  Plaintiff has made no attempt to demonstrate otherwise.  In the absence of price impact, Plaintiff cannot invoke the *Basic* presumption, and Plaintiff's motion for class certification therefore must be denied.  *Halliburton II*, 134 S. Ct. at 2416.

17

## II.    AT A MINIMUM, THE CLASS SHOULD EXCLUDE INVESTORS WHO DID NOT PURCHASE QUORUM STOCK AT A MARKET PRICE

Plaintiff proposes to certify a class of "all persons and entities who purchased or otherwise acquired" Quorum common stock between May 2, 2016 and August 10, 2016.  Zwick Br. 1.  Should the Court certify a class at all, it should strike the words "or otherwise acquired" from that class definition and supplant the words "at a market price."

Rule 10b-5 prohibits misstatements "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  For that reason, "the plaintiff class for purposes of [§] 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities."  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975).  "[A] person who receives a security as a gift or through inheritance" is not "entitled to maintain a § 10(b) and Rule 10b-5 cause of action."  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. H-01-3624, 2008 WL 4178151, at *9 (S.D. Tex. Sept. 8, 2008).[15]

Accordingly, courts have held that those who acquired securities other than by purchasing them at a market price should not be included in a class.  *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 157 n.62 (S.D.N.Y. 2012) (revising notice to class members to exclude shareholders who had received securities by "gift, inheritance, [or] donation").  Here, investors that acquired Quorum stock other than at a market price—such as preexisting CHSI investors who received Quorum stock by dint of their CHSI holdings—should therefore be excluded from any class.

---

[15] *See also Rose v. Arkansas Valley Envtl. & Util. Auth.*, 562 F. Supp. 1180, 1188 (W.D. Mo. 1983) (persons who received stock by inheritance are not entitled to bring 10b-5 actions); *Sanderson v. H.I.G. P-XI Holding, Inc.*, No. 99-3313, 2000 WL 1042813, at *9 (E.D. La. July 27, 2000) (donees not entitled to bring 10b-5 actions).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Class Certification with prejudice.  Defendants further request an evidentiary hearing for the Court to consider the expert evidence regarding price impact.


Dated:  August 31, 2018


/s/ Jessica P. Corley                               /s/ Gary A. Orseck


| | |
|---|---|
| Jessica P. Corley (*pro hac vice*) | Gary A. Orseck (*pro hac vice*) |
| Lisa R. Bugni (*pro hac vice*) | William J. Trunk (*pro hac vice*) |
| Brandon R. Keel (*pro hac vice*) | Jack A. Herman (*pro hac vice*) |
| King & Spalding LLP | Wendy Liu (*pro hac vice*) |
| 1180 Peachtree Street, NE | ROBBINS, RUSSELL, ENGLERT, |
| Atlanta, Georgia 30309-3521 | ORSECK, UNTEREINER & SAUBER LLP |
| Telephone: (404) 572-4600 | 1801 K Street, N.W., Suite 411L |
| Facsimile: (404) 572-5100 | Washington, DC 20006 |
| jcorley@kslaw.com | Telephone: (202) 775-4500 |
| lbugni@kslaw.com | Facsimile: (202) 775-4510 |
| bkeel@kslaw.com | gorseck@robbinsrussell.com |

| | |
|---|---|
| James A. Haltom (BPRN 028495) | Robert J. Walker (BPR No. 2498) |
| Nelson Mullins Riley & Scarborough, LLP | Jason W. Callen (BPR No. 26225) |
| 150 Fourth Avenue, North, Suite 1100 | BUTLER SNOW LLP |
| Nashville, Tennessee 37219 | The Pinnacle at Symphony Place |
| Telephone: (615) 664-5339 | 150 3rd Avenue South, Suite 1600 |
| Facsimile: (615) 664-5399 | Nashville, TN 37201 |
| james.haltom@nelsonmullins.com | Telephone: (615) 651-6700 |
| | Bob.walker@butlersnow.com |
| *Counsel for Quorum Defendants* | Jason.callen@butlersnow.com |

*Counsel for CHSI Defendants*

19

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served upon all registered users of the Electronic Case Filing System, including:

Paul K. Bramlett
Robert P. Bramlett
Bramlett Law Offices
P.O. Box 150734
Nashville, TN 37215
(615) 248-2828
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jessica Perry Corley
Lisa R. Bugni
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309
(404) 572-4717
jpcorley@kslaw.com
lbugni@kslaw.com

Wade B. Cowan
Davies, Humphreys, Horton & Reese, PLC
85 White Bridge Road, Suite 300
Nashville, TN 37205
(615) 256-8125
wcowan@dhhrplc.com

Patrick V. Dahlstrom
Pomerantz LLP
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

Corey D. Holzer
Marshall Dees
Holzer & Holzer, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
(770) 392-0090
mdees@holzerlaw.com
cholzer@holzerlaw.com

John T. Baxter
James A. Haltom
Nelson Mullins Reley & Scarborough LLP
150 Fourth Avenue, N, Suite 1100
Nashville, TN 37219
(615) 664-5323
(615) 664-5399
John.baxter@nelsonmullins.com
James.haltom@nelsonmullins.com

Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Marc C. Gorrie
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
mjwernke@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Robert J. Walker (BPR No. 2498)
Jason W. Callen (BPR No. 26225)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Bob.walker@butlersnow.com
Jason.callen@butlersnow.com

this 31st day of August, 2018.

/s/ Gary A. Orseck