# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| ZWICK PARTNERS, LP and APARNA RAO, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> QUORUM HEALTH CORPORATION, COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH, THOMAS D. MILLER, and MICHAEL J. CULOTTA, <br><br> *Defendants*. | Case No.: 3:16-cv-02475 <br><br> Class Action <br><br> Judge Waverly D. Crenshaw Jr. <br> Magistrate Judge Joe B. Brown <br><br> ORAL ARGUMENT REQUESTED |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Brandon R. Keel (*pro hac vice*)
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com

Gary A. Orseck (*pro hac vice*)
William J. Trunk (*pro hac vice*)
Jack A. Herman (*pro hac vice*)
Wendy Liu (*pro hac vice*)
Lauren Cassady (*pro hac vice*)
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
gorseck@robbinsrussell.com

Woods Drinkwater (BPR No. 033838)
Nelson Mullins Riley & Scarborough, LLP
150 Fourth Avenue, North, Suite 1100
Nashville, Tennessee 37219
Telephone: (615) 664-5339
Facsimile: (615) 664-5399
Woods.drinkwater@nelsonmullins.com
*Counsel for Quorum Defendants*

Robert J. Walker (BPR No. 2498)
Jason W. Callen (BPR No. 26225)
BUTLER SNOW LLP
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Bob.walker@butlersnow.com
*Counsel for CHSI Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    CHSI Announces The Spinoff, And Quorum Evaluates Its Goodwill For Impairment ................................................................................................... 3

    B.    Quorum Performs Its Annual Impairment Test As Of September 30, 2015, Identifying No Goodwill Impairment ......................................................... 5

    C.    Quorum Conducts An Interim Impairment Analysis As Of December 31, 2015, Again Identifying No Impairment ..................................................... 5

    D.    Following An Extensive Audit By Deloitte, Quorum Issues Audited Financial Statements Reporting No Goodwill Impairment ........................... 6

    E.    Quorum Updates Its Impairment Analysis After The Spinoff ....................... 7

    F.    Following A Disappointing Second Quarter, Quorum Takes An Impairment ................................................................................................... 9

    G.    Deloitte Confirms That The Impairment Was Properly Taken After The Spinoff ........................................................................................................ 11

    H.    This Litigation ............................................................................................ 12

ARGUMENT ........................................................................................................................ 13

I.    THE CHALLENGED STATEMENTS WERE NOT MATERIALLY FALSE OR MISLEADING ......................................................................................... 14

    A.    Because Plaintiffs Are Challenging Statements Of Opinion, They Must Identify Material Facts That Defendants Concealed From Investors ................... 14

    B.    There Is No Evidence That Defendants Concealed Material Facts In Connection With Their Impairment Analyses ............................................ 15

    C.    Plaintiffs' Expert's Hindsight-Driven Criticisms Do Not Create A Triable Dispute Of Fact .......................................................................................... 18

**TABLE OF CONTENTS—Continued**

**Page**

II.  THE RECORD IS DEVOID OF EVIDENCE THAT ANY OF THE DEFENDANTS ACTED WITH THE REQUISITE SCIENTER ................................... 21

    A.  Plaintiffs Must Prove That Defendants Acted Knowingly And With The Specific Intent To Deceive.................................................................. 21

    B.  There Is No Evidence That Any Of The Defendants Knowingly Misstated Quorum's Goodwill Or Long-Lived Assets ......................................... 22

III.  THERE IS NO TRIABLE ISSUE AS TO LOSS CAUSATION .................................... 25

    A.  Plaintiffs Have Not Met Their Burden Of Disentangling the Impairment News From The Guidance News ......................................................... 27

    B.  The Expert Evidence Overwhelmingly Shows That Quorum's Impairment Announcement Did Not Cause The Stock Price Decline .................................... 30

        1.  Neither Quorum's Nor CHSI's Stock Reacted To A Comparable Impairment Taken By CHSI Eight Days Before Quorum's Announcement ........................................................................... 31

        2.  Contemporaneous Market Analysts Attributed The Stock Price Decline To Quorum's Earnings Announcement, Not The Impairment Charges.................................................................... 32

        3.  Similar Impairments Taken By Other Companies Have Likewise Had No Price Impact.................................................................. 32

        4.  The "Triggering Factors" That Plaintiffs Claim Should Have Triggered A Pre-Spin Impairment Were Publicly Known ....................... 33

III.  THE SECTION 20(A) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED.................................................... 34

IV.  AT A MINIMUM, THE CLAIMS AGAINST THE CHSI DEFENDANTS RELATING TO POST-SPIN STATEMENTS SHOULD BE DISMISSED................... 34

V.  THE COURT SHOULD DISMISS THE CLAIMS OF ASSERTED CLASS MEMBERS WHO DID NOT PURCHASE THEIR QUORUM STOCK ...................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  398 F. Supp. 2d 244 (S.D.N.Y. 2005)...................................................................37

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ....................................................................................13

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)....................................................................................36

*Bomarko, Inc. v. Hemodynamics, Inc.*,
  848 F. Supp. 1335 (W.D. Mich. 1993) ....................................................................13

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)....................................................................................35

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .................................................................14, 20, 21

*D.E.&J. Ltd. P'ship v. Conaway*,
  133 F. App'x 994 (6th Cir. 2005) ........................................................................26

*Doshi v. General Cable Corp.*,
  823 F.3d 1032 (6th Cir. 2016) .................................................................22, 24, 34

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................25, 26, 30

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. H-01-3624, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008)................................................36

*In re EveryWare Glob., Inc.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) ....................................................................22

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)..............................................................................14

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*,
  898 F. Supp. 2d 176 (D.D.C. 2012) .......................................................................25

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
  869 F.2d 175 (2d Cir. 1989)..............................................................................37

*Glickenhaus & Co. v. Household Int'l*,
  787 F.3d 408 (7th Cir. 2015) ....................................................................... *passim*

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Gross v. GFI Grp., Inc.*,
310 F. Supp. 3d 384 (S.D.N.Y. 2018)............................................................................27

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .......................................................................................24

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) .....................................................................................28

*IDT Corp. v. U.S. Specialty Ins. Co.*,
No. CVN18C03032PRWCCLD, 2019 WL 413692 (Del. Super. Ct. Jan. 31,
2019) .............................................................................................................................37

*Isquith by Isquith v. Caremark Int'l, Inc.*,
136 F.3d 531 (7th Cir. 1998) .......................................................................................37

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011).....................................................................................................35

*In re John Alden Fin. Corp. Sec. Litig.*,
249 F. Supp. 2d 1273 (S.D. Fla. 2003) .......................................................................22

*In re KBC Asset Mgmt. N.V.*,
572 F. App'x 356 (6th Cir. 2014) ...............................................................................33

*Kuyat v. BioMimetic Therapeutics, Inc.*,
747 F.3d 435 (6th Cir. 2014) .......................................................................................24

*La. School Emps. Ret. Sys. v. Ernst & Young LLP*,
622 F.3d 471 (6th Cir. 2010) .......................................................................................22

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)........................................................................................30

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)...................................................................................26, 30

*Lorenzo v. S.E.C.*,
139 S. Ct. 1094 (2019).................................................................................................35

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007)....................................................................................27, 34

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...................................................................................33

iv

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Mittman v. Rally's Hamburgers, Inc.*,
  278 F. Supp. 2d 831 (W.D. Ky. 2003) ................................................................21

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................24

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  No. 3:11-cv-00433, --- F.R.D. ---, 2019 WL 3387450 (M.D. Tenn. July 26,
  2019) ..................................................................................................................36

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) .....................................................................27, 34

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) .......................................................................25, 26

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..........................................................................................15

*In re Omnicare, Inc. Sec. Litig.* ("*Omnicare III*),
  769 F.3d 455 (6th Cir. 2014) .......................................................................13, 21

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) .......................................................... *passim*

*Rose v. Ark. Valley Envtl. & Util. Auth.*,
  562 F. Supp. 1180 (W.D. Mo. 1983) .................................................................36

*Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*,
  973 F.2d 474 (6th Cir. 1992) .............................................................................35

*Sanderson v. H.I.G. P-XI Holding, Inc.*,
  No. 99-3313, 2000 WL 1042813 (E.D. La. July 27, 2000) ...............................36

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ..............................................................................20

*In re Tronox, Inc. Sec. Litig.*,
  No. 09 Civ. 6220(SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010) ............37

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ...............................................................27, 29, 34

## TABLE OF AUTHORITIES—Continued

**Page(s)**

**Statutes**

15 U.S.C. § 78t.................................................................................................................34

15 U.S.C. § 78u-4 ...........................................................................................................25

**Rules**

Fed. R. Civ. P. 23...........................................................................................................36

Fed. R. Civ. P. 56...........................................................................................................13

**INTRODUCTION**

Quorum Health Corporation ("Quorum") was a wholly owned subsidiary of Community Health Systems, Inc. ("CHSI"), until it was spun off from CHSI on April 29, 2016.  In anticipation of that spinoff, Quorum publicly filed its historical financial statements, which were subject to rigorous audit by Deloitte & Touche ("Deloitte").  Quorum reported, among other things, $540 million of "goodwill"—an accounting entry that, under Generally Accepted Accounting Principles ("GAAP"), arose as a result of corporate acquisitions made by CHSI years earlier.  Quorum reaffirmed that goodwill balance in its Q1 2016 financial statements, which (after review by Deloitte) were issued shortly after the spinoff.

Quorum's first quarter as a standalone company was a difficult one for the healthcare industry.  Industrywide trends, including reduced patient volumes and increased costs, took their toll.  Quorum—together with CHSI and numerous other healthcare companies—missed its earnings targets in Q2 2016, and revised downward its full-year earnings guidance.  Quorum also announced estimated impairment charges to its goodwill and long-lived assets.  The next day, Quorum's stock price fell by nearly 50%.

Plaintiffs, a class of investors who acquired Quorum stock following the spinoff, cry fraud. They theorize that Quorum's goodwill and long-lived assets were actually impaired in the first quarter of 2016, before the spinoff, but that Quorum and CHSI fraudulently concealed those impairments until the second quarter (after the spinoff).  Their theory fails for two principal reasons.

*First*, after years of extensive discovery, there is not a whiff of evidence to support Plaintiffs' fable.  No internal emails even remotely suggesting the existence of an impairment before the spinoff.  No contradictory or dissembling statements by management.  Not a piece of paper suggesting that Quorum's pre-spin impairment analyses were done in bad faith, or even

1

violated GAAP. And, for that matter, no evidence that the auditors were asleep at the switch or performed an audit that was deficient in any respect.

To the contrary, *every single* contemporaneous document shows that Quorum and CHSI acted in good faith, worked diligently with their auditors, and reasonably evaluated whether their goodwill and long-lived assets were impaired prior to the spinoff. Quorum identified no impairment. Deloitte issued a clean audit opinion. And, after the fact, both Quorum and Deloitte confirmed (even with the benefit of hindsight) that the impairments did not arise until *after* the spinoff. For good measure, the two lead Deloitte audit partners testified at deposition and full-throatedly defended the work that they and Quorum performed. In the lexicon of a securities-fraud case, the conclusion is inescapable: Quorum's statements were not false. And they *certainly* were not made with scienter.

Confronted with this overwhelming evidence—all of it inconvenient for Plaintiffs' fraud case—the best Plaintiffs can do to gin up a triable question of fact is to offer the testimony of a paid expert who, with the benefit of hindsight, quarrels with the contemporaneous judgments made by Quorum and Deloitte. But, when pressed at his deposition, Plaintiffs' expert conceded that his opinions amount simply to a "difference of opinion." Some fraud.

*Second*, there is no triable question of fact on loss causation in any event. Plaintiffs have not shown—nor can they—that Quorum's stock price dropped in response to the impairment charges (the alleged corrective disclosure) as opposed to other factors. Importantly, Quorum announced lackluster Q2 2016 performance and decreased its full-year guidance simultaneously with the impairment charges. Plaintiffs have made no effort whatsoever to show that the impairment charges, rather than the poor earnings results and lowered guidance, were the cause-in-fact of their loss. Nor can they: Defendants' expert has demonstrated, beyond meaningful

dispute, that the impairment announcement had nothing to do with the stock price decline. That alone is dispositive of Plaintiffs' claims.

In apparent recognition of that fatal defect, Plaintiffs turn cartwheels to make this case about Quorum's earnings miss, rather than the impairments. They must hope the third time is the charm. When Plaintiffs amended their complaint to add an earnings-guidance-based theory of fraud, this Court correctly dismissed those allegations as barred by the Safe Harbor to the Private Securities Litigation Reform Act ("PSLRA"). Dkt. 209, at 15. Then, when Plaintiffs moved to amend their complaint (again) to add allegations about Quorum's earnings guidance, the Court rejected that gambit as well. Dkt. 246.

Enough already. Plaintiffs have had every opportunity to prove up their conspiracy theories, and they have come up empty. Summary judgment is warranted.

<strong><u>BACKGROUND</u></strong>

**A.    CHSI Announces The Spinoff, And Quorum Evaluates Its Goodwill For Impairment**

On August 3, 2015, CHSI—one of the nation's largest publicly traded hospital companies—announced its plan to spin off 38 hospitals and a hospital management company into an independent publicly traded corporation to be known as Quorum Health Corporation. [8/3/15 CHSI Form 8-K]. CHSI believed the transaction would optimize the performance of both companies and create shareholder value: It would allow CHSI's subsidiaries to concentrate on larger markets, while Quorum could focus on the unique opportunities of its predominantly non-urban hospitals. [Ex. 1, Cash Tr. 408:22-409:8; Ex. 2, W. Smith Tr. 104:3-8].

In the months leading up to the spinoff, Quorum shared with prospective investors detailed financial information about the transaction. Because Quorum had no operating history as an independent company, management derived this information from CHSI's historical financial

3

statements.   Among the items included in Quorum's "carve-out" financial statements was an accounting of Quorum's goodwill.   Quorum's starting goodwill balance was principally derived using a "relative fair value" approach:   CHSI allocated to Quorum a portion of CHSI's own aggregate goodwill based on the ratio of Quorum's value to that of CHSI.   [Ex. 3, 8/27/15 Memorandum, at CHS-R200034444].

Quorum also tested whether its goodwill was impaired as of September 30, 2014.   An impairment occurs when an asset's fair value falls below its carrying, or book, value.   [Ex. 4, ASC 350-20-35-2].   Quorum conducted a valuation analysis (known as a "Step 1" analysis) and confirmed that the fair values of its reporting units comfortably exceeded their carrying values.[1] Thus, Quorum concluded that its goodwill was not impaired.   [Ex. 3, 8/27/15 Memorandum, at CHS-R200034446-451].

On September 4, 2015, Quorum publicly filed its carve-out financial statements for calendar years 2013 and 2014 and reported a goodwill balance of $535 million.   [9/4/15 Quorum Form 10, at F-40].[2]  A highly experienced audit team from Deloitte, headed by Engagement Partner Thomas Walker, performed an audit on those financial statements, including the results of Quorum's impairment testing.   [*Id.* at F-2; Ex. 5, Walker Tr. 149:7-13; Ex. 6, Stark Tr. 12:4-13:22]. Deloitte issued a clean audit report.   [9/4/15 Quorum Form 10, at F-2].[3]

---

[1] Quorum consisted of two reporting units:   Its hospital unit, and its management unit (associated with its subsidiary Quorum Health Resources ("QHR")).   The lion's share of Quorum's goodwill was derived from its hospital operations unit.   [Ex. 3, 8/27/15 Memorandum, at CHS-R200034445].

[2] The SEC filings cited herein are available at https://www.sec.gov/edgar/.

[3]  Mr. Walker was a Deloitte partner for 25 years until his 2018 retirement, holding various leadership positions (including Managing Partner) of Deloitte's Nashville office.   Mr. Walker now holds a chair and serves on the faculty of the accounting department at Middle Tennessee State University.   [Ex. 5, Walker Tr. 9:5-12:5]

4

Plaintiffs challenge none of this.

**B.    Quorum Performs Its Annual Impairment Test As Of September 30, 2015, Identifying No Goodwill Impairment**

Shortly after filing its Form 10, Quorum again tested its goodwill for impairment (with a testing date of September 30, 2015) in connection with the preparation of its 2015 financial statements.  [Ex. 7, 1/28/16 Memorandum].  It calculated the fair value of its reporting units using a weighted average of two valuation methods: (1) an income approach (*i.e.*, a discounted cash flow ("DCF") analysis); and (2) a market approach, based on market multiples of comparable companies.  [Ex. 7, 1/28/16 Memorandum; Ex. 8, ASC 350 Impairment Study].  Quorum retained KPMG, a third-party valuation specialist, to assist with this valuation exercise.  [Ex. 7, 1/28/16 Memorandum, at DT 00000933].  That team was headed by James Weaver, an experienced Charter Financial Analyst and Principal at KPMG.  [Ex. 9, Weaver Tr. 12:6-13:21, 15:19-16:12].  Among other things, KPMG reviewed and vetted the valuation assumptions used by management.  [*Id.* at 176:14-177:13].  Following this analysis, KPMG and management concluded that the total fair value of Quorum's reporting units exceeded their carrying value by more than $400 million.  [Ex. 8, ASC 350 Impairment Study, at DT 00000937; Ex. 10, 2/25/16 Deloitte IFV Memorandum, at 1].  Thus, no impairment was taken.  [Ex. 7, 1/28/16 Memorandum, at DT 00000933].

Again, Plaintiffs challenge none of this.

**C.    Quorum Conducts An Interim Impairment Analysis As Of December 31, 2015, Again Identifying No Impairment**

In addition to annual testing, companies are required to conduct interim assessments to determine whether it is more likely than not that the fair value of a reporting unit has fallen below its carrying value, such that an interim Step 1 test is required before the next annual assessment. [Ex. 4, ASC 350-20-35-3; Ex. 11, LaRue Decl., Ex. A, ¶ 68].  Public companies typically conduct such interim impairment assessments on a quarterly basis.  [Ex. 5, Walker Tr. 80:7-16].  Rather

than require a full, quantitative Step 1 impairment test (as is the case for annual testing), the rules instruct companies to consider a non-exclusive set of indicators in conducting this qualitative interim assessment, including macroeconomic conditions, industry and market considerations, and recent financial performance. [Ex. 4, ASC 350-20-35-3C; Ex. 11, LaRue Decl., Ex. A, ¶ 69]. The mere presence of one or more of these indicators is not, standing alone, sufficient to necessitate an interim Step 1 analysis. [Ex. 11, LaRue Decl., Ex. A, ¶ 70; Ex. 4, ASC 350-20-35-30D]. Rather, an interim Step 1 impairment test is required only if, after "assessing the totality of events or circumstances," a company "determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount." [Ex. 4, ASC 350-20-35-3D & -3F; Ex. 11, LaRue Decl., Ex. A, ¶¶ 70-72].

Consistent with that guidance, Quorum performed a qualitative impairment analysis as of December 31, 2015. [Ex. 7, 1/28/16 Memorandum, at DT 00000933]. It considered, among other things, the company's recent financial performance, the stock prices of peer companies (including CHSI), and other potential indicators. [Ex. 12, Moody Tr. 264:5-7, 266:3-9, 270:18-273:6]. Quorum concluded that no indicators of impairment had arisen during the fourth quarter that made an impairment more likely than not. [Ex. 7, 1/28/16 Memorandum, at DT0000933].[4]

**D.     Following An Extensive Audit By Deloitte, Quorum Issues Audited Financial Statements Reporting No Goodwill Impairment**

On April 1, 2016—shortly before the spinoff—Quorum filed an amended Form 10. The Form 10 contained Quorum's carve-out financial statements through December 31, 2015, which

---

[4] CHSI conducted its own impairment testing in connection with the issuance of its annual Form 10-K, and likewise concluded that no impairment existed. [Ex. 13, 2/11/16 Memorandum, at DT 00005024]. Deloitte examined CHSI's impairment analysis in the course of its audit and, as with Quorum, concluded that CHSI had appropriately applied the accounting guidance. [Ex. 14, 1/29/16 Deloitte Memorandum, at DT 00004727; Ex. 5, Walker Tr. 49:22-50:15].

6

had been audited by Deloitte.  [4/1/16 Quorum Form 10, at F-2].  Among other things, Deloitte examined Quorum's valuation assumptions, performed sensitivity analyses, and enlisted the expertise of both its National Audit personnel and Internal Valuation specialists.  [Ex. 10, 2/25/16 Deloitte Memorandum; Ex. 15, 1/29/16 Deloitte Memorandum; Ex. 16, 2/24/16 Deloitte Memorandum].   Deloitte concluded that the impairment analyses were performed using appropriate valuation techniques and that the inputs used (including the projections) were appropriate.  [Ex. 15, 1/29/16 Deloitte Memorandum, at DT 00000668; Ex. 5, Walker Tr. 47:6-48:3].  Deloitte therefore concurred with Quorum's conclusion that no goodwill impairment existed.  [Ex. 15, 1/29/16 Deloitte Memorandum, at DT 00000668; Ex. 6, Stark Tr. 22:14-25; Ex. 5, Walker Tr. 67:19-69:4].

In light of the inherent uncertainty surrounding a company about to be spun off, however, Quorum included extensive risk disclosures in its Form 10.  Among other things, Quorum cautioned investors that a goodwill impairment could materialize if the fair value of its reporting units declined.  [4/1/16 Quorum Form 10, at 24-25].  It warned investors, in particular, that declines in patient volumes and/or increases in operating costs could trigger an impairment.  [*Id.*; *see also id.* at 114].  Quorum also issued pages of specific and tailored risk disclosures concerning its business, the spinoff, and its common stock.  [*Id.* at 19-40; *see also* Dkt. 209, at 14-15 ("When viewed as a whole, the cautionary statements consistently provided comprehensive and tailored warnings . . . to address new risks as the spinoff developed, and were the antithesis of 'generic' warnings.")].

E.      **Quorum Updates Its Impairment Analysis After The Spinoff**

The spinoff closed on April 29, 2016.  Shortly thereafter, and in conjunction with its Q1 2016 financial reporting, Quorum performed another interim impairment assessment, as of March

31, 2016.  Quorum's management reviewed its recently performed annual impairment test—which

had revealed a $400 million "cushion" between the combined fair value of Quorum's reporting

units and their carrying value—and assessed whether there had been "any changes in the economic,

financial or other qualitative factors that would be an indicator of impairment."  [Ex. 17, 5/10/16

Memorandum, at DT 00001299].  Quorum's management documented the bevy of factors that it

considered in a contemporaneous memorandum prepared by Megan Moody, Vice President,

Financial Reporting, and Assistant Controller.  This included:

> ➢ Although Adjusted EBITDA and income from operations had fallen compared to the prior year, this was primarily due to non-recurring costs that made year-over-year comparisons inapt.  Excluding those items, Adjusted EBITDA "would have increased 5.2% and income from operations would have been relatively flat";

> ➢ Admissions were "relatively stable" in the first quarter, with adjusted admissions and emergency room visits both up from the prior year;

> ➢ "Other than a reduction in Medicaid supplemental payment program reimbursements ($3.6 million impact on the current quarter versus the same period in 2015), there have not been significant or unexpected changes in the health care industry or regulatory environment during 2016"; and

> ➢ "[N]o other factors . . . impact [its] previous calculation of fair value," performed just weeks earlier.

[*Id.*].

Because no impairment indicators had arisen that made an impairment more likely than

not, Quorum concluded that no interim Step 1 test was required.  [*Id.* at DT 00001300].[5]

Deloitte reviewed Quorum's work in connection with its interim review of Quorum's

quarterly financial statements.  [Ex. 11, LaRue Decl., Ex. A, ¶ 145, App. A ¶ 42].  As part of an

interim review, an auditor conducts certain analytical procedures and "mak[es] inquiries of persons

---

[5] Quorum likewise concluded that no impairment was required for its long-lived assets. [Ex. 18, 5/5/16 Memorandum].

responsible for financial and accounting matters." [*Id.*, Ex. A, App. A ¶ 43]. The objective of such a review is to provide the accountant "with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles." [Ex. 19, AU 722.07; Ex. 11, LaRue Decl., Ex. A, App. A ¶ 43]. Following that review, Deloitte identified no issues warranting a Step 1 impairment test. [Ex. 6, Stark Tr. 36:10-14, 40:7-41:17].[6]

In its Form 10-Q, issued on May 11, 2016, Quorum reported $541.8 million in goodwill, including $508.5 million for its hospital operations unit. [5/11/16 Quorum Form 10-Q, at 3, 30]. It informed investors that its last goodwill impairment test had revealed no impairment, but cautioned that an impairment could well become necessary if Quorum's post-spin performance fell short of expectations. [*Id.* at 30].

**F.    Following A Disappointing Second Quarter, Quorum Takes An Impairment**

The second quarter of 2016 was a difficult one for the hospital industry. [Ex. 21, Phillips Decl., Ex. A, at 13, 41; Ex. 22, Phillips Tr. 105:22-106:10]. Hospital companies struggled to manage, among other things, a systemic shift from (more profitable) inpatient to (less profitable) outpatient treatment settings. [Ex. 23, S. Smith Tr. 71:5-72:18]. Other large hospital companies suffered significant earnings misses as well. [Ex. 21, Phillips Decl., Ex. A, at 13, 41].

On August 2, 2016, CHSI announced its Q2 2016 results. [8/2/16 CHSI Form 8-K]. Like many of its peer companies, CHSI reported that it had missed its earnings targets and was revising downward its earnings guidance for the year. [*Id.*, Ex. 99.1, at 16-19]. It also reported a $1.4 billion goodwill impairment. [*Id.*, Ex. 99.1, at 1].

---

[6] CHSI conducted a similar assessment and likewise concluded that no impairment was required. Deloitte reviewed CHSI's impairment memoranda as part of its interim review, and identified no issues. [Ex. 20, March 31, 2016 Update; Ex. 5, Walker Tr. 79:22-23; 82:1-22].

9

Market watchers were impassive to CHSI's goodwill impairment. [Ex. 24, Allen Decl., Ex. A, ¶ 60]. Notably, no analyst covering Quorum so much as issued a report following CHSI's announcement, even though Quorum's goodwill and CHSI's goodwill were inextricably linked—and, therefore, as one analyst later explained, it should have "been obvious" following CHSI's announcement that Quorum was impaired as well. [*Id.*, ¶ 61; Ex. 25, 8/10/16 Mizuho Rpt.].

Nor did Quorum's or CHSI's stock price react to CHSI's impairment. Defendant's expert, Lucy P. Allen, conducted an event study for Quorum's stock using two different event study specifications, including the event study model used by Plaintiffs' expert Dr. Zachary Nye. [Ex. 24, Allen Decl., Ex. A, ¶¶ 30-43]. Based on both models, Allen concluded that "Quorum's stock price reaction after [CHSI's] August 2 announcement, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be statistically distinguished from zero." [*Id.*, ¶ 41]. Allen arrived at a similar conclusion regarding CHSI. [*Id.*, ¶ 30]. Plaintiffs' expert agrees that there was no statistically significant reaction in either CHSI's or Quorum's stock price to CHSI's impairment announcement. [Ex. 26, 1/14/20 Nye Tr. 216:14-21].

Quorum released its second quarter earnings eight days later, on August 10, 2016. The results were equally disappointing. Quorum reported decreased net operating revenues (down 1.6%), hospital admissions (down 2.5%), and adjusted EBITDA (down 51%), compared to Q2 2015. [8/10/16 Quorum Form 8-K]. It also reduced its full-year net revenue guidance from a range of $2.2B-$2.3B to a range of $2.15B-$2.20B, and its full-year adjusted EBITDA guidance from a range of $265M-$275M to a range of $175M-$200M. [*Id.*]. In addition, it announced impairments to its goodwill ($205 million) and long-lived assets ($45 million). [*Id.*].

10

Quorum's stock price fell 49.8 percent, closing at $5.03 per share on August 11, 2016. But no one seemed to care about the impairment charges, as opposed to the earnings miss and revised guidance. None of the nine analysts covering Quorum asked any questions about the impairment charges during Quorum's earnings call. [Ex. 24, Allen Decl., Ex. A, ¶ 55]. And none of the eleven analyst reports filed after the announcement included any comment characterizing the impairment charges as "surprising" or "disappointing" information that had impacted the analysts' valuations of Quorum's stock. In fact, five of the reports did not mention the impairments at all. [*Id.*].

### G.    Deloitte Confirms That The Impairment Was Properly Taken After The Spinoff

In connection with its review of Quorum's Q2 2016 financial statements, Deloitte examined Quorum management's conclusion that the impairments had not arisen until after the spinoff. Deloitte agreed with management's judgment: The impairments did not occur until *after* the spinoff, "when results for the [second] quarter became apparent and management determined that [its financial forecasts] need[ed] to be revised." [Ex. 27, 8/8/16 Deloitte Memorandum, at DT 00001309].

In an abundance of caution, Deloitte asked Quorum's management to document its own views about the appropriate timing of the impairment charges.[7] In a contemporaneous memorandum, Quorum's management outlined why the impairment charges were appropriately taken in Q2 2016 after the spinoff. They noted that "[u]pon further review of the facts and circumstances of QHC's operations, financial trends and changes as a result of the spin-off, management has concluded that the totality of evidence did not exist to indicate impairment of its

---

[7] Deloitte's request was prompted by certain public comments by Mike Culotta, Quorum's CFO, suggesting that an impairment may have existed prior to the spinoff. [Ex. 28, 11/8/16 Deloitte Memorandum; Ex. 29, 3/19/17 Deloitte Memorandum]. Deloitte ultimately concluded that the timing of Quorum's impairments was appropriate. [Ex. 6, Stark Tr. 76:10-77:1].

11

goodwill until after the spin-off from CHS on April 29, 2016 but prior to the end of the second quarter." [Ex. 30, 11/8/16 Memorandum, at DT 00001357].

Deloitte agreed.   [Ex. 28, 11/8/16 Deloitte Memorandum; Ex. 29, 3/19/17 Deloitte Memorandum].  In its own workpapers, Deloitte noted that "the trend of EBITDA remained strong until the middle of Q2 2016 when admissions dropped significantly at a number of QHC facilities," and that management "did not expect the dramatic drop in volumes experienced in Q2." [Ex. 28, 11/8/16 Deloitte Memorandum, at DT 00001338].  After consulting with representatives in its national and local office, Deloitte concluded that, consistent with management's conclusions, and "based upon the review of the financial trends and changes as a result of the spin-off, the totality of evidence supports that indicators of impairment were not present as of the spin date, but occurred in the second quarter, post-spin."  [*Id.* at DT 00001341; Ex. 6, Stark Tr. 61:1-67:18]. Deloitte also confirmed during its annual audit that the timing of the impairment was appropriate. [Ex. 29, 3/19/17 Deloitte Memorandum, at DT 00001880 ("[W]e ultimately concluded that the Goodwill impairment charge was appropriately recorded in Q2 2016, post-spin."); Ex. 6, Stark Tr. 45:24-46:2, 50:4-51:18, 89:22-91:8].

## H.    This Litigation

Lawyers raced to the courthouse after Quorum's Q2 2016 results were issued.  This class action was filed less than a month later in September 2016 and charged that Quorum fraudulently overstated its goodwill and long-lived assets prior to the spinoff.

Plaintiffs soon realized the frailty of this theory.  In September 2018, in response to Defendants' argument that Quorum's announcement of its Q2 2016 earnings miss and revised earnings projection (not the impairment charges) caused the stock price decline, Plaintiffs amended their complaint to add the theory that Quorum's pre-spin earnings projections (which it restated

12

just after the spinoff, on May 11, 2016) were likewise fraudulent.  The Court summarily dismissed those claims on the ground that Quorum's earnings projections were forward-looking statements, protected by the PSLRA's Safe Harbor provision.  Dkts. 209, 210.

Undeterred, Plaintiffs later moved to amend their Complaint to add another batch of earnings-guidance-related theories.  The Court rejected that motion as well.  Dkt. 246.

Plaintiffs thus are stuck with their original impairment theory.  As explained below, discovery has thoroughly debunked that theory.  Summary judgment is warranted.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  And "the mere existence of *some* alleged factual dispute between the parties" is not enough to defeat a motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact."  *Bomarko, Inc. v. Hemodynamics, Inc.*, 848 F. Supp. 1335, 1339 (W.D. Mich. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In order to prove liability under Rule 10b-5, Plaintiffs must show six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re Omnicare, Inc. Sec. Litig.* ("*Omnicare III*"), 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011)).  "A complete failure of proof" as to any of these essential elements "necessarily renders all other facts immaterial."  *Bomarko*, 848 F. Supp. at 1339 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

## I.   THE CHALLENGED STATEMENTS WERE NOT MATERIALLY FALSE OR MISLEADING

The only two alleged misstatements remaining in the case are Quorum's statements of goodwill and long-lived assets in the April 1, 2016 Form 10 and the May 11, 2016 Form 10-Q.[8] But those qualitative impairment assessments, replete with subjective judgments, are textbook statements of *opinion*. And Plaintiffs have unearthed no evidence—not a shred—that Quorum departed from proper accounting practices, offered these statements in bad faith, or otherwise did not honestly believe what they said. Nor is there any evidence that Defendants concealed a known impairment. To the contrary, every single contemporaneous document demonstrates that Quorum and its auditors acted in good faith and in compliance with GAAP. The notion that anyone committed securities fraud is preposterous.

### A.   Because Plaintiffs Are Challenging Statements Of Opinion, They Must Identify Material Facts That Defendants Concealed From Investors

Statements about goodwill and long-lived assets are statements of opinion, "because they are inherently subjective and involve management's opinion regarding fair value." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) (internal quotation marks omitted); *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). A statement of opinion, as distinct from a statement of fact, is actionable only if: (1) the speaker does not "actually hold[] the stated belief"; (2) the statement is accompanied by a "supporting fact" that is untrue; or (3) the statement "omits material facts about the issuer's inquiry . . . or knowledge," and "those facts conflict with what a reasonable investor would take

---

[8] Because the Form 10-Q was issued after the spinoff, at a time when Quorum and CHSI were independent companies, CHSI cannot be liable for the contents of that document in all events. *See infra* Part IV.

from the statement itself." *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184-189 (2015).

There is zero evidence that the statements were "false" in that they did not reflect Quorum's sincerely held beliefs at the time. Indeed, Quorum's public statements about goodwill and long-lived assets were in complete alignment with its contemporaneous accounting memoranda. [Ex. 7, 1/28/16 Memorandum (Goodwill); Ex. 31, 1/15/16 Memorandum (Long-Lived Assets); Ex. 17, 5/10/16 Memorandum (Goodwill); Ex. 18, 5/5/16 Memorandum (Long-Lived Assets)].

Plaintiffs therefore must demonstrate that Quorum omitted mention of some material fact. But pursuing an omissions theory on an opinion statement is "no small task for an investor." *Omnicare*, 575 U.S. at 194. It is not enough merely to show that Defendants failed to disclose "some fact cutting the other way." *Id.* at 189. Plaintiffs must "identify particular (and material) facts going to the basis for the issuer's opinion," the omission of which makes the opinion misleading to the "reasonable investor . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* at 190, 194.

### B.    There Is No Evidence That Defendants Concealed Material Facts In Connection With Their Impairment Analyses

Plaintiffs theorize that Defendants were aware of—but concealed from investors—facts that required Quorum to record impairments to its goodwill and long-lived assets in the first quarter of 2016, prior to the spinoff. But the discovery record tells a different story: Quorum acted carefully and diligently, every step of the way, and its numerous impairment analyses preceding the spinoff were done in good faith consistent with GAAP.

*9/30/2015 Analysis.* Quorum's annual impairment test, performed just months before the spinoff, was thorough and careful. Quorum engaged KPMG to vet its financial projections and perform an independent valuation of its hospital reporting unit, which confirmed that Quorum's

total fair value exceeded its carrying value by more than $400 million.  [Ex. 8, ASC 350 Impairment Study, at DT 00000956; Ex. 7, 1/28/16 Memorandum, at DT 00000932-933; Ex. 10, 2/25/16 Deloitte IFV Memorandum, at 1].  Quorum thus appropriately concluded that no impairment existed at that time.  Plaintiffs do not claim that an impairment should have been taken at 9/30/2015.

*12/31/2015 Analysis*.  Quorum renewed its impairment assessment as at December 31, 2015.  Consistent with GAAP, it performed a qualitative assessment to evaluate whether any impairment indicators had arisen since its annual test that would render an impairment more probable than not.  Quorum concluded that no such indicators had arisen to warrant another Step 1 impairment test.  [Ex. 7, 1/28/16 Memorandum; Ex. 12, Moody Tr. 264:5-7, 266:3-9, 270:18-273:6; Ex. 6, Stark Tr. 15:14-17].

Deloitte performed a full audit of Quorum's 2015 carve-out financial statements.  In the course of that audit, Deloitte examined management's impairment tests—including KPMG's valuation study—and concluded that management had reasonably determined that no impairment was required.  [Ex. 15, 1/29/16 Deloitte Memorandum; Ex. 6, Stark Tr. 15:19-16:9, 19:2-29:7].  Among other things, Deloitte inquired of company management, performed sensitivity analysis, and consulted its internal valuation experts.  [Ex. 15, 1/29/16 Deloitte Memorandum, at DT 00000667-668; Ex. 5, Walker Tr. 62:6-66:19; Ex. 11, LaRue Decl., Ex. A, ¶¶ 291-293].  Following those robust procedures, Deloitte issued a clean audit opinion with the (supposedly fraudulent) Form 10.  [4/1/16 Quorum Form 10, at F-2; Ex. 6, Stark Tr. 13:19-22].[9]

---

[9] Defendants' accounting experts agree that Quorum's impairment analyses complied with GAAP and reasonably supported the conclusion that no interim Step 1 test was necessary as at December 31, 2015.  [Ex. 11, LaRue Decl., Ex. A, ¶ 195; Ex. 32, Goolsby Decl., Ex. A, ¶ 106].

*3/31/2016 Analysis*.  Quorum renewed its impairment analysis shortly after the spinoff, and concluded that no impairment indicators had arisen in Q1 2016 rendering an impairment more likely than not.  [Ex. 17, 5/10/16 Memorandum (Goodwill); Ex. 18 5/5/16 Memorandum (Long-Lived Assets); Ex. 11, LaRue Decl., Ex. A, ¶ 107].  A contemporaneous memorandum documents the array of factors that went into this analysis:  Quorum's Adjusted EBITDA and income from operations as compared to the same period in 2015; its quarterly admissions volumes; and the impact (or lack thereof) of any "significant or unexpected changes in the health care industry or regulatory environment."  [Ex. 17, 5/10/16 Memorandum, at DT 00001299; Ex. 12, Moody Tr. 427:6-431:12]. Quorum also appropriately considered the $400 million fair-value "cushion" that existed as of its most recent impairment test.  [Ex. 17, 5/10/16 Memorandum, at DT 00001299; Ex. 11, LaRue Decl., Ex. A, ¶¶ 72, 143].

Yet again, Deloitte reviewed Quorum's memorandum in connection with its quarterly review procedures.  It identified no issues warranting a Step 1 impairment test.  [Ex. 17, 5/10/16 Memorandum; Ex. 6, Stark Tr. 39:18-41:7 (goodwill); Ex. 18, 5/5/16 Memorandum; Ex. 6, Stark Tr. 34:13-35:19 (long-lived assets)].  Deloitte expressed no concerns about the quality of Quorum's assessment or the conclusions it reached.  [Ex. 12, Moody Tr. 431:13-432:15].  And Deloitte's opinion, as an independent and experienced auditor, was that no material modifications needed to be made to the (supposedly fraudulent) Form 10-Q.  [Ex. 6, Stark Tr. 40:7-12; Ex. 11, LaRue Decl., Ex. A, ¶ 270].

*Retrospective Analyses*.  Quorum did not stop there.  In September 2016, at the request of Deloitte (*supra* p. 11 and note 7), Quorum's management performed a retrospective analysis to evaluate whether the impairments should have been taken prior to the spinoff.  They concluded

17

that the "totality of evidence did not exist to indicate impairment of its goodwill" until Q2 2016, after the spinoff. [Ex. 30, 11/8/16 Memorandum, at DT 00001357].

Deloitte came to the same conclusion. It contemporaneously documented its views "supporting the conclusion that no Goodwill impairment indicators were noted in Q1 2016." [Ex. 27, 8/8/16 Deloitte Memorandum, at DT 00001304]. Deloitte noted that "there were no concerns regarding interim impairment indicators as of Q1 2016," given the expected "fluctuations" and "recent volatility in healthcare provider results," and that "management did not expect the dramatic drop in volumes experienced in Q2." [*Id.* at DT 00001307]. Deloitte therefore "conclude[d] the estimated charge was correctly recorded in Q2 2016." [Ex. 28, 11/8/16 Deloitte Memorandum, at DT 00001336]. Deloitte reaffirmed that conclusion in the course of its exhaustive year-end audit of Quorum's 2016 financial statements. [Ex. 6, Stark Tr. 89:22-91:9]. Plaintiffs do not challenge Quorum's year-end financial statements or Deloitte's audit in any respect.[10]

### C.      Plaintiffs' Expert's Hindsight-Driven Criticisms Do Not Create A Triable Dispute Of Fact

In an effort to create a factual dispute, Plaintiffs proffer the expert report of John Mitchell, a CPA, who quarrels with the contemporaneous judgments made by Quorum, Deloitte, and KPMG. But Mitchell's criticisms—based entirely on hindsight—cannot salvage Plaintiffs' claims.[11]

---

[10] Quizzically, Plaintiffs' expert pronounced that Deloitte's extensive review and audit procedures were irrelevant to his opinions. [Ex. 33, Mitchell Tr. 66:12-14 ("ultimately what Deloitte did and what they concluded is not relevant to my opinion")].

[11] Mitchell's opinion takes hindsight analysis to the extreme. For example, in identifying Quorum's fair value using the "market approach," he relied upon data that *did not exist* at the time Quorum performed its analyses—and which Mitchell was constrained to admit neither Quorum nor anyone else could have known at the time. [Ex. 33, Mitchell Tr. 139:17-21].

18

*First*, Mitchell points to an array of asserted impairment indicators that he claims Quorum and Deloitte overlooked.  So, for example, he says that Quorum should have considered the "clear negative trends" in Quorum's financial performance to be an indicator of impairment.  [*E.g.*, Ex. 34, Mitchell Rpt., at 2-9].  But Quorum expressly ***did*** consider recent financial trends in its impairment analyses.  [Ex. 7, 1/28/16 Memorandum, at DT 00000933; Ex. 12, Moody Tr. 264:5-7, 266:3-9, 270:18-273:6 (Dec. 31, 2015); Ex. 17, 5/10/16 Memorandum, DT 00001299; Ex. 12, Moody Tr. 427:6-431:12 (March 31, 2016)].  So did Deloitte.  [Ex. 27, 8/8/16 Deloitte Memorandum, at DT 00001303 (noting that Quorum "did not experience a decline in fourth quarter operating results")].  And both reasonably concluded that those trends did not make an impairment more probable than not.[12]  At his deposition, Mitchell freely conceded that interim impairment assessments are "judgmental determination[s]," and thus "[r]easonable individuals armed with the same information could have differences of opinion."  [Ex. 33, Mitchell Tr. 44:14-24].

*Second*, Mitchell spills much ink discussing CHSI's declining stock price in the months leading up to the spinoff.  [Ex. 34, Mitchell Rpt., at 3-10 to 3-15].  But even assuming it were appropriate to consider CHSI's stock price in evaluating ***Quorum***'s goodwill—and Mitchell cites no support for this—Mitchell is wrong as a matter of fact:  Quorum management ***did*** consider broader economic trends, including the stock prices of peer companies (such as CHSI), in connection with its interim assessments.  [Ex. 12, Moody Tr. 264:5-7, 266:3-9, 270:6-273:6,

---

[12] Further, Quorum's financial trends were ***public information***—the exact opposite of an omitted fact.  The same is true of most of the supposed impairment indicators—*e.g.*, poverty rates, uninsured rates, employment rates, stock prices—identified by Mitchell.  [Ex. 24, Allen Decl., Ex. A, ¶¶ 96-101].

19

427:6-431:12].  In any event, Deloitte (like the rest of the world) was well aware of CHSI's stock price when it repeatedly concluded that the timing of Quorum's impairment was appropriate.

*Third*, Mitchell charges that Quorum's 2016 earnings guidance was based on "inflated" financial projections and failed to account for known cost increases that Quorum would confront as a standalone company.  This is a final Hail Mary by Plaintiffs to bring a case based upon the very earnings-guidance theory that this Court has twice rejected:  Quorum's earnings guidance is absolutely protected under the PSLRA's Safe Harbor, and is not at issue in this case.  Dkt. 109.[13] The interim impairment analyses that Plaintiffs challenge were not predicated on that guidance; they were *qualitative* assessments.  And there is no evidence—none—that those qualitative assessments were anything but good-faith efforts to comply with GAAP.  What is more, Quorum expressly cautioned investors that its goodwill could become impaired if its financial performance fell short of expectations and warned investors of the very risks that Plaintiffs allege rendered the goodwill statements misleading.[14]  *See Align Tech*, 856 F.3d at 619 (no fraudulent omission where defendant "publicly disclosed" as "potential risks" the allegedly omitted items Plaintiffs alleged made the goodwill statements misleading).

In the end, Mitchell's hindsight-driven contention that Quorum's goodwill was impaired before the spinoff is—as Mitchell put it—a "difference of opinion."  [Ex. 33, Mitchell Tr. 206:9-10].  But a difference of opinion about highly subjective accounting judgments is not securities fraud.  *See Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016).  "[T]hat Plaintiff selected certain

---

[13] The argument is nonsense in any event.  Deloitte contemporaneously reviewed the inputs and assumptions used in Quorum's goodwill valuation analysis, and identified no errors.  [Ex. 15, 1/29/16 Deloitte Memorandum, at DT 00000668; Ex. 5, Walker Tr. 47:13-48:3].  So too with Quorum's pre-spin estimates of its standalone costs.  [Ex. 35, 5/3/16 Email; Ex. 36, Quorum Pro-Forma Analysis; Ex. 21, Phillips Decl., Ex. A, at 31].

[14] *See*, *e.g.*, 4/1/2016 Quorum Form 10, at 22 (competition); 23 (shift to outpatient services); 24 (impairment); 36 (standalone costs).

assumptions to reach a conclusion of impairment" does not "suffice to show that [Defendants'] selection of different assumptions [was] so unreasonable as to amount to fraud." *Align Tech.*, 856 F.3d at 618.

## II.   THE RECORD IS DEVOID OF EVIDENCE THAT ANY OF THE DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

Even if Plaintiffs could adduce evidence of falsity (and they cannot), their claims fail for an independent reason:  There is no evidence that any of the Defendants acted with scienter. Plaintiffs have received 68,000 documents from Defendants and taken 22 depositions.  The discovery record is closed.  And Plaintiffs cannot point to a single piece of paper or deposition excerpt to demonstrate that any of the Defendants acted in anything other than good faith.  That alone is grounds for summary judgment.  *See, e.g.*, *Mittman v. Rally's Hamburgers, Inc.*, 278 F. Supp. 2d 831, 839 (W.D. Ky. 2003) (granting summary judgment to defendants on scienter grounds); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1238 (S.D. Cal. 2010) (same).

### A.   Plaintiffs Must Prove That Defendants Acted Knowingly And With The Specific Intent To Deceive

"When an alleged misrepresentation concerns 'soft information,' which 'includes predictions and matters of opinion,'" a plaintiff must demonstrate that the defendants "knowingly misrepresented" facts with a specific intent to "deceive, manipulate, or defraud" the public.  *See Omnicare III*, 769 F.3d at 470, 472.  The scienter of a corporation (like Quorum) is evaluated by reference to the knowledge of its agents.  *Id.* at 476.

The law sets a high bar for proving scienter with respect to a highly subjective inquiry, such as an impairment analysis.  "[A] corporation's mere knowledge of negative factors that potentially indicate goodwill impairment does not of itself support an inference that a corporation acted with scienter in exercising its judgment to conclude that no goodwill impairment is likely to occur."  *Align Tech.*, 856 F.3d at 621.

21

**B.** **There Is No Evidence That Any Of The Defendants Knowingly Misstated Quorum's Goodwill Or Long-Lived Assets**

For many of the same reasons that Quorum's Form 10 and 10-Q were not false in the first place, *supra* pp. 15-18, there is no evidence in the record that any of the Defendants acted knowingly to deceive investors about Quorum's goodwill and long-lived assets. Rather, the contemporaneous evidence demonstrates, without exception, that Quorum's management acted in good faith. There is no evidence that Ms. Moody, who prepared Quorum's interim impairment memoranda, acted for some nefarious motive. There is no evidence that Ms. Moody was unduly influenced or instructed to conceal an impairment. Indeed, there is no evidence that ***anyone*** at Quorum (or CHSI, for that matter) was motivated to inflate Quorum's goodwill balance or deceive investors. *See Doshi v. General Cable Corp.*, 823 F.3d 1032, 1041 (6th Cir. 2016).

This case would be difficult enough for Plaintiffs even if any of Quorum's financial statements violated GAAP.[15]  But the fact that Quorum fully complied with GAAP—as contemporaneously confirmed by its independent auditors—is all but dispositive:  Quorum's "level of transparency" with Deloitte, coupled with Deloitte's affirmation that the timing of Quorum's impairments was appropriate, is powerful evidence negating scienter. *REMEC*, 702 F. Supp. 2d at 1246; *In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1279 (S.D. Fla. 2003) (auditor's review of methodology and assumptions "suggest[s] a lack of scienter as a matter of law").

---

[15] Failure to follow GAAP is, "by itself, insufficient to establish scienter for a securities fraud claim." *La. School Emps. Ret. Sys. v. Ernst & Young LLP*, 622 F.3d 471, 481 (6th Cir. 2010). Rather, "only accounting violations that are the type of extreme 'in your face facts' that 'cry out' scienter are sufficient under the PSLRA." *In re EveryWare Glob., Inc.*, 175 F. Supp. 3d 837, 858-59 (S.D. Ohio 2016) (internal quotation marks omitted), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).

22

As detailed above, Deloitte audited Quorum's April 1, 2016 Form 10, reviewed its May 11, 2016 Form 10-Q, and received copies of all of Quorum's annual and interim impairment analyses, including KPMG's valuation studies.  [Ex. 3, 8/27/15 Memorandum; Ex. 7, 1/28/16 Memorandum; Ex. 8, ASC 350 Impairment Study; Ex. 17, 5/10/16 Memorandum].  Deloitte employed internal valuation specialists, together with national audit professionals, in the course of its work.  And it concluded, time and time again, that Quorum's 2016 impairment was properly recorded in Q2 2016, after the spinoff.  [Ex. 27, 8/8/16 Deloitte Memorandum, at DT 00001309 ("we agree with QHC management's conclusion that the indicators of impairment did not arise until Q2 (and after the spin transaction was consummated)"); Ex. 28, 11/8/16 Deloitte Memorandum, at DT00001341 ("we agree with management's conclusions that based upon the review of the financial trends and changes as a result of the spin-off, the totality of evidence supports that indicators of impairment were not present as of the spin date, but occurred in the second quarter, post-spin"); Ex. 29, 3/19/17 Deloitte Memorandum, at DT 00001880 ("we ultimately concluded that the Goodwill impairment charge was appropriately recorded in Q2 2016, post-spin")].

And Deloitte stands by those conclusions to this day.  Two of its lead auditors (whose independence is unquestioned) sat for deposition, and both testified unequivocally that Quorum's impairment analyses were reasonable, Quorum's Q1 2016 financial statements were not misstated, and Quorum's impairment was appropriately recorded after the spinoff.  [Ex. 5, Walker Tr. 47:13-48:20, 67:19-69:2; Ex. 6, Stark Tr. 36:10-14, 40:7-41:17, 50:4-51:21].  They further testified (Ex. 5, Walker Tr. 247:7-22) that neither Quorum nor CHSI ever refused to provide relevant information or otherwise obstructed their work.  *See In re REMEC Inc.*, 702 F. Supp. 2d at 1246.  Deloitte had unfettered access to the projections underlying Quorum's valuation analyses and was

well aware of the indicators Mitchell professes should have triggered a Step 1 test (*e.g.*, financial results, stock prices, TSA agreements, etc.). "In sum, the evidence demonstrates that [Deloitte] conducted an independent check and concurred in the conclusion that [Quorum's] goodwill was not impaired." *See In re REMEC Inc.*, 702 F. Supp. 2d at 1255.

For good measure, none of the *Helwig* factors indicates scienter on the part of any Defendant. *Doshi*, 823 F.3d at 1039-40; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). There are no allegations (much less evidence) of insider trading, bribery, or any other financial incentives for the Defendants' officers to have committed fraud. Quite to the contrary, each of the officers was heavily invested in Quorum and had every incentive to see the company succeed. The Individual Defendants (Wayne T. Smith, W. Larry Cash, Thomas D. Miller, and Michael J. Culotta) personally suffered significant losses relating to their Quorum stock. [Ex. 2, W. Smith Tr. 135:12-136:4; Ex. 1, Cash Tr. 415:22-416:24; Culotta Decl. ¶ 9; Miller Decl. ¶¶ 8, 9]. Some fraudsters. *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462-63 (S.D.N.Y. 2000) (granting summary judgment on scienter where "individual defendants had nothing to gain from making the alleged misrepresentations" and "held or increased their holdings and lost $27.8 million collectively").

Nor is there evidence of a "divergence" between internal reports and external statements by Defendants. Quorum's public statements are on all fours with its contemporaneously prepared memoranda documenting its impairment analyses. And Quorum's public filings also disclosed, at great length, the risk that Quorum's goodwill and long-lived assets could become impaired in the future. They also included detailed and tailored disclosures relating to various business and industry risks, as well as potential risks related to the spinoff. [4/1/16 Quorum Form 10, at 22; 5/11/16 Quorum Form 10-Q, at 33-34; Ex. 11, LaRue Decl., Ex. A, ¶ 20]. *See Kuyat v. BioMimetic*

24

*Therapeutics, Inc.*, 747 F.3d 435, 443 (6th Cir. 2014) ("[D]isclosing adverse information to the public negates an inference of scienter.").

In short, there is nothing to see here. The record overwhelmingly demonstrates that Defendants and their auditors acted in utmost good faith. Summary judgment is warranted.[16]

## III.   THERE IS NO TRIABLE ISSUE AS TO LOSS CAUSATION

Defendants are further entitled to summary judgment because Plaintiffs have not adduced evidence that the alleged misstatements regarding Quorum's goodwill and long-lived assets caused Plaintiffs' losses.

Federal securities laws are not intended to "provide investors with broad insurance against market losses but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Thus, to prevail on a securities fraud claim, the plaintiff must prove "loss causation"—*i.e.*, that the alleged misrepresentation was the cause-in-fact of the plaintiff's economic loss. 15 U.S.C. § 78u-4(b)(4). "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quotation marks omitted). Without proof of loss causation, "the securities laws would

---

[16] The Court plainly should grant summary judgment for each of the Individual Defendants. All have affirmatively denied knowledge of any scheme to overstate Quorum's goodwill and long-lived assets. [Declaration of Michael J. Culotta ("Culotta Decl.") ¶ 8; Declaration of Thomas D. Miller ("Miller Decl.") ¶ 8; Declaration of W. Larry Cash ("Cash Decl.") ¶ 5; Declaration of Wayne T. Smith ("Smith Decl.") ¶ 4]. And each reasonably relied upon the companies' internal and external experts as it relates to accounting matters. *See REMEC*, 702 F. Supp. 2d at 1246; *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & ERISA Litig.*, 898 F. Supp. 2d 176, 182 (D.D.C. 2012) (granting summary judgment where defendants "relied on internal and external accounting experts to ensure that the company's financial statements complied with GAAP, and these experts universally assured [defendant] that [company's] financial statements were accurate in all material respects.").

become nothing more than 'a partial downside insurance policy.'" *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999 (6th Cir. 2005) (quoting *Dura*, 544 U.S. at 348).

Plaintiffs flunk this basic requirement. They attempt to demonstrate loss causation by pointing to the fact that Quorum's stock price fell after the August 10, 2016 announcement. But that announcement revealed an array of new information to the market—including that Quorum had missed its earnings targets and was revising downward its earnings guidance for the year. Plaintiffs make no effort to demonstrate that the supposed fraud-related disclosures (the impairments), rather than those other announcements, caused the stock price to fall. And for good reason: The record evidence, including the testimony of Defendants' expert Lucy P. Allen, demonstrates that Quorum's impairment announcement had nothing to do with its stock price drop.

In recognition of this problem, Plaintiffs attempt to bootstrap Quorum's earnings miss into their goodwill-impairment theory. They urge that the goodwill impairment and the earnings miss simultaneously revealed the same fraud—so even if the earnings miss (*not* the impairment announcement) caused the stock price decline, they can still prevail. [Ex. 37, Nye Rpt. ¶ 18; Ex. 26, 1/14/20 Nye Tr. 118:18-23].[17] The Court should reject this gambit. Indeed, the Court has *already dismissed* the very allegations that Plaintiffs now seek to resuscitate because the earnings

---

[17] Proof of loss causation may be achieved through either a "corrective disclosure theory" or a "materialization of risk theory." Under the corrective disclosure theory, a plaintiff must show that a so-called corrective disclosure—that is, a disclosure of information revealing the truth behind Defendants' misstatements—reveals the fraud and that "the market react[ed] negatively to [this] disclosure of fraud." *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 384 (internal quotation marks omitted). Alternatively, under the materialization of risk theory, a plaintiff must show that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis omitted). Plaintiffs fail to show loss causation under either theory. Plaintiffs have failed to show that their economic loss was caused by the alleged impairment charges or that the risk that caused their economic loss was within the zone of risk concealed by the alleged impairment charges—rather than any other company-specific factor.

26

guidance is a quintessential forward-looking statement under the PSLRA.  Dkt. 209, at 13-15.  In

the end, Plaintiffs have failed to adduce evidence that the impairment announcement—as opposed

to the earnings guidance, or other company-specific announcements unrelated to the alleged

fraud—caused the stock price to fall.  That failing is dispositive.

A.    **Plaintiffs Have Not Met Their Burden Of Disentangling the Impairment News From The Guidance News**

To prevail on a securities fraud claim, a plaintiff must prove that the alleged fraud—and

not any other factor—was the cause-in-fact of the decline in stock price.  *Glickenhaus & Co. v.*

*Household Int'l*, 787 F.3d 408, 421 (7th Cir. 2015).  Accordingly, a plaintiff must show that "it

was the *very facts* about which the defendant lied [that] caused its injuries."  *See Nuveen Mun.*

*High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013)

(quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 431 (3d Cir. 2007)) (emphasis added).

Courts routinely grant summary judgment where, as here, the plaintiffs fail to show that

the stock price decline was attributable to the alleged fraud rather than other factors.  *See In re*

*Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138-39 (10th Cir. 2009) (granting summary

judgment where plaintiffs "failed to present evidence suggesting that the declines in price were the

result of the revelation of the truth and not some other factor"); *McCabe*, 494 F.3d at 436-38

(granting summary judgment where the plaintiffs "cannot point to sufficient record evidence to

show that the very facts misrepresented or omitted by [the defendant] were a substantial factor in

causing the [plaintiffs'] economic loss"); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 398-399

(S.D.N.Y. 2018) (granting summary judgment where "a jury would not be able to disaggregate

that portion of the increase in [the defendant's] share price attributable to [the alleged corrective

disclosure] from that portion of the increase attributable to the other information simultaneously

disclosed to the market").

On August 10, 2016, Quorum disclosed two distinct pieces of news: (i) impairments to its goodwill and long-lived assets, which Plaintiffs claim were fraudulently delayed; and (ii) a Q2 earnings miss and downward revision to its earnings guidance. [8/10/16 Quorum Form 8-K]. This Court has already held, however, that Plaintiffs cannot sue on a theory that Quorum's pre-spin earnings projections were overstated. Dkt. 209, at 13-15. The day after the August 10 disclosures, Quorum's stock price fell by 49.8 percent.

Plaintiffs freely concede that the earnings miss and downward revision in guidance were causes of Quorum's stock price decline. According to Plaintiffs' expert Dr. Zachary Nye, the only expert Plaintiffs offer on loss causation, "the second quarter miss contributed to the decline to some extent," and the downward revision in guidance likewise impacted the stock price decline. [Ex. 26, 1/14/20 Nye Tr. 126:1-19]. Yet Nye made no effort whatsoever to demonstrate that the *impairment announcement* contributed to the stock price decline. [Ex. 38, Nye Reply Rpt. ¶ 22].[18] That failure is independently dispositive of Plaintiffs' claims. *See Household Int'l*, 787 F.3d at 421 (plaintiff must "isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors"); *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729 (11th Cir. 2012) (defendant entitled to judgment as matter of law where "[n]one of [plaintiffs'] evidence excluded the possibility that class members' losses resulted not from [alleged misrepresentations], but from [other] market forces").

---

[18] *See* Ex. 26, 1/14/20 Nye Tr. 118:25-119:8 (Q: "[T]he earnings miss contributed to the stock price decline but you haven't attempted the task of figuring out which portion, if any, of the stock price decline it caused, correct?" A: "I haven't precisely quantitatively estimated its contribution relative to the impairment charge taken or the earnings guidance reduction."); *id.* 123:16-21 (Q: "How much of the company-specific stock price drop was caused by [the downward revision in earnings guidance] announcement . . .?" A: "I haven't disentangled it . . . I just haven't quantified it.").

28

Nye explains away his failure to disaggregate by claiming that the impairment and earnings announcements disclosed the exact same information to the market, and thus *both* caused *all* of Plaintiffs' losses. [Ex. 37, Nye Rpt. ¶ 18; Ex. 38, Nye Reply Rpt. ¶ 22.]. That argument is not well taken.[19] For one thing, there is no support (and Nye offers none) for the notion that an impairment announcement and an earnings announcement reveal the same information to the market. Of course they don't. Investors cannot divine a company's financial prospects by looking at the company's goodwill balance. [Ex. 24, Allen Decl., Ex. A, ¶ 9 (goodwill values are subjective and have "limited informational content," and thus do not reveal a company's "true cash flow prospects" (quotations marks omitted)); Ex. 33, Mitchell Tr. 214:17-215:11 (one cannot determine earnings guidance from a goodwill number)]. That is why—as Defendants' expert, Lucy P. Allen, explains at length, *see infra*—goodwill impairments have no observable effect on stock prices.

And Nye's theory has no limiting principle. At some level, virtually ***any*** statement by a company can be said to "relate to" its financial condition, its earnings prospects, or the like. It would render the Safe Harbor a dead letter if a plaintiff could tether a protected, forward-looking statement ("we forecast X in revenues") with a statement of opinion ("we do not believe our goodwill is impaired") and challenge both as being "related" to one another in some metaphysical sense. Courts have wisely rejected such boundless theories of loss causation. *See In re Williams*, 558 F.3d at 1138-1140 (plaintiffs, who alleged company's financial condition and future prospects were misrepresented following spinoff, could not simply "label[] any negative information about [the company] a corrective disclosure" to evade loss causation requirement).

---

[19] Plaintiffs refuse to take no for an answer. This Court has rejected—twice—Plaintiffs' request to add a fraud claim relating to Quorum's earnings guidance. Dkts. 209, 210; Dkt. 246. Their latest attempt to shoehorn the earnings miss into their case is a transparent effort to end-run the PSLRA's Safe Harbor.

But even were Nye correct that the impairment announcement and earnings announcement were "inextricably intertwined," Ex. 37, Nye Rpt. ¶ 18, it still would not excuse his failure to show that the price decline was caused by the impairment announcement.  It is not enough for an alleged misrepresentation to "relate to" or be "intertwined with" a loss; it must *cause* the loss, full stop. *See Dura*, 544 U.S. at 343 ("To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." (emphasis omitted)).  Thus, courts have rejected securities fraud claims where the plaintiff failed to show that the plaintiff's economic loss was caused by the defendant's statement rather than a co-defendant's statement—even where the statements were "to the same or similar effect."  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007); *accord Lentell*, 396 F.3d at 177 (plaintiffs must establish that "it was defendant's fraud—rather than other salient factors—that proximately caused [their] loss"); *Household Int'l*, 787 F.3d at 421 (plaintiffs must "isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors").

*          *          *

Because Plaintiffs have failed to show—indeed, have not even attempted to show—that the alleged misrepresentations were ***the*** cause-in-fact of Quorum's stock price decline, summary judgment is warranted.

**B.    The Expert Evidence Overwhelmingly Shows That Quorum's Impairment Announcement Did Not Cause The Stock Price Decline**

Plaintiffs' failure to demonstrate loss causation should come as no surprise.  Defendants' expert, Lucy P. Allen, has overwhelmingly demonstrated that Quorum's impairment announcement did not cause Plaintiffs' losses.  To wit: (1) neither Quorum's nor CHSI's stock price reacted to a comparable impairment taken by CHSI; (2) analyst commentary uniformly attributed Quorum's stock decline to lower-than-expected financial results and reduced guidance,

30

not the impairment charges; (3) an event study shows that similar impairments taken by other companies did not result in loss causation; and (4) nearly all of Plaintiffs' alleged triggering factors—each of which, Plaintiffs say, was independently sufficient to signal an impairment— were publicly known prior to the alleged corrective disclosure.

### 1. Neither Quorum's Nor CHSI's Stock Reacted To A Comparable Impairment Taken By CHSI Eight Days Before Quorum's Announcement

On August 2, 2016—eight days before Quorum's earnings and impairment announcement—CHSI announced an estimated $1.6 billion impairment charge, including a $1.4 billion impairment to its goodwill. [8/2/2016 CHSI Form 8-K]. CHSI's impairment announcement presaged that an impairment charge would likewise be taken by Quorum: After all, Quorum's goodwill was derived from CHSI's goodwill (Ex. 24, Allen Decl., Ex. A, ¶¶ 32-36, 43), and Plaintiffs contend that CHSI's impairment was precipitated by the same factors that caused Quorum's impairment (TAC ¶¶ 209-210). A market analyst contemporaneously observed that Quorum's goodwill impairment "should have been obvious" in the wake of CHSI's August 2 announcement. [Ex. 25, 8/10/16 Mizuho Rpt.; Ex. 24, Allen Decl., Ex. A, ¶ 43]. Plaintiffs' expert echoed that sentiment. [Ex. 33, Mitchell Tr. 151:10-17 ("[I]f CHS' goodwill was impaired, it's likely that Quorum's goodwill would have been impaired because, again, up until the date of the spinoff, they were one company.")].

Yet Quorum's stock price did not budge. According to an event study performed by Allen, "there was no statistically significant reaction in Quorum's or CHSI's stock price to CHSI's goodwill write-down." [Ex. 24, Allen Decl., Ex. A, ¶¶ 41-43]. Rather, Quorum's and CHSI's stock prices, "after controlling for market and industry movements, [were] within the range of normal expected daily variation" and "cannot be statistically distinguished from zero." [*Id.*, ¶¶ 41-

31

42]. Plaintiffs' expert concedes the point.[20] It was not until eight days later—after Quorum announced its earnings miss and guidance revision—that Quorum's stock price fell like a rock.

### 2. Contemporaneous Market Analysts Attributed The Stock Price Decline To Quorum's Earnings Announcement, Not The Impairment Charges

The market evidence is of a piece. Market analysts uniformly attributed Quorum's stock price decline to Quorum's earnings miss and downward guidance revision; *not* the impairment charges. [Ex. 24, Allen Decl., Ex. A, ¶ 44]. Not a single analyst covering Quorum breathed a word about the impairments on the Q2 2016 earnings call. [*Id.*, ¶ 65; Ex. 39, 8/11/16 Quorum Earnings Call Transcript]. Of the eleven analyst reports issued after the August 10 announcement, five made no mention whatsoever of the impairment charges. [Ex. 24, Allen Decl., Ex. A, ¶¶ 65-66]. The other six reports mentioned them only in passing—and none characterized the impairment charges as new or surprising developments that affected their valuations of Quorum's stock. [*Id.*]. Plaintiffs' expert disputes none of this. [Ex. 26, 1/14/20 Nye Tr. 202:6-203:21 (no analyst expressed surprise or disappointment about Quorum's goodwill or long-lived asset write-down); Ex. 40, Nye Class Cert. Rpt., at 27 ("News reports attributed Quorum's stock price decline on August 11, 2016 to the Company's earnings miss and reduced guidance.")].

### 3. Similar Impairments Taken By Other Companies Have Likewise Had No Price Impact

Another event study performed by Allen further demonstrates that impairment charges do not move stock prices. Allen's study evaluated 38 goodwill impairment announcements and 29 long-lived-asset impairment announcements from the relevant time period (2015-2017). [Ex. 24, Allen Decl., Ex. A, ¶¶ 63-65]. *Not one* had a statistically significant effect on the announcing

---

[20] Ex. 26, 1/14/20 Nye Tr. 216:15-21 ("Q: "[T]here was no statistically significant reaction [in CHSI's stock price] at the 95 percent level, correct?" A: "I agree." Q: "And so, too, for Quorum's reaction to the CHS[I] impairment announcement, no statistically significant reaction?" A: "Yes.").

company's stock price.  [*Id*., ¶ 62].[21]   Again, this is not surprising:  Impairment charges are mechanical accounting entries that do not themselves reveal anything to the market about the financial prospects or earning potential of an enterprise.  That is doubtless why Plaintiffs' own expert has previously acknowledged—when it advanced his cause—that goodwill impairments "provide[] no new information" to the market.  [Ex. 41, Nye Kinross Rpt. ¶¶ 95-96.]

### 4.   The "Triggering Factors" That Plaintiffs Claim Should Have Triggered A Pre-Spin Impairment Were Publicly Known

Plaintiffs point to a host of "triggering factors" that they claim should have prompted Quorum to take an impairment in Q1 2016, prior to the spin:  (i) a sustained decrease in share price; (ii) a decline in overall financial performance; (iii) underperformance of Quorum's hospitals; (iv) a deterioration in the healthcare industry; and (v) "increased competition from larger hospitals."  TAC ¶ 12.  According to Plaintiffs, each of those factors was "sufficient on its own" to indicate an impairment.  *Id*.

The problem is that every one of these supposed triggering factors was a matter of public record prior to the spinoff.  Plaintiffs do not dispute this.  [Ex. 42, 8/17/18 Nye Tr. 218:23-221:18 (triggering factors "were definitely public"); *see* Ex. 38, Nye Reply Rpt., ¶ 16; Ex. 24, Allen Decl., Ex. A, ¶¶ 26-28].  Thus, according to ***Plaintiffs'*** theory, it was apparent to investors prior to the spinoff that Quorum's goodwill and long-lived assets were impaired.  That alone is dispositive of Plaintiffs' claims.  *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("the mere repackaging of already-public information . . .  is simply insufficient to constitute a corrective disclosure") (collecting cases); *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014)

---

[21] Indeed, some of the companies in the study even had a statistically significant ***positive*** effect on the stock price—a point Nye does not dispute.  [Ex. 26, 1/14/20 Nye Tr. 246:22-24].

(no loss causation where the alleged misrepresentations were "public information that the market absorbed long before").

*          *          *

In short, Plaintiffs have offered no affirmative evidence to demonstrate that the impairment charges, rather than other factors, caused the stock price to fall. And the expert evidence overwhelmingly demonstrates that the impairment charges were not the cause-in-fact of the stock price drop. Because there is no triable issue of loss causation, the Court should grant summary judgment in Defendants' favor. *See Nuveen*, 730 F.3d at 1123; *In re Williams*, 558 F.3d at 1138-39; *McCabe*, 494 F.3d at 436-37.

## III.    THE SECTION 20(A) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED

The Court should further grant summary judgment on the Section 20(a) "controlling person" claims against the Individual Defendants. A necessary predicate to a Section 20(a) claim is a primary violation of the securities laws. *See Doshi*, 823 F.3d at 1045. Because there is none, the Section 20(a) claims against the Individual Defendants likewise should be dismissed.

Moreover, Section 20(a) does not permit liability where the alleged control person "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Here, the record evidence conclusively demonstrates that each of the Individual Defendants acted in utmost good faith. Cash Decl. ¶¶ 5-7; Smith Decl. ¶¶ 4-6; Culotta Decl. ¶¶ 5-8; Miller Decl. ¶¶ 5-8.

## IV.    AT A MINIMUM, THE CLAIMS AGAINST THE CHSI DEFENDANTS RELATING TO POST-SPIN STATEMENTS SHOULD BE DISMISSED

If nothing else, the Court should grant summary judgment to the CHSI Defendants as to any alleged misstatements in Quorum's May 11, 2016 Form 10-Q. That document was issued after the spinoff and cannot be attributable to the CHSI Defendants.

34

There is no such thing as aiding-and-abetting liability under Section 10(b). *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191-92 (1994). Accordingly, absent some "other form of fraud," Section 10(b) imposes private civil liability against only an individual who either makes or disseminates a false statement. *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1103 (2019).

CHSI did not "make" or disseminate any of the statements in Quorum's 10-Q.[22] "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The record evidence establishes beyond dispute that Quorum—not CHSI—had "ultimate authority" over the contents of its 10-Q. The Form 10-Q was filed by Quorum in its own name and signed by Quorum's officers, Michael Culotta and Thomas Miller. [5/11/16 Quorum Form 10-Q]. Quorum's Audit and Compliance Committee reviewed the Form 10-Q before it was filed. [Ex. 43, Committee Meeting Agenda, at QHC00000316]. And the internal memoranda documenting Quorum's goodwill and long-lived assets impairment analyses were prepared by a Quorum employee (Megan Moody) and reviewed by Quorum officers (Culotta and Stan Hunt) as part of Quorum's financial reporting process. [Ex. 18, 5/5/16 Memorandum; Ex. 17, 5/10/16 Memorandum; Ex. 12, Moody Tr. 278:18-279:13]. Thus, no claims may lie against CHSI relating to that document.[23]

---

[22] The Court previously found that Plaintiffs managed to state a claim against the CHSI Defendants relating to the post-spin Form 10-Q (Dkt. 144, at 7-8), but discovery has now confirmed that the CHSI Defendants did not—could not—have ultimate authority over that filing.

[23] The Court likewise should grant summary judgment for the Individual CHSI Defendants, Cash and Smith, with respect to Quorum's post-spin Form 10-Q. Neither had the requisite "power to control" Quorum's post-spin securities filings sufficient to sustain Section 20(a) liability. *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992); *see also* Smith Decl. ¶ 6; Cash Decl. ¶ 7.

## V.    THE COURT SHOULD DISMISS THE CLAIMS OF ASSERTED CLASS MEMBERS WHO DID NOT PURCHASE THEIR QUORUM STOCK

As currently constituted, the class includes persons who "purchased *or otherwise acquired* Quorum Health Corporation common stock between May 2, 2016 and August 10, 2016, both dates inclusive."  Dkt. 209, at 16 (emphasis added).  But only purchasers and sellers of securities are entitled to bring private actions under Section 10(b) and Rule 10b-5.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975) ("[T]he plaintiff class for purposes of [§] 10(b) and Rule 10b-5 private damages actions is limited to purchasers and sellers of securities.").  Accordingly, the Court should dismiss claims of class members who acquired Quorum stock through some means other than purchase (*e.g.*, heirs and donees).  *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. H-01-3624, 2008 WL 4178151, at \*9 (S.D. Tex. Sept. 8, 2008); *Rose v. Ark. Valley Envtl. & Util. Auth.*, 562 F. Supp. 1180, 1188 (W.D. Mo. 1983) (persons who received stock by inheritance are not entitled to bring 10b-5 actions); *Sanderson v. H.I.G. P-XI Holding, Inc.*, No. 99-3313, 2000 WL 1042813, at \*9 (E.D. La. July 27, 2000) (donees not entitled to bring 10b-5 actions).[24]

To the extent CHSI stockholders who received Quorum stock in connection with the spinoff could be construed to fall within the class definition in the first place,[25] the Court should

---

[24] Judge Richardson recently struck the words "or otherwise acquired" from the proposed definition in a securities class action for precisely this reason.  *See Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, No. 3:11-cv-00433, --- F.R.D. ---, 2019 WL 3387450, at \*17 (M.D. Tenn. July 26, 2019) (quotation marks omitted).  Those shareholders who did not purchase Quorum stock should be excluded from the class definition here (to the extent that their acquisitions of Quorum stock even fall within the class period).  *See* Fed. R. Civ. P. 23(c)(1).

[25] The spinoff was completed on April 29, 2016, at which time CHSI distributed one share of Quorum common stock for every four shares of CHSI common stock to shareholders who held CHSI common stock as of April 22, 2016 (the record date).  [4/29/2016 Quorum Form 8-K].  Thus, shareholders who acquired Quorum stock via the spinoff did so before the start of the class period and so are, by definition, not class members.

enter summary judgment for Defendants on their claims.  These shareholders received Quorum stock through no investment decision of their own and thus are beyond the purview of the securities laws.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005) (dismissing claims of shareholders who received stock as part of spinoff because they "did not engage in a 'purchase' within the scope of Section 10(b)"); *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220(SAS), 2010 WL 2835545, at *11 n.160 (S.D.N.Y. June 28, 2010) (claims based on distribution of stock to investors as a dividend barred); *Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998) (affirming dismissal because spinoff does not involve purchase or sale of securities); *cf. IDT Corp. v. U.S. Specialty Ins. Co.*, No. CVN18C03032PRWCCLD, 2019 WL 413692, at *13 (Del. Super. Ct. Jan. 31, 2019) ("[F]ederal and various state courts have consistently held that a spinoff is not a 'purchase or sale of securities' within the meaning of the Securities Act of 1933 because it does not affect a fundamental change in the stockholders' holdings.").  Section 10(b) does not authorize lawsuits merely because a shareholder may have *held* its stock due to an alleged misrepresentation.  *See First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175, 180, n.2 (2d Cir. 1989) ("[P]laintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or to sell, not from decisions to hold or refrain from trading.").

Dated: January 31, 2020

Respectfully submitted,

/s/ Jessica P. Corley

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Brandon R. Keel (*pro hac vice*)
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com

Woods Drinkwater (BPR No. 033838)
Nelson Mullins Riley & Scarborough, LLP
150 Fourth Avenue, North, Suite 1100
Nashville, Tennessee 37219
Telephone: (615) 664-5339
Facsimile: (615) 664-5399
Woods.drinkwater@nelsonmullins.com

*Counsel for Defendants Quorum Health Corporation, Thomas D. Miller, and Michael J. Culotta*

/s/ Gary A. Orseck

Gary A. Orseck (*pro hac vice*)
William J. Trunk (*pro hac vice*)
Jack A. Herman (*pro hac vice*)
Wendy Liu (*pro hac vice*)
Lauren Cassady (*pro hac vice*)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
gorseck@robbinsrussell.com

Robert J. Walker (BPR No. 2498)
Jason W. Callen (BPR No. 26225)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Bob.walker@butlersnow.com

*Counsel for Defendants Community Health Systems, Inc., Wayne T. Smith, and W. Larry Cash*

38

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing has been served upon all registered users of the Electronic Case Filing System, including:

Paul K. Bramlett
Robert P. Bramlett
Bramlett Law Offices
P.O. Box 150734
Nashville, TN 37215
(615) 248-2828
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jessica Perry Corley
Lisa R. Bugni
Brandon R. Keel
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309
(404) 572-4717
jpcorley@kslaw.com
lbugni@kslaw.com
bkeel@kslaw.com

Wade B. Cowan
Davies, Humphreys, Horton & Reese, PLC
85 White Bridge Road, Suite 300
Nashville, TN 37205
(615) 256-8125
wcowan@dhhrplc.com

Patrick V. Dahlstrom
Pomerantz LLP
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

Corey D. Holzer
Marshall Dees
Holzer & Holzer, LLC
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
(770) 392-0090
mdees@holzerlaw.com
cholzer@holzerlaw.com

Woods Drinkwater
Nelson Mullins Riley & Scarborough LLP
150 Fourth Avenue, N, Suite 1100
Nashville, TN 37219
(615) 664-5323
(615) 664-5399
Woods.drinkwater@nelsonmullins.com

Jeremy A. Lieberman
Michael J. Wernke
J. Alexander Hood II
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
mjwernke@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Robert J. Walker (BPR No. 2498)
Jason W. Callen (BPR No. 26225)
BUTLER SNOW LLP
The Pinnacle at Symphony Place
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
Telephone: (615) 651-6700
Bob.walker@butlersnow.com
Jason.callen@butlersnow.com

this 31st day of January, 2020

/s/  Gary A. Orseck