# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| ZWICK PARTNERS, LP and APARNA RAO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> QUORUM HEALTH CORPORATION, COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH, THOMAS D. MILLER, and MICHAEL J. CULOTTA, <br><br> Defendants. | **Case No. 3:16-cv-02475** <br><br> **CLASS ACTION** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 4

I.  DEFENDANTS' OVERARCHING SCHEME TO MISREPRESENT QUORUM'S
    FINANCIAL HEALTH AND FUTURE CASH FLOWS.................................................. 4

    A.  CASH NEEDED TO MAXIMIZE THE DEBT PLACED ON QUORUM SO AS
        TO REDUCE CHS' OWN LEVERAGE TO MAINTAIN ITS RATING............. 4

    B.  CHS MANAGEMENT SET THE QUORUM HOSPTIALS ADRIFT ONCE
        THEY DECIDED TO SPIN THEM OFF CAUSING A PRECIPITOUS
        DECLINE IN PERFORMANCE (¶¶24-43) ........................................................... 4

    C.  MANAGEMENT INFLATED QUORUM'S PROJECTED CASH FLOWS
        USED IN QUORUM'S IMPAIRMENT ANALYSIS ......................................... 6

        1.  Management Inflated Projected Revenues and EBITDA (¶¶53-69) .......... 6

        2.  The Cash Flow Model Omitted Increased Corporate Overhead Costs
            (¶¶75-104) ................................................................................................. 9

        3.  Management Deflated Projected Costs from the TSAs (¶¶70-74) ........... 10

        4.  Management Inflated Projected Proceeds From the Sale of Negative
            EBITDA Hospitals in 2016 (¶¶105-115) ................................................. 10

        5.  Fleck Was So Uncomfortable With Cash's "Absurd" Assumptions That
            He Kept a Log Detailing the Fraud (¶¶116-132) ..................................... 11

    D.  THE INFLATED CASH FLOW MODEL WAS USED TO TEST QUORUM'S
        GOODWILL FOR IMPAIRMENT ...................................................................... 11

    E.  CASH MAXIMIZED THE DEBT PLACED ON QUORUM DESPITE ITS
        HARM TO QUORUM'S FINANCIAL PROSPECTS (¶¶137-154).................... 12

    F.  DEFENDANTS ISSUED INFLATED GUIDANCE TO THE MARKET (¶¶155-
        185) .................................................................................................................... 12

    G.  DEFENDANTS FALSIFIED QUORUM'S Q1 RESULTS (¶¶186-214) ............ 14

    H.  DEFENDANTS FALSIFIED QUORUM'S Q4 2015 AND Q1 2016 GOODWILL
        ANALYSIS.......................................................................................................... 15

        1.  Quorum's Assets were Impaired at Q4 2015 and Q1 2016 ...................... 16

        2.  Management Falsified Its Impairment Analysis ....................................... 17

    I.  DEFENDANTS CONTINUED TO CONCEAL QUORUM'S TRUE
        FINANCIAL HEALTH AFTER THE SPINOFF................................................. 17

        1.  Quorum Continues to Mislead Concerning the Guidance ........................ 17

        2.  Quorum Defendants Intended to Conceal The Goodwill Impairment
            Beyond Q2 2016 ...................................................................................... 18

i

J.      QUORUM IS FORCED TO TAKE AN IMPAIRMENT AND ADMIT THAT IMPAIRMENT EXISTED PRIOR TO THE SPINOFF ...................................... 18

ARGUMENT ................................................................................................................. 19

I.      A REASONABLE JURY WOULD HAVE NO DIFFICULTY CONCLUDING THAT DEFENDANTS' STATEMENTS ARE MISLEADING ................................................. 20

II.     A REASONABLE JURY WOULD EASILY CONCLUDE THAT DEFENDANTS ACTED WITH SCIENTER ................................................................................... 22

        A.      DEFENDANTS' HAD A MOTIVE TO DELAY IMPAIRMENT UNTIL AFTER THE SPINOFF ................................................................................... 23

        B.      THERE IS AMPLE EVIDENCE UPON WHICH A JURY COULD CONCLUDE THAT DEFENDANTS ACTED WITH SCIENTER ......................................... 24

III.    THERE IS A TRIABLE ISSUE OF FACT OVER LOSS CAUSATION ...................... 29

        A.      THERE IS AMPLE EVIDENCE UPON WHICH A JURY COULD CONCLUDE THAT THE ALLEGED FRAUD CAUSED THEIR LOSS ............................... 29

        B.      THERE IS A DISPUTE BETWEEN EXPERTS CONCERNING THE IMPACT OF QUORUM'S IMPAIRMENT ON ITS STOCK PRICE .............................. 33

IV.     THERE IS A TRIABLE ISSUE ON THE SECTION 20(a) CLAIMS ........................... 36

V.      THE CHS INDIVIDUAL DEFENDANTS SHOULD NOT BE DISMISSED AS TO POST-SPIN STATEMENTS ........................................................................... 36

VI.     CLASS MEMBERS THAT RECEIVED THEIR SHARES IN THE SPINOFF WERE DAMAGED AND SHOULD NOT BE DISMISSED ...................................... 37

CONCLUSION .............................................................................................................. 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aaron v. SEC*,
    446 U.S. 680 (1980)..........................................................................................................22

*Abrahamson v. Fleschner*,
    568 F.2d 862 (2d Cir. 1977)............................................................................................38

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) .....................................................................................3, 31

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................................19

*Bryant v. Maffucci*,
    923 F.2d 979 (2d Cir.), cert. denied, 502 U.S. 849 (1991) .......................................19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................................................34

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................................19

*Cosby v. KPMG, LLP*,
    2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ..........................................................32

*Dronsejko v. Thornton*,
    632 F.3d 658 (10th Cir. 2011) ........................................................................................26

*Dudley v. Haub*,
    2013 U.S. Dist. LEXIS 61386 (D.N.J. Apr. 30, 2013) ........................................21, 23

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ..........................................................................................24

*Freudenberg v. E\*TRADE Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................................31

*Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*,
    2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ........................................................22

*Grae v. Corrections Corp. of America*,
    2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)..........................................................24

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .................................................................................22

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................................22

*IDT Corp. v. U.S. Specialty Ins. Co.*,
    2019 WL 413692 (Del. Super. Ct. Jan. 31, 2019) ...................................................39

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    398 F. Supp. 2d 244 (S.D.N.Y. 2005).......................................................................39

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ............................................................................30, 35

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009).....................................................................................23

*In re Dynegy, Inc. Securities Litigation*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ......................................................................29

*In re Envision Healthcare Corp. Sec. Litig.*,
    2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ......................................................32

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F.Supp.2d 429 (S.D.N.Y. 2005).........................................................................21

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004).......................................................................24

*In re Huffy Corp. Secs. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) .....................................................................36

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    2014 U.S. Dist. LEXIS 32028 (S.D.N.Y. Mar. 11, 2014) .......................................39

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013).......................................................................26

*In re Omnicom Grp., Inc. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 5272 (S.D.N.Y. Mar. 30, 2005) .........................................21

*In re RAIT Fin. Trust Sec. Litig.*,
    2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008).......................................21

*In re Res. Fund Sec. & Derivative Litig. v. Res. Mgmt. Co.*,
    2012 U.S. Dist. LEXIS 147723 (S.D.N.Y. Sep. 12, 2012).......................................26

*In re Telxon Corp. Securities Litigation*,
  133 F. Supp. 2d 1010 (N.D. Ohio 2000)..................................................................25

*In re Tronox, Inc.*,
  2010 U.S. Dist. LEXIS 67664 (S.D.N.Y. June 28, 2010).........................................39

*In re Vivendi Universal*,
  634 F. Supp. 2d at 367 .............................................................................................31

*In re Vivendi Universal, S.A.*,
  284 F.R.D. 144 (S.D.N.Y. 2012) .............................................................................38

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ...............................................................................38

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp.2d 512 (S.D.N.Y. 2011).......................................................................23

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ...............................................................................31

*In re Winstar Commc'ns.*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).............................................................26

*Int'l Controls Corp. v. Vesco*,
  490 F.2d 1334 (2d Cir. 1974)...................................................................................38

*Isquith by Isquith v. Caremark Int'l, Inc.*,
  136 F.3d 531 (7th Cir. 1998) ...................................................................................39

*Isquith v. Caremark Int'l*,
  1997 U.S. Dist. LEXIS 3715 (N.D. Ill. Mar. 26, 1997)...........................................38

*Markowski v. S.E.C*,
  34 F.3d 99 (2d Cir. 1994)..........................................................................................26

*Nat. Res. Def. Council, Inc. v. Rauch*,
  244 F. Supp. 3d 66 (D.D.C. 2017) ...........................................................................34

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) ..................................................................................32

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016) ...................................................................................31

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
  50 F. Supp. 3d 1328 (C.D. Cal. 2014) .....................................................................36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)................................................................................2, 20, 21

*Patrick v. Le Fevre*,
    745 F.2d 153 (2d Cir. 1984).................................................................................23

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
    614 Fed. Appx. 237 (6th Cir. 2015)......................................................................21

*PR Diamonds, Inc. v. Chandler*,
    91 Fed. Appx. 418 (6th Cir. 2004)........................................................................24

*Pub. Emp'rs Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ...............................................................................31

*Rathborne v. Rathborne*,
    683 F.2d 914 (5th Cir. 1982) ..........................................................................38, 39

*Schad v. Arizona*,
    501 U.S. 624 (1991)..............................................................................................26

*SEC v. Caserta*,
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) ......................................................................26

*SEC v. CKB168 Hldgs, Ltd.*,
    210 F. Supp. 3d 421 (E.D.N.Y. 2016) ...................................................................24

*SEC v. Premier Links, Inc.*,
    2017 U.S. Dist. LEXIS 151170 (E.D.N.Y. Sep. 14, 2017)......................................22

*United Housing Foundation v. Forman*,
    421 U.S. 837 (1975)..............................................................................................39

*United States v. Duncan*,
    850 F.2d 1104 (6th Cir. 1988) ..............................................................................26

*United States v. Erickson*,
    601 F.2d 296 (7th Cir.1979) .................................................................................29

*Wechsler v. Steinberg*,
    733 F.2d 1054 (2d Cir. 1984)................................................................................23

*Wedbush Morgan Securities, Inc. v. Robert W. Baird & Co.*,
    320 F. Supp. 2d 123 (S.D.N.Y. 2004)....................................................................23

## **Statutes**

15 U.S.C. § 78c(a)(13).................................................................................................37

PSLRA ........................................................................................................................................32

## **Rules**

Fed. R. Civ. P. 23(c)(1)(C) .....................................................................................................40

Rule 10b-5................................................................................................................................37

## PRELIMINARY STATEMENT

On April 1, 2016, a month prior to the Quorum spinoff, Defendants told investors that (1) Quorum's $541.7 million of goodwill was based on "estimates about our future performance and cash flows," (2) the goodwill was not impaired, (3) there was no "risk of goodwill impairment" and (3) "We expect to recover the carrying value of this goodwill through our future cash flows." Defendants repeated these statements and confirmed the lack of any impairment on May 11, 2016 in Quorum's Q1 2016 Form 10-Q.

On August 10, 2016, after only two months of operations, Quorum announced a $250 million impairment resulting from a "decrease in the estimated future earnings of the Company" calculated using "a discounted cash flow model as well as a multiple model based on [EBITDA]." As a result, Quorum's stock price plummeted by 50%.

Defendants knew well-before the spinoff that Quorum's goodwill was impaired because (i) Defendants had massively inflated the cash flow model used to assess Quorum's goodwill for impairment as part of an over-arching scheme to mislead investors as to the financial health and prospects of Quorum as a stand-alone company, and (ii) Defendants were aware of numerous other "red flag" indicators of impairment, including their own accounting fraud.

As soon as CFO Larry Cash ("Cash") decided to spinoff the Quorum hospitals, his only concern was to maximize the debt taken on by Quorum because CHS desperately needed the proceeds from the spinoff to pay down its own significant debt. CHS had no interest in the future viability of Quorum, ceasing all activity necessary for any success. Capital improvements and physician recruiting were terminated. As a result, the hospitals suffered a precipitous decline in performance in the four quarters leading up to the spinoff. Moreover, management knew that Quorum's performance after the spinoff would be even worse. Cash used the spinoff to transfer approximately $100 million in corporate overhead, including 200 employees of CHS, to Quorum even though its corporate overhead under CHS had been only $36.5 million. And despite Quorum having no prior corporate structure, the future management was forbidden from preparing for the operation of Quorum as a stand-alone company.

1

Despite knowing of the dire (and ever worsening) prospects of Quorum, Cash, Culotta and the rest of CHS management drastically inflated the cash flow model used to secure the financing for the spinoff and to test for impairment. Over the course of 75 versions of the model, they repeatedly increased every assumption of growth and decreased every assumption of cost until the cash flow model provided a number that would allow Cash to secure the financing amount he wanted. Indeed, the person responsible for entering the manipulations into the model stated that the assumptions were "borderline absurd" and he did not see any way the spinoff could happen. He was so uncomfortable that he created a log to memorialize the manipulations.

In addition to inflating the cash flow model used to test for impairment, Defendants were aware of numerous other "red flags" or "indicators" of impairment that showed that it likely that Quorum's goodwill (and long-lived assets) were impaired prior to the spinoff. For example, Quorum's financial results were plummeting, CHS' stock price had dropped by 65%, and the fair value of Quorum's market capitalization was $177 million below the carrying value of equity. Moreover, Defendants knew that the adjusted EBITDA guidance they had provided to the market (based on the cash flow model) was inflated. When Defendants learned that Quorum's Q1 2016 results would reveal the falsity of their projections, they intentionally cooked the books to inflate the results so they could conceal the true financial health and prospects of Quorum and reassure investors that there was no impairment.

There is overwhelming evidence of Defendants' fraud. A reasonable jury would have no difficulty finding Defendants liable.

Nevertheless, Defendants assert that their statements are not misleading because they are opinions. Even if Defendants' statements are deemed to be opinions, there is overwhelming evidence that those statements did not "fairly align with the information in [Defendants'] possession at the time." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015).

In the face of the overpowering evidence of their scienter, Defendants assert that no jury could find them liable because KPMG, which assisted management in its annual impairment test,

2

and Deloitte, which reviewed Quorum's financial statements, never uncovered the fraud or forced a restatement. *First*, the responsibility of a company's financial statements rests exclusively with management, not its auditors or third parties. *Second*, KPMG and Deloitte were crystal clear that the projections were management's responsibility and they relied on management's express representations that their projections and goodwill assessments were reasonable and honestly believed. *Third*, in order prove the defense of reliance on an auditor Defendants must prove they provided all relevant information to their auditor.  Here, there is ample evidence that Defendants not only withheld critically important information but that they affirmatively lied in the memos provided to Deloitte. If the mere existence of clean audit opinions during the Class Period were sufficient to absolve a company of liability then no company would ever be held liable for securities fraud.

Finally, despite both parties' experts agreeing that the August 10, 2016 announcement caused the decline in Quorum's stock price, Defendants argue that the alleged fraud was not the proximate cause of investors' loss because, they argue, Plaintiffs are required to separate the decline attributable to the impairment news from the decline attributable to the reduction in guidance announced at the same time. This is absurd. As Plaintiffs' expert Dr. Zachary Nye explains, the impairment of a company's goodwill and its projected adjusted EBITDA are "inextricably linked." Indeed, projected adjusted EBITDA was the fundamental input to the models that Quorum used to test for impairment and Quorum admitted that the impairment was the result of a "decrease in the estimated future earnings of the Company." These are facts that Defendants' expert does not dispute. Indeed, the adjusted EBITDA guidance that was issued to the market (and later reduced) was taken directly from the inflated cash flow model that Defendants used to test Quorum's goodwill. As Dr. Nye explains, the impairment and the guidance reduction revealed to the market the same critical fact that had been concealed by management – that Quorum's future cash flows and prospects were much lower than previously represented. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009)

3

("[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'--the truth obscured by the fraudulent statements.")

The remainder of Defendants' arguments should be rejected for the reasons stated below.

## FACTUAL BACKGROUND

I.    **DEFENDANTS' OVERARCHING SCHEME TO MISREPRESENT QUORUM'S FINANCIAL HEALTH AND FUTURE CASH FLOWS**

A.    **CASH NEEDED TO MAXIMIZE THE DEBT PLACED ON QUORUM SO AS TO REDUCE CHS' OWN LEVERAGE TO MAINTAIN ITS RATING**

By mid-2015, CHS had decided it would spinoff the hospitals that would become Quorum. ¶11[1] Cash, who was responsible for determining the terms of the spinoff, determined early in the process that they would cause Quorum to seek financing (i.e. debt) equaling five times ("5x") that of Quorum's annual adjusted EBITDA, which was determined to be the maximum amount that the market could bear. ¶¶13-15, 20 Cash was determined to saddle Quorum with as much debt that the market would bear since all the proceeds would be paid back to CHS and CHS could use those proceeds to pay down its own enormous debt. ¶¶12-16, 154 Cash was concerned about CHS' leverage because it could cause CHS' credit rating to decline to CCC+ which would force many large investors "to remove [the] bonds from the accounts that can't take triple Cs." ¶¶17-23 When others suggested reducing the debt taken on by Quorum because Quorum's financial results were not justifying such high debt, Cash instructed them to keep the debt where it was at because "OUR LEVERAGE HAS INCREASED." ¶16

B.    **CHS MANAGEMENT SET THE QUORUM HOSPTIALS ADRIFT ONCE THEY DECIDED TO SPIN THEM OFF CAUSING A PRECIPITOUS DECLINE IN PERFORMANCE (¶¶24-43)**

As soon as CHS decided to spinoff the Quorum hospitals, management cut off critical support. For example, CHS "curtailed capital investment in" and "severely curtailed physician recruitment at" the 38 hospitals that would be going to Quorum "during the eight-month period

---

[1] Unless otherwise noted, references to "¶" refer to Plaintiffs' Statement of Facts and "Ex." Refers to Exhibits to the Declaration of Michael J. Wernke.

4

leading up to the Spin-Off." Physician recruitment and capital expenditures were key to growing Quorum's volume. The hold on capital expenditures even included "basic infrastructure needs, O[perating] R[oom] lights, nurse call systems." ¶¶24-34

Despite the fact that the 38 hospitals had never operated as a corporate unit, CHS management chose not to organize the hospitals into their own division prior to the spinoff, and also prohibited the future corporate management of Quorum from preparing in any way for Quorum's future operations. Indeed, Quorum's management did not even meet together to plan for Quorum's operations as a standalone company until three days before the spinoff. ¶¶44-50

As a result of CHS' actions (or inaction), the Quorum hospitals "started experiencing downward trend and higher provider turnover after the announcement of the spin-off in the third quarter of 2015… Without clear direction, the providers and other hospital staff, unclear on direction began to depart the business…" ¶24

Specifically, net operating revenues, adjusted EBITDA, operating income and admissions precipitously declined in Q2, Q3 and Q4 2015 compared to the same quarters in 2014.

| Quorum Same-Store Net Operating Revenues Compared to Same Quarter of Prior Year | | | | |
|---|---|---|---|---|
| | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 |
| Net Revenue | 9.5% | 1.7% | 0.5% | -4.8% |

| Quorum Same-Store Adjusted EBITDA Compared to Same Quarter of Prior Year | | | | |
|---|---|---|---|---|
| | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 |
| Adjusted EBITDA | 146.9% | -7.0% | -25% | -15.2% |

| Quorum Same-Store Operating Income Compared to Same Quarter of Prior Year | | | | |
|---|---|---|---|---|
| | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 |
| Adjusted EBITDA | 680.5% | -11.8% | -43.1% | -19.3% |

| Quorum Same-Store Admissions Compared to Same Quarter of Prior Year | | | | |
|---|---|---|---|---|
| | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 |
| Adjusted EBITDA | -0.9% | -4.5% | -3.2% | -5.7% |

¶¶35-43  Lest there be any doubt as to how Quorum's performance was viewed by management in late 2015, on November 2, 2016, Megan Moody ("Moody") emailed Michael Culotta ("Culotta") regarding Quorum's Q3 2015 results, stating that adjusted EBITDA was only $60.295 million. Culotta responded, "crap." Ex. 25.

### C.    MANAGEMENT INFLATED QUORUM'S PROJECTED CASH FLOWS USED IN QUORUM'S IMPAIRMENT ANALYSIS

In late-2015, management began modeling Quorum's cash flow projections from 2016 to 2022, which were necessary to obtain the financing required to complete the spinoff. ¶¶51-52 The cash flow model was also used to test Quorum's goodwill for impairment. ¶¶133-35.

### 1.    Management Inflated Projected Revenues and EBITDA (¶¶53-69)

From the outset, the model utilized assumptions that were contradicted by the trends management was observing. Early versions of the cash flow model assumed net revenue growth from 2.7% - 4.0%, which was much higher than the change in net revenue for Q2, Q3 and Q4 2015 of 1.7%, 0.5% and negative 4.8%, respectively. The model also assumed an average annual adjusted EBITDA growth of 5.5%, which was vastly higher than the change in adjusted EBITDA for Q2, Q3 and Q4 2015 of  -7.0%, -26%, and -15.2%, respectively. ¶53

Even with these inflated assumptions, the cash flow projected by the model was well below what CHS needed to secure the high level of financing because Quorum's actual results (which were the starting point for the projections) were so dismal. ¶54 Management's solution was "mitigate these cash reductions" by changing the assumptions in the model to project higher cash flows. *Id.* Even with these initial changes (for which absolutely no operational reasons were identified to justify the changes), the projected cash flow was still hundreds of millions of dollars too low. *Id.* Lee Fleck ("Fleck"), who was charged with modelling the cash flows at Cash's direction, suggested: "Potential cash improvements could come from: 1) increased EBITDA

6

growth 2) improving cash flows from working capital accts … 3) sell additional low margin hospitals and 4) reduce capex which is only 4% of net revenues in out-years." ¶56

In response, Cash told Fleck to simply make any assumption that "improves payoff." ¶57 Cash left it to Fleck to change the assumptions despite Fleck's complete lack of operational knowledge of the relevant hospitals (or how Quorum would operate as a stand-alone company). Moreover, Cash believed "[h]e wasn't a good operating finance person. He – he didn't quite understand the operations of the business." ¶57 This did not matter to Cash, since that changes to the model had no operational justification anyway.

Over the course of an astonishing **75 models**, CHS management at Cash's direction repeatedly inflated every aspect of the cash flow model. ¶69 For example, on November 14, 2015, in response to the low cash flows in the model, Cash wrote simply "I would grow margin to 14-15% faster." ¶58 On November 16, 2015, when Moody asked if the most recent model was still the operative model, Fleck responded that it had to be further changed because "cash flows too weak." ¶59 Fleck testified that they had to increase the projected cash flows so the investment would "look more attractive" to the investors. *Id.*

On November 18, 2015, Culotta emailed the team (Cash, Moody, Fleck and others) explaining that the reason they were continually manipulating the model was because "For Bank purposes we have to have a model showing at least 55% pay down of debt with no acquisitions." ¶65 He explained that they could not inflate the projected performance of the hospitals to the point that would raise red flags to a third party: "Because we have a number of hospitals that have been historical[y] EBITDA challenged, for us to get financing we could either show great improvement in operations or sell them. However, we still have to defend why they would suddenly be so profitable. And we would have to be very detailed on the turnaround." *Id.* As a result, management decided to incorporate into the model an assumption that Quorum would sell up to 11 of its 38 hospitals by the end of 2016. ¶¶62, 65, 105-15

Even after these changes to the model, on November 22, Cash stated to Fleck and Culotta, "Margins look too low still." ¶66

7

Management's complete disregard for any operational justification for the repeated inflation of the cash flow model is further demonstrated by the fact that every time something occurred in the real world that required a reduction to the cash flow model or increased the financing costs management simply inflated the assumptions to keep the cash flows up.

For example, when Quorum's Q3 2014 results were much lower than modelled Fleck wrote "Some changes I made to mitigate these cash reductions include reducing A/R [account receivables] days by 6 days through 2020 and scaling down the $88M Springfield project down to $50M." ¶54 After $18 million in additional "dyssynergies" from the spinoff were identified that were not previously accounted for in the model, Cash instructed Fleck "to get to 15% [EBITDA margin] faster and offset dissynergies." ¶66 Then when Quorum's Q4 2015 results were lower than modelled, Fleck was instructed by Cash to cut the $18 million in annual "dissynergies" to $8 million: "The Q4 2015 EBITDA has been reduced, but is largely mitigated in out-years by reduced estimates of dis-synergies now at $8M ($10M a year drop)." ¶67 When the interest expense for the financing increased, Fleck wrote: "Interest expense up around $100M over next 7 years, but mitigated in part by additional hospital sales with negative EBITDA and capex savings." ¶68

Defendants made numerous changes, all increasing projected cash flows, including (¶69):

- same-store adjusted admission growth increased from a range of 0.60% - 1.50% to a range of 1.5% - 2.1%;

- Same-store net revenue growth increased from a range of 2.7%-4.0% per year to a range of 3.8% - 4.7% per year;

- EBITDA margin increases rose from 30 bps per year to 70 bps per year;

- Average same-store EBITDA growth increased from 5.5% to 7.0% per year;

- Average account receivables days in out-years were reduced from 77 days to 75 days, to 70 days, and then to 67 days; and

- Capital expenditures as a percentage of net revenue declined in 2016 from 6.7% to 6.1% resulting in a reduction of $16 million; and capital expenditures as a percentage of net revenue decline in out-years from an already low 4.0% to 3.5%;

8

### 2.    The Cash Flow Model Omitted Increased Corporate Overhead Costs (¶¶75-104)

Prior to the spin-off, CHS incurred certain corporate overhead that it allocated to its individual hospitals (including those that became Quorum) via a "management fee." ¶75

The cash flow model included an entry titled "Management Fee," which represented the projected corporate overhead costs for Quorum. ¶76 The Management Fee was set to 2.0% of net revenues for 2016 and 2.3% of net revenues for the remaining years through 2022. *Id.* The 2.0% figure was based on the historical management fee allocated to the Quorum hospitals when they were part of CHS, which was approximately 2.0% of the hospital's net operating revenue, approximately $36.5 million in 2015. ¶77

Cash decided that all of Quorum's corporate staff would come from CHS. ¶¶89, 97-98 Cash used the spinoff to transfer approximately $100 million in "administrative operating costs" to Quorum "derived from transferring nearly 200 corporate office personnel" and other "overhead." ¶88 Cash did this so CHS could unload staff that it did not want from its departments. ¶¶99-102 Future management of Quorum asked Cash to reduce the number of corporate staff being sent to Quorum, but Cash refused. ¶¶101-02 Cash, Kevin Hammons ("Hammons") and Moody each testified that all the information necessary to determine Quorum's corporate overhead and budget was available to management prior to the spinoff. ¶¶90-96

This $100 million in annual corporate overhead was approximately $55 million higher than the $45 million projected "management fee" in the cash flow model. ¶87 While the cash flow model assumed that the expected increased costs from Quorum being a stand-alone company would be only $3 million per year, it was "baked into" the management fee. ¶78 Moreover, Culotta and Ottinger admitted that this figure did not include the expected increased costs from "corporate overhead" "corporate administrative services," "treasury," "risk management," "legal," or "human resources." ¶¶83-85 Rather, it only included the costs

9

associated with being a public company (e.g. salaries for board of directors and SEC registration fees). ¶83

### 3. Management Deflated Projected Costs from the TSAs (¶¶70-74)

As part of the spinoff, CHS had Quorum enter into Transition Service Agreements ("TSAs") under which CHS would provide certain services such as collections and IT support.

CHS originally projected that the increase costs from the TSAs for the services compared to what was allocated to Quorum when it was part of CHS would be $10 million each year. ¶70 Cash instructed Fleck to cut this in half to $5 million in later cash flow models. ¶¶70, 131 As mentioned above, this cut occurred in order to offset the decline in projected cash flows from Quorum's poor Q4 2015 results. The backup to the reduced $5 million figure reveals that it was reached by assuming growth rates that contradicted those elsewhere in the cash flow model. ¶¶70-74

### 4. Management Inflated Projected Proceeds From the Sale of Negative EBITDA Hospitals in 2016 (¶¶105-115)

As discussed above, as it became clear that there was no way for the Quorum hospitals to generate sufficient cash flow to secure the financing that Cash wanted (even with the inflated projections) management altered the cash flow model to assume that Quorum would sell shortly after the spinoff five to seven of Quorum's "negative EBITDA" hospitals. ¶¶105-115 Or as Gabe Ottinger ("Ottinger") stated to Moody, those with "**crap[] margins**." ¶107 As Culotta explained, they made this assumption only for "bank purposes"; there was no actual plan to sell the hospitals. ¶65

Because the hospitals were losing money there was no way they could fetch a high price. In early versions of the cash flow model, management assumed that they would receive approximately "0.2x" (or 20%) of the hospital's annual revenue. ¶106  This "revenue multiple" was in line with comparable sales that management examined. ¶110 When these assumptions still failed to project enough cash flow, Cash instructed Fleck to increase the revenue multiple, first to 0.3x and then again to 0.4x in order to help mitigate the increase in projected interest

10

expenses on the debt. ¶111, 127-28 Tellingly, when some of the hospitals were eventually sold, the average proceeds were 0.20x of the hospitals' 2015 net revenue. ¶114

### 5.    Fleck Was So Uncomfortable With Cash's "Absurd" Assumptions That He Kept a Log Detailing the Fraud (¶¶116-132)

Fleck testified that he did not think the spinoff was "doable" and that he became increasingly uncomfortable with Cash's directives to make changes to the cash flow model, stating that he "felt very pressured" and describing the assumptions as "very aggressive" and "borderline absurd." ¶¶116-121, 130  Fleck was so uncomfortable with the instructions he was receiving from Cash that he decided to create a log to memorialize Cash's directives. ¶119 Fleck's log details the repeated directives of Cash to inflate the cash flow model. ¶¶122-131

For example, Cash instructed Fleck to increase Quorum's margins to 15% simply because he wanted the model to show revenue and EBITDA growth like the company Lifepoint. But Fleck testified that he did not see any world in which Quorum would ever look like Lifepoint. ¶¶122-24 The margins Cash had him place in the model were even higher than those of CHS. *Id.* Fleck was likewise uncomfortable with the assumed 4% revenue growth. ¶125 And Fleck's log also reveals that the only explanation given for reducing the increase costs from the TSAs from $10 million to $5 million was because it "saves 5M a year in EBITDA." ¶131

### D.    THE INFLATED CASH FLOW MODEL WAS USED TO TEST QUORUM'S GOODWILL FOR IMPAIRMENT

Prior to the spin-off, CHS performed its annual "step-one" goodwill impairment analysis for Quorum for 2015. CHS hired KPMG to assist CHS in the valuation analysis, which was completed on February 24, 2016. ¶135 To conduct the analysis CHS gave KPMG the same inflated cash flow model that CHS management prepared for the financing of the spinoff. ¶¶133-34

Even when KPMG questioned the assumptions in the model, Moody assured them "We feel that this version is still appropriate and that our projections don't need to be revised." ¶134

11

If management had not inflated the cash flow projections in the model, the tests performed by CHS and KPMG would have shown that Quorum's goodwill was impaired. ¶136

### E.    CASH MAXIMIZED THE DEBT PLACED ON QUORUM DESPITE ITS HARM TO QUORUM'S FINANCIAL PROSPECTS (¶¶137-154)

Even with the massively inflated cash flow model, CHS was having difficulty securing the high level of financing that Cash wanted. Nevertheless, Cash refused to reduce the amount of debt taken on by Quorum even though the only other alternatives were to severely harm the future operations of Quorum.

For example, when Credit Suisse (the bookrunner for the spinoff) recommended that they seek preliminary rating guidance under three different leverage structures of 5.0x, 4.5x and 4.0x Cash refused to consider anything other than the maximum 5x. ¶137-38 As a result, Moody's rating for Quorum was a disappointing "C," that Thomas Miller ("Miller") and Cash recognized would add "as much as '150 basis points' to the rate" and would harm Quorum's ability to "turn around the Cash Flow projections from [the prior year]." When Miller asked Cash to reduce the debt in order to get a better rating from S&P, Cash refused, stating that they should have simply inflated the cash flow models even more: "We should have projected better growth and cash flow." ¶¶140-46 By contrast, Cash had no problem increasing the interest rate on the bonds from the already high 11.5% to 12% and giving bondholders a discount off the face of the bonds in order to get the deal done even though it would severely limit the cash Quorum had to operate. ¶148

### F.    DEFENDANTS ISSUED INFLATED GUIDANCE TO THE MARKET (¶¶155-185)

By early March, Cash started pressuring Culotta and the future management of Quorum to announce guidance to the market. ¶¶157-60 Neither Culotta nor Moody wanted to provide guidance, but it was their understanding that they had to issue guidance publicly in order for them to do the road show to secure the financing for the spinoff. ¶¶157-60, 167

The assumption of Moody and Culotta was that they had to issue guidance that conformed to the approximately $272-$277 million 2016 adjusted EBITDA in the cash flow model, and they would issue a range of approximately $265-$280 million. ¶¶158-169, Culotta did not think that Quorum could meet the guidance that Cash wanted them to issue: "I mean all I hear is how bad CHS is doing even with higher volumes. It is mostly [out-patient] and not turning into earnings. They may miss again by $65-$85 million at EBITDA line. Larry [Cash] wore my ass out on the plane on guidance. I think he wants us covering up their fall." Culotta testified that by "covering up their fall" he meant that Cash wanted them to issue inflated guidance for Quorum so that when CHS inevitably had to reduce its own guidance, it could falsely claim that the reduction was a result of the Quorum spinoff rather than poor operations. ¶¶158-59

Culotta was particularly concerned about issuing Q1 guidance in addition to annual guidance for Quorum because when Quorum inevitably missed the Q1 guidance it would reveal to the market that the annual guidance was inflated as well: "My concern is coming out with guidance or should say a Q-1 estimate and then we miss. And if it does not look good then is 2016 still a good number." ¶158 As a result, management decided to issue only annual guidance.

Culotta and Moody decided to use Quorum's 2015 results as a starting point to back into the inflated guidance from the cash flow model. However, in order to get to the desired range they had to further inflate the expected revenue growth from 3.4% to a range of 4% to 6%. They also assumed a margin on revenue growth up to 10%. Like with the cash flow model, they completely ignored the massive corporate overhead being transferred to Quorum. ¶¶164-173

After backing into the desired range from the cash flow model, Culotta realized that his calculation did not account for the fact that certain "HITECH" credits would be approximately $13 million lower in 2016. His solution was to increase the assumed revenue and EBITDA growth to offset the costs, telling Moody, "If that is the case we can include the reduction in DSH and the HITECH," despite both admitting that the HITECH reimbursements have absolutely no connection to revenue growth. Nevertheless, the revised calculation included $13.0

13

million decline to adjusted EBITDA from the HITECH reimbursements but offset the decline by increasing the revenue growth up to 7% and increasing the margin on revenue growth up to 18%. ¶¶174-178

When it was time to file the press release announcing the guidance neither CHS management nor the future Quorum management wanted to be responsible for the $265 - $275 million range. The letterhead was changed from CHS to Quorum at the last minute. Hammons, who signed the filing stated "I still think that future QHC management should take some responsibility for these projections." Miller stated "feeling a little uncomfortable [with "the language related to prepared by QHC management"] since as of this morning I have seen no information on this." Hammons responded, "Ok but I am the only one signing the document. I want someone else taking responsibility. These are not my numbers."  ¶¶179-184

### G.     DEFENDANTS FALSIFIED QUORUM'S Q1 RESULTS (¶¶186-214)

As Q1 2016 came to a close a month prior to the spin-off, Defendants had concrete evidence that their inflated projections would never come to pass. For example, Culotta learned that an increase in medical specialist fees and purchased services fees "are decreasing our EBITDA $10 million" in Q1 2016 alone, and that "it will impact quarter comps for the remainder of 2016." ¶¶187-88

While closing the books in mid-April, Moody informed Culotta that Q1 results were dismal. The inflated cash flow model projected Quorum's Q1 2016 adjusted EBITDA had to be $63 million in order to hit the $272 million annual figure. Moody informed Culotta, "Right now we are sitting at $46M Adj EBITDA. Not good." Culotta responded that he "had no sleep thinking oh my" at the prospect of adjusted EBITDA being between $48 million and $51 million. ¶¶189-195

Ultimately, Quorum's Q1 2016 adjusted EBITDA was approximately $48.8 million, approximately 23% lower than the inflated projections, 26% lower than Q1 2015 adjusted

14

EBITDA of $66.0 million, and indicating an annual 2016 adjusted EBITDA of only [$48.9 X 4=] $195 million, even excluding the higher post-spin corporate overhead costs. ¶¶186, 195, 211

Defendants' response to this sobering reality was to commit accounting fraud by manipulating the insurance expenses/credits allocated to the Quorum hospitals.

CHS budgets for Workers' Compensation, Health insurance, and Medical Malpractice expense to be allocated to each hospital based on each hospital's historical loss experience. When actual costs are lower than the budget expenses, credits are allocated to a hospital. ¶¶196-198

Defendants initially followed the proper methodology to calculate the credits to push down to QHC, which resulted in total credits of approximately $11.37. ¶199 However, not wanting the market to learn the truth about Quorum's poor financial health and prospects, on April 24, 2016, Hammons emailed Culotta, Moody and Ottinger, stating "Let's discuss early Monday our allocation of co[rp]orate OH [overhead]." Hammons stated, "For insurance, let's look at the expense as a percent of net revenue instead of just focusing on credits. Expense should be about flat from prior years." ¶200 Defendants sought to smooth the earnings to hide Quorum's downfall.

As revealed in subsequent emails and spreadsheets, Moody zeroed out the proper calculation of insurance expenses and credits and hard-keyed in a new figures that resulted in a total of $7.18 million in "Additional Credits." ¶¶202-11  As Ottinger and Thomas Walker of Deloitte testified (and Plaintiffs' accounting expert, John Mitchell, opines), allocating the insurance credits as Moody did is a violation of the accounting principles. ¶¶201, 212- 214

The addition of the $7.18 million credits inflated Quorum's Q1 adjusted EBITDA from $48.82 to the $56.0 million that CHS and Quorum falsely reported to the public in their SEC filings. ¶211

H.     DEFENDANTS FALSIFIED QUORUM'S Q4 2015 AND Q1 2016
        GOODWILL ANALYSIS

15

### 1.    Quorum's Assets were Impaired at Q4 2015 and Q1 2016

As Plaintiffs' expert John Mitchell explained, indicators of impairment that existed prior to the spinoff when viewed in total demonstrated that it was more likely than not (greater than 50%) that the fair value of Quorum's hospital reporting unit was below its carrying value at December 31, 2015 and March 31, 2016. There were numerous indicators of impairment that of which management was aware (¶¶319-368):

- The cash flow model used to conduct the last annual impairment test as of September 30, 2015 was knowingly inflated by management and was the reason that no impairment was indicated during the test was an indicator of impairment.

- Given that Quorum's goodwill was allocated as a percentage of CHS goodwill based on a $41.50 stock price of CHS, the decline in CHS's stock price to approximately $22 on December 31, 2015 and even further to $15.24 on March 31, 2016 was an indicator of impairment.

- The decline in Quorum's stock price between the first day of trading on May 2, 2016 to the date of the filing of the Q1 2016 10-Q from $13.50 to $10.33, or 23% was an indicator of impairment.

- Quorum's market capitalization at the time of the spinoff (even with a 20% "control premium" added) being approximately $177 million below the carrying value of Quorum's equity was an indicator of impairment.

- The much higher operating costs from corporate overhead and the TSA that management knew Quorum would incur was an indicator of impairment.

- Management knowingly inflating the guidance issued to the market was an indicator of impairment.

- The steady and continued decline in Quorum's financial performance was an indicator of impairment. For example, in Q2, Q3, Q4 2015 and Q1 2016 Quorum's adjusted EBITDA declined 7.0%, 25%, 15% and 26% compared to the same quarter the prior year.

- Management's intentional manipulation of Quorum's Q1 2016 adjusted EBITDA was an indicator of impairment.

- The formation of an entirely new management team, corporate staff and Board of Directors, to operate the new entity was an indicator of impairment.

- Managements' disengagement in the operations of Quorum and the halting of physician recruiting and capital improvements was an indicator of impairment.

- Management's assumption that Quorum would divest 11 of its 38 (29%) hospitals by the end of 2016 because of poor performance was an indicator of impairment.

16

If management had conducted a "Step-One" impairment test at either Q4 2015 or Q1 2016, it would have revealed that the fair value of Quorum was well below the carrying value by hundreds of millions of dollars. ¶¶319, 367.

### 2. Management Falsified Its Impairment Analysis

Despite having knowledge of all of the above indicators of impairment, many of which are expressly identified in the accounting literature, Moody identified almost none of them in her memos to Deloitte for Q4 2015 or Q1 2016. Moody's Q4 2015 memo consisted of two sentences with only a bottom line assertion that "no indicators existed that would require us to re-perform step one of the impairment analysis." Def. Ex. 7 at 993. Moody's Q1 2016 memo written a day before filing the Q1 10-Q contains a single paragraph of analysis, stating "We have concluded that there are no quantitative or qualitative factors that indicate our most recent conclusion on goodwill impairment have changed." Ex. 163 Culotta, CFO of Quorum admitted that he "may have read [Moody's memo" but did no analysis at all of goodwill impairment. ¶371 In justifying the lack of any indicators of impairment, Moody relies on the Q1 2016 adjusted EBITDA of $56.0 asserting that "the Company has not identified any indicator of a decline in operating results that would require us to perform a test for goodwill impairment prior to our annual test performed on the September 30th balances." Ex. 163 Of course, the $56.0 figure was fraudulently inflated by Moody and the rest of management.

### I. DEFENDANTS CONTINUED TO CONCEAL QUORUM'S TRUE FINANCIAL HEALTH AFTER THE SPINOFF

### 1. Quorum Continues to Mislead Concerning the Guidance

Immediately after the spinoff, internal Quorum documents show that Quorum's projected 2016 adjusted EBITDA was only $206 million, and Culotta acknowledged "We are going to have to update our guidance to the Investment Community." ¶¶380-384 Culotta prepared slides for an investor presentation scheduled for June 23, 2016, which lowered the guidance by $100 million. However, Culotta and Miller removed the slides the day before the presentation. ¶¶382-85.

17

During the investor presentation, Miller and Culotta were asked point blank "Where are you at with your comfort level with the guidance that's out there?"  Miller lied: "We're feeling much more comfortable today than we did on May 2, I will assure you of that." ¶386

### 2. Quorum Defendants Intended to Conceal The Goodwill Impairment Beyond Q2 2016

In Q2 2016, Quorum's adjusted EBITDA was $29.2 million and management was projecting 2016 EBITDA to be approximately $206 million (down from $265 – $275 million). Nevertheless, management was still not willing to announce any impairment. Management's July 29, 2016 goodwill memo to Deloitte falsely asserted that despite the declining financial performance no impairment test was necessary because "[c]urrent projections estimate a favorable turn-around in the third and fourth quarters of 2016." ¶¶384, 390.

### J. QUORUM IS FORCED TO TAKE AN IMPAIRMENT AND ADMIT THAT IMPAIRMENT EXISTED PRIOR TO THE SPINOFF

The only reason management ultimately took the impairment was because CHS announced an impairment on August 2, 2016, a week before Quorum planned to file its Q2 2016 Form 10-Q.  This public information forced Quorum to conduct a Step-One test and revealed that the company's goodwill and long-lived assets were massively impaired and that Quorum's cash flows in 2016 and beyond were drastically lower than previously represented. Indeed, for 2016 alone, Quorum was forced to reduce its guidance to $175 – $200 million.

Culotta, Moody and Cash have admitted that Quorum's goodwill was impaired prior to the spinoff. During the August 8, 2016 meeting of Quorum's audit and compliance committee, Culotta admitted that "the assets were impaired prior to the spin-out, but that no impairment had been taken by Community Health Systems despite consecutive quarters of missing earnings projections significantly." Culotta likewise admitted during the August 11, 2016 Q2 2016 earnings call with investors that "at spin" "it was apparent that there were indicators of impairment." ¶¶393-95.

18

Similarly, in a memo dated September 6, 2016 Moody wrote "we compared the carrying value of equity to our market capitalization as of April 29, 2016 (the date of the spin-off transaction) and concluded that indicators of impairment existed at that date and the amount of impairment was approximately $177 million. ¶397

A presentation from CHS' August 1, 2016 audit and compliance committee meeting shows that CHS acknowledged that Quorum's fair value was $209 million below its carrying value at the time of the spinoff.  Cash confirmed this in his deposition. ¶¶ 391.

It was only *after* this lawsuit was filed on September 9, 2016 that the company reversed course yet again. Quorum's general counsel hired KPMG to help Quorum justify their taking the impairment in Q2 2016 rather than in the quarters prior to the spinoff. The agreement expressly contemplated that "Counsel" may "request that someone form KPMG provide expert testimony or an expert report in the future." On November 4, 2016, KPMG circulated a draft of their memo stating that it was "WORK PRODUCT" (i.e. in "anticipation of litigation").  This draft continued to conclude that "indicators of impairment existed at [April 29, 2016]." However, a revised draft removed all references to the impairment existing prior to the spinoff, which is the version that Defendants now assert absolves them of liability. ¶¶398-401

## ARGUMENT

A motion for summary judgment will be granted only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986). The court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Id.* at 255. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

## I.    A REASONABLE JURY WOULD HAVE NO DIFFICULTY CONCLUDING THAT DEFENDANTS' STATEMENTS ARE MISLEADING

The Supreme Court held in *Omnicare* that a statement of opinion is actionable if (i) the person stating the opinion does not "actually hold[] the stated belief", (ii) the opinion contains a materially false "embedded statement[] of fact" or (iii) the speaker "omits material facts about the . . . inquiry into or knowledge concerning [the] statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." 135 S. Ct. 1318, 1326-27 (2015). Specifically:

> …a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience… ***He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time***.

*Id.*at 1328-29 (emphasis supplied). Thus, "whether a statement is misleading depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Id.* at 1327.

On April 1, 2016, Defendants filed with the SEC Amendment No. 6 to Form 10, stating that (i) Quorum's "Goodwill is evaluated for impairment…when an event occurs or circumstances change that, more likely than not, reduce the fair value of the reporting unit below its carrying value," (ii) "[t]he testing of goodwill for impairment requires us to make significant estimates about our future performance and cash flows," (iii) "[n]o impairment was indicated in connection with our last goodwill evaluation conducted during the fourth quarter of 2015," (iv) "none of our reporting units were at risk of goodwill impairment as of such date,"  (v) "[a]t December 31, 2015, we had approximately $541.7 million of goodwill," and (vi) "[w]e expect to recover the carrying value of this goodwill through our future cash flows." ¶449 On May 11, 2016, Quorum filed its Q1 2016 Form 10-Q, repeating the above statements, and stating that "Goodwill related to our hospital operations reporting unit was $508.5 million and $508.4 million as of March 31, 2016 and December 31, 2015, respectively." ¶451

20

Plaintiffs' accounting expert, John Mitchell, opined that Quorum's assets were impaired at December 15, 2015 and March 31, 2016 and Defendants failure to take impairments violated GAAP. ¶319 Thus, Defendants' statements were factually false. Moreover, Defendants knew that the cash flow projection used to test goodwill impairment in the fourth quarter of 2015 that purportedly showed no impairment was massively inflated. It was the only reason that the test did not indicate impairment. ¶136 Defendants were also aware of the myriad of other indicators of impairment identified above, including (i) setting the Quorum hospitals adrift once the spinoff was announced; (ii) the resulting poor financial performance of the hospitals; (iii) the massive increase in corporate overhead that would occur at spinoff; (iv) that the 2016 guidance was inflated; and (v) and the accounting fraud that inflated Quorum's Q1 2016 adjusted EBITDA. A reasonable jury could easily conclude based on these facts that Defendants' statements (i) did not "fairly align with the information in [Defendants'] possession at the time" and/or (ii) conflicted with what a reasonable investor would have taken from the statements. *Omnicare*, at 1329. *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc*., 614 Fed. Appx. 237, 247 (6th Cir. 2015) (opinions are actionable if "the opinion is not factually well-grounded"). Evidence that Defendants' representation of no goodwill impairment was made in the face of overwhelming contrary facts is sufficient to demonstrate falsity. *See Dudley v. Haub*, 2013 U.S. Dist. LEXIS 61386, at *32-*34 (D.N.J. Apr. 30, 2013) (holding that falsity adequately alleged where four triggering events existed during the two quarters prior to when the impairment was taken)[2]

---

[2] *See also In re RAIT Fin. Trust Sec. Litig*., 2008 U.S. Dist. LEXIS 103549, at *28-*29 (E.D. Pa. Dec. 22, 2008) (plaintiffs alleged facts supporting a reasonable belief "that RAIT knew about other-than temporary impairments" and should have recognized an impairment charge pursuant to the relevant GAAP provision); *In re Omnicom Grp., Inc. Sec. Litig*., 2005 U.S. Dist. LEXIS 5272, at *21-*22 (S.D.N.Y. Mar. 30, 2005) (securities fraud claim upheld where internet investments experienced steep declines in revenue and share price, yet company failed to take a write-down); *In re Flag Telecom Holdings, Ltd. Sec. Litig*., 352 F.Supp.2d 429, 465-66 (S.D.N.Y. 2005) (plaintiff adequately alleged that an "impairment charge . . . should have been taken sooner than it was" where, *inter alia*, the telecommunications market had "imploded" and confidential sources indicated that asset values were vastly overstated).

21

Furthermore, Defendants' statements of *fact* as to how the impairment test was conducted were false and misleading as they failed to disclose that cash flow model used was inflated. "[O]nce [a company] chooses to speak on a subject, [it is required] to do so fully and fairly." *Garden City Employees' Ret. Sys. v. Psychiatric Solutions, Inc.*, 2011 WL 1335803, at *48 (M.D. Tenn. Mar. 31, 2011) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)).

Defendants argue that no jury could find their statements were false and misleading because the memos that management drafted to their auditors did not admit that goodwill was impaired. Def. Br. at 15-18. This is absurd. Plaintiffs' theory is that management defrauded everyone about the financial prospects of Quorum, including its auditors. Only the dumbest fraudster would admit to the fraud in a memo to its auditor. Tellingly, none of the memos that Defendants cite identify the most egregious indicators of impairment.[3]

## II.   A REASONABLE JURY WOULD EASILY CONCLUDE THAT DEFENDANTS ACTED WITH SCIENTER

Scienter is a mental state embracing an intent to deceive, manipulate or defraud. *Aaron v. SEC*, 446 U.S. 680, 686 n. 5 (1980). Direct evidence is not necessary. Rather, scienter can be proven through circumstantial evidence of conscious misbehavior or recklessness. *SEC v. Premier Links, Inc.*, 2017 U.S. Dist. LEXIS 151170, at *15 (E.D.N.Y. Sep. 14, 2017). *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30 (1983) ("[T]he proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence.").

> "[W]here subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."

---

[3] Taking Mitchell's testimony out of context, Defendants assert that he only opined that Defendants' failure to impair Quorums assets was a difference of opinion. Def. Br. at 18-21. Mitchell's expert testimony recognized the accounting principle that goodwill assessments can involve reasonable judgments and opinions, but when he analyzed the data Quorum had available at the time, not in hindsight, there was only one conclusion: "if I put myself in the shoes of Quorum management, I would say that it's impossible to conclude that [Quorum's goodwill was not impaired]." Ex. 204, Mitchell Tr. 205:12-19.

*Patrick v. Le Fevre*, 745 F.2d 153, 159 (2d Cir. 1984). Thus, summary judgment should be denied where there exists evidence from which a jury could infer scienter. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp.2d 512, 547 (S.D.N.Y. 2011) (contrast between internal documents and external statements can "support[] an inference that Vivendi … acted with scienter"). Courts must be "'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'"*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 , 693 (2d Cir. 2009).

### A.   DEFENDANTS' HAD A MOTIVE TO DELAY IMPAIRMENT UNTIL AFTER THE SPINOFF

"[S]cienter can be proved through circumstantial evidence establishing facts 'showing a motive for committing fraud and a clear opportunity for doing so.'" *Wedbush Morgan Securities, Inc. v. Robert W. Baird & Co.*, 320 F. Supp. 2d 123, 130 (S.D.N.Y. 2004). "Issues of motive and intent are usually inappropriate for disposition on summary judgment." *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984).

Defendants' motive to misrepresent the goodwill and financial prospects of Quorum as a stand-alone company could not be clearer.  CHS was a highly leveraged company with enormous debt that it needed to maximize the proceeds from the spinoff to pay down its debt and avoid a ratings downgrade. If Quorum was forced to impair its assets, revealing that the EBITDA and cash flow projections were much lower than represented, the spinoff would never happen.

Indeed, Cash's determination to spinoff Quorum and obtain the maximum level of financing of "5x" at any cost was palpable. He massively inflated the cash flow model used to justify the debt (and test for impairment), and instructed Culotta to issue inflated guidance to the market to "cover the fall" of CHS. He refused to lower the leverage even (i) when the credit market got worse, (ii) the leverage resulted in a C rating for Quorum, (iii) caused the interest rate on Quorum's bonds to increase, and (iv) caused Quorum to issue a discount on the bonds. Courts routinely find that similar motives provide "circumstantial evidence that the [] Defendants acted with conscious disregard or recklessness by delaying the goodwill impairment charge." *Dudley v.*

23

*Haub*, 2013 U.S. Dist. LEXIS 61386, at *32-34 (scienter alleged where "the A&P Defendants were motivated to delay the goodwill impairment charge so that A&P could complete the 2015 Notes Offering on more favorable terms, thereby raising $260 million in proceeds").

### B.      THERE IS AMPLE EVIDENCE UPON WHICH A JURY COULD CONCLUDE THAT DEFENDANTS ACTED WITH SCIENTER

As this Court previously held in denying Defendants' motion to dismiss, "Scienter may also take the form of recklessness." ECF No. 144 at 16, citing *Frank v. Dana Corp*., 646 F.3d 954, 959 (6th Cir. 2011). "While the danger need not be known, it must at least be so obvious that any reasonable person would have known it." *Id*. (citing *Frank*, 646 F.3d at 959. A plaintiff need only show "why or how the defendant knew about the alleged danger." *Id*. citing *Grae v. Corrections Corp. of America*, 2017 WL 6442145 at * 20 (M.D. Tenn. Dec. 18, 2017).

Relatedly, scienter can be alleged by identifying "red flags" that Defendants ignored.  "A red flag creating a strong inference of scienter consists of '[a]n egregious refusal to see the obvious, or to investigate the doubtful." *PR Diamonds, Inc. v. Chandler*, 91 Fed. Appx. 418, 440 (6th Cir. 2004) (citation omitted). "[A]sserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." *SEC v. CKB168 Hldgs, Ltd.*, 210 F. Supp. 3d 421, 446 (E.D.N.Y. 2016) (citation omitted). Specifically, a plaintiff can demonstrate a defendant knowingly or recklessly failed to test for impairment by showing (1) "a factual basis for the conclusion that an adjustment for the impairment in the value of [the goodwill] was warranted," and (2) "that the facts requiring the adjustment were known to [defendants]." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 343 (S.D.N.Y. 2004).

Denying Defendants' motion to dismiss, this Court held that the SAC had "sufficiently alleged, given the underlying 'red flags,' that the decisions not to test for impairments and not take those impairment in 1Q 2016 were fraudulent." ECF No. 144 at 13.  Discovery has revealed many more "red flags" that are more egregious than those alleged in the SAC. Thus, summary judgment should be denied.

24

Scienter is also supported by the numerous other false statements Defendants made to investors concerning Quorum's financial health in furtherance of their scheme. For example, Defendants (i) issued inflated guidance to the market, (ii) told investors that the increase in Quorum's corporate overhead as a stand-alone company would be only $3 million (¶¶450, 453) when they knew that figure did not account for the $100 million in corporate overhead costs being transferred to Quorum, (iii) told investors that the increase in costs from the TSAs would only be $5 million (*id.*) when they internally calculated $10 million, (iv) compared Quorum to Lifepoint even though they knew that there would never be a world in which Quorum could be like Lifepoint (¶¶44-46, 123-24) (v) committed accounting fraud to inflate Quorum's Q1 2016 adjusted EBITDA by $7.18 million, (vi) internally stated that Q1 2016 results were "bad news" and "less than what was expected" but telling investors "We are pleased that our financial results for the first quarter were consistent with our expectations," (¶¶215-17) (vii) affirmed the inflated guidance despite internal projections being approximately $70 million lower, (viii) intended to lie about Quorum's impairment even in Q2 2016; and (ix) admitted that impairment existed prior to the spinoff but then reversed course after this lawsuit was filed.[4]

Defendants argue that no jury could ever find Defendants acted with scienter because KPMG assisted with the annual impairment analysis and Deloitte reviewed Quorum's financial statements and neither uncovered that Quorum's assets were impaired. Def. Br. at 22-24.

---

[4] To the extent that Defendants assert that these facts are irrelevant because the Court did not permit Plaintiffs to amend the complaint to add certain statements as "actionable" statements, they ignore the express ruling by the Court that, "[o]f course, nothing in this opinion should be construed to limit Plaintiffs' ability to use the evidence generated in discovery in their pursuit of proving Defendants' liability either through dispositive motions or at trial." ECF No. 246 at 17-18 n.3. *See In re Telxon Corp. Securities Litigation*, 133 F. Supp. 2d 1010, 1033 (N.D. Ohio 2000) ("many of the otherwise 'forward-looking' statements referenced in the complaint are offered to show motive--i.e., to explain defendants' alleged need to manipulate revenue in order to live up to their own promises. Thus, while those statements may not be independently actionable, they remain relevant to the question of scienter").

"A company's management—not the auditor—is responsible for the information contained in its financial statements and the propriety of its underlying accounting policies, including compliance with GAAP." *Dronsejko v. Thornton*, 632 F.3d 658, 663 (10th Cir. 2011).

Moreover, while a "[g]ood faith reliance on the advice of an accountant or an attorney has been recognized as a viable defense to scienter in securities fraud cases," *In re Res. Fund Sec. & Derivative Litig. v. Res. Mgmt. Co.*, 2012 U.S. Dist. LEXIS 147723, at *18-19 (S.D.N.Y. Sep. 12, 2012), such "good faith reliance" is "not a complete defense, [however,] but only one factor for consideration." *Markowski v. S.E.C*, 34 F.3d 99, 105 (2d Cir. 1994); *In re Winstar Commc'ns.*, 2006 WL 473885, *8 (S.D.N.Y. Feb. 27, 2006) (recognizing that corporate officials have a "well defined obligation to ensure the accuracy of the information filed with the SEC" even where they have in good faith relied on independent accountants); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) ("reliance on an independent accountant cannot completely absolve the defendants of their obligation")

Critically, "[t]o establish the defense, the defendant should show that he/she/it made a **complete disclosure**, **sought the advice** as to the appropriateness of the challenged conduct, **received advice that the conduct was appropriate**, and **relied on that advice in good faith**." *SEC v. Caserta*, 75 F. Supp. 2d 79, 95 (E.D.N.Y. 1999). *See United States v. Duncan*, 850 F.2d 1104, 1116 (6th Cir. 1988) overruled on other grounds by *Schad v. Arizona*, 501 U.S. 624, 111 (1991) (describing the elements of a reliance defense as "(1) full disclosure of all pertinent facts, and (2) good faith reliance on the accountant's advice").

Here, it is clear that as to both the KPMG and Deloitte engagements (i) the projections and goodwill analysis were management's responsibility, (ii) management was required to provide all relevant information, (iii) management represented that they had provided all relevant information and it was complete, reasonable and honest, (iv) KPMG and Deloitte relied on management's representations, and (iv) the statements concerning any impairment since December 31, 2015 were not audited or verified by either KPMG or Deloitte.

26

Specifically, Defendants provided KPMG with a "management representations letter" that assured KPMG "we have supplied you with all significant and relevant information of which we are aware," "we have no reason to dispute the underlying assumptions" or "financial information" contained in the cash flow projections, and that management understood that KPMG "ha[s] not undertaken any procedures to verify the accuracy or completeness of this information." KPMG required these representations and wouldn't have issued its valuation on Quorum's goodwill without the assurances. KPMG told management as part of the engagement "[w]e do not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions." ¶¶441-47

Similarly, Defendants represented to Deloitte that "[m]anagement is responsible for the preparation, fair presentation, and overall accuracy of the combined financial statements and interim financial information," "[s]ignificant assumptions used by us in making accounting estimates are reasonable," and management had provided "all information of which management…are aware that is relevant to the preparation of a fair presentation of the financial statement." ¶¶411-17 Specifically, Defendants told Deloitte that "we used our best estimate, based on reasonable and supportable assumptions and projections, in reviewing …goodwill and other intangible assets for impairment in the financial statements." ¶418 Zac Stark of Deloitte stated: "at any point in the audit where we are provided projections that are used to support our audit procedures, it is management's responsibilities that those projections are prepared using reasonable assumptions based on their knowledge of the business." ¶416 Both Walker and Stark of Deloitte testified that Deloitte relied on management to provide projections were "reasonable," "accurate" and "honestly believe[d]", Deloitte's opinions were conditioned on management's representations to that affect, and Deloitte would not have provided its opinions if management had not made these representations. ¶¶412-418

Defendants also overstate the analysis that Deloitte did in reviewing the reasonableness of management's inflated cash flow projections and goodwill analyses. The procedures that an auditor conducts during an audit are not capable of ferreting out intentional fraud. ¶435 Walker

27

testified that "There's no surety in auditing projections, obviously." ¶419 Moreover, for the statements in the April 1, 2016 Form 10 related to any "subsequent events" since December 31, 2015 that could impact impairment, and for all statements in Quorum's Q1 2016 Form 10-Q, Deloitte only performed a "review," which Deloitte explained is much less rigorous than an audit. A review merely involves "making inquiries" of management as to whether anything occurred since December 31, 2015 that would change the conclusions previously made. No report or opinions concerning compliance with GAAP are issued for these "reviews" and they "cannot be relied on to reveal all significant matters that would be disclosed in an audit." ¶¶420-22

Furthermore, Defendants cannot seek refuge in KPMG's or Deloitte's review of management's impairment analysis because it is undisputable that management never provided Deloitte all relevant information. To the contrary, there is ample evidence that management was inflating the cash flow model, and manipulating the Q1 2016 adjusted EBITDA results with the specific intent that third-parties that reviewed it would not be able to identify the manipulation. *E.g.* ¶65 Walker testified that Deloitte never saw or provided any feedback on the cash flow models prepared by CHS management or the assumptions that were used in the models. ¶423 Walker stated that Deloitte did not audit the forward-looking financial projections for Quorum. As for the $3 million in additional costs to be a stand-alone company, Deloitte merely checked to see if the numbers added up. It did not audit the figure or do an independent verification of the numbers to ensure no corporate overhead was left out. ¶424

Indeed, there is no evidence that Deloitte knew that (i) Cash was determined to get 5x leverage financing at any cost, (ii) CHS had abandoned the Quorum hospitals once the spinoff was announced, cutting off physician recruiting and capital improvement, (iii) the cash flow model used to test impairment had been inflated over 75 versions with "borderline absurd" assumptions from Cash, (iv) the TSA costs would be much higher than identified in the cash flow model, (v) CHS was transferring $100 million in corporate overhead costs to Quorum but the cash flow model only assumed $45 million in costs, and (vi) management had inflated Q1

28

2016 adjusted EBITDA by $7.18 through accounting fraud to prevent anyone from discovering the dismal condition of Quorum at the time of the spinoff.[5] *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir.1979) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance."); *In re Dynegy, Inc. Securities Litigation*, 339 F. Supp. 2d 804, 874 (S.D. Tex. 2004) (rejecting dismissal where plaintiffs alleged that the defendant "withheld material information from its auditor").

Moreover, Moody's memos to Deloitte for Q4 2015 and Q1 2016 consisted of only a sentence or paragraph of "analysis" that ignored management's manipulations. There is also ample evidence that CHS's assets were likewise impaired at Q4 2015 and Q1 2016 (¶¶222-73) and CHS manipulated the information provided to Deloitte to avoid recording an impairment prior to the spinoff. ¶¶274-318.

Finally, while Defendants provided memos to Deloitte (which did not identify all the relevant information), there is no evidence that those memos were provided with the specific intent to seek Deloitte's advice as to the impairment issue, rather than just as part of normal procedures that were required as part of CHS and Quorum being public companies.

## III.    THERE IS A TRIABLE ISSUE OF FACT OVER LOSS CAUSATION

### A.    THERE IS AMPLE EVIDENCE UPON WHICH A JURY COULD CONCLUDE THAT THE ALLEGED FRAUD CAUSED THEIR LOSS

On August 10, 2016, investors finally learned the truth that Defendants had been concealing by refusing to impair Quorum's assets – that Quorum's future cash flows would be significantly lower. Quorum announced a $250 million impairment and reduced its guidance to $170-$200 million. Quorum's stock price plummeted by approximately 50%.

---

[5] Thomas Walker of Deloitte testified that anything Deloitte considered in its annual audit or quarterly review would be contained in their workpapers. ¶305. There is no evidence that Deloitte was aware of these facts. ¶¶432-440.

29

Plaintiffs' expert Dr. Zachary Nye conducted an event study, which demonstrated that as a result of the corrective disclosure Quorum's stock price declined in a statistically significant manner at the 99.99% confidence level, meaning the probability that the decline occurred by chance was effectively zero. Ex. 191, Nye Report ¶¶20-26 Dr. Nye also examined the news and analyst reports concerning the announcement and concluded that the decline was caused by the alleged fraud. *Id*. This alone requires denying Defendants' motion. *See In re Apple Computer Sec. Litig*., 886 F.2d 1109, 1116 (9th Cir. 1989) ("summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.").

Unable to dispute the staggering evidence that it was the alleged fraud that caused investors' loss, Defendants assert the truly novel argument that Plaintiffs must distinguish between the portion of the decline related to the impairment charge and the portion related to the reduction in guidance because, Defendants assert, the reduction in guidance is a "non-fraud factor" that affected the stock price. Def. Br. at 27-30

This is a facially absurd argument. As Dr. Nye explains, the impairment and the guidance reduction revealed to the market the same critical fact that had been concealed by management not recording the impairment earlier – that Quorum's future cash flows and prospects were much lower than previously represented. Ex. 191, Nye Report ¶¶11-19; Nye Reply ¶¶6-15 Contrary to Defendants' baseless assertion, projected adjusted EBITDA and goodwill impairment are "inextricably intertwined." Nye Report ¶18; Nye Reply ¶¶6-22 Indeed, Quorum had previously told the market that "[w]e expect to recover the carrying value of this goodwill through our future cash flows." Nye Reply ¶14 When announcing the impairment Quorum stated that its estimate of the fair value of its goodwill was based on its "projected future earnings and net cash flows," that the fair value was "estimated using both a discount cash flow model as well as a multiple model based on [EBITDA]," that "[b]oth models [we]re based on the Company's best estimate of future revenues and operating costs," and that a "primary reason" for its impairment was because of "a decrease in the estimated future earnings of the Company." Nye Reply ¶¶13-14 Moreover, Defendants' internal documents, including the very goodwill tests performed,

30

show that the fair value of goodwill was "based on projected revenue and Adjusted EBITDA." Nye Reply n.35. Indeed, the inflated guidance that Defendants issued to the market in March 2016 (and reduced on August 10) was expressly **taken from the inflated cash flow model that Defendants used to falsify their annual impairment test of Quorum**. ¶¶158-169 It was one piece of the larger cash flow model, thus the reduction of that guidance is subsumed within the impairment. When Defendants admitted that the future cash flows of Quorum would be lower this fact required management to take the impairment as well as reduce guidance.

As cases cited by Defendants acknowledge, "to be corrective, the disclosure need not precisely mirror the earlier misrepresentation." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). Rather, it must only "relate back to the misrepresentation and not to some other negative information about the company." *Id.* "[T]he 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" *Freudenberg v. E\*TRADE Financial Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Thus, plaintiffs need only show that "the truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Pub. Emp'rs Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). "[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'--the truth obscured by the fraudulent statements." *Flowserve Corp.*, 572 F.3d at 230.

Moreover, Defendants ignore that loss causation can be shown through a "corrective disclosure" theory and/or a "materialization of risk theory." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016). Under the materialization of risk theory, the market reacts negatively to the "materialization of the risks" concealed by an alleged fraud. *Id. In re Vivendi Universal* provides a helpful description of the causal connection between the allegedly false and misleading statements and the materialization of the risk: "[I]f a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an

31

indication of risk X (liquidity). . . . When fact B is revealed, the market need not be aware of fact A or that fact A had been previously misrepresented." 634 F. Supp. 2d at 367.

Here, in addition to the impairment directly correcting Defendant's prior statement, the related guidance reduction was the materialization of the risks that Defendants failed to disclose by not taking impairment earlier – that Quorum's expected future cash flows (*i.e.* financial health) were poor. *See In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *25 (M.D. Tenn. Nov. 19, 2019) (loss causation sufficient where plaintiff alleged "that high levels of out-of-network revenue were unsustainable and that Envision saw decreased revenue when this risk was realized"); *Cosby v. KPMG, LLP*, 2018 WL 3723712, at *6-7 (E.D. Tenn. Aug. 2, 2018) (loss causation sufficient where defendants' over-valuation of assets concealed the risk of the company's collapse, which later occurred). Indeed, as this Court previously recognized, Defendants' "failure[] to test for and take additional impairment" was an "assurance[] of financial health." ECF No. 246 at 3. Thus, the impairment as well as the reduction in guidance was a revelation of Quorum's true financial condition concealed by the fraud. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111 , 1119-20 (9th Cir. 2013) (loss causation is demonstrated where plaintiffs state that a company had engaged in improper accounting practices and that the stock fell precipitously after the company began to reveal figures showing the company's true financial condition).

Tellingly, Allen never opines that the reduction in guidance is <u>not</u> related to the impairment or the alleged fraud. To the contrary, she conceded that Quorum's goodwill and test for impairment were based on its projected future revenues and operating costs. ¶463.

Indeed, Defendants' entire basis for arguing that the impairment news must be separated from the guidance news (something that Dr. Nye has stated is impossible because it is essentially the same news) is because the Court previously ruled that that the guidance issued in March 2016 was not an actionable statement under the PSLRA safe harbor. However, just because one statement is not actionable on statutory grounds does not mean that Plaintiffs cannot recover damages from similar statements that **are** actionable and concealed the same underlying fraud.

32

### B.    THERE IS A DISPUTE BETWEEN EXPERTS CONCERNING THE IMPACT OF QUORUM'S IMPAIRMENT ON ITS STOCK PRICE

Ignoring the direct evidence that Quorum's stock price cratered by 50% upon the announcement of the massive impairment, Allen purports to affirmatively "demonstrate no loss causation" from the alleged fraud by looking at impairments of other companies.

Allen concludes that *Quorum's* impairment did not cause any price decline because CHS's and Quorum's stock price did not decline in a statistically significant manner following the impairment disclosure *by CHS* on August 2, 2016. This observation is unremarkable for numerous reasons. *First*, CHS's impairment concerned CHS's assets, not Quorum's. At the time of the announcements, they were two completely distinct companies with distinct assets. Moreover, it was not until Quorum's announcement of impairment that the market learned how Quorum's goodwill was allocated from CHS' goodwill. Nye Reply ¶¶33-42[6] Allen admitted that the indicators of impairment identified by CHS and Quorum were not the same. ¶466 *Second*, in addition to announcing the impairment, CHS also announced positive news concerning the company's updated divestiture plan, which was expected to reduce its debt, and which analysts described as "encouraging," "positive," a "bright spot." Nye Reply ¶¶49-53. The disclosure of positive and negative news completely explains why there was no statistically significant price decline. *Id*. *Third*, The stock prices of CHS and Quorum **did** decline following the news, just not at a statistically significant level which must have been because of news given that the market is efficient. Nye Reply ¶48 More importantly, it is a fundamental flaw of statistics for Allen to conclude that there was no price impact from the disclosure simply because the price decline was not statistically significant. A statistically significant price reaction allows one to conclude that there **was** a price impact. The **lack** of a statistically significant price reaction does not permit one to draw any conclusion in either direction. It is called "accepting the null hypothesis" which is

---

[6] Defendants' point to an analyst's statement after *Quorum's* impairment which said the company's impairment "should have been obvious." Def. Br. at 31. This supports Plaintiffs' position. The analyst is admitting that they did not see the impairment coming. Allen admitted that she is not aware of any analyst prior to August 10, 2016 suggesting that Quorum's assets were impaired.

33

fundamental flaw that invalidates Allen's testimony. Nye Reply ¶¶43-47 Allen admitted that it is impermissible to accept the null hypothesis. ¶471 *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) ("[t]he failure of an event study to disprove the null hypothesis with respect to an event does not prove that the event had no impact on the stock price."); *Nat. Res. Def. Council, Inc. v. Rauch*, 244 F. Supp. 3d 66 (D.D.C. 2017) (concluding that acceptance of the null hypothesis was "a common [statistical] mistake[]" (*Id.* at 92), "not the type of technical issue that can reasonably lead to competing expert perspectives" (*Id.* at 91), "constitutes an unreasoned choice" (*Id.* at 93), a "simple error of logic" (*Id.* at 94) and the conclusion based on it was "arbitrary and capricious." *Id.* at 96).

Allen also incorrectly suggests that analysts were uninterested in the implications of the impairment. Quorum highlighted the impairment in its earnings press release, Culotta discussed it in detail during the earnings call (¶395), and most analysts expressly mentioned the impairment and all analysts discussed the reduced expected cash flows of the company. Nye Report ¶¶22-23

Defendants also point to Allen's analysis of 67 impairment announcements by other companies, falsely asserting that "***Not one*** had a statistically significant effect on the announcing company's stock price." Def. Br. at 32-33 (emphasis original). To the contrary, Allen's own backup to her study reveals that 14 of the companies analyzed experienced statistically significant price reactions at the 95% confidence level. Nye Reply ¶ 62.  Moreover, Dr. Nye discovered that only eight of the 67 companies announced impairments as large as Quorum's and four of those eight experienced statistically significant stock price declines, and another two experience statistically significant declines when the correct impact date is used. *Id.* ¶ 63. Indeed, at her deposition, Allen admitted that she is **not** opining that impairment announcements are incapable of causing a price reaction. ¶473 This is because any such conclusion would also be an improper acceptance of the null hypothesis and because the peer-reviewed academic literature is

34

in complete agreement that asset impairments cause statistically significant stock price declines upon disclosure. Ex. 191, Nye Class Cert Reply ¶¶ 25-27; Nye Reply ¶ 60.[7]

Finally, Defendants assert a "truth-on-the-market" defense, claiming that investors already knew that Quorum's assets were impaired by $250 million simply because a few of the indicators of impairment (*e.g.* CHS's decline in stock price) were publicly available. Def. Br. at 33. As the Ninth Circuit explained in the widely-cited *In re Apple Computer Sec. Litig.*, to succeed on a truth-on-the-market defense, "any material information which insiders fail to disclose must be transmitted to the public with a degree of ***intensity and credibility*** sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." 886 F.2d 1109, 1116 (9th Cir. 1989). Defendants ignore that the vast majority of indicators of impairment were not known to investors. Nye Reply ¶¶16-21. It is the totality of these indicators that demonstrate Defendants' knowledge that Quorum's assets were impaired. *Id.* Moreover, the identification of certain indicators of impairment is different than concluding that impairment does exist, an analysis only management can do. Here, there can be no dispute that the disclosure of the massive write-down was "new" information. Nye Reply ¶ 21. Allen admitted that she is not of the opinion that as of the spinoff, the public was aware that Quorum's goodwill was impaired by any amount, and she is not aware of any analyst prior to August 10, 2016 suggesting that Quorum's assets were impaired or at risk of impairment. ¶477.

*      *      *

At bottom, there is overwhelming evidence that Defendants' fraud was the proximate cause of investors' losses suffered when Quorum's stock price plummeted by 50% following the August 10, 2015 announcement.  There certainly is a triable issue of fact for the jury to decide.

---

[7] Defendants falsely assert that Dr. Nye previously concluded that goodwill impairments "provide[] no new information" to the market. Def. Br. 33. In the case to which Defendants refer, Dr. Nye concluded, similar to what he concludes here, that the impairment did not provide any additional information to the market that was not also learned as a result of the related announcement, both of which informed the market that the asset was worth less than when it was purchased. Nye Reply ¶¶ 23-24.

35

## IV.    THERE IS A TRIABLE ISSUE ON THE SECTION 20(a) CLAIMS

Because there is a triable issue of fact as to Defendants' Section 10(b) violations and there is ample evidence by which a reasonable jury could conclude that the Individual Defendants did not act in good faith, Plaintiffs' Section 20(a) claims should not be dismissed.

## V.    THE CHS INDIVIDUAL DEFENDANTS SHOULD NOT BE DISMISSED AS TO POST-SPIN STATEMENTS

Defendants incorrectly assert that the CHS Defendants cannot be found to be "makers" of the statements contained in Quorum's Form 10-Q issued approximately a week after the spinoff because no CHS employee was the signatory to the filing. Def. Br. at 35.

"[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue." *In re Huffy Corp. Secs. Litig.*, 577 F. Supp. 2d 968, 985 (S.D. Ohio 2008) (citation omitted). Such a link can be established by "explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1355 (C.D. Cal. 2014).

Here, the financial information in the Q1 2016 10-Q concerned the period in which the hospitals were still part of CHS. The financial information was compiled, calculated, and even manipulated by Moody, Culotta, Hammons, Ottinger and other CHS employees prior to the spinoff on April 29, 2016 when they were officers of CHS. ¶10 Indeed, every single one of the 200 corporate employees of Quorum was transferred from CHS. ¶89 Specifically, the goodwill identified in the Form 10-Q was calculated when Quorum was still part of CHS. Indeed, the completion of the financial information is demonstrated by the fact that Smith and Cash announced the breakout of the Quorum financial information during CHS's Q1 2016 earnings call on May 2, 2016, announcing the inflated $56.0 adjusted EBITDA. ¶¶215-16 A jury could easily conclude that CHS Defendants were "involved in the formulation" of the false statements.

36

## VI.   CLASS MEMBERS THAT RECEIVED THEIR SHARES IN THE SPINOFF WERE DAMAGED AND SHOULD NOT BE DISMISSED

Rehashing arguments that this Court has repeatedly rejected, Defendants seek to dismiss Class members that "acquired" their Quorum shares through the spinoff. Def. Br. at 36-37.

At the outset of the Action, Defendants moved to eliminate the claims of these class members by asserting that the misrepresentations in the April 1, 2016 Form 10 were not actionable because they were made prior to the Class Period. ECF No. 117 at 10-11. The Court rejected Defendants argument. ECF No. 144 at 20-21. In opposition to class certification, Defendants made the exact argument they assert here, that the class definition should be modified to remove the shareholders that "otherwise acquired" their shares in the spinoff because they did not "purchase" their shares. ECF No. 167 at 18. Implicitly rejecting Defendants' argument, the Court certified the class without modification, leaving the "otherwise acquired" language intact. ECF No. 209.

Once again, Defendants assert that only "purchasers" of securities are entitled to bring actions under Section 10(b) and Rule 10b-5. They fail to inform the Court that "purchase" is defined to include "any contract to buy, purchase, *or otherwise acquire*." 15 U.S.C. § 78c(a)(13).

Defendants assert that these class members should be dismissed because they "received Quorum stock through no investment decision of their own." Def. Br. at 37. This is false.

On April 1, 2016, CHS announced that Quorum would spinoff of CHS after the close of trading on April 29, 2016, start trading on May 2, 2016 (the next trading day), and that every CHS shareholder would receive one share of QHC common stock for every four shares of CHS common stock. ¶3 Following the April 1, 2016 announcement there were two markets for CHS common stock; a "regular way" market and an "ex-distribution" market. Shares purchased in the "regular way" market were entitled to shares of QHC common stock at spinoff; shares purchased in the "ex-distribution" market were not. ¶4 Between April 1, 2016 and April 29, 2016, 58,045,590 shares traded in the "regular way" market compared to 80,374 traded on the "ex-distribution" market. ¶¶5-6 That is, 99.87% of the purchases were done so with an express

37

investment decision to acquire shares of Quorum upon spinoff. These Class members made an "investment decision," acquired shares that were inflated by Defendants' fraud and were damaged just like all Class members. They are clearly within the purpose of 10(b), which "was intended by Congress to protect investors, including corporations, from deceptive devices and contrivances which would inhibit informed decision-making in the course of securities transactions." *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1345 (2d Cir. 1974) (finding the issuance of a dividend by a corporation to fit within 10(b)'s purpose because the denial of material information to a corporation would disable the corporation "from availing itself of an informed judgment" when deciding to spin-off a subsidiary).[8]

Class members that acquired Quorum shares in the spinoff can alternatively be deemed "purchasers" under the "fundamental change" doctrine. "[W]here a securities transaction results in a fundamental change in the nature of a shareholder's investment, leaving the plaintiff with shares that represent a participation in a wholly new and different enterprise, the plaintiff may be considered a purchaser or seller." *Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982). *See Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977) ("there must be such significant change in the nature of the investment or the investment risks as to amount to a new investment"). "The fundamental change test applies whether or not plaintiff made an investment decision; if plaintiff's investment is fundamentally changed by a securities transaction, plaintiff may be considered a purchaser or seller despite not having made an investment decision." *Isquith v. Caremark Int'l*, 1997 U.S. Dist. LEXIS 3715, at *13 (N.D. Ill. Mar. 26, 1997). To determine

---

[8] Courts routinely certify classes including the "otherwise acquired" terminology, and it is well-settled that acquisition of shares through a merger, dividend or spin-off involve "purchases" and "sales" under the securities laws. *See Vesco*, 490 F.2d at 1343-45 (discussing "line of cases holding that such subsidiary spin-offs constitute 'sales'" and holding that stock dividend was a "sale" although shareholders did not exchange anything of value: "[a spin-off] is a transaction involving … the disposition of securities and, therefore, one for which the [plaintiff] is well deserving of and entitled to the protection of § 10(b)" ); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 86 (S.D.N.Y. 2007) ("old Vivendi S.A. shareholders who accepted shares in Vivendi Universal were likely damaged thereby"); *In re Vivendi Universal, S.A.*, 284 F.R.D. 144, 157 n.62 (S.D.N.Y. 2012) (refusing to remove "otherwise acquired" in context of merger)

38

whether a fundamental change has occurred in plaintiff's investment, courts look to the "'economic reality' of the transaction and determine whether the transaction has 'transformed' the plaintiff's interests 'in any real sense.'" *Rathborne*, 683 F.2d at 920 (citing *United Housing Foundation v. Forman*, 421 U.S. 837, 848 (1975)).[9]

Here, the essence of Plaintiffs' claim is that the prospects of the completely new company Quorum were dismal because the hospitals were abandoned after announcement of the spinoff, it had never operated as a unit before, it was being loaded down with debt and the costs as a stand-alone company would skyrocket. Thus, it was a fundamentally new enterprise from when the individual hospitals were part of CHS, and the investors that acquired the Quorum shares were "purchasers" under the fundamental change doctrine.

Finally, for the first time in the three and a half years of this litigation, Defendants half-heartedly assert in a footnote that Class members that acquired shares in the spinoff are not covered by the class definition because the class period is technically defined as between May 2, 2016 and August 10, 2016 but the shares from the spinoff were, Defendant assert, "distributed" after the close of trading the trading day before May 2, 2016. Def. Br. at 36 n. 25.

*First*, arguments advanced in footnotes should be rejected and are considered waived. *In re MF Glob. Holdings Ltd. Inv. Litig.*, 2014 U.S. Dist. LEXIS 32028, at *17-18 (S.D.N.Y. Mar. 11, 2014). *Second*, Defendants newly-minted assertion is belied by the fact that Defendants have repeatedly attempted to get these class members dismissed from the case or excluded from the class. If Defendants truly thought they were not members of the Class then they would not have

---

[9] The cases upon which Defendants rely are easily distinguishable as each involved the distribution of shares of another separately-existing company as dividend, the companies would operate exactly the same as they did pre-spinoff, the distribution did not fundamentally change the investors' holdings, and there was no investment decision by the investors. *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005); *In re Tronox, Inc.*, 2010 U.S. Dist. LEXIS 67664, at *47 n.16 (S.D.N.Y. June 28, 2010); *Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534 (7th Cir. 1998); *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *13 (Del. Super. Ct. Jan. 31, 2019) (where spinoff is issued as a dividend, it is not a "purchase" when "it does not affect a fundamental change in the stockholders' holdings.").

made any of these arguments and Defendants' experts would not have addressed these class members' damages. Def. Ex. 24, Allen Report at ¶¶ 106-107. They did because the parties always understood that they were within the class definition (as evidenced by the SAC stating "Quorum's assets were impaired as of the date of the spin-off on April 29, 2016 but Defendants concealed this information from investors." ECF no 92 at ¶ 3). the Class Period begins on May 2 simply because that was the first day of trading on the New York Stock Exchange. *Id.*  ¶ 2. ***Third***, there is no practical difference between the shares being distributed to investors after the close of trading on Friday April 29, 2016 or before trading began on May 2, 2016.  Indeed, the millions of shares could not actually be distributed to the countless investors between during this time because business was closed and the distribution could only be affected through contacting the "street name", then the brokers, and then the beneficial holders – which takes significant amounts of time. Indeed, Defendants have admitted that the shares were **not** actually distributed on April 29, 2016. In CHS's SEC filing, they stated that the Quorum shares were distributed by CHS's "distribution agent" beginning sometime after the close of trading on Friday April 29, 2016, and distribution of all shares was not completed until "***up to two weeks after the distribution date***." ¶8 Thus, shares spunoff after the close of trading on April 29, 2016 were not acquired by the shareholders until up to two weeks later – the first two weeks of the Class Period.

Defendants' eleventh-hour attempt at a "gotcha" argument to disenfranchise the shareholders they duped based on a disputable technicality should not be accepted. To the extent the Court determines it is necessary, the class definition can be adjusted at any time by the Court as justice requires. Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment")

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

Dated: March 13, 2020                              Respectfully submitted,

40

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
       mjwernke@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone:  (615) 248-2828
Facsimile:  (866) 816-4116
Email:  PKNASHLAW@aol.com
      Robert@BramlettLawOffices.com

*Liaison Counsel*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone:  (770) 392-0090
Facsimile:  (770) 392-0029
Email:  cholzer@holzerlaw.com
mdees@holzerlaw.com

41

*Attorneys for Plaintiff Aparna Rao*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Attorneys for Lead Plaintiff*

42

CERTIFICATE OF SERVICE

This is to certify that on the 13th day of MARCH 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District for the Middle District of Tennessee, for receipt electronically by the parties listed on the Court's Service list, as listed below.

SO CERTIFIED this 13th day of MARCH 2020.

s/*Michael J. Wernke*
**Michael J. Wernke**


**John Thompson Baxter**
Nelson Mullins Riley & Scarborough LLP
(Nashville Office)
150 Fourth Avenue, N
Suite 1100                                                            **Quorum Health**
Nashville, TN 37219              representing          **Corporation**
(615) 664-5323                                                       *(Defendant)*
(615) 664-5399 (fax)
john.baxter@nelsonmullins.com
 *Assigned: 03/22/2018*
 *ATTORNEY TO BE NOTICED*


                                                                        **Michael J. Culotta**
                                                                        *(Defendant)*


                                                                        **Thomas D. Miller**
                                                                        *(Defendant)*


**Paul Kent Bramlett**
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734                                                    **Zwick Partners LP**
Nashville, TN 37215             representing          *(Plaintiff)*
(615) 248-2828
(615) 254-4116 (fax)
pknashlaw@aol.com
 *Assigned: 09/09/2016*

*ATTORNEY TO BE NOTICED*

                                                   **Aparna Rao**
*(Plaintiff)*

**Robert P. Bramlett**
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215              representing    **Aparna Rao**
(615) 248-2828                                   *(Plaintiff)*
(615) 254-4116 (fax)
robert@bramlettlawoffices.com
*Assigned: 09/09/2016*
*ATTORNEY TO BE NOTICED*

**Lisa R. Bugni**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Atlanta, GA 30309-3521                **Quorum Health**
(404) 572-4677               representing    **Corporation**
lbugni@kslaw.com                                  *(Defendant)*
*Assigned: 03/19/2018*
*ATTORNEY TO BE NOTICED*

                                                   **Michael J. Culotta**
*(Defendant)*

                                                   **Thomas D. Miller**
*(Defendant)*

**Jason W. Callen**
Butler Snow LLP (Nashville)
The Pinnacle at Symphony Place
150 Third Avenue South                  **Community Health**
Suite 1600                    representing    **Systems, Inc.**
Nashville, TN 37201                           *(Defendant)*
(615) 651-6700
(615) 651-6701 (fax)

Jason.Callen@butlersnow.com
 *Assigned: 02/16/2018*
 *ATTORNEY TO BE NOTICED*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Lauren M. Cassady**
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP
2000 K Street, NW
4th Floor
Washington, DC 20006
(202) 775-4500
lcassady@robbinsrussell.com
 *Assigned: 12/04/2018*
 *ATTORNEY TO BE NOTICED*

representing

**Community Health
Systems, Inc.**
*(Defendant)*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Jessica Perry Corley**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309-3521
(404) 572-4717
jpcorley@kslaw.com
 *Assigned: 11/08/2016*
 *ATTORNEY TO BE NOTICED*

representing

**Quorum Health
Corporation**
*(Defendant)*

**Michael J. Culotta**
*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Wade B. Cowan**
Davies, Humphreys, Horton & Reese, PLC
85 White Bridge Road
Suite 300
Nashville, TN 37205
(615) 256-8125
(615) 242-7853 (fax)
wcowan@dhhrplc.com
  *Assigned: 11/08/2016*
  *ATTORNEY TO BE NOTICED*

representing

**Mitch Mongell**
*(Movant)*

**Patrick V. Dahlstrom**
Pomerantz LLP (Chicago Office)
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
(312) 377-1181
(312) 377-1184 (fax)
pdahlstrom@pomlaw.com
  *Assigned: 09/09/2016*
  *ATTORNEY TO BE NOTICED*

representing

**Aparna Rao**
*(Plaintiff)*

**Marshall Dees**
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
(770) 392-0029 (fax)
mdees@holzerlaw.com
  *Assigned: 09/09/2016*
  *ATTORNEY TO BE NOTICED*

representing

**Aparna Rao**
*(Plaintiff)*

**William W. Drinkwater**
Nelson Mullins Riley & Scarborough LLP
(Nashville Office)
150 Fourth Avenue, N
Suite 1100
Nashville, TN 37219

representing

**Quorum Health
Corporation**
*(Defendant)*

(615) 664-5307
(615) 664-5399 (fax)
woods.drinkwater@nelsonmullins.com
 *Assigned: 08/27/2019*
 *ATTORNEY TO BE NOTICED*

**Michael J. Culotta**
*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Michael I. Fistel, Jr.**
Johnson Fistel, LLP (Georgia Office)
40 Powder Springs Street
Marietta, GA 30064
(770) 200-3104
(770) 200-3101 (fax)
michaelf@johnsonfistel.com
 *Assigned: 11/21/2016*
 *TERMINATED: 03/03/2017*

representing

**Manzoor Bevinal**
*TERMINATED: 03/06/2017*
*(Plaintiff)*

**Marc C. Gorrie**
mgorrie@pomlaw.com
 *Assigned: 09/09/2016*
 *ATTORNEY TO BE NOTICED*

representing

**Aparna Rao**
*(Plaintiff)*

**Melissa Joy Gworek**
Alston & Bird LLP (Atlanta Office)
One Atlantic Center
1201 W Peachtree Street
Suite 4900
Atlanta, GA 30309-3424
(404) 881-4471
(404) 881-7777 (fax)
Mel.Gworek@alston.com
 *Assigned: 11/22/2016*
 *TERMINATED: 03/21/2018*

representing

**Quorum Health Corporation**
*(Defendant)*

**Michael J. Culotta**

*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**James Auman Haltom**
Nelson, Mullins, Riley & Scarborough, LLP
(Nashville Office)
One Nashville Place
150 Fourth Avenue, North
Suite 1100
Nashville, TN 37219
(615) 664-5339
(615) 664-5399 (fax)
James.haltom@tn.gov
 *Assigned: 03/22/2018*
 *TERMINATED: 08/28/2019*

representing

**Quorum Health
Corporation**
*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Michael J. Culotta**
*(Defendant)*

**John C. Hayworth**
Butler Snow LLP (Nashville)
The Pinnacle at Symphony Place
150 Third Avenue South
Suite 1600
Nashville, TN 37201
(615) 651-6700
(615) 651-6701 (fax)
John.Hayworth@butlersnow.com
 *Assigned: 05/05/2017*
 *TERMINATED: 03/09/2018*

representing

**Community Health
Systems, Inc.**
*(Defendant)*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**

*(Defendant)*

**Jack A. Herman**
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP
2000 K Street, NW
4th Floor
Washington, DC 20006                     representing    **Community Health
(202) 775-4500                                          Systems, Inc.**
(202) 775-4510 (fax)                                     *(Defendant)*
jherman@robbinsrussell.com
 *Assigned: 05/09/2017*
 *ATTORNEY TO BE NOTICED*


**W. Larry Cash**
*(Defendant)*


**Wayne T. Smith**
*(Defendant)*


**Al Holifield**                                         **Cornelius Koh
aholifield@hapc-law.com                                  Beng Yan**
 *Assigned: 11/21/2016*                  representing    *(Movant)*
 *ATTORNEY TO BE NOTICED*


**James A. Holifield, Jr.**
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934                      representing    **Aparna Rao**
(865) 566-0115                                           *(Plaintiff)*
(865) 566-0119 (fax)
aholifield@holifieldlaw.com
 *Assigned: 11/08/2016*
 *ATTORNEY TO BE NOTICED*


**Corey D. Holzer**
Holzer & Holzer, LLC                                     **Aparna Rao**
1200 Ashwood Parkway                     representing    *(Plaintiff)*
Suite 410

Atlanta, GA 30338
(770) 392-0090
(770) 392-0029 (fax)
cholzer@holzerlaw.com
 *Assigned: 09/09/2016*
 *ATTORNEY TO BE NOTICED*

**J. Alexander Hood, II**
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016          representing    **Aparna Rao**
(212) 661-1100                               *(Plaintiff)*
(212) 661-8665 (fax)
ahood@pomlaw.com
 *Assigned: 09/09/2016*
 *ATTORNEY TO BE NOTICED*

**Susan Elaine Hurd**                        **Quorum Health**
Susan.Hurd@alston.com                        **Corporation**
 *Assigned: 11/08/2016*     representing      *(Defendant)*
 *TERMINATED: 03/21/2018*

                                             **Michael J. Culotta**
                                             *(Defendant)*

                                             **Thomas D. Miller**
                                             *(Defendant)*

**John R. Jacobson**
Riley, Warnock & Jacobson
1906 West End Avenue
Nashville, TN 37203                          **Quorum Health**
(615) 320-3700             representing       **Corporation**
jjacobson@rwjplc.com                         *(Defendant)*
 *Assigned: 10/06/2016*
 *TERMINATED: 04/02/2018*

                                             **Michael J. Culotta**
                                             *(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Frank J. Johnson**
Johnson Fistel, LLP (San Diego, CA Office)
655 West Broadway
Suite 1400
San Diego, CA 92101                                        **Manzoor Bevinal**
(619) 230-0063                    representing          *TERMINATED:*
(619) 255-1856 (fax)                                       *03/06/2017*
frankj@johnsonfistel.com                                *(Plaintiff)*
  *Assigned: 11/22/2016*
  *TERMINATED: 03/03/2017*

**Brandon R. Keel**
King & Spalding LLP (Atlanta Office)
1180 Peachtree Street NE
Suite 1600                                                 **Quorum Health**
Atlanta, GA 30309-3521            representing          **Corporation**
(404) 527-2780                                             *(Defendant)*
bkeel@kslaw.com
  *Assigned: 05/18/2018*
  *ATTORNEY TO BE NOTICED*

**Jeremy A. Lieberman**
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016                                         **Aparna Rao**
(212) 661-1100                    representing          *(Plaintiff)*
(212) 661-8665 (fax)
jalieberman@pomlaw.com
  *Assigned: 09/09/2016*
  *ATTORNEY TO BE NOTICED*

**Wendy Liu**
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP                                               **Community Health**
2000 K Street, NW                representing          **Systems, Inc.**
4th Floor                                                  *(Defendant)*
Washington, DC 20006
(202) 775-4500

(202) 775-4510 (fax)
wliu@robbinsrussell.com
  *Assigned: 06/29/2018*
  *ATTORNEY TO BE NOTICED*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Jerry E. Martin**
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
(615) 252-3798 (fax)
jmartin@barrettjohnston.com
  *Assigned: 11/08/2016*
  *TERMINATED: 03/07/2017*

representing

**IBEW 673 Pension Plan**
*TERMINATED: 03/07/2017*
*(Movant)*

**Milton S. McGee, III**
Riley, Warnock & Jacobson
1906 West End Avenue
Nashville, TN 37203
615) 320-3700
tmcgee@rwjplc.com
  *Assigned: 10/06/2016*
  *TERMINATED: 04/02/2018*

representing

**Quorum Health Corporation**
*(Defendant)*

**Michael J. Culotta**
*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Danielle S. Myers**
Robbins Geller Rudman & Dowd LLP (San

representing

**IBEW 673 Pension Plan**

Diego)
655 W Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 (fax)
danim@rgrdlaw.com
 *Assigned: 12/20/2016*
 *TERMINATED: 03/07/2017*

**Gary A. Orseck**
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber LLP
2000 K Street, NW
4th Floor
Washington, DC 20006          representing
(202) 775-4504
(202) 775-4510 (fax)
gorseck@robbinsrussell.com
 *Assigned: 05/09/2017*
 *ATTORNEY TO BE NOTICED*

*TERMINATED:*
*03/07/2017*
*(Movant)*

**Community Health
Systems, Inc.**
*(Defendant)*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Quorum Health
Corporation**
*(Defendant)*

**Michael J. Culotta**
*(Defendant)*

**Thomas D. Miller**
*(Defendant)*

**Lauren Patten**
Butler Snow LLP (Nashville)          representing

**Community Health
Systems, Inc.**

The Pinnacle at Symphony Place
150 Third Avenue South
Suite 1600
Nashville, TN 37201
(615) 651-6700
Lauren.Patten@butlersnow.com
  *Assigned: 12/11/2018*
  *ATTORNEY TO BE NOTICED*

**(Defendant)**

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Darren J. Robbins**
Robbins Geller Rudman & Dowd LLP (San Diego)
655 W Broadway
Suite 1900
San Diego, CA 92101                    representing
(619) 231-1058
(619) 231-7423 (fax)
darrenr@rgrdlaw.com
  *Assigned: 12/05/2016*
  *TERMINATED: 03/07/2017*

**IBEW 673 Pension Plan**
*TERMINATED: 03/07/2017*
*(Movant)*

**William J. Trunk**
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
2000 K Street, NW
4th Floor
Washington, DC 20006                    representing
(202) 775-4500
(202) 775-4510 (fax)
wtrunk@robbinsrussell.com
  *Assigned: 05/09/2017*
  *ATTORNEY TO BE NOTICED*

**Community Health Systems, Inc.**
*(Defendant)*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Robert Jackson Walker**
Butler Snow LLP (Nashville)
The Pinnacle at Symphony Place
150 Third Avenue South
Suite 1600
Nashville, TN 37201                    representing    **Community Health**
(615) 651-6700                                          **Systems, Inc.**
(615) 651-6701 (fax)                                    *(Defendant)*
Bob.Walker@butlersnow.com
 *Assigned: 05/05/2017*
 *ATTORNEY TO BE NOTICED*

**W. Larry Cash**
*(Defendant)*

**Wayne T. Smith**
*(Defendant)*

**Michael J. Wernke**
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016                    representing    **Aparna Rao**
(212) 661-1100                                          *(Plaintiff)*
mjwernke@pomlaw.com
 *Assigned: 02/28/2017*
 *ATTORNEY TO BE NOTICED*

**Zwick Partners LP**
*(Plaintiff)*