# EXHIBIT E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ZWICK PARTNERS, LP and APARNA    )
RAO, individually and on behalf of all    )
others similarly situated,    )
    )
      Plaintiffs,    )    NO. 3:16-cv-02475
    )    CHIEF JUDGE CRENSHAW
v.    )
    )
QUORUM HEALTH CORP., et al.,    )
    )
      Defendants.    )

**<u>MEMORANDUM OPINION</u>**

Pending before the Court are three separate motions. The first motion is Zwick Partners,

LP ("Zwick") and Aparna Rao's (collectively "Plaintiffs") Motion for Class Certification. (Doc.

No. 161.) Community Health Systems, Inc. ("CHSI"), Quorum Health Corp. ("Quorum"), and the

individual defendants (collectively "Defendants") have filed a response in opposition (Doc. No.

167) and an additional supplemental response (Doc. No. 179), to which Plaintiffs have replied

(Doc. No. 184). Plaintiffs have filed an expert report from Dr. Zachary Nye in support of their

class certification motion (Doc. No. 163-1), and Defendants have included their own expert report

from Lucy P. Allen in opposition. (Doc. No. 168-1).

Also pending before the Court is Quorum, Thomas D. Miller, and Michael J. Culotta's

(collectively "Quorum Defendants") Partial Motion to Dismiss Plaintiffs' Third Amended

Complaint. (Doc. No. 174.) Plaintiffs have filed a response in opposition (Doc. No. 186), to which

the Quorum Defendants have replied (Doc. No. 192).

Finally, CHSI, Wayne T. Smith, and W. Larry Cash (collectively "CHSI Defendants") have

a filed a separate Partial Motion to Dismiss the Third Amended Complaint. (Doc. No. 176.)

Plaintiffs have filed a response in opposition (Doc. No. 187), to which the CHSI Defendants have replied (Doc. No. 193). For the reasons stated herein, the Quorum Defendants and CHSI Defendants' respective Partial Motions to Dismiss (Doc. Nos. 174, 176) will be granted, and Plaintiffs' Motion for Class Certification (Doc. No. 179) will be granted in part.

## I.    Relevant Procedural and Factual Background[1]

### A.  Procedural Background

On September 9, 2016, Rao filed an initial complaint against the Quorum Defendants, alleging that they violated the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). (Doc. No. 1 at 11-18.) Rao brought his claims on behalf of himself and a class of persons or entities, other than the Quorum Defendants, who purchased or otherwise acquired Quorum securities pursuant to Quorum's "spinoff" from CHSI on April 29, 2016 or on the open market between May 2, 2016 and August 10, 2016. (Id. at 2.) Approximately seven months later, Plaintiffs (now including Zwick) filed a Second Amended Complaint, on behalf of themselves and all others similarly situated, against Defendants (including the CHSI Defendants), alleging that they acquired Quorum stock at artificially inflated prices between May 2, 2016, and August 10, 2016. (Doc. No. 92 at 3-4).

In response to the Second Amended Complaint, the Defendants filed separate Motions to Dismiss, which the Court denied. (See Doc. Nos. 113, 116, 144.) The Court then entered its Initial Case Management Order setting the deadline for amended pleadings as September 14, 2018. (Doc. No. 155.) One month later, on July 13, 2018, Plaintiffs filed the instant Motion to Certify Class.

---

[1] The Court presumes that the parties are familiar with the factual and procedural record and therefore discusses only those facts necessary to resolve the instant motions.

(Doc. No. 161.) On September 14, 2018, Plaintiffs filed the Third Amended Complaint (Doc. No. 169), and, in response, the Defendants filed their respective instant Partial Motions to Dismiss (Doc. Nos. 174, 176).

### B. Third Amended Complaint

The Third Amended Complaint largely reiterates the allegations in the prior complaints. Briefly, the Second Amended Complaint essentially alleged that: (1) Quorum's goodwill and long-lived assets were impaired on the date of the spinoff; (2) important indicators existed prior to the spin-off that should have, or did in fact, alert the Defendants to test for such impairments; and (3) by not testing for those impairments, investors purchased Quorum's stock at artificially inflated prices between May 2, 2016 and August 10, 2016 (the "Class Period"). (Doc. Nos. 92 at 4-5, 144 at 1-2.)

The Third Amended Complaint, in addition to reiterating the allegations surrounding the impairment of Quorum's goodwill and long-lived assets, challenges certain additional statements made by CHSI and Quorum in connection with the spinoff. (Doc. No. 169 at 58-63.) Plaintiffs maintain that these additional statements, which concerned Quorum's projected EBITDA[2] range and estimated expenses as a standalone company, constitute separately actionable "false and misleading statements" under the Exchange Act, apart from the impairment allegations. (Id.) Specifically, Plaintiffs state that, prior to the spinoff, Defendants told investors that the costs associated with being a stand-alone company would be only $8 million higher annually than when

---

[2] EBITDA, which stands for earnings before interest, taxes, depreciation, and amortization, is a commonly reported measure of a company's pre-tax earnings calculated on a cash basis. Murray Energy Holdings Co. v. Mergermarket USA, Inc., Case No. 2:15-cv-2844, 2016 WL 3365422, at *1 n.2 (S.D. Ohio Jun. 17, 2016).

3

Quorum was a part of CHSI. (Id. at 58-59.) Moreover, Defendants identified that Quorum's annual adjusted EBITDA range was $265 million to $275 million. (Id. at 58-63.) Plaintiffs then allege that these statements, which were made in the context of investor presentations, conference calls, and Securities and Exchange Commission filings, were false and misleading because Defendants knew that the increased costs of Quorum operating as a stand-alone company would be much higher than stated and thus Quorum was ill-positioned in the marketplace, all of which would translate into a lower EBITDA range. (Id.)

Accordingly, Plaintiffs, on behalf of themselves and the proposed class, reiterate that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10(b)(5) promulgated thereunder. (Id. at 71-76.) The Court will first consider the Quorum and CHSI Defendants' respective Partial Motions to Dismiss and then address Plaintiffs' Motion to Certify Class.

## II.    Partial Motions to Dismiss the Third Amended Complaint

In light of the Third Amended Complaint, the Quorum Defendants have filed a Partial Motion to Dismiss. (Doc. No. 174.) The Quorum Defendants maintain that the financial statements added in the Third Amended Complaint fall under the ambit of the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision, and, therefore, cannot support a securities fraud claim. (Id. at 3.) Further, the Quorum Defendants argue that Plaintiffs do not adequately plead scienter with respect to any of the statements because they have not pled sufficient facts to show that the Quorum Defendants had actual knowledge that the statements were false when made. (Id.) The CHSI Defendants rely on an identical PSLRA safe harbor argument and assert that they were not the "makers" of the newly identified statements. (See Doc. No. 177.)

4

In response, Plaintiffs assert that the identified statements are not covered by the PSLRA's safe harbor provision because the statements were not accompanied by "meaningful" cautionary language. (Doc. No. 186 at 22.) Plaintiffs argue that the cautionary language accompanying the statements are mere "generalized warnings." (Id. at 25-28.) Further, Plaintiffs maintain that they have pled facts that support a strong inference that Defendants had actual knowledge of the falsity of the statements when made. (Id. at 28-33.) Finally, Plaintiffs argue that CHSI Defendants were the "makers" of the newly alleged misrepresentations. (Doc. No. 187.)

## A.  Federal Rule of Civil Procedure 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the Court must view the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). However, the plaintiff must allege sufficient facts to show that the claim is "plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (quoting Twombly, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

5

## B.  Federal Securities Law and the PSLRA

Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." La. Sch. Bd. Employees' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010). To state a securities fraud claim under § 10(b), a plaintiff "must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." Id. "Scienter is a mental state embracing intent to deceive, manipulate, or defraud." Id. (citing PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004)). Securities fraud claims under § 10(b) must satisfy the pleading requirements of Fed. R. Civ. P. 9(b). Ernst & Young, 622 F.3d at 478. Thus, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id.

In addition to the underlying substantive and procedural requirements, the PSLRA imposes additional and more exacting pleading requirements in a securities fraud case. Id. There are three distinct scienter requirements for securities fraud actions, each of which depends on the type of statement that is being made, and, in the case of "forward-looking statements," whether that statement was material and accompanied by meaningful cautionary statements.[3] See 15 U.S.C. §

---

[3] Under the PSLRA, a "forward-looking statement" is defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations,

6

78u–5(c). For "forward-looking statements" that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in the PSLRA makes the state of mind irrelevant. See 15 U.S.C. § 78u–5(c)(1)(A); see also Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999). In other words, if the statement qualifies as "forward-looking" and is accompanied by sufficient cautionary language, it is protected and non-actionable in a securities fraud action regardless of the defendant's actual state of mind. Under the second prong of the safe harbor provision of the PSLRA, in the case of "forward-looking statements" that are not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is required. See 15 U.S.C. § 78u–5(c)(1)(B); see also Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001) (en banc).

The cautionary language required by the PSLRA must be extensive and specific; vague or blanket disclaimers that merely warn the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. Inst. Inv'rs. Grp. v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir.

including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

See 15 U.S.C. § 78u-5(i)(1).

2009). "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Id. Similarly, the Fifth Circuit has held that "[t]he requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." Southland Secs. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 371–72 (5th Cir. 2004); see also Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 246–47 (5th Cir. 2009) (concluding that cautionary language was not meaningful where the warning was "very vague and general" and did not "disclose the specific risks and their magnitude"); Slayton v. Am. Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010) ("Cautionary language must be extensive and specific . . . [a] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation . . . [t]o suffice the cautionary statements must be substantive and tailored to the specific future projections, estimate or opinions in the prospectus which the plaintiffs challenge.").

C.  Challenged Statements and Cautionary Language

The Quorum Defendants argue that the seven following financial statements, identified in the Third Amended Complaint, are "forward looking" and accompanied by sufficiently detailed cautionary language such that they cannot be characterized as false and misleading:

March 22, 2016 Press Release: Based on its preliminary assessment of its results of operations, QHC [Quorum] expects net operating revenues for the year ending December 31, 2016, to range from $2.2 billion to $2.3 billion and expected adjusted EBITDA for the year ending December 31, 2016, to range from $265 million to $275 million. (Doc. No. 175-2 at 6.)

Cautionary Language in Press Release: Certain statements contained in this communication may constitute "forward-looking statements" within the meaning

8

of the Private Securities Litigation Reform Act of 1995. These statements include, but are not limited to, statements regarding projections of net operating revenues, Adjusted EBITDA, the expected timing of the completion of the spin-off transaction, the benefits of the spin-off transaction to either CHS or QHC, the tax-free treatment of the spinoff transaction, the anticipated management of QHC, the market position of QHC and transactions and other events and other statements that are not historical facts. Such statements are based on the views and assumptions of QHC and are subject to significant risks and uncertainties. There can be no assurance that the proposed transaction or other future events will occur as anticipated, if at all, or that actual results will be as expected. Actual future events or results may differ materially from these statements. Such differences may result from a number of factors, including but not limited to: the timing and completion of the proposed transaction; a failure to obtain necessary regulatory approvals; a failure to obtain assurances of anticipated tax treatment; a deterioration in the business or prospects of CHS or QHC; adverse developments in CHS' or QHC's markets; adverse developments in the U.S. or global capital markets, credit markets or economies generally; the risk that the benefits of the proposed transaction may not be fully realized or may take longer to realize than expected; the impact of the proposed transaction on CHS' or QHC's third-party relationships; risks associated with QHC's substantial indebtedness, leverage and debt service obligations; QHC's ability to successfully make acquisitions or complete divestitures; QHC's ability to successfully integrate any acquired hospitals, or to recognize expected synergies from acquisitions; and changes in regulatory, social and political conditions . . . . (Id. at 6-7.)

March 29, 2016 Investor Presentation: (1) Quorum's projected Adjusted EBITDA for the year end December 31, 2016 is estimated to be in the range of $265 to $275 million; and (2) the estimated incremental expenses associated with being an independent, public company, including costs associated with corporate administrative services (~$3 million) and costs and expenses associated with the Transition Services Agreements with CHS (~$5 million) are expected to be approximately $8 million per year. (Doc. No. 175-4 at 28.)

Cautionary Language in Investor Presentation: This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that involve risk and uncertainties relating to, among other things, the proposed spin-off of Quorum Health by CHS and the future performance of Quorum Health. All statements in this presentation other than statements of historical fact, including statements regarding projections, expected operating results, expected timing of the completion of the spinoff transaction, the benefits of the spin-off transaction, the tax-free treatment of the spin-off transaction, the anticipated management of the business to be spun-off, the market position of the business to be spun-off and other events that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends,"

9

"plans," "believes," "estimates," "thinks," and similar expressions, are forward-looking statements. Although we believe that these forward-looking statements are based on reasonable assumptions, these assumptions are inherently subject to significant risks, uncertainties and contingencies, which are difficult or impossible to predict accurately and are beyond our control. Accordingly, there can be no assurance that the proposed transaction or these future events will occur as anticipated, if at all, or that actual results will be as expected. A number of factors could affect the future results of Quorum Health or the healthcare industry generally and could cause Quorum Health's expected results to differ materially from those expressed in this presentation. In addition, as it relates to the proposed transaction, such differences may result from a number of factors, including but not limited to: the timing and completion of the proposed transaction; a failure to obtain necessary regulatory approvals; a failure to obtain assurances of anticipated tax treatment; a deterioration in the business or prospects of Quorum Health's or CHS' business; adverse developments in Quorum Health's or CHS' markets; our ability to improve the operations of acquired or existing hospitals; adverse developments in the U.S. or global capital markets, credit markets or economies generally; the risk that the benefits of the proposed transaction may not be fully realized or may take longer to realize than expected; the impact of the proposed transaction on our third-party relationships; risks associated with Quorum Health's substantial indebtedness, leverage and debt service obligations; Quorum Health's ability to successfully make acquisitions and to integrate such hospitals, or complete divestitures; and changes in regulatory, social and political conditions. (Doc. Nos. 175-4 at 3; 175-5 at 6.)

April 1, 2016 Form 10: The estimated expenses associated with being an independent, public company includ[ing] costs associated with corporate administrative services such as tax, treasury, audit, risk management, legal, investor relations and human resources and are estimated to be approximately $3 million higher annually than amounts previously allocated to QHC by CHS. Additionally, the costs and expenses associated with the Transition Services Agreements which are expected to be provided by CHS to QHC are estimated to be approximately $5 million higher annually than amounts previously allocated to QHC by CHS. (Doc. No. 175-1 at 56.)

Cautionary Language in the Form 10: We do not have an operating history as an independent company and the historical financial information for the spun-off hospital drawn from CHS financial results may not be a reliable indicator of our future results of operations and cash flows. Following the spin-off, we will have substantial debt and high leverage, which could adversely affect our business. We expect the agreements governing our debt, including our new credit facilities and the indenture governing our senior notes, will contain various covenants that impose restrictions on us that may affect our ability to operate our business. We could incur significant tax liabilities if the distribution were to be deemed a taxable

10

event. Our accounting and other management systems and resources may not be adequately prepared to meet the financial reporting and other requirements to which we will be subject following the distribution. We may be unable to achieve some or all of the benefits that we expect to achieve from the spin-off. We may incur greater costs as an independent company than we did when we were part of CHS. The spin-off may expose us to potential liabilities arising out of state and federal fraudulent conveyance laws and legal distribution requirements. We may have been able to receive better terms from unaffiliated third parties than the terms we receive in our agreements related to the spin-off. Transfer or assignment to us of certain contracts, investments in joint ventures and other assets may require the consent of a third party. If such consent is not given, we may not be entitled to the benefit of such contracts, investments and other assets in the future. (Doc. No. 175-1 at 8.)

April 14, 2016 Investor Presentation: The estimated incremental expenses associated with being an independent, public company, including costs associated with corporate administrative services (~$3 million) and costs and expenses associated with Transition Services Agreements with CHS (~$5 million) are expected to be approximately $8 million per year. (Doc. No. 175-5 at 26.)

Cautionary Language in the April Investor Presentation: This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that involve risk and uncertainties relating to, among other things, the proposed spin-off of Quorum Health by CHS and the future performance of Quorum Health. All statements in this presentation other than statements of historical fact, including statements regarding projections, expected operating results, expected timing of the completion of the spinoff transaction, the benefits of the spin-off transaction, the tax-free treatment of the spin-off transaction, the anticipated management of the business to be spun-off, the market position of the business to be spun-off and other events that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates," "thinks," and similar expressions, are forward-looking statements. Although we believe that these forward-looking statements are based on reasonable assumptions, these assumptions are inherently subject to significant risks, uncertainties and contingencies, which are difficult or impossible to predict accurately and are beyond our control. Accordingly, there can be no assurance that the proposed transaction or these future events will occur as anticipated, if at all, or that actual results will be as expected. A number of factors could affect the future results of Quorum Health or the healthcare industry generally and could cause Quorum Health's expected results to differ materially from those expressed in this presentation. In addition, as it relates to the proposed transaction, such differences may result from a number of factors, including but not limited to: the timing and completion of the proposed transaction; a failure to obtain necessary regulatory approvals; a failure to obtain assurances of anticipated tax treatment; a deterioration in the business or prospects of Quorum Health's or CHS' business;

11

adverse developments in Quorum Health's or CHS' markets; our ability to improve the operations of acquired or existing hospitals; adverse developments in the U.S. or global capital markets, credit markets or economies generally; the risk that the benefits of the proposed transaction may not be fully realized or may take longer to realize than expected; the impact of the proposed transaction on our third-party relationships; risks associated with Quorum Health's substantial indebtedness, leverage and debt service obligations; Quorum Health's ability to successfully make acquisitions and to integrate such hospitals, or complete divestitures; and changes in regulatory, social and political conditions. (Doc. Nos. 175-4 at 3; 175-5 at 6.)

May 11, 2016 Press Release: Today we are affirming our established guidance for 2016 . . . [t]he Company expects net operating revenues for the year ending December 31, 2016 to range from $2.2 billion to $2.3 billion and expects adjusted EBITDA for the year ending December 31, 2016 to range from $265 million to $275 million. (Doc. No. 175-7 at 2, 10.)

Cautionary Language in Press Release: Although the Company believes that these forward-looking statements are based on reasonable assumptions, these assumptions are inherently subject to significant economic and competitive uncertainties and contingencies, which are difficult or impossible to predict accurately and may be beyond the control of the Company. Accordingly, the Company cannot give any assurance that its expectations will in fact occur and cautions that actual results may differ materially from those in the forward-looking statements. A number of factors could affect the future results of the Company or the healthcare industry generally and could cause the Company's expected results to differ materially from those expressed in this press release. These factors include, among other things . . . the effects of our spin-off from CHS that was completed on April 29, 2016, including our ability to achieve the anticipated benefits of the spinoff. (Id. at 17-18.)

May 11, 2016 Form 10-Q: The estimated expenses associated with being an independent, public company include costs associated with corporate administrative services such as tax, treasury, audit, risk management, legal, investor relations, and human resources are estimated to be approximately $3 million higher annually than amounts previously allocated to QHC by CHS. Additionally, costs and expenses associated with the transition services agreements are estimated to be approximately $5 million higher annually than amounts previously allocated to QHC by CHS. (Doc. No. 175-6 at 5.)

Cautionary Language in May Form 10-Q: [Same as in May 11, 2016 Press Release]. (Doc. No. 175-6 at 6-7.)

12

May 12, 2016 Conference Call: At this time, we are reconfirming our guidance of net operating revenues of $2.2 billion to $2.3 billion and adjusted EBITDA of $265 million to $275 million. We will be giving more detailed guidance when we report the second quarter. We are in the process of completing our budget for the remainder of the year, particularly with respect to our new corporate budgets. (Doc. No. 175-9 at 8.)

Cautionary Language in Conference Call: [C]ompanies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized. (Doc. No. 175-9 at 16.)

**D. Analysis**

The Court first notes that, despite the different contexts in which the alleged statements were made, the subject of these statements is essentially the same. All of the statements are, in one form or another, financial estimates regarding the anticipated earnings or increased costs associated with the spinoff of Quorum from CHS. This type of guidance falls squarely within the PSLRA's definition of forward looking statements. See 15 U.S.C. § 78u-5(i)(1) (a forward-looking statement means a statement containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure, or other financial items); see also, e.g, Pension Fund Grp. v. Tempur-Pedic Int'l, Inc., 614 F. App'x 237, 243 (6th Cir. 2015) (concluding that Tempur-Pedic's projection of between $1.60 and $1.65 billion in net sales and between $3.80 and $3.95 in earnings per diluted share were squarely within the PSLRA's definition of forward-looking statements); Miller v. Champion Enterprises Inc., 346 F.3d 660, 677 (6th Cir. 2003) (holding that statements speaking of earnings estimates and enhancement projections or objectives

13

are "classically forward-looking"). Indeed, Plaintiffs have not mounted any serious challenge to the Quorum Defendants' assertion that the challenged statements are forward-looking. (See Doc. No. 186 at 22-28.) Rather, Plaintiffs instead contend that the statements were not accompanied by sufficiently meaningful cautionary statements. (See id.)

The Court exhaustively cites the disclosure language at issue to properly determine whether such language was meaningful. Beach v. Healthways, Inc., No. 3:08-0569, 2009 WL 650408, at *4 (M.D. Tenn. Mar. 9, 2009) ("Whether the statements were accompanied by adequate cautionary language depends upon, statement by statement, what the actual facts were at the time the statement was made and what cautionary language was used.") Here, the challenged forward-looking statements essentially had two components: (1) the EBITDA range for Quorum was $265 million to $275 million; and (2) Quorum's standalone costs would only be $8 million higher than when it was a part of CHSI.

To be "meaningful," a "cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (citing In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005)). True cautionary language must "warn[ ] investors of exactly the risk that plaintiffs claim was not disclosed." Id. (citing Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999)); see also In re Prudential Sec. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("Cautionary language . . . must precisely address the substance of the specific statement or omission that is challenged.").

The Court believes that the identified cautionary statements qualify as "meaningful" under the PSLRA. When viewed as a whole, the cautionary statements consistently provided

14

comprehensive and tailored warnings, which changed over time to address new risks as the spinoff developed, and were the antithesis of "generic" warnings. Individually, each warning, at its most specific, identifies that the adjusted earnings and estimated costs for Quorum were subject to change for a variety of factors, including Quorum's lack of an operating history as an independent company, changes to cost structures, and the overall effects of the spinoff not coming to fruition. (Doc. Nos. 175-4 at 3; 175-5 at 6.) These are the gravamen of Plaintiff's lawsuit, and these changes, particularly the downward revisions to earnings and increase in standalone costs, are precisely what occurred post-spinoff. See Helwig, 251 F.3d at 558-9 (holding that a company that chooses to speak is protected against failed projections provided it identifies substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements); Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) (holding that the cautionary language must "warn[] of risks of significance similar to that actually realized").

Accordingly, the Court need not proceed further. Plaintiffs' newly identified statements were: (1) forward-looking; and (2) accompanied by sufficiently meaningful cautionary language such that the statements are protected by the PSLRA. See 15 U.S.C. § 78u-5(i)(1); Helwig, 251 F.3d at 547-48 (holding that the PSLRA's safe-harbor provision "excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance"). Accordingly, the Quorum Defendants' Partial Motion to Dismiss (Doc. No. 174) will be granted. For these same reasons, the CHSI Defendants' Partial Motion to Dismiss The Third Amended Complaint (Doc. No. 176), which includes an identical PSLRA safe harbor argument, will also be granted.

15

### III.   Motion to Certify Class

In the motion, Zwick seeks: (1) class certification pursuant to Federal Rule of Civil Procedure 23; (2) appointment as Class Representative; and (3) appointment of Pomerantz LLP as Class Counsel.[4]  (Doc. No. 162 at 8.) Further, as evidentiary support for its motion, Zwick has filed a declaration from Michael J. Wernke, lead counsel for Plaintiffs. The declaration contains: (1) Dr. Nye's expert report; (2) a deposition from Johannes Zwick on behalf of Zwick Partners, LP; and (3) a firm resume for Pomerantz LLP. Zwick seeks certification for the following putative class:

> All persons and entities who purchased or otherwise acquired Quorum Health Corporation common stock between May 2, 2016 and August 10, 2016, both dates inclusive ("Class Period"). Excluded from the Class are Defendants, current and former officers and directors of Quorum and Community Health Systems, Inc., members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Id.

In its brief in support, Zwick argues that it and other proposed class members were injured by a common course of misconduct—material misrepresentations and omissions by Defendants concerning Quorum's goodwill and long-lived assets, EBITDA range, and standalone company costs. (Id.) Zwick asserts that the instant action satisfies all the requirements for class certification under Federal Rule of Civil 23(a) (numerosity, commonality, typicality, and adequacy of representation) and the two core requirements for certification under Rule 23(b)(3) (predominance

---

[4] As stated above, in the Third Amended Complaint, Plaintiffs expanded the scope of Defendants' alleged misrepresentations. As a result, Defendants supplemented their response to Plaintiffs' Motion to Certify Class, arguing that the newly alleged misstatements fell within the safe harbor provision of the PSLRA. Because the Court agrees that these statements are not actionable, the Court refences them to provide context but does not consider them for purposes of the Motion to Certify Class.

16

of common questions of law or fact and superiority of a class action over other available method for adjudication). (Id. at 9.)

With regard to Rule 23(b)(3), Zwick argues that the elements of the Sections 10(b) and 20(a) Exchange Act claims predominate. (Id. at 17.) Zwick acknowledges that common questions of law or fact in a securities fraud action often turn on the element of reliance, and it contends that in the instant matter reliance can be established on a common basis through a "fraud on the market" theory under Basic Inc. v. Levinson, 485 U.S. 224 (1988). Essentially, Zwick asserts that the fraud on the market theory applies because: (1) Quorum and CHSI's alleged material misstatements were publicly known; (2) Quorum's stock traded on an efficient market; and (3) it, and the proposed class members, purchased shares between when the misleading statements were made and when the truth was revealed, thereby paying an inflated price. (Id.) Finally, Zwick maintains that, under Rule 23(b)(3), a class action is superior to other methods of handling the litigation because the members of the proposed class have little incentive to pursue individual actions, class certification will facilitate vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market, and piecemeal litigation of the individual claims would risk disparate results. (Id. at 26-27.)

As noted above, Zwick included, as evidentiary support, Dr. Nye's expert report (the "Nye Report.") (Doc. No. 163-1.) The Nye Report has essentially two main conclusions: (1) the market for Quorum stock was efficient during the Class Period; and (2) damages for investors who purchase Quorum stock during the Class Period can be calculated using a method that is common to the Class. (Id. at 5-6.) In reviewing whether the market for Quorum's stock was efficient during the Class Period, the Nye Report first noted that Quorum traded on the New York Stock Exchange

17

("NYSE"). (Id. at 12-13.) Further, the Nye Report concluded: (1) the average weekly trading volume of outstanding shares was 9% during the Class Period; (2) the annualized share turnover was 507.7%; (3) over twenty (20) analyst reports were issued on Quorum during the Class Period; (4) there were more than eighty (80) active market makers that traded Quorum stock during the Class Period; (5) there was significant arbitrage activity related to Quorum's stock; and (6) Quorum's ineligibility to file a Form S-3 during the Class Period was only due to timing factors. (Id. at 13-24.)

The Nye Report also included an event study that used a regression analysis to determine whether a cause-and-effect relationship existed between the material goodwill and long-live asset impairment disclosure and the resulting downward movements in Quorum's stock price. (Id. at 26.) According to the event study, event dates on which new, material, positive Quorum-specific news reached the market were associated with a statistically significant positive return; and event dates on which new, material, negative Quorum-specific news reached the market were associated with a statistically significant negative return, including the impairment announcement. (Id. at 27.) Finally, the Nye Report concluded that, although damages had not yet been calculated, those damages for putative class members could be calculated on a class-wade basis. (Id. at 28-31.) After the Third Amended Complaint, Dr. Nye authored an amended report ("Nye Amended Report") specifically attributing Quorum's stock decline to: (1) financial results that were well below market expectations; (2) impairment of goodwill and long-lived assets; (3) reduced EBITDA guidance; and (4) increased standalone costs associated with Quorum's spinoff. (Doc. No. 185-1 at 19.)

In their first response, Defendants seek to defeat Plaintiffs' fraud on the market reliance theory by demonstrating that the alleged misrepresentations concerning Quorum's goodwill and

18

long-lived assets had no price impact on Quorum's stock. (Doc. No. 167 at 13.) Regarding the impairment announcement, Defendants argue that there was no front-end impact (i.e., the alleged misrepresentations did not inflate Quorum's stock in the first instance) because "all of the facts [that] required an impairment were publicly known before Quorum's stock began trading." (Id. at 14.) Defendants further contend that there was no back-end impact (i.e., the alleged corrective disclosure did not cause the stock price to fall) because the market was wholly indifferent to the impairment announcement. (Id.) Specifically, as to the back-end impact argument, Defendants assert that Quorum's stock price decline was not caused by the impairment announcement (which revealed nothing of consequence that was not already known), but, rather, was due to the financial results and earning guidelines that were below market expectations. (Id. at 16-17.)

In support of their argument, Defendants filed a competing expert report from Lucy P. Allen (the "Allen Report"). (Doc. No. 168-1 at 3.) The Allen Report concludes that the alleged misrepresentations concerning goodwill and long-lived assets did not have a price impact because: (1) the factors impairing Quorum's goodwill and long-lived assets were known to investors when Quorum's stock started trading, thus the price already included the impairment; (2) there was no statistically significant reaction to Quorum or CHSI's stock price due to the impairment announcement; (3) financial analysts uniformly attributed the decline to other financial metrics besides the impairment announcement. (Id. at 3-5.) The Allen Report found that the "triggering factors" necessitating impairment of Quorum's goodwill and long-lived assets—a sustained decrease in CHSI's stock price, a decline in CHSI and Quorum's overall financial performance, the relative underperformance of Quorum's hospitals prior to the spinoff, deterioration of the hospital management industry, and increased market competition—were known to investors and

19

the market before Quorum's stock began trading. (*Id.* at 18-32.) Therefore, the impairment announcement could not have had a front-end price impact (i.e., Quorum's stock was not overstated at the outset) because the negative information necessitating the impairment was already known before the stock began trading. (Id. at 32.)

Further, the Allen Report included an event study, which determined that, although CHSI announced an impairment to its own goodwill and long-lived assets prior to Quorum's impairment announcement, this announcement did not have a statistically significant effect on either company's stock. (Id. at 36-41.) Moreover, the Allen Report exhaustively cited analyst commentary, which uniformly attributed the stock decline to earnings misses, declines in EBITDA forecasts, and increased costs associated with the spinoff. (Id. at 41-48.) Finally, the Allen Report included a study of other companies' announcements of goodwill and long-lived asset write-downs similar to the Quorum's, and these studies showed no statistically significant effect on these companies' stock prices from those announcements. (Id. at 53-56.) After the Third Amended Complaint was filed, Allen authored an amendment to the Allen Report, noting that she had not been asked by counsel to consider whether the new alleged misstatements (those related to the EBITDA range and standalone costs) had a price impact and affirming she offered "no opinion on that question." (Doc. No. 180-1 at 3-4.)

## A. Legal Standard—Motion to Certify Class

To certify a class, the Court must be satisfied that Plaintiffs have met the requirements of both Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure. "A class action will be certified only if, after 'rigorous analysis,' the Court is satisfied that the prerequisites of Rule 23(a) have been met and also that the action falls within one of the categories under Rule 23(b)." Castillo

20

v. Envoy Corp., 206 F.R.D. 464, 467-68 (M.D. Tenn. 2002) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts "must exercise that discretion within the framework of Rule 23." Coleman v. Gen. Motors Acceptance Corp., 296 F.3d 443, 446 (6th Cir. 2002); see also In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996).

The party seeking class certification bears the burden of showing that the requirements for class certification are met. Bridging Communities Inc. v. Top Flite Fin. Inc., 843 F.3d 1119, 1124 (6th Cir. 2016). In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. In re Am. Med. Sys., Inc., 75 F.3d at 1079; see also Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-52 (2011) (explaining that a court's rigorous analysis will frequently entail "some overlap" with the merits of plaintiffs' underlying claim) (citing Falcon, 457 U.S. at 160). A party seeking to maintain a class action thus must be prepared to establish that Rule 23(a)'s numerosity, commonality, typicality and adequacy of representation requirements have been met. Comcast v. Behrend, 569 U.S. 27, 33 (2013). In addition, the party must satisfy, through evidentiary proof, at least one of Rule 23(b)'s provisions. Id. at 34. Plaintiffs rely on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

21

    (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Although Plaintiffs retain the initial burden of demonstrating their compliance with Rule 23(a) and Rule 23(b)(3), Defendants only challenge compliance in one respect: whether "questions of law or fact common to class members predominate over any questions affecting only individual members," in particular regarding the issue of reliance. (See Doc. No. 167 at 14.) Accordingly, the Court will first consider the parties' reliance arguments and then, if necessary, consider whether Plaintiffs have carried their initial burden in other respects.

### B. Rule 23(b)(3)—Reliance

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II"), 573 U.S. 258, 263 (2014). The Supreme Court has found that investors may satisfy the reliance requirement by invoking a presumption known as the fraud-on-the-market. Basic, 108 S.Ct. at 989-90. Without the presumption of reliance, a suit cannot proceed as a class action because each plaintiff would have to prove reliance individually, so common issues would never predominate over individual ones as required by Rule 23(b)(3). Halliburton II, 573 U.S. at 282. The Basic fraud-on-the-market presumption is based on the premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices. In re

22

Bankcorp South, Inc., Case No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (denying BancorpSouth's petition to appeal grant of class certification on the grounds that BancorpSouth's incomplete and allegedly misleading voluntary disclosures imputed upon them a duty to full disclose material facts and other factors also weighed against granting an appeal).

To demonstrate that the fraud-on-the-market presumption of reliance applies, a plaintiff must show that "(1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."[5] Halliburton II, 573 U.S. at 268. The presumption can be rebutted by appropriate evidence, such as proof that news of the truth entered the market and dissipated the effects of the prior misstatements. Id. at 462 ("The presumption, however, is just that and can be rebutted by appropriate evidence.") (internal quotations omitted). Any showing that "severs" the link between the alleged misrepresentation and either the price received or paid by the plaintiff or his decision to trade at a fair market price will be sufficient to rebut the presumption. Halliburton II, 573 U.S. at 268-69. For example, evidence that a plaintiff knew the company's statements were false but sold his shares nevertheless could rebut the presumption of reliance. Basic, 485 U.S. at 248.

1. Publicly Known

---

[5] See Amgen Inc. v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 461-62 (2013) ("The fraud-on-the-market theory rests on the premise that certain well-developed markets are efficient processors of public information . . . [i]n such markets, the market price of shares will reflect all publicly available information.") (internal quotations omitted). If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price. Id.

As noted, to rely on the fraud-on-the-market presumption theory of reliance, Plaintiffs must first demonstrate that Defendants' alleged misrepresentations were publicly known. Halliburton II, 573 U.S. at 268-69. Neither Zwick nor Defendants set forth any specific arguments regarding whether Defendants' alleged misrepresentations and omissions were "publicly known," presumably because there is no real doubt that the identified statements were communicated to the public. Defendants' alleged misrepresentations were "communicated to investors" through the spin-off announcement, investor presentations, press releases, and Form 10 filings. (Doc. No. 169 at 6-7.) Other courts have summarily recognized that these types of statements are sufficiently public to be "publicly known." See, e.g., In re Red Hat, Inc. Sec. Litig., 261 F.R.D. 83, 91 (E.D.N.C. 2009) (summarily finding statements made "via SEC filings, press releases, analyst conferences calls, and an interview" to be public); In re Neustar, Inc. Sec. Litig., Case No. 1:14-cv-885, 2015 WL 5674798, at * 7 (E.D. Va. Sept. 23, 2015) (same). The Court concurs and similarly finds that the identified statements in this case are sufficiently public to satisfy Plaintiffs' obligation under the first element of the presumption.

2. Materiality

Even though materiality is an element for invoking the fraud-on-the-market presumption, the Supreme Court has held that it should be left to the merits stage of the litigation because it does not bear on the predominance requirement of Rule 23(b)(3). See Halliburton II, 573 U.S. at 282-83. In Amgen, the Court stated that proof of materiality is not a prerequisite to class certification, noting that materiality is a common question and the class will either prevail or fall in unison as to that issue. See 568 U.S. at 459 ("[W]e hold that such proof is not a prerequisite to class certification . . . the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to

24

select the method best suited to adjudication of the controversy fairly and efficiently.") (internal quotations omitted). Thus, the Court need not address materiality on this motion.

3. Efficient Market

The fraud-on-the-market theory centrally rests on the premise that certain well-developed markets are efficient processors of public information. Id. In such markets, the market price of shares will reflect all publicly available information. Id. A district court may consider five factors in determining whether a security was traded on an efficient market: (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. See Freeman v. Laventhol & Horwath, 915 F.2d 193, 197-98 (6th Cir. 1990); Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 605 (S.D. Ohio 2003). "Rather than apply these factors as a checklist, they are to be used as analytic tools by the court to assist in its market efficiency determination." In re Accredo Health, Inc. Sec. Litig., Case No. 03-2216-DP, 2006 WL 1716910, at * 10 (W.D. Tenn. Apr. 10, 2006).

Here, Plaintiffs spend a considerable portion of their brief arguing that Quorum stock was traded on an efficient market, primarily because the stock traded on the New York Stock Exchange ("NYSE"). (See Doc. No. 19-25.) As evidentiary support for their efficient market argument, Plaintiffs rely on the Nye Report, which concluded that Quorum stock traded on an efficient market because: (1) the average weekly trading volume of outstanding shares was 9% during the Class Period; (2) the annualized share turnover was 507.7%; (3) over twenty (20) analyst reports were issued on Quorum during the Class Period; (4) there were more than eighty (80) active market

25

makers[6] that traded Quorum stock during the Class Period; (5) there was significant arbitrage activity related to Quorum's stock; and (6) Quorum's ineligibility to file a Form S-3 during the Class Period was only due to timing factors. (Doc. No. 163-1 at 13-24.) The Nye Report concluded that all of these factors indicated that the Quorum stock traded on an efficient market such that its price incorporated all of the readily available public information. (Id.) Defendants contend that Plaintiffs have not carried their burden, relying upon price impact arguments and challenging the findings of Plaintiffs' expert through their own expert report—the Allen Report. However, although it challenges the Nye Report's conclusions, the Allen Report in fact assumes market efficiency. (See Doc. No. 168-1 at 16.)

The Court finds that shares of the Quorum's stock traded on an efficient market primarily because they were traded in significant volume on the NYSE. Accredo, 2006 WL 1716910, at *8-9 ("Accredo's stock was traded on a national security market [NASDAQ] that is widely regarded as efficient."). Certain markets, such as the NYSE, are well-suited for application of the fraud-on-the-market theory because "[a] well-developed and impersonal market, such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly available information about a given security into the market price of that security." Bovee, 216 F.R.D. at 606. Additionally, Plaintiffs evidentiary support—the Nye Report—demonstrates that Quorum stock was traded in large volumes on the NYSE, numerous analysts followed the stock, and there were approximately twenty market makers and significant arbitrage activity. (Doc. No. 163-1 at 13-24.) All of the

---

[6] Market makers are persons who, with respect to a particular security, regularly publish bids and offer quotations, furnish competitive bids and quotations on request, or are ready, willing and able to effect transactions in reasonable quantities at quoted prices with other brokers or dealers. See 17 C.F.R. § 240.15c3–1[c][8] (2006).

26

factors also indicate that Quorum stock traded on an efficient market. <u>Freeman</u>, 915 F.2d at 197-98. Again, Defendants do not contest this finding through their evidence, because, as noted, the Allen Report assumed market efficiency. (Doc. No. 168-1 at 16.) Accordingly, the Court is satisfied that Plaintiffs have established, for purposes of class certification, that shares of Quorum stock traded in an efficient market. <u>Id.</u>

4. <u>Rebuttal—Price Impact</u>[7]

As noted, Defendants argue that they have rebutted Plaintiffs' fraud on the market theory of reliance by showing that the alleged misrepresentations had no price impact. (Doc. No. 167 at 13-21.) Plaintiffs are not required to present direct evidence to prove price impact to rely on the fraud-on-the-market presumption. <u>Sterling Heights Gen. Emp. Ret. Sys. v. Prudential Fin., Inc.</u>, Case No. 12-5275, 2015 WL 5097883, at * 12 (D. N.J. Aug. 31, 2015) ("A plaintiff is not required to prove price impact in order to rely on the <u>Basic</u> presumption."). Plaintiffs may establish entitlement to the presumption through evidence of publicity and market efficiency, an indirect way of showing price impact. <u>Id.</u> As noted and discussed in detail above, Plaintiffs offer the Nye Report as evidentiary support showing publicity and market efficiency. (Doc. No. 163-1 at 13-24; Doc. No. 185-1.) The burden to prove lack of price impact by a preponderance of the evidence rests on the defendant in order to rebut the fraud-on-the-market presumption at this stage. <u>Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.</u>, 879 F.3d 474, 485 (2d Cir. 2018) ("[D]efendants

---

[7] In connection with the issue of price impact, the Court extensively reviewed <u>Grae v. Corr. Corp. of America, et al.</u>, No. 3:16-cv-2267, 2019 WL 266674, at *3-10 (M.D. Tenn. Jan. 18, 2019), and the parties' respective supplemental briefs (Doc. Nos. 204, 205) on the issue. However, the Court notes that the <u>Grae</u> court recently vacated the opinion, and, therefore, it holds no precedential value to the instant case.

seeking to rebut the <u>Basic</u> presumption of reliance must do so by a preponderance of the evidence.")

Before <u>Halliburton II</u>, courts around the country held that the presumption of reliance could be rebutted at trial. <u>See</u>, <u>e.g.</u>, <u>In re Accredo Health, Inc.</u>, 2006 WL 1716910, at *11 (holding that presumed reliance can be rebutted at trial); <u>In re Polymedica Corp. Sec. Litig.</u>, 432 F.3d 1, 17 (1st Cir. 2005) (holding that at the class certification stage, courts will not address whether defendants can rebut the presumption of reliance). In <u>Halliburton II</u>, however, the Court held that defendants must be afforded an opportunity before class certification to demonstrate that an alleged misrepresentation did not actually affect the market price of the stock, whether through direct or indirect price impact evidence. <u>Haliburton II</u>, 573 U.S. at 280-81. Defendants' evidentiary support on price impact is limited to the Allen Report. (Doc. No. 168-1.)

Price impact is the consideration of whether the alleged misrepresentations affected the market price. <u>Id.</u> Because a lack of price impact would defeat "the basis for finding that the fraud had been transmitted through market price," a lack of price impact would necessarily defeat a plaintiff's ability to invoke <u>Basic</u>'s presumption of reliance. <u>Id.</u> As discussed above, without the presumption of reliance, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." <u>Id.</u> at 281-82. Thus, price impact is "an essential precondition for any Rule 10b–5 class action." <u>Id.</u> A defendant can therefore defeat the presumption of reliance at the class certification stage with evidence of a lack of price impact. <u>Id.</u>

Defendants assert that there are two ways of proving a lack of price impact: (1) by showing that the alleged misrepresentations did not cause a stock price to increase (what Defendants refer

to as "front-end price impact"), or (2) by showing that the alleged corrective disclosure did not cause the stock price to decrease (what Defendants refer to as "back-end price impact"). (Doc. No. 167 at 13-14.) Here, Defendants, through the Allen Report, attempt to show that the alleged misrepresentations, and corrective disclosures, did not cause Quorum's stock price to increase or decrease in a statistically significant manner. (Id. at 13-21; Doc. No. 168-1.)

There is no dispute that, after Quorum issued its Q2 2016 report, which downwardly revised its EBITDA range, announced significant increases in standalone costs, and impairments to its goodwill and long-lived assets, Quorum's stock price declined by almost 50%. (See Doc. No. 167 at 16.) Plaintiffs' evidentiary support—the Nye Report—concluded that the corrective disclosure at issue (the impairment announcement) was responsible for at least a portion of Quorum's stock decline. (Doc. No. 185-1 at 13-20.) Defendants' evidentiary support—the Allen Report—found that any decline in stock price reflected other factors besides the impairment announcement, including financial results and earnings guidance that were below market expectations. (Doc. No. 168-1 at 17.) "Whether Defendants are correct, however, involves merits issues as to causation." Burges v. Bancorpsouth, Inc., Case No. 3:14-cv-1564, 2017 WL 2772122, at *10 (M.D. Tenn. Jun. 26, 2017) ("Defendants assert that any decline in stock price after the corrective disclosure likely reflects other factors besides the corrective disclosure . . . [w]hether Defendants are correct, however, involved merits issues as to causation.").

Although the Court acknowledges that it is authorized to "take a peek" at the merits, definitively determining causation constitutes a finding on the merits, which is to be avoided at this stage of litigation. See Castillo v. Envoy Corp., 206 F.R.D. 464, 471 (M.D. Tenn. 2002) ("The Court his hereby asked to walk the fine line [between] avoid[ing] a finding on the merits, and Basic

29

. . .). Further, Plaintiffs have produced the Nye Report, showing statistically significant changes in Quorum's stock price following the disclosure of the impairment, and Defendants have produced the Allen Report to the contrary. At best, the evidence on the issue is split evenly. Therefore, Defendants' proof does not rebut the fraud on the market presumption by a preponderance of the evidence. Rather, it creates a factual dispute as to the materiality of the impairment announcement and its consequent correction on Quorum's stock price, which involves complicated questions of causation better left until trial or at the earliest a summary judgment proceeding. See In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 308, 311 (E.D. Mich. 2001) ("At this stage, the Court should not delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts.").

### C. Rule 23(b)(3)—Superiority of Class Action

Federal Rule 23(b)(3) requires that a class action be superior to other methods of handling the litigation. In determining the superiority of a class action to other litigation options, a court must consider "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

In the instant case, all of these factors weigh in favor of a certifying the case as a class action. First, the relatively small amount of individual damages and the similarity of claims give class members little interest in individually controlling separate actions. Second, the Court is unaware of any other federal litigation concerning these alleged misstatements, nor is such

litigation likely given the costs of litigation relative to the potential recovery on individual claims. Third, concentration of these claims in this Court is desirable, as it will streamline the resolution of the claims and conserve judicial and litigation resources. Finally, the Court is aware of no particular difficulties associated with the management of this class action, especially given the current stage of the litigation. Thus, for purposes of Rule 23(b)(3), a class action is superior to other methods of adjudication in the instant case.

### D. Federal Rule Civil Procedure 23(a)

Having considered Plaintiffs' Rule 23(b) showing, the Court turns its attention to the requirements of Federal Rule Civil Procedure 23(a). As noted, Rule 23(a) establishes four requirements for class certification: the class is so numerous that joinder of all members is impracticable; there are questions of law or fact common to the class; the claims or defenses of the representative party are typical of those of the class; and the representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

1. Numerosity

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. While there is no strict numerical test, "substantial" numbers usually satisfy the numerosity requirement. In re Polyurethane Foam Antitrust Litig., 314 F.R.D. 226, 237 (N.D. Ohio 2014) (citing Daffin v. Ford Motor Co., 458 F.3d 549, 552 (6th Cir. 2006)). "Numerosity is generally assumed to have been met in class action suits involving nationally traded securities." In re Direct Gen. Corp. Sec. Litig., Case No. 3:05-0077, 2006 WL 2265472, at * 2 (M.D. Tenn. Aug. 8, 2006) (citing Ballan v. Upjohn Co., 159 F.R.D. 473, 479 (W.D. Mich. 1994)). Plaintiffs have adequately shown that Quorum's stock was nationally traded and that there are most likely

31

thousands of class members. (Doc. Nos. 162 at 12-13, 163-1 at 7.) The Court finds that the numerosity requirement has been met in this case and Defendants do not suggest otherwise. (See Doc. No. 167.)

2. Commonality

Rule 23(a)'s second requirement for class certification is that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To demonstrate commonality, Plaintiffs must show that class members have suffered the same injury. Dukes, 564 U.S. at 356. Their claims must depend upon a common contention of such a nature that it is capable of class-wide resolution, which means that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Id. at 349-50.

"What matters to class certification is not the raising of common questions, but the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (internal citation and quotations omitted). The mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible. In re Am. Med. Sys., Inc., 75 F.3d at 1080; see also Young v. Nationwide Ins. Co., 693 F.3d 532, 543 (6th Cir. 2012) (presence of questions peculiar to each individual member of the class was no bar when liability arose from a single course of conduct).

Plaintiffs assert that commons questions of law and fact include: (1) whether Defendants' statements were materially false and misleading; (2) whether the underlying misrepresentations and omissions were made with scienter; (3) whether the price of Quorum's stock was artificially inflated during the Class Period. (Doc. No. 162 at 14.) The common questions posed by Plaintiffs

32

do arise from a single course of conduct by Defendants, namely the spinoff of Quorum from CHSI. The misrepresentation allegations are the same as relates to all potential class members. Determination of their truth or falsity, and the intent of Defendants when making the representations, will resolve issues that are central to the validity of each of the claims in one stroke. If those misstatements and omissions violated federal law, they violated federal law as to all potential class members. Therefore, answering those questions will generate common, class-wide answers concerning liability. Accordingly, the Court finds that the commonality requirement is satisfied.

3.  Typicality and Adequacy

Rule 23(a)(3) requires Zwick to show that its claims are typical of the claims of the proposed class. "A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if its claims are based on the same legal theory." In re Am. Med. Sys., 75 F.3d at 1082. Zwick's interests must be aligned with those of the putative class and, in pursuing its own claims, Zwick must also advance the interests of the class members. Id. Moreover, Rule 23(a)(4) requires the Court to find that Zwick will fairly and adequately protect the interests of the class. To satisfy the requirement of adequacy, "the class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Young, 693 F.3d at 543. In other words, Zwick must have common interests with unnamed members of the class and must be able to rigorously prosecute the interests of the class through qualified counsel.

Zwick has carried its burden of establishing that its claims are the same as those of the class. Zwick and the class both allege that Defendants violated Sections 10(b) and 20(a) of the

33

Exchange Act and Rule10b-5 thereunder by making misrepresentations and omissions regarding the impairment of Quorum's goodwill and long-lived assets. The claims of Zwick and the class involve the same security (Quorum), the same alleged misstatements and omissions, the same legal theories, and the same evidence. In other words, Zwick's allegations rise and fall with the class. Defendants have not made any argument to the contrary. (See Doc. Nos. 167, 179, 204.) For all these reasons, the Court finds that Zwick has shown sufficient typicality and adequacy and meets the requirements of Fed. R. Civ. P. 23(a).

### E.   Conclusion—Motion to Certify Class

For all the above reasons, the Court finds that Zwick's Motion to Certify Class (Doc. No. 161) should be granted in part. Additionally, after considering the factors set out in Federal Rule of Civil Procedure 23(g)(1)(A), the Court determines that Pomerantz LLP is qualified to represent the class and is appointed Class Counsel. Zwick will serve as the Class Representative.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part Plaintiffs' Motion to Certify Class (Doc. No. 161) and grant the CHSI and Quorum Defendants' Partial Motions to Dismiss (Doc. Nos. 174, 176). The Class will be defined as set forth herein. Zwick shall serve as Class Representative and Pomerantz LLP as Class Counsel.

The Court will enter an appropriate Order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

34