# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF OMAHA POLICE AND FIREFIGHTERS RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>COGNYTE SOFTWARE LTD, ELAD SHARON, and DAVID ABADI,<br><br>Defendants. | Case No. 1:23-cv-01769-LGS<br><br>[PROPOSED] REPLY DECLARATION OF JEREMY A. LIEBERMAN IN FURTHER SUPPORT OF MOTION OF CLAL INSURANCE COMPANY LTD., CLAL PENSION AND PROVIDENT LTD., AND ATUDOT PENSION FUND FOR EMPLOYEES & INDEPENDENT WORKERS LTD. FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL |

I, Jeremy A. Lieberman, Esq., hereby declare as follows:

1.    I am a Partner with the law firm of Pomerantz LLP ("Pomerantz"), counsel on behalf of Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. (collectively "Clal"), and have personal knowledge of the facts set forth herein.  I make this Declaration in further support of Clal's motion for appointment as Lead Plaintiff and approval of its selection of Pomerantz as Lead Counsel for the Class in the above-captioned action.

2.    Attached hereto as the exhibits indicated are true and correct copies of the following:

| | |
|---|---|
| Exhibit A: | Chart comparing Clal's losses in this litigation as set forth in its motion papers to calculations, prepared by competing movant City of Omaha Police and Firefighters' Retirement System, purporting to represent Clal's losses. |
| Exhibit B: | Analysis of ownership by institutional investors of Cognyte Software Ltd. ("Cognyte") shares issued pursuant to its spin-off from Verint Systems Inc. as of December 31, 2021 and June 28, 2022. |
| Exhibit C: | Excerpt of the Draft Registration Statement filed with the U.S. Securities and Exchange ("SEC") Commission by Cognyte on September 25, 2020. |
| Exhibit D: | Excerpt of the Draft Registration Statement filed with the SEC by Cognyte on November 18, 2020. |
| Exhibit E: | Excerpt of the Registration Statement filed with the SEC by Cognyte on December 22, 2020. |
| Exhibit F: | Threat Report on the Surveillance-for-Hire Industry, prepared by employees of Meta Platforms, Inc., dated December 16, 2021. |
| Exhibit G: | Order entered in *Bajjuri v. Raytheon Technologies Corporation et al.*, 4:20-cv-00648 (D. Ariz.) (Dkt. No. 30), on July 27, 2021. |

1

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed on May 18, 2023, at New York, New York.

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman

2

# EXHIBIT A

## ACCURATE  FIFO  CALCULATION

| Purchase Date | Shares | Price | Amount | Sales Date | Shares | Price | Amount | Loss |
|---|---|---|---|---|---|---|---|---|
| **Account 1** | | | | | | | | |
| 3/5/2021 | 97,295 | $27.4897 | ($2,674,610) | 1/13/2022 | (110,344) | $13.7895 | $1,521,589 | |
| 3/24/2021 | 13,049 | $27.7842 | ($362,556) | | | | | |
| 3/24/2021 | 84,243 | $27.7842 | ($2,340,624) | 1/18/2022 | (243,842) | $12.5742 | $3,066,118 | |
| 6/28/2021 | 97,533 | $23.9838 | ($2,339,212) | | | | | |
| 6/29/2021 | 62,066 | $24.2640 | ($1,505,969) | | | | | |
| 6/29/2021 | 35,467 | $24.2640 | ($860,571) | 1/19/2022 | (201,442) | $12.7682 | $2,572,052 | |
| 7/1/2021 | 97,532 | $24.5325 | ($2,392,704) | | | | | |
| 9/27/2021 | 68,443 | $20.8696 | ($1,428,378) | | | | | |
| 9/27/2021 | 4,710 | $20.8696 | ($98,296) | 1/20/2022 | (5,093) | $12.6418 | $64,385 | |
| 9/28/2021 | 383 | $20.4870 | ($7,847) | | | | | |
| 9/28/2021 | 7,658 | $20.4870 | ($156,889) | 1/24/2022 | (146,303) | $11.2063 | $1,639,515 | |
| 10/4/2021 | 97,538 | $20.4804 | ($1,997,617) | | | | | |
| 11/1/2021 | 41,107 | $19.8749 | ($816,998) | | | | | |
| 11/1/2021 | 56,434 | $19.8749 | ($1,121,620) | 1/25/2022 | (97,536) | $11.1993 | $1,092,335 | |
| 12/1/2021 | 41,102 | $20.3409 | ($836,052) | | | | | |
| 12/1/2021 | 56,438 | $20.3409 | ($1,148,000) | 2/1/2022 | (56,438) | $10.7701 | $607,843 | |
| | **860,998** | | **($20,087,943)** | | **(860,998)** | | **$10,563,836** | **($9,524,107)** |
| | | | | | | | | |
| **Account 2** | | | | | | | | |
| 3/5/2021 | 1,826 | $27.4897 | ($50,196) | 1/19/2022 | (1,826) | $12.7682 | $23,315 | |
| 3/5/2021 | 110 | $27.4897 | ($3,024) | 1/20/2022 | (110) | $12.6418 | $1,391 | |
| 3/5/2021 | 367 | $27.4897 | ($10,089) | 1/24/2022 | (3,158) | $11.2063 | $35,389 | |
| 3/26/2021 | 2,306 | $27.7842 | ($64,070) | | | | | |
| 6/28/2021 | 485 | $23.9838 | ($11,632) | | | | | |
| 6/28/2021 | 1,622 | $23.9838 | ($38,902) | 1/25/2022 | (2,105) | $11.1993 | $23,575 | |
| 6/29/2021 | 483 | $24.2640 | ($11,720) | | | | | |
| 6/29/2021 | 1,624 | $24.2640 | ($39,405) | 2/1/2022 | (11,787) | $10.7701 | $126,947 | |
| 7/1/2021 | 2,108 | $24.5325 | ($51,715) | | | | | |
| 9/29/2021 | 1,578 | $20.8696 | ($32,932) | | | | | |
| 9/30/2021 | 173 | $20.4870 | ($3,544) | | | | | |
| 10/4/2021 | 2,103 | $20.4804 | ($43,070) | | | | | |

Yellow denotes instances where sales are matched to purchases after the sales date.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11/1/2021 | 2,100 | $19.8749 | ($41,737) | | | | | |
| 12/1/2021 | 2,101 | $20.3409 | ($42,736) | | | | | |
| | **18,986** | | **($444,772)** | | **(18,986)** | | **$210,617** | **($234,156)** |

**Account 3**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3/5/2021 | 363 | $27.4897 | ($9,979) | 3/11/2021 | (363) | $32.0443 | $11,632 | |
| 3/5/2021 | 39 | $27.4897 | ($1,072) | 7/28/2021 | (360) | $25.2430 | $9,087 | |
| 3/26/2021 | 321 | $27.7842 | ($8,919) | | | | | |
| 3/26/2021 | 81 | $27.7842 | ($2,251) | 8/5/2021 | (180) | $27.6101 | $4,970 | |
| 6/28/2021 | 99 | $23.9838 | ($2,374) | | | | | |
| 6/28/2021 | 129 | $23.9838 | ($3,094) | 8/6/2021 | (129) | $27.4757 | $3,544 | |
| 6/28/2021 | 132 | $23.9838 | ($3,166) | 8/11/2021 | (180) | $27.6501 | $4,977 | |
| 6/29/2021 | 48 | $24.2640 | ($1,165) | | | | | |
| 6/29/2021 | 20 | $24.2640 | ($485) | 8/17/2021 | (20) | $27.5655 | $551 | |
| 6/29/2021 | 14 | $24.2640 | ($340) | 11/22/2021 | (14) | $23.1602 | $324 | |
| 6/29/2021 | 278 | $24.2640 | ($6,745) | 12/17/2021 | (360) | $18.3621 | $6,610 | |
| 7/1/2021 | 82 | $24.5325 | ($2,012) | | | | | |
| 7/1/2021 | 278 | $24.5325 | ($6,820) | 12/20/2021 | (422) | $17.3047 | $7,303 | |
| 9/29/2021 | 144 | $20.8696 | ($3,005) | | | | | |
| 9/29/2021 | 125 | $20.8696 | ($2,609) | 12/21/2021 | (1,232) | $15.4704 | $19,060 | |
| 9/30/2021 | 30 | $20.4870 | ($615) | | | | | |
| 10/4/2021 | 359 | $20.4804 | ($7,352) | | | | | |
| 11/1/2021 | 359 | $19.8749 | ($7,135) | | | | | |
| 12/1/2021 | 359 | $20.3409 | ($7,302) | | | | | |
| | **3,260** | | **($76,439)** | | **(3,260)** | | **$68,059** | **($8,381)** |

Yellow denotes instances where sales are matched to purchases after the sales date.

## ACCURATE  LIFO  CALCULATION

| Purchase Date | Shares | Price | Amount | Sales Date | Shares | Price | Amount | Loss |
|---|---|---|---|---|---|---|---|---|
| **Account 1** | | | | | | | | |
| 3/5/2021 | 88,021 | $27.4897 | ($2,419,671) | 3/11/2021 | (88,021) | $32.0443 | $2,820,571 | |
| 7/1/2021 | 97,530 | $24.5325 | ($2,392,655) | 7/28/2021 | (97,530) | $25.2278 | $2,460,472 | |
| 7/1/2021 | 2 | $24.5325 | ($49) | 8/3/2021 | (48,766) | $27.5949 | $1,345,695 | |
| 6/29/2021 | 48,764 | $24.2640 | ($1,183,210) | | | | | |
| 6/29/2021 | 35,007 | $24.2640 | ($849,410) | 8/4/2021 | (35,007) | $27.4606 | $961,312 | |
| 6/29/2021 | 13,762 | $24.2640 | ($333,921) | 8/10/2021 | (48,766) | $27.6349 | $1,347,644 | |
| 6/28/2021 | 35,004 | $23.9838 | ($839,529) | | | | | |
| 6/28/2021 | 5,511 | $23.9838 | ($132,175) | 8/17/2021 | (5,511) | $27.5503 | $151,830 | |
| 11/1/2021 | 3,768 | $19.8749 | ($74,889) | 11/22/2021 | (3,768) | $23.1602 | $87,268 | |
| 12/1/2021 | 97,537 | $20.3409 | ($1,983,990) | 12/17/2021 | (97,537) | $18.3621 | $1,790,984 | |
| 12/1/2021 | 3 | $20.3409 | ($61) | 12/20/2021 | (114,489) | $17.3047 | $1,981,198 | |
| 11/1/2021 | 93,773 | $19.8749 | ($1,863,729) | | | | | |
| 10/4/2021 | 20,713 | $20.4804 | ($424,211) | | | | | |
| 10/4/2021 | 76,825 | $20.4804 | ($1,573,407) | 12/21/2021 | (321,603) | $15.4704 | $4,975,327 | |
| 9/28/2021 | 8,041 | $20.4870 | ($164,736) | | | | | |
| 9/27/2021 | 73,153 | $20.8696 | ($1,526,674) | | | | | |
| 6/28/2021 | 57,018 | $23.9838 | ($1,367,508) | | | | | |
| 3/24/2021 | 97,292 | $27.7842 | ($2,703,180) | | | | | |
| 3/5/2021 | 9,274 | $27.4897 | ($254,939) | | | | | |
| | **860,998** | | **($20,087,943)** | | **(860,998)** | | **$17,922,300** | **($2,165,643)** |
| | | | | | | | | |
| **Account 2** | | | | | | | | |
| 3/5/2021 | 2,085 | $27.4897 | ($57,316) | 3/11/2021 | (2,085) | $32.0443 | $66,812 | |
| 7/1/2021 | 2,108 | $24.5325 | ($51,715) | 7/28/2021 | (2,110) | $25.2430 | $53,263 | |
| 6/29/2021 | 2 | $24.2640 | ($49) | | | | | |
| 6/29/2021 | 1,054 | $24.2640 | ($25,574) | 8/5/2021 | (1,054) | $27.6101 | $29,101 | |
| 6/29/2021 | 757 | $24.2640 | ($18,368) | 8/6/2021 | (757) | $27.4757 | $20,799 | |
| 6/29/2021 | 294 | $24.2640 | ($7,134) | 8/11/2021 | (1,054) | $27.6501 | $29,143 | |
| 6/28/2021 | 760 | $23.9838 | ($18,228) | | | | | |
| 6/28/2021 | 119 | $23.9838 | ($2,854) | 8/17/2021 | (119) | $27.5655 | $3,280 | |
| 11/1/2021 | 81 | $19.8749 | ($1,610) | 11/22/2021 | (81) | $23.1602 | $1,876 | |

Yellow denotes instances where sales are matched to purchases after the sales date.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/1/2021 | 2,101 | $20.3409 | ($42,736) | 12/17/2021 | (2,103) | $18.3621 | $38,615 | |
| 11/1/2021 | 2 | $19.8749 | ($40) | | | | | |
| 11/1/2021 | 2,017 | $19.8749 | ($40,088) | 12/20/2021 | (2,469) | $17.3047 | $42,725 | |
| 10/4/2021 | 452 | $20.4804 | ($9,257) | | | | | |
| 10/4/2021 | 1,651 | $20.4804 | ($33,813) | 12/21/2021 | (7,154) | $15.4704 | $110,675 | |
| 9/30/2021 | 173 | $20.4870 | ($3,544) | | | | | |
| 9/29/2021 | 1,578 | $20.8696 | ($32,932) | | | | | |
| 6/28/2021 | 1,228 | $23.9838 | ($29,452) | | | | | |
| 3/26/2021 | 2,306 | $27.7842 | ($64,070) | | | | | |
| 3/5/2021 | 218 | $27.4897 | ($5,993) | | | | | |
| | **18,986** | | **($444,772)** | | **(18,986)** | | **$396,291** | **($48,481)** |

**Account 3**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3/5/2021 | 363 | $27.4897 | ($9,979) | 3/11/2021 | (363) | $32.0443 | $11,632 | |
| 7/1/2021 | 360 | $24.5325 | ($8,832) | 7/28/2021 | (360) | $25.2430 | $9,087 | |
| 6/29/2021 | 180 | $24.2640 | ($4,368) | 8/5/2021 | (180) | $27.6101 | $4,970 | |
| 6/29/2021 | 129 | $24.2640 | ($3,130) | 8/6/2021 | (129) | $27.4757 | $3,544 | |
| 6/29/2021 | 51 | $24.2640 | ($1,237) | 8/11/2021 | (180) | $27.6501 | $4,977 | |
| 6/28/2021 | 129 | $23.9838 | ($3,094) | | | | | |
| 6/28/2021 | 20 | $23.9838 | ($480) | 8/17/2021 | (20) | $27.5655 | $551 | |
| 11/1/2021 | 14 | $19.8749 | ($278) | 11/22/2021 | (14) | $23.1602 | $324 | |
| 12/1/2021 | 359 | $20.3409 | ($7,302) | 12/17/2021 | (360) | $18.3621 | $6,610 | |
| 11/1/2021 | 1 | $19.8749 | ($20) | | | | | |
| 11/1/2021 | 344 | $19.8749 | ($6,837) | 12/20/2021 | (422) | $17.3047 | $7,303 | |
| 10/4/2021 | 78 | $20.4804 | ($1,597) | | | | | |
| 10/4/2021 | 281 | $20.4804 | ($5,755) | 12/21/2021 | (1,232) | $15.4704 | $19,060 | |
| 9/30/2021 | 30 | $20.4870 | ($615) | | | | | |
| 9/29/2021 | 269 | $20.8696 | ($5,614) | | | | | |
| 6/28/2021 | 211 | $23.9838 | ($5,061) | | | | | |
| 3/26/2021 | 402 | $27.7842 | ($11,169) | | | | | |
| 3/5/2021 | 39 | $27.4897 | ($1,072) | | | | | |
| | **3,260** | | **($76,439)** | | **(3,260)** | | **$68,059** | **($8,381)** |

Yellow denotes instances where sales are matched to purchases after the sales date.

IMPROPER OMAHA P&F LIFO CALCULATION

| Purchase Date | Shares | Price | Amount | Sales Date | Shares | Price | Amount | Loss |
|---|---|---|---|---|---|---|---|---|
| **Account 1** | | | | | | | | |
| 3/5/2021 | 97,295 | $27.4897 | ($2,674,610) | 2/2/2021 | (101,900) | $32.6779 | $3,329,878 | |
| 3/24/2021 | 4,605 | $27.7842 | ($127,946) | | | | | |
| 3/24/2021 | 92,687 | $27.7842 | ($2,575,234) | 2/11/2021 | (116,750) | $30.0402 | $3,507,193 | |
| 6/28/2021 | 24,063 | $23.9838 | ($577,122) | | | | | |
| 6/28/2021 | 37,963 | $23.9838 | ($910,497) | 2/18/2021 | (37,963) | $31.5938 | $1,199,395 | |
| 6/28/2021 | 35,507 | $23.9838 | ($851,593) | 3/11/2021 | (88,021) | $32.0443 | $2,820,571 | |
| 6/29/2021 | 52,514 | $24.2640 | ($1,274,200) | | | | | |
| 6/29/2021 | 45,019 | $24.2640 | ($1,092,341) | 7/28/2021 | (97,530) | $25.2278 | $2,460,472 | |
| 7/1/2021 | 52,511 | $24.5325 | ($1,288,226) | | | | | |
| 7/1/2021 | 45,021 | $24.5325 | ($1,104,478) | 8/3/2021 | (48,766) | $27.5949 | $1,345,695 | |
| 9/27/2021 | 3,745 | $20.8696 | ($78,157) | | | | | |
| 9/27/2021 | 35,007 | $20.8696 | ($730,582) | 8/4/2021 | (35,007) | $27.4606 | $961,312 | |
| 9/27/2021 | 34,401 | $20.8696 | ($717,935) | 8/10/2021 | (48,766) | $27.6349 | $1,347,644 | |
| 9/28/2021 | 8,041 | $20.4870 | ($164,736) | | | | | |
| 10/4/2021 | 6,324 | $20.4804 | ($129,518) | | | | | |
| 10/4/2021 | 5,511 | $20.4804 | ($112,867) | 8/17/2021 | (5,511) | $27.5503 | $151,830 | |
| 10/4/2021 | 3,768 | $20.4804 | ($77,170) | 11/22/2021 | (3,768) | $23.1602 | $87,268 | |
| 10/4/2021 | 81,935 | $20.4804 | ($1,678,062) | 12/17/2021 | (97,537) | $18.3621 | $1,790,984 | |
| 11/1/2021 | 15,602 | $19.8749 | ($310,088) | | | | | |
| 11/1/2021 | 81,939 | $19.8749 | ($1,628,529) | 12/20/2021 | (114,489) | $17.3047 | $1,981,198 | |
| 11/1/2021 | 32,550 | $20.3409 | ($662,096) | | | | | |
| 12/1/2021 | 64,990 | $20.3409 | ($1,321,955) | 12/21/2021 | (64,990) | $15.4704 | $1,005,421 | |
| | **860,998** | | **($20,087,943)** | | **(860,998)** | | **$21,988,861** | **$1,900,918** |
| | | | | | | | | |
| **Account 2** | | | | | | | | |
| 3/5/2021 | 2,303 | $27.4897 | ($63,309) | 2/16/2021 | (2,766) | $30.0402 | $83,091 | |
| 3/26/2021 | 463 | $27.7842 | ($12,864) | | | | | |
| 3/26/2021 | 899 | $27.7842 | ($24,978) | 2/18/2021 | (899) | $31.5938 | $28,403 | |
| 3/26/2021 | 944 | $27.7842 | ($26,228) | 3/11/2021 | (2,085) | $32.0443 | $66,812 | |
| 6/28/2021 | 1,141 | $23.9838 | ($27,366) | | | | | |
| 6/28/2021 | 966 | $23.9838 | ($23,168) | 7/28/2021 | (2,110) | $25.2430 | $53,263 | |

Yellow denotes instances where sales are matched to purchases after the sales date.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6/29/2021 | 1,144 | $24.2640 | ($27,758) | | | | | |
| 6/29/2021 | 963 | $24.2640 | ($23,366) | 8/5/2021 | (1,054) | $27.6101 | $29,101 | |
| 7/1/2021 | 91 | $24.5325 | ($2,232) | | | | | |
| 7/1/2021 | 757 | $24.5325 | ($18,571) | 8/6/2021 | (757) | $27.4757 | $20,799 | |
| 7/1/2021 | 1,054 | $24.5325 | ($25,857) | 8/11/2021 | (1,054) | $27.6501 | $29,143 | |
| 7/1/2021 | 119 | $24.5325 | ($2,919) | 8/17/2021 | (119) | $27.5655 | $3,280 | |
| 7/1/2021 | 81 | $24.5325 | ($1,987) | 11/22/2021 | (81) | $23.1602 | $1,876 | |
| 7/1/2021 | 6 | $24.5325 | ($147) | 12/17/2021 | (2,103) | $18.3621 | $38,615 | |
| 9/29/2021 | 1,578 | $20.8696 | ($32,932) | | | | | |
| 9/30/2021 | 173 | $20.4870 | ($3,544) | | | | | |
| 10/4/2021 | 346 | $20.4804 | ($7,086) | | | | | |
| 10/4/2021 | 1,757 | $20.4804 | ($35,984) | 12/20/2021 | (2,469) | $17.3047 | $42,725 | |
| 11/1/2021 | 712 | $19.8749 | ($14,151) | | | | | |
| 11/1/2021 | 1,388 | $19.8749 | ($27,586) | 12/21/2021 | (3,489) | $15.4704 | $53,976 | |
| 12/1/2021 | 2,101 | $20.3409 | ($42,736) | | | | | |
| | **18,986** | | **($444,772)** | | **(18,986)** | | **$451,086** | **$6,314** |

**Account 3**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3/5/2021 | 402 | $27.4897 | ($11,051) | 2/16/2021 | (484) | $30.0402 | $14,539 |
| 3/26/2021 | 82 | $27.7842 | ($2,278) | | | | |
| 3/26/2021 | 157 | $27.7842 | ($4,362) | 2/18/2021 | (157) | $31.5938 | $4,960 |
| 3/26/2021 | 163 | $27.7842 | ($4,529) | 3/11/2021 | (363) | $32.0443 | $11,632 |
| 6/28/2021 | 200 | $23.9838 | ($4,797) | | | | |
| 6/28/2021 | 160 | $23.9838 | ($3,837) | 7/28/2021 | (360) | $25.2430 | $9,087 |
| 6/29/2021 | 200 | $24.2640 | ($4,853) | | | | |
| 6/29/2021 | 160 | $24.2640 | ($3,882) | 8/5/2021 | (180) | $27.6101 | $4,970 |
| 7/1/2021 | 20 | $24.5325 | ($491) | | | | |
| 7/1/2021 | 129 | $24.5325 | ($3,165) | 8/6/2021 | (129) | $27.4757 | $3,544 |
| 7/1/2021 | 180 | $24.5325 | ($4,416) | 8/11/2021 | (180) | $27.6501 | $4,977 |
| 7/1/2021 | 20 | $24.5325 | ($491) | 8/17/2021 | (20) | $27.5655 | $551 |
| 7/1/2021 | 11 | $24.5325 | ($270) | 11/22/2021 | (14) | $23.1602 | $324 |
| 9/29/2021 | 3 | $20.8696 | ($63) | | | | |
| 9/29/2021 | 266 | $20.8696 | ($5,551) | 12/17/2021 | (360) | $18.3621 | $6,610 |
| 9/30/2021 | 30 | $20.4870 | ($615) | | | | |
| 10/4/2021 | 64 | $20.4804 | ($1,311) | | | | |
| 10/4/2021 | 295 | $20.4804 | ($6,042) | 12/20/2021 | (422) | $17.3047 | $7,303 |

Yellow denotes instances where sales are matched to purchases after the sales date.

| Date | Shares | Price | Amount | Date | Shares | Price | Amount | Total |
|---|---|---|---|---|---|---|---|---|
| 11/1/2021 | 127 | $19.8749 | ($2,524) | | | | | |
| 11/1/2021 | 232 | $19.8749 | ($4,611) | 12/21/2021 | (591) | $15.4704 | $9,143 | |
| 12/1/2021 | 359 | $20.3409 | ($7,302) | | | | | |
| | **3,260** | | **($76,439)** | | **(3,260)** | | **$77,642** | **$1,202** |

Yellow denotes instances where sales are matched to purchases after the sales date.

# EXHIBIT B

**INSTITUTIONAL HOLDINGS OF COGNYTE SPIN-OFF SHARES**
**AS OF DECEMBER 31, 2021 AND JUNE 28, 2022**

| Percentage of Institutions that Retained Shares of Cognyte Received Via Spin-Off | | |
|---|---|---|
| | **12/31/2021** | **6/28/2022** |
| **FIFO** | 50.99% | 34.78% |
| **LIFO** | 56.52% | 49.80% |

| Percentage of Shares Held by Institutions at Spin-Off and Retained | | |
|---|---|---|
| | **12/31/2021** | **6/28/2022** |
| **FIFO** | 52.83% | 22.14% |
| **LIFO** | 57.92% | 30.39% |

# EXHIBIT C

**Table of Contents**

grow the footprint of our solutions with both our existing and new government customers. Many government customers have built proprietary systems. Our strategy is to augment or replace such systems with our analytics platform providing customers more agile response to evolving security challenges.

- ***Leverage our Success in the Government Market to Expand our Presence Over Time in the Enterprise Market.*** We see the opportunity to further leverage our technology for enterprise security customers by expanding our sales and marketing efforts over time to drive broader enterprise adoption of our security analytics software.

**Our Solutions**

Governments and enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and other threats. They seek security analytics software to transform their security operations and drive more strategic outcomes.

Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.

End-users for our solutions include data analysts, investigation managers, SOC operators and field unit teams. Our solutions provide them with a rich set of analytics engines, AI models, workflows, and visualization tools to address specific security challenges.

Our solutions span across three categories. Each category addresses specific security challenges with common characteristics, as follows:

*Investigative Analytics*

Security investigations can vary in length from several days to several years. Some investigations end without resolution due to lack of sufficient insight. More complex security investigations can also be very expensive and labor intensive as they involve data collection from many different sources and a challenging process of connecting the dots to reach quick conclusions and prevent security threats.

The stakes are high. An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public. Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes.

The Cognyte investigative analytics solutions are designed to empower investigative teams with Actionable Intelligence by providing:

- the ability to effectively fuse massive amounts of data from many different sources;

- tools to analyze data through predictive and behavioral analytics and rapidly transform data into critical insights; and

- workflows to uncover vital leads and drive collaboration across investigative teams to accelerate investigations and reach faster conclusions and resolutions.

*Operational Intelligence Analytics*

Field security units are responsible for carrying out operational security missions and it is vital for them to receive real-time or 'near real-time' insights to ensure successful completion of missions. Events on the ground can change rapidly during operation and the field team's ability to quickly adapt and respond is mission critical.

55

**Table of Contents**

The Cognyte operational intelligence analytics solutions are designed to empower field security teams with Actionable Intelligence by providing:

- real-time or near real-time insights delivered to users through mobile devices;

- visualization tools that bring intuitive insights to the field teams; and

- the ability to adjust analytics parameters based on changing circumstances to support events on the ground.

*Threat Intelligence Analytics*

SOCs are used by government and enterprise organizations to detect security threats and effectively manage responses. SOC personnel are responsible for a variety of security tasks including cyber-attacks mitigation, employee safety and operations continuity.

The Cognyte threat intelligence analytics solutions are designed to empower SOC teams with Actionable Intelligence by providing:

- the ability to fuse data from a variety of data sources systems and devices and provide real time situational intelligence;

- tools to analyze events, recognize anomalies, visualize insights, and drive a real time response; and

- visualization and workflows that can drive action and support collaboration across security teams responding to cyber incidents.

**Our Technology**

The Cognyte analytics platform is designed around an open, modular and scalable architecture to enable customers to address a broad range of security threats with fast detection and quick mitigation.

- Our platform powers our entire solution portfolio: Investigative Analytics, Operational Intelligence Analytics, and Threat Intelligence Analytics.

- Our platform easily integrates with customer data sources to enable holistic fusion of data and insights.

- Our platform easily integrates with third-party solutions to expand a customer's ecosystem.

- Our platform enables system integrators who are developing customized software and applying data science.

The platform is designed to support security users, including data analysts, investigation managers, SOC operators, as well as operational field teams. Visualization and workflows enable non-technical users to easily operate within our platform. It also enables skilled security analysts and data scientists to perform advanced data investigation by developing and implementing their own algorithms and data models for specific analytical tasks.

The Cognyte analytics platform is comprised of five key components:

- *Data Analytics Engines.* A diverse toolbox of engines for data analysts to develop and perform analytical investigations such as data modeling tools, and statistical analysis tools.

- *Artificial Intelligence and Machine Learning Models*. AI models to execute automated machine learning algorithms and to find new patterns in massive amounts of data. Also offers the flexibility to develop customer specific machine learning ("ML") models using the platform's AI/ML framework, which can then be tuned based on the aggregated data.

- *Workflows.* Workflows using an integrated set of graphical tools using a drag-and-drop interface with no customizations required. Flexible workflows are configurable to a customer's specific processes and procedures.

56

# EXHIBIT D

**Table of Contents**

grow the footprint of our solutions with both our existing and new government customers. Many government customers have built proprietary systems. Our strategy is to augment or replace such systems with our analytics platform providing customers more agile response to evolving security challenges.

- *Leverage our Success in the Government Market to Expand our Presence Over Time in the Enterprise Market.* We see the opportunity to further leverage our technology for enterprise security customers by expanding our sales and marketing efforts over time to drive broader enterprise adoption of our security analytics software.

**Our Solutions**

Governments and enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and other threats. They seek security analytics software to transform their security operations and drive more strategic outcomes.

Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.

End-users for our solutions include data analysts, investigation managers, SOC operators and field unit teams. Our solutions provide them with a rich set of analytics engines, AI models, workflows, and visualization tools to address specific security challenges.

Our solutions span across three categories. Each category addresses specific security challenges with common characteristics, as follows:

*Investigative Analytics*

Security investigations can vary in length from several days to several years. Some investigations end without resolution due to lack of sufficient insight. More complex security investigations can also be very expensive and labor intensive as they involve data collection from many different sources and a challenging process of connecting the dots to reach quick conclusions and prevent security threats.

The stakes are high. An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public. Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes.

The Cognyte investigative analytics solutions are designed to empower investigative teams with Actionable Intelligence by providing:

- the ability to effectively fuse massive amounts of data from many different sources;

- tools to analyze data through predictive and behavioral analytics and rapidly transform data into critical insights; and

- workflows to uncover vital leads and drive collaboration across investigative teams to accelerate investigations and reach faster conclusions and resolutions.

*Operational Intelligence Analytics*

Field security units are responsible for carrying out operational security missions and it is vital for them to receive real-time or 'near real-time' insights to ensure successful completion of missions. Events on the ground can change rapidly during operation and the field team's ability to quickly adapt and respond is mission critical.

55

**Table of Contents**

The Cognyte operational intelligence analytics solutions are designed to empower field security teams with Actionable Intelligence by providing:

- real-time or near real-time insights delivered to users through mobile devices;

- visualization tools that bring intuitive insights to the field teams; and

- the ability to adjust analytics parameters based on changing circumstances to support events on the ground.

### *Threat Intelligence Analytics*

SOCs are used by government and enterprise organizations to detect security threats and effectively manage responses. SOC personnel are responsible for a variety of security tasks including cyber-attacks mitigation, employee safety and operations continuity.

The Cognyte threat intelligence analytics solutions are designed to empower SOC teams with Actionable Intelligence by providing:

- the ability to fuse data from a variety of data sources systems and devices and provide real time situational intelligence;

- tools to analyze events, recognize anomalies, visualize insights, and drive a real time response; and

- visualization and workflows that can drive action and support collaboration across security teams responding to cyber incidents.

### Our Technology

The Cognyte analytics platform is designed around an open, modular and scalable architecture to enable customers to address a broad range of security threats with fast detection and quick mitigation.

- Our platform powers our entire solution portfolio: Investigative Analytics, Operational Intelligence Analytics, and Threat Intelligence Analytics.

- Our platform easily integrates with customer data sources to enable holistic fusion of data and insights.

- Our platform easily integrates with third-party solutions to expand a customer's ecosystem.

- Our platform enables system integrators who are developing customized software and applying data science.

The platform is designed to support security users, including data analysts, investigation managers, SOC operators, as well as operational field teams. Visualization and workflows enable non-technical users to easily operate within our platform. It also enables skilled security analysts and data scientists to perform advanced data investigation by developing and implementing their own algorithms and data models for specific analytical tasks.

The Cognyte analytics platform is comprised of five key components:

- *Data Analytics Engines.* A diverse toolbox of engines for data analysts to develop and perform analytical investigations such as data modeling tools, and statistical analysis tools.

- *Artificial Intelligence and Machine Learning Models*. AI models to execute automated machine learning algorithms and to find new patterns in massive amounts of data. Also offers the flexibility to develop customer specific machine learning ("ML") models using the platform's AI/ML framework, which can then be tuned based on the aggregated data.

- *Workflows.* Workflows using an integrated set of graphical tools using a drag-and-drop interface with no customizations required. Flexible workflows are configurable to a customer's specific processes and procedures.

56

# EXHIBIT E

**Table of Contents**

grow the footprint of our solutions with both our existing and new government customers. Many government customers have built proprietary systems. Our strategy is to augment or replace such systems with our analytics platform providing customers more agile response to evolving security challenges.

- *Leverage our Success in the Government Market to Expand our Presence Over Time in the Enterprise Market.* We see the opportunity to further leverage our technology for enterprise security customers by expanding our sales and marketing efforts over time to drive broader enterprise adoption of our security analytics software.

**Our Solutions**

Governments and enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and other threats. They seek security analytics software to transform their security operations and drive more strategic outcomes.

Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.

End-users for our solutions include data analysts, investigation managers, SOC operators and field unit teams. Our solutions provide them with a rich set of analytics engines, AI models, workflows, and visualization tools to address specific security challenges.

Our solutions span across three categories. Each category addresses specific security challenges with common characteristics, as follows:

*Investigative Analytics*

Security investigations can vary in length from several days to several years. Some investigations end without resolution due to lack of sufficient insight. More complex security investigations can also be very expensive and labor intensive as they involve data collection from many different sources and a challenging process of connecting the dots to reach quick conclusions and prevent security threats.

The stakes are high. An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public. Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes.

The Cognyte investigative analytics solutions are designed to empower investigative teams with Actionable Intelligence by providing:

- the ability to effectively fuse massive amounts of data from many different sources;

- tools to analyze data through predictive and behavioral analytics and rapidly transform data into critical insights; and

- workflows to uncover vital leads and drive collaboration across investigative teams to accelerate investigations and reach faster conclusions and resolutions.

*Operational Intelligence Analytics*

Field security units are responsible for carrying out operational security missions and it is vital for them to receive real-time or 'near real-time' insights to ensure successful completion of missions. Events on the ground can change rapidly during operation and the field team's ability to quickly adapt and respond is mission critical.

61

**Table of Contents**

The Cognyte operational intelligence analytics solutions are designed to empower field security teams with Actionable Intelligence by providing:

- real-time or near real-time insights delivered to users through mobile devices;

- visualization tools that bring intuitive insights to the field teams; and

- the ability to adjust analytics parameters based on changing circumstances to support events on the ground.

#### *Threat Intelligence Analytics*

SOCs are used by government and enterprise organizations to detect security threats and effectively manage responses. SOC personnel are responsible for a variety of security tasks including cyber-attack mitigation, employee safety and operations continuity.

The Cognyte threat intelligence analytics solutions are designed to empower SOC teams with Actionable Intelligence by providing:

- the ability to fuse data from a variety of data sources systems and devices and provide real time situational intelligence;

- tools to analyze events, recognize anomalies, visualize insights, and drive a real time response; and

- visualization and workflows that can drive action and support collaboration across security teams responding to cyber incidents.

#### **Our Technology**

The Cognyte analytics platform is designed around an open, modular and scalable architecture to enable customers to address a broad range of security threats with fast detection and quick mitigation.

- Our platform powers our entire solution portfolio: Investigative Analytics, Operational Intelligence Analytics, and Threat Intelligence Analytics.

- Our platform easily integrates with customer data sources to enable holistic fusion of data and insights.

- Our platform easily integrates with third-party solutions to expand a customer's ecosystem.

- Our platform enables system integrators who are developing customized software and applying data science.

The platform is designed to support security users, including data analysts, investigation managers, SOC operators, as well as operational field teams. Visualization and workflows enable non-technical users to easily operate within our platform. It also enables skilled security analysts and data scientists to perform advanced data investigation by developing and implementing their own algorithms and data models for specific analytical tasks.

The Cognyte analytics platform is comprised of five key components:

- *Data Analytics Engines.* A diverse toolbox of engines for data analysts to develop and perform analytical investigations such as data modeling tools, and statistical analysis tools.

- *Artificial Intelligence and Machine Learning Models*. AI models to execute automated machine learning algorithms and to find new patterns in massive amounts of data. Also offers the flexibility to develop customer specific machine learning ("ML") models using the platform's AI/ML framework, which can then be tuned based on the aggregated data.

- *Workflows.* Workflows using an integrated set of graphical tools using a drag-and-drop interface with no customizations required. Flexible workflows are configurable to a customer's specific processes and procedures.

62

# EXHIBIT F

December 2021

# Threat Report on the Surveillance-for-Hire Industry

*December 16, 2021*
*By Mike Dvilyanski, Head of Cyber Espionage Investigations,*
*David Agranovich, Director, Threat Disruption, and*
*Nathaniel Gleicher, Head of Security Policy*

 Meta

# Summary

- The global surveillance-for-hire industry targets people to collect intelligence, manipulate and compromise their devices and accounts across the internet.

- While these "cyber mercenaries" often claim that their services only target criminals and terrorists, our months-long investigation concluded that targeting is in fact indiscriminate and includes journalists, dissidents, critics of authoritarian regimes, families of opposition members and human rights activists.

- We disabled seven entities who targeted people across the internet in over 100 countries; shared our findings with security researchers, other platforms and policymakers; issued Cease and Desist warnings; and also alerted people who we believe were targeted to help them strengthen the security of their accounts.

This report is the result of our months-long investigation and disruption of seven entities providing surveillance-for-hire services to target people across the internet, including journalists and human rights activists. It outlines the actions we took against them and includes our research into what we call the "surveillance chain" — phases of attack we've observed over the course of our threat intelligence research. Our hope is to contribute to the broader understanding of the harms this industry represents worldwide and call on the democratic governments to take further steps to help protect people and impose oversight on the sellers of ubiquitous spyware.

## What is surveillance-for-hire and how does it work?

In recent months, there has been an increased focus on NSO, the company behind the Pegasus spyware (i.e. software used to enable surveillance) that we enforced against and sued in 2019. However, it's important to realize that NSO is only one piece of a much broader global cyber mercenary ecosystem. As part of a separate effort, today, we are sharing our findings about seven entities that engaged in surveillance activity and we will continue to take action against others as we find them.

The global surveillance-for-hire industry targets people across the internet to collect intelligence, manipulate them into revealing information and compromise their devices and accounts. While cyber mercenaries often claim that their services and surveillanceware are intended to focus on criminals and terrorists, our investigation found they in fact regularly targeted journalists, dissidents, critics of authoritarian regimes, families of opposition and human rights activists around the world. These companies are part of a sprawling industry that provides intrusive software tools and surveillance services indiscriminately to any customer — regardless of who they target or the human rights abuses they might enable.

This ecosystem works to provide powerful capabilities to its clients against victims who in most cases have no way of knowing they are being targeted. In a sense, this industry "democratizes" these threats, making them available to government and non-government groups that otherwise wouldn't have these capabilities to cause harm. They in effect exponentially increase the supply of threat actors in the world.

We observed three phases of targeting activity by these commercial players that make up their "surveillance chain": *Reconnaissance, Engagement, and Exploitation.* Each phase informs the next and often they repeat in cycles. While some of these entities specialize in one particular stage of surveillance, others support the entire chain from start to finish. Although public debate so far has mainly focused on the *exploitation* phase, it's critical to disrupt the entire lifecycle of the attack because the earlier stages enable the later ones. If we can collectively tackle this threat earlier in the surveillance chain, it would help stop the harm before it gets to its final, most serious stage of compromising people's devices and accounts.

Here are more details and TTPs (the tactics, techniques, and procedures) characteristic for each attack chain stage.

### *Reconnaissance*

This first stage of the surveillance chain is typically the least visible to the targets, who are silently profiled by cyber mercenaries on behalf of their clients, often using software to automate data collection from across the internet. Firms selling these capabilities typically market themselves as "web intelligence services" to enable collection, retention, analysis and searchability — both targeted and at scale.

Usually, these services and apps are designed to pull information about targets from all available online records. They typically scrape and store data from public websites such as blogs, social media, knowledge management platforms like Wikipedia and Wikidata, news media, forums and "dark web" sites. Surveillanceware often provides the benefit of obfuscating the origin of the activity through unattributable infrastructure.

One of the primary means of collecting information on social media is the use of fake accounts. These inauthentic assets can be used to search and view people's profiles, Friends, Likes and other publicly available information, join Groups and Events, and follow or friend targets. They are typically managed by the service provider for its clients, or operated by the customers themselves through software provided by the surveillance-for-hire firm. The level of sophistication of the fake accounts varies considerably across cyber mercenaries and their customers.

### Engagement

This second phase of the surveillance chain is typically the most visible to its targets and most critical to spot to prevent compromise. It is aimed at establishing contact with the targets or people close to them in an effort to build trust, solicit information, and trick them into clicking on links or downloading files (to enable the next "exploitation" phase).

To do that, the operators typically rely on social engineering tactics and use fictitious personas to reach out to people via email, phone calls, text messages, or direct messages on social media. These personas are typically tailored to each particular target to seem credible and avoid tipping people off to suspect malicious intent. These efforts are often prolonged and involve creating backstops for fake personas and organizations across multiple internet services so they appear more legitimate and can withstand scrutiny. The social engineering aims can range from obtaining sensitive information desired by the client to targeting the individual with malware to enable full-device digital surveillance. To achieve them, the operators may attempt to direct people to more direct channels like voice or video calls or even in-person meetings.

### Exploitation

The final stage of the surveillance chain manifests as what's commonly known as "hacking for hire." Providers may create phishing domains designed to trick targets into giving away their credentials to sensitive accounts like email, social media, financial services, and corporate networks. We've seen them spoof the domains of news organizations, telecom providers, banks, and URL-shortening services to deceive their victims.

To enable the delivery of malicious "payload," the operators may either use their own custom-built exploits or acquire malicious tools from other vendors. The sophistication in tooling varies significantly across this industry, ranging from off-the-shelf malware easily detected by most anti-virus software to single-click or even zero-click exploit links sent to the targets. The ultimate goal is to enable device-level surveillance and monitoring of mobile phones or computers. At that point, depending on the exploit, the attacker can access any data on the target's phone or computer, including passwords, cookies, access tokens, photos, videos, messages, address books, as well as silently activate the microphone, camera, and geo-location tracking.

# Our investigative findings and the actions we took

As a result of our months-long investigation, we took action against seven different surveillance-for-hire entities to disrupt their ability to use their digital infrastructure to abuse social media platforms and enable surveillance of people across the internet. They provided services across all three phases of the surveillance chain that were used to indiscriminately target people. These surveillance providers are based in China, Israel, India, and North Macedonia. They targeted people in over 100 countries around the world on behalf of their clients.

To help disrupt these activities, we blocked related infrastructure, banned these entities from our platform and issued Cease and Desist warnings, putting each of them on notice that their targeting of people has no place on our platform and is against our Community Standards. We also shared our findings with security researchers, other platforms, and policymakers so they too can take appropriate action. We also notified people who we believe were targeted to help them take steps to strengthen the security of their accounts.

The entities behind these surveillance operations are persistent, and we expect them to evolve their tactics. However, our detection systems and threat investigators, as well as other teams in the broader security community keep improving to make it harder for them to remain undetected. We will continue to share our findings when possible so people are aware of the threats we are seeing and can take steps to strengthen the security of their accounts.

*Here is what we found*



### 1. Cobwebs Technologies
**Surveillance chain phases: Reconnaissance, Engagement**

We removed about 200 accounts which were operated by Cobwebs and its customers worldwide. This firm was founded in Israel with offices in the United States and sells access to its platform that enables reconnaissance across the internet, including Facebook, Instagram, WhatsApp, Twitter, Flickr, public websites and "dark web" sites. In addition to collecting

information about their targets, the accounts used by Cobwebs customers also engaged in social engineering to join closed communities and forums and trick people into revealing personal information.

Our investigation identified customers in Bangladesh, Hong Kong, the United States, New Zealand, Mexico, Saudi Arabia, Poland, and other countries. In addition to targeting related to law enforcement activities, we also observed frequent targeting of activists, opposition politicians and government officials in Hong Kong and Mexico.

## 2. Cognyte
### Surveillance chain phases: Reconnaissance, Engagement

We removed about 100 accounts on Facebook and Instagram which were linked to Cognyte (formerly known as WebintPro) and its customers. This firm is based in Israel and sells access to its platform which enables managing fake accounts across social media platforms including Facebook, Instagram, Twitter, YouTube, and VKontakte (VK), and other websites to social-engineer people and collect data.

Our investigation identified customers in Israel, Serbia, Colombia, Kenya, Morocco, Mexico, Jordan, Thailand, and Indonesia. Their targets included journalists and politicians around the world.

## 3. Black Cube
### Surveillance chain phases: Reconnaissance, Engagement, Exploitation

We removed about 300 Facebook and Instagram accounts linked to Black Cube, an Israeli-based firm with offices in the UK, Israel and Spain. It provides surveillance services that include social engineering and intelligence gathering. Black Cube operated fictitious personas tailored for its targets: some of them posed as graduate students, NGO and human rights workers, and film and TV producers. They would then attempt to set up calls and obtain the target's personal email address, likely for later phishing attacks. Black Cube relied on different tactics to obfuscate its activity, including by performing unrelated activities, likely to drown out malicious targeting in the "noise" of the seemingly innocuous social media behavior.

Our investigation found a wide range of customers, including private individuals, businesses, and law firms around the world. Targeting by Black Cube on behalf of its customers was also widespread geographically and across industries, including the medical, mining, minerals and energy industries. It also included NGOs in Africa, Eastern Europe, and South America, as well as Palestinian activists. They also targeted people in Russia associated with universities, the telecom, high tech, consulting, legal, and financial industries, real estate development and media.

## 4.  Bluehawk CI
### Surveillance chain phases: Reconnaissance, Engagement, Exploitation

We removed about 100 Facebook accounts linked to Bluehawk, a firm based in Israel with offices in the UK and the US. We collaborated on this investigation with The Daily Beast who had identified a subset of this activity leading us to uncover the full cluster and who's behind it earlier this year. Bluehawk sells a wide range of surveillance-for-hire activities that included social engineering, gathering of litigation-related intelligence about people, and managing fake accounts to trick them into installing malware. The individuals behind this firm showed persistence and continued to try to come back to our platform after we took down dozens of their accounts.

These fake accounts posed as journalists working for existing media organizations like La Stampa in Italy and Fox News in the US to trick their targets into giving an on-camera interview. As reported by The Daily Beast, some of these accounts targeted opponents of the UAE emirate Ras Al Khaimah, while others attempted to social-engineer people in Qatar and politicians and businessmen in the Middle East. Most recently, Bluehawk attempted to create accounts claiming to be based in Argentina.

## 5.  BellTroX
### Surveillance chain phases: Reconnaissance, Engagement, Exploitation

We removed about 400 Facebook accounts, the vast majority of which were inactive for years, linked to BellTroX and used for reconnaissance, social engineering and to send malicious links. BellTroX is based in India and sells what's known as "hacking for hire" services, which were

reported on by [researchers](#) at the Citizen Lab and [Reuters](#). Its activity on our platform was limited and sporadic between 2013 to 2019, after which it paused. BellTroX operated fake accounts to impersonate a politician and pose as journalists and environmental activists in an attempt to social-engineer its targets to solicit information including their email addresses, likely for phishing attacks at a later stage.

This activity, based on the exact same playbook, re-started in 2021 with a small number of accounts impersonating journalists and media personalities to send phishing links and solicit the targets' email addresses. Among those targeted were lawyers, doctors, activists, and members of the clergy in countries including Australia, Angola, Saudi Arabia, and Iceland.

## 6. Cytrox
### Surveillance chain phases: primarily Exploitation

We removed about 300 accounts on Facebook and Instagram linked to Cytrox. This North Macedonian company develops exploits and sells surveillance tools and malware that enable its clients to compromise iOS and Android devices. In collaboration with the [Citizen Lab](#), we obtained copies of iOS and Android malware for further analysis. As a result, our team at Meta was able to find a vast domain infrastructure that we believe Cytrox used to spoof legitimate news entities in the countries of their interest and mimic legitimate URL-shortening and social media services (see the full domain list in the Appendix). They used these domains as part of their phishing and compromise campaigns. Cytrox and its customers took steps to tailor their attacks for particular targets by only infecting people with malware when they passed certain technical checks, including IP address and device type. If the checks failed, people could be redirected to legitimate news or other websites.

Our investigation identified customers in Egypt, Armenia, Greece, Saudi Arabia, Oman, Colombia, Côte d'Ivoire, Vietnam, the Philippines, and Germany. Targets of Cytrox and its customers included politicians and journalists around the world, including in Egypt and Armenia. Our findings suggest that Cytrox likely provided services to another threat actor known in the security community as [Sphinx](#), which targeted people in Egypt and its neighboring countries.

### 7. An unknown entity in China
**Surveillance chain phases: primarily Reconnaissance, Exploitation**

We removed about 100 Facebook and Instagram accounts linked to an unidentified entity in China responsible for developing surveillanceware for Android, iOS, Windows, and also Linux, Mac OS X, and Solaris operating systems. It also engaged in reconnaissance and social engineering activity before delivering malicious payload to its targets. While we haven't been able to attribute this activity to a particular actor, our investigation and analysis of the command-and-control servers behind this surveillance tooling indicate its usage by domestic law enforcement in China.

In some instances, we found this group's malware framework deployed along with facial recognition software developed by a Beijing-based company. At the time of our investigation, access to this framework required not only a username and password but also a SafeNet SuperDog physical hardware key, likely to make sure that only authorized customers who were given that key could use it. Analysis of the malware samples distributed by this entity provided additional insights, indicating that the people behind it were operating on a standard Monday to Friday work schedule with most software builds occurring on Mondays Beijing time.

Our investigation found that malware tools were used to support surveillance against minority groups throughout the Asia-Pacific region, including in the Xinjiang region of China, Myanmar, and Hong Kong.

## Our response to abuse by surveillance-for-hire groups

The "surveillance-for-hire" entities we removed and described in this report violated multiple Community Standards and Terms of Service. Given the severity of their violations, we have banned them from our services. We also alerted around 50,000 people who we believe were targeted by these malicious activities worldwide, using the alert system we launched in 2015. We recently updated it to provide people with more granular details about the types of targeting and the actor behind it so they can take steps to protect their accounts, depending on the phase of the surveillance attack chain we detect in each case.

 

## A security notice from Facebook

We believe that a sophisticated attacker may be targeting your Facebook account. Be cautious when accepting friend requests and interacting with people you don't know.

We recommend you take the Privacy Checkup and we'll guide you through the steps for how to keep your Facebook account secure.

OK

The existence and proliferation of these services worldwide raises a number of important questions. While these cyber mercenaries often claim that their services and surveillanceware are meant to focus only on criminals and terrorists, our own investigation, independent researchers, our industry peers and governments have demonstrated that targeting is indeed indiscriminate and includes journalists, dissidents, critics of authoritarian regimes, families of opposition and human rights activists. In fact, for platforms like ours, there is no scalable way to discern the purpose or legitimacy of such targeting. What's more, the use of these third-party services obfuscates who each end customer might be, what's collected and how the information is being used against vulnerable groups. This is why we focus on enforcing against this behavior, regardless of who's behind it or who the target might be.

To support the work of law enforcement, we already have authorized channels where government agencies can submit lawful requests for information, rather than resorting to the surveillance-for-hire industry which indiscriminately sells these services to anyone willing to pay, including known bad actors. These channels are designed to safeguard due process and we report the number and the origin of these requests publicly so that people worldwide have the full picture.

We will continue to investigate and enforce against anyone abusing our apps. However, these cyber mercenaries work across many platforms and national boundaries. Their capabilities are used by both nation-states and private enterprises, and effectively lower the barrier to entry for anyone willing to pay. For their targets, it is often impossible to know they are being surveilled across the internet.

Protecting people against this threat requires a collective effort from platforms, policymakers, and civil society to counter the underlying market and its incentive structure. We believe a public discussion about the use of surveillance-for-hire technology is urgently needed to deter the abuse of these capabilities both among those who sell them and those who buy them, anchored in the following principles:

- **Greater transparency & oversight:** There is a need for a robust international oversight that establishes transparency and "know your customer" standards for this market and holds surveillance-for-hire entities to these norms.
- **Industry collaboration:** Surveillance efforts manifest differently on various tech platforms, making industry collaboration critical if we want to fully understand and mitigate them. We stand ready to work with our peers to investigate abuse, share and disrupt surveillance-for-hire threats, including by using legal levers, so we can collectively build deterrence and impose costs on abusive services.
- **Governance & ethics:** We welcome domestic and international efforts to raise accountability through legislation, export controls and regulatory actions. We also encourage broader civil society and regulator-led conversations about the ethics of using these technologies by law enforcement and private companies, as well as creating effective victim protection regimes.

Until recently, these cyber mercenaries rarely faced consequences when their products were used to target vulnerable groups like activists, journalists, and minority groups, and cause serious harm. We're encouraged to see our peers and governments join the effort we began in 2019 and draw attention to this threat. For our collective response against abuse to be effective, it is imperative for technology platforms, civil society and democratic governments to raise the costs on this global industry and disincentivize these abusive surveillance-for-hire services. Our hope with this threat report is to contribute to this global effort and help shine the light on this industry.

# Appendix:

## Indicators of Compromise related to Cytrox

2y4nothing[.]xyz

5m5[.]io

addons[.]news

adibjan[.]net

adservices[.]gr[.]com

adultpcz[.]xyz

advertsservices[.]com

advfb[.]xyz

affise[.]app

almasryelyuom[.]com

alpineai[.]uk

alraeeenews[.]com

alraeesnews[.]net

altsantiri[.]news

amazing[.]lab

ancienthistory[.]xyz

android-apps[.]tech

api-apple-buy[.]com

api-telecommunication[.]com

applepps[.]com

apps-ios[.]net

aramexegypt[.]com

atheere[.]com

audit-pvv[.]com

bank-alahly[.]com

bbcsworld[.]com

bitlinkin[.]xyz

bi[.]tly[.]gr[.]com

bi[.]tly[.]link

bit-li[.]com

bit-li[.]ws

bit-ly[.]link

bit-ly[.]org

bitlly[.]live

bitlyrs[.]com

bitt[.]fi

bity[.]ws

bityl[.]me

blacktrail[.]xyz

bmw[.]gr[.]com

bookjob[.]club

browsercheck[.]services

bumabara[.]bid

burgerprince[.]us

businesnews[.]net

canyouc[.]xyz

carrefourmisr[.]com

cbbc01[.]xyz

celebrnewz[.]xyz

cellconn[.]net

charmander[.]xyz

chatwithme[.]store

citroen[.]gr[.]com

ckforward[.]one

clockupdate[.]com

cloudstatistics[.]net

cloudtimesync[.]com

cnn[.]gr[.]com

connectivitycheck[.]live

connectivitycheck[.]online

connectivitychecker[.]com

covid19masks[.]shop

crashonline[.]site

cut[.]red

cyber[.]country

danas[.]bid

distedc[.]com

download4you[.]xyz

dragonair[.]xyz

eagerfox[.]xyz

ebill[.]cosmote[.]center

efsyn[.]online

egyqaz[.]com

engine[.]ninja

enigmase[.]xyz

enikos[.]news

ereportaz[.]news

espressonews[.]gr[.]com

etisalategypt[.]tech

etisalatgreen[.]com

ewish[.]cards

fastdownload[.]me

fastuploads[.]xyz

fbc8213450838f7ae251d4519c195138[.]xyz

ferrari[.]gr[.]com

ffoxnewz[.]com

fimes[.]gr[.]com

fireup[.]xyz

fisherman[.]engine[.]ninja

flexipagez[.]com

forwardeshoptt[.]com

getsignalapps[.]com

getsignalapps[.]live

getupdatesnow[.]xyz

goldenscent[.]net

goldenscint[.]com

goldescent[.]com

gosokm[.]com

guardian-tt[.]me

guardnews[.]live

heaven[.]army

heiiasjournai[.]com

hellasjournal[.]company

hellasjournal[.]website

hellottec[.]art

hempower[.]shop

hopnope[.]xyz

icloudeu[.]com

icloudflair[.]com

iibt[.]xyz

ikea-egypt[.]net

ilnk[.]xyz

in-politics[.]com

infosms-a[.]site

inservices[.]digital

insider[.]gr[.]com

instagam[.]click

instagam[.]in

instagam[.]photos

instegram[.]co

invoker[.]icu

ios-apps[.]store

iosmnbg[.]com

itcgr[.]live

itly[.]link

itter[.]me

jquery-updater[.]xyz

kathimerini[.]news

kinder[.]engine[.]ninja

koenigseggg[.]com

kohaicorp[.]com

koora-egypt[.]com

kormoran[.]bid

kranos[.]gr[.]com

lamborghini-s[.]shop

landingpg[.]xyz

landingpge[.]xyz

leanwithme[.]xyz

lexpress[.]me

lifestyleshops[.]net

limk[.]one

linkit[.]digital

linktothisa[.]xyz

link-m[.]xyz

link-protection[.]com

liponals[.]store

livingwithbadkidny[.]xyz

llinkedin[.]net

lnkedin[.]org

localegem[.]net

lylink[.]online

makeitshort[.]xyz

mifcbook[.]link

md-news-direct[.]com

miniiosapps[.]xyz

mitube1[.]link

mlinks[.]ws

mobnetlink1[.]com

mobnetlink2[.]com

mobnetlink3[.]com

mozillaupdate[.]xyz

msas[.]ws

mycoffeeshop[.]shop

myfcbk[.]net

mytrips[.]quest

myutbe[.]net

mywebsitevpstest[.]xyz

nabd[.]site

nabde[.]app

nassosblog[.]gr[.]com

nemshi-news[.]xyz

nemshi[.]net

networkenterprise[.]net

newsbeast[.]gr[.]com

newslive2[.]xyz

newzeto[.]xyz

newzgroup[.]xyz

niceonase[.]com

niceonesa[.]net

nikjol[.]xyz

nissan[.]gr[.]com

novosti[.]bid

oilgy[.]xyz

olexegy[.]com

olxeg[.]com

omanreal[.]net

omeega[.]xyz

onlineservices[.]gr[.]com

orangegypt[.]co

orchomenos[.]news

otaupdatesios[.]com

paok-24[.]com

pastepast[.]net

pdfviewer[.]app

playestore[.]net

pocopoc[.]xyz

politika[.]bid

politique-koaci[.]info

prmopromo[.]com

pronews[.]gr[.]com

protothema[.]live

proupload[.]xyz

ps1link[.]xyz

ps2link[.]xyz

quickupdates[.]xyz

qwert[.]xyz

qwxzyl[.]com

redeitt[.]com

safelyredirecting[.]com

safelyredirecting[.]digital

sepenet[.]gr[.]com

sephoragroup[.]com

servers-mobile[.]info

serviceupdaterequest[.]com

sextape225[.]me

shorten[.]fi

shortenurls[.]me

shortmee[.]one

shortwidgets[.]com

shortxyz[.]com

simetricode[.]uk

sinai-new[.]com

sitepref[.]xyz

smsuns[.]com

snapfire[.]xyz

sniper[.]pet

solargoup[.]xyz

solargroup[.]xyz

speedy[.]sbs

speedygonzales[.]xyz

speedymax[.]shop

sportsnewz[.]site

sports-mdg[.]xyz

static-graph[.]com

stonisi[.]news

supportset[.]net

suzuki[.]gr[.]com

svetovid[.]bid

symoty[.]com

syncservices[.]one

synctimestamp[.]com

syncupdate[.]site

telecomegy-ads[.]com

telenorconn[.]com

tesla-s[.]shop

teslal[.]shop

teslal[.]xyz

teslali[.]com

tgrthgsrgwrthwrtgwr[.]xyz

timestampsync[.]com

timeupdate[.]xyz

timeupdateservice[.]com

tiny[.]gr[.]com

tinylinks[.]live

tinyulrs[.]com

tinyurl[.]cloud

tiol[.]xyz

tly[.]gr[.]com

tly[.]link

tovima[.]live

trecv[.]xyz

trecvf[.]xyz

trkc[.]online

tsrt[.]xyz

tw[.]itter[.]me

twtter[.]net

ube[.]gr[.]com

uberegypt[.]cn[.]com

updates4you[.]xyz

updateservice[.]center

updatetime[.]zone

updatingnews[.]xyz

updete[.]xyz

url-promo[.]club

url-tiny[.]app

uservicescheck[.]com

uservicesforyou[.]com

utube[.]digital

viva[.]gr[.]com

vodafoneegypt[.]tech

vodafonegypt[.]com

wavekli[.]xyz

we-site[.]net

weathear[.]live

weathernewz[.]xyz

weathersite[.]online

webaffise[.]com

wha[.]tsapp[.]me

worldnws[.]xyz

wtc1111[.]com

wtc2222[.]com

wtc3333[.]com

xf[.]actor

xnxx-hub[.]com

xyvok[.]xyz

yallakora-egy[.]com

yo[.]utube[.]digital

yo[.]utube[.]to

youarefired[.]xyz

yout[.]ube[.]gr[.]com

youtu–be[.]net

youtub[.]app

youtube[.]gr[.]live

youtube[.]voto

youtubesyncapi[.]com

youtubewatch[.]co

yuom7[.]net

z2a[.]digital

z2adigital[.]cloud

z2digital[.]cloud

zougla[.]gr[.]com

zougla[.]news

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Pranay K Bajjuri,

Plaintiff,

v.

Raytheon Technologies Corporation, et al.,

Defendants.

No. CV-20-00468-TUC-JCH
CV-20-00543-TUC-JCH

**ORDER**

Before the Court are the following: Charles M. Francisco, III's Notice of Motion and Motion for Consolidation of Cases, Appointment as Lead Plaintiff and Approval of His Selection of Lead Counsel (Doc. 11); Motion of FNY Partners Fund LP and FNY Managed Accounts LLC for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel and Memorandum of Points and Authorities in Support Thereof (Doc. 12); Motion and Memorandum of Law in Support of Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel (Doc. 13); and Motion of the State Teachers Retirement System of Ohio for Consolidation, Appointment as Lead Plaintiff, and Approval of Counsel; Memorandum of Points and Authorities in Support (Doc. 14).

The motions are fully briefed, and the Court's decision follows.

## I.    BACKGROUND

### a.  Procedural Background

This action concerns alleged violations of the Securities and Exchange Act of 1934

(15 U.S.C. §§ 78a *et seq.*) by Defendants Raytheon Technologies Corporation ("Raytheon") and certain officers. (Doc. 1, 4:20-cv-00468; Doc. 1, 4:20-cv-00543.) On October 30, 2020, Plaintiff Pranay K. Bajjuri ("Bajjuri") filed his Complaint. (Doc. 1, 4:20-cv-00468.) On December 11, 2020, Plaintiff Daniel Norris ("Norris") filed his Complaint. (Doc. 1, 4:20-cv-00543.) On January 29, 2021, *Norris* was transferred to this Court. (Doc. 17, 4:20-cv-00543.)

### b. Factual Background

Raytheon[1] is the result of an April 3, 2020 merger (the "Merger") between Raytheon Company[2] and United Technologies Corporation.[3] (Doc. 1 at ¶ 8, 4:20-cv-00468; Doc. 1 at ¶ 17, 4:20-cv-00543.) The Merger was announced on June 9, 2019. Plaintiffs allege that from 2015-2019, Raytheon and the officer defendants made false or misleading statements in Raytheon's annual reports concerning its internal controls over financial reporting and procedures. (Doc. 1 at ¶ 35, 4:20-cv-00468; Doc. 1 at ¶ 30, 4:20-cv-00543.) For these years, Raytheon's annual reports stated that it maintained effective internal controls over financial reporting. (Doc. 1 at ¶¶ 20, 24, 27, 30, 33, 4:20-cv-00468; Doc. 1 at ¶¶ 19, 22, 24, 26, 28, 4:20-cv-00543.) However, on October 27, 2020, during after-market hours, Raytheon filed its September 30, 2020 quarterly report announcing a DOJ investigation as follows:

> On October 8, 2020, the Company received a criminal subpoena from the DOJ seeking information and documents in connection with an investigation relating to financial accounting, internal controls over financial reporting, and cost reporting regarding Raytheon Company's Missiles & Defense business since 2009. We are cooperating fully with the DOJ's investigation. At this time, the Company is unable to predict the outcome of the investigation. Based on the information available to date, however, we do not believe the results of this inquiry will have a material adverse effect on our financial condition, results of operations or liquidity.

(Doc. 1 at ¶ 36, 4:20-cv-00468; Doc. 1 at ¶ 31, 4:20-cv-00543.)

Plaintiffs allege that on this news the price of RTX shares fell $4.19 per share, or approximately 7%, to close at $52.34 per share on October 28, 2020. (Doc. 1 at ¶ 37, 4:20-

---

[1] New York Stock Exchange ("NYSE") trading symbol "RTX"
[2] NYSE trading symbol "RTN"
[3] NYSE trading symbol "UTX"

cv-00468; Doc. 1 at ¶ 32, 4:20-cv-00543.) They allege as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of RTX securities, they and other class members have suffered significant losses. (Doc. 1 at ¶ 38, 4:20-cv-00468; Doc. 1 at ¶ 33, 4:20-cv-00543.)

The class period ("Class Period") is defined as February 10, 2016 to October 27, 2020, inclusive. (Doc. 1 at ¶ 1, 4:20-cv-00468; Doc. 1 at ¶ 1, 4:20-cv-00543.) Bajjuri brings his action as a class action under Rule 23(a) and (b)(3), Fed. R Civ. P., on behalf of a class "consisting of all persons other than [D]efendants who purchased publicly traded Raytheon securities during the Class Period, and who were damaged thereby (the 'Class')." (Doc. 1 at ¶ 39, 4:20-cv-00468.) Norris brings a class action under Rule 23(a) and (b)(3), Fed. R. Civ. P., on behalf of a class: "consisting of all persons and entities other than Defendants that purchased or otherwise acquired Raytheon securities during the Class Period, and who were damaged thereby (the 'Class')." (Doc. 1 at ¶ 34, 4:20-cv-00543.)

### c. The Pending Motions

Five joint motions to consolidate, appoint lead plaintiff and approve lead counsel were filed. (Docs. 8 (Movant Kee Chun Hon ("Hon")), 11 (Movant Charles M. Francisco, III ("Francisco")), 12 (Movant FNY Partners Fund LP and MNY Managed Accounts LLC ("FNY")), 13 (Movant Heavy & General Laborers' Locals 472 & 172 Annity Fund ("Annuity Fund")), 14 (Movant The State Teachers Retirement System of Ohio ("Retirement System")), 4:20-cv-00468.)[4] Hon subsequently withdrew his motion. (Doc. 15.) Annuity Fund and Retirement System have filed motions requesting leave to file a sur-reply. (Docs. 24, 26.) The sur-replies have either been lodged with the Clerk of the Court or filed as an attachment. *Id*.

### II.   *BAJJURI* AND *NORRIS* WILL BE CONSOLIDATED

The Private Securities Litigation Reform Act ("PSLRA") requires the Court to decide whether to consolidate actions prior to appointing a lead plaintiff. *See* 15 U.S.C. § 78u-4(3)(B)(ii) ("If more than one action on behalf of a class asserting substantially the

---

[4] Movants filed the same motions in both *Bajjuri* and *Norris*. In this Order the Court refers only to the motions filed in *Bajjuri*.

same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (i) until after the decision on the motion to consolidate is rendered."). Consolidation is permitted where "actions before the court involve a common question of law or fact." Fed. R. Civ. P. 42(a). "Consolidation is within the broad discretion of the court." *In re Adams Apple, Inc.*, 829 F.2d 1484, 1487 (9ᵗʰ Cir. 1987).

"In determining whether … to consolidate cases, the Court should 'weigh the interest of judicial convenience against the potential for delay, confusion and prejudice.'" *Zhu v. UCBH Holdings, Inc.*, 682 F. Supp. 2d 1049, 1052 (N.D. Cal. 2010) (quoting *Southwest Marine, Inc. v. Triple A. Machine Shop, Inc*., 720 F. Supp. 805, 806-07 (N.D. Cal. 1989)). "Only a party to an action may move for consolidation of its action with another; alternatively, a district court presiding over the matters may order consolidation sua sponte." *Yousefi v. Lockheed Martin Corp*., 70 F. Supp. 2d 1061, 1065 (C.D. Cal. 1999) (citing *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012-21 (5th Cir. 1977) (explaining who may bring a motion to consolidate)). *See also*, 15 U.S.C. § 78u-4(a)(3)(B)(ii) ("If more than one action on behalf of a class asserting substantially the same claim … has been filed, and any party has sought to consolidate those actions…[.]")

The two cases here are brought as federal securities class actions. Each Plaintiff names the same Defendants. The injuries to Plaintiffs and the putative class are alleged to be the result of buying or otherwise acquiring Raytheon securities and the decline in value of those securities after Raytheon's announcement that it was served with a DOJ subpoena and had become the subject of a DOJ investigation. All claims arise under the same laws and a common question of law appears to exist. Both cases are early in litigation. The potential for delay, confusion and prejudice appears to be low if the actions are consolidated. No movant or party opposes consolidation.

However, no movant is a party to either *Bajjuri* or *Norris* and only a party may move to consolidate actions. *See Yousefi*, 70 F. Supp. 2d at 1065 ("Only a party to an action may move for consolidation of its action with another..."). *See also, Employers-Teamsters Local*

*Nos. 14 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 923-24 (9th Cir. 2007) (putative class members who had not intervened were not parties to action; a motion to be appointed as lead plaintiff is not the same as a formal motion to intervene). No movant has sought to intervene pursuant to Rule 24, Fed. R. Civ. P.

The Court will deny the requests to consolidate advanced in the pending motions and instead will consolidate the cases pursuant to its inherent power to manage its docket. *See In re Adams Apple, Inc*., 829 F.2d at 1487 (trial courts may consolidate cases *sua sponte*). *Bajjuri* and *Norris* will be consolidated under the case number **4:20-cv-00468-JCH**.

## III.  LEGAL STANDARD FOR LEAD PLAINTIFF APPOINTMENT

The PLSRA provides that "[n]ot later than 20 days after the date on which the complaint is filed," the plaintiff shall publish a notice alerting members of the purported class of the pendency of the action, the claims asserted, and the purported class period. *Hessefort v. Super Micro Computer, Inc*., 317 F. Supp. 3d 1056, 1059 (N.D. Cal. 2018) (quoting 15 U.S.C. § 78u-4(3)(a)(i)). Potential class members should be informed that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." *Id*. (quoting 15 U.S.C. § 78u-4(3)(a)(i)(II)). "If multiple class actions are brought 'asserting substantially the same claims,' publication is required only of the first plaintiff to file." *Borteanu v. Nikola Corp*., __F.3d__, No. 2:20-CV-01797-PXH-SPL, 2020 WL 7392795, at *3 (D. Ariz. Dec. 15, 2020) (quoting *Tsirekidze v. Syntax-Brillan Corp*., No. 2:07-CV-2204-PHX-FJM, 2008 WL 942273, at *2 (D. Ariz. Apr. 7, 2007) (citing 15 U.S.C. § 78u-4(a)(3)(A)(ii))). "Once the 60-day window closes, the court determines the lead plaintiff ('the most adequate plaintiff')." *Borteanu*, 2020 WL 7392795, at *3 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)) (quotations omitted). "The most adequate plaintiff is the 'person or group of persons that … has the largest financial interest in the relief sought by the class' and 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *Id*. (quoting *Tsirekidze*, 2008 WL 942273, at *2 (citing 15 U.S.C. § 78u-

4(a)(30(B)(iii)(I)).

The United States Court of Appeals for the Ninth Circuit has established a three-step process for the appointment of a lead plaintiff. *Doherty v. Pivotal Software, Inc.*, No. 3:19-CV-03589-CRB, 2019 WL 5864581, at \*5 (N.D. Cal. Nov. 8, 2019) (citing *In re Cavanaugh*, 306 F.3d 726, 729-31 (9ᵗʰ Cir. 2002)) (slip copy) (additional citations omitted). "First, the court must determine whether the plaintiff in the first-filed action issued a notice publicizing the pendency of the action." *Doherty*, 2019 WL 5864581, at \*4 (citing *Cavanaugh*, 306 F.3d at 729) (footnote omitted). "Second, the court must compare the financial stakes of the various plaintiffs, determine which has the most to gain from the lawsuit, and determine whether that plaintiff satisfies Rule 23, particularly its typicality and adequacy requirements." *Doherty*, 2019 WL 5864581, at \*4 (citing *Cavanaugh*, 306 F.3d at 730). "If so, it is entitled to lead plaintiff status." *Doherty*, 2019 WL 5864581, at \*4 (citing *Cavanaugh*, 306 F.3d at 732). "If not, the court must then consider the plaintiff with the next-largest financial stake and repeat the inquiry." *Doherty*, 2019 WL 5864581, at \*4 (citing *Cavanaugh*, 306 F.3d at 730). "Third, the court must then consider competing plaintiffs' attempts to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23." *Doherty*, 2019 WL 5864581, at \*4 (citing *Cavanaugh*, 306 F.3d at 730). "This can be done using proof that the presumptive lead plaintiff (1) will not fairly and adequately protect the interests of the class, or (2) is subject to unique defenses that render the plaintiff incapable of adequately representing the class." *Doherty*, 2019 WL 5864581, at \*4 (citing Fed. R. Civ. P. 23(a)); 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *In re Network Assocs., Inc., Sec. Litig.*, 76 F.Supp.2d 1017, 1021 (N.D. Cal. 1999)).

## IV.   LEAD PLAINTIFF ANALYSIS

### a. The PSLRA Notice

Bajjuri timely issued a notice (the "Notice") publicizing the pendency of an action as follows:

> Rosen Law Firm, a global investor rights law firm, announces it has filed a class action lawsuit on behalf of purchasers of the securities of Raytheon Technologies Corporation f/k/a Raytheon Corporation Company (NYSE:

RTX, RTN) between February 10, 2016 and October 27, 2020, inclusive (the 'Class Period'). The lawsuit seeks to recover damages for Raytheon investors under federal securities laws.

(Doc. 11-5 at 2.) No movant has objected to the Notice. The Court finds Bajjuir, the Plaintiff in the first filed action, properly issued notice as required by the PSLRA.

### b. The Largest Financial Interest

In determining the "largest financial interest" the following factors are considered: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period. *Aronson v. McKesson HBOC*, 79 F. Supp. 2d 1146, 1157-58 (N.D. Cal. 1999) (citing *In re Olsten Corp. Securities Litigation*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998) (citing *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)). "These factors are useful, because they look to relatively objective indicators, such as number of shares purchased or sold, rather than to the ultimate question of damages." *Id*. at 1158. "[W]hen calculating lead plaintiff movant's losses, only the retained shares (*i.e.*, shares bought during the class period and held through the alleged corrective disclosure) will be accounted for, and any loss or gain on pre-disclosure sales will be disregarded." *In re AudioEye, Inc., Sec. Litig.*, No. 4:15-CV-163-TUC-DCB, 2015 WL 13654027, *5 (D. Ariz. July 31, 2015). This is because if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura Pharm., Inc. v. Broudu*, 544 U.S. 336 (2005). "Given the statutory scheme for quick resolution of the lead plaintiff question, it is undesirable for the court to prejudge the damages issue through an extensive fact-finding process." *Aronson*, 79 F. Supp. 2d at 1157 (citing 15 U.S.C. § 78u-4(3)(B)(i) (West 1997)).

Movants here have not clearly provided the Court with their approximate losses suffered during the Class Period. Retirement System submitted a table setting forth the competing movants' gain (or loss) using the divergent loss-calculation methodologies put forth by three of the movants, Retirement System, Annuity Fund and Francisco. *See* Doc.

22-5 at 2-4. This table illustrates the difficulty the Court faced in determining each movant's respective claimed loss. In light of the difficulty experienced, the Court will primarily rely upon the number of securities purchased, funds expended, and securities retained during the Class Period in determining the largest financial interest.

As shown below, Retirement System appears to be the movant with the greatest number of shares purchased, funds expended, and securities retained during the Class Period.

| Movant | Securities Purchased | Funds Expended | Securities Retained |
|---|---|---|---|
| **Retirement System**[5] | 1,159,370 shares $28,013,000 in bond principal | $142,036,888 | 787,219 shares $12,000,000 in bond principal |
| **Annuity Fund**[6] | 11,373 shares 1,869,000 in bond principal | $2,942,022 | 11,373 shares 1,197,000 in bond principal |
| **Francisco**[7] | 1,914 shares | $95,566 | 1,914 shares |
| **FNY**[8] | | | |

A brief discussion of the Class Period is necessary before addressing movants' specific arguments concerning greatest financial interest. Courts usually use the most inclusive class period and select as lead plaintiff the movant with the largest financial interest under that period. *See Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624–25 (E.D. Wis. 2009) (citing *Miller v. Dyadic Int'l, Inc.,* No. 07-80948-CIV, 2008 WL 2465286, at *4; *In re Doral Fin. Corp. Sec. Lit.*, 414 F. Supp. 2d 398, 402–03 (S.D. N.Y. 2006)). "This approach seems to be based on the assumption that

---

[5] (Doc. 18 at 11.)
[6] (Doc. 22 at 14.)
[7] *Id.*
[8] FNY presented its "Holdings of United Technologies Corporation Common Stock" as of close of trading on April 2, 2020, (the day before the Merger). (Doc. 12-2 at 3.) It only seeks appointment as "lead plaintiff of a class consisting of investors who held stock in United Technologies Corporation […]" at the time of the Merger. (Doc. 12 at 5.) The Court addresses FNY's position in its discussion of the Rule 23, Fed. R. Civ. P., factors *infra*.

- 8 -

'the class,' as referenced in § 78u–4(a)(3)(B)(iii)(I)(bb), should be defined as the broadest, most inclusive potential class." *Id.* (citing *Miller*, 2008 WL 2465286, at \*4). "Such an assumption makes some sense, because at the outset of a case the court should view the facts in the light most favorable to the plaintiffs and should narrow the allegations only after the parties have had the opportunity to develop the record." *Id.*

Here, the complaints identify the Class Period as February 10, 2016 to October 27, 2020, inclusive. Retirement System explains the Class Period reflects the application of the five-year statute of repose applicable to fraud claims arising under 28 U.S.C. § 1658(b). (Doc. 26-1 at 3.) It contends Raytheon's alleged malfeasance likely preceded the start of the Class Period by six or seven years pointing out that Plaintiffs allege the DOJ subpoena sought information relating to Raytheon's reporting going back to 2009. *Id*. *See* Doc. 1 at ¶ 36, 4:20-cv-00468; Doc. 1 at ¶ 31, 4:20-cv-00583. The Class Period allegations are supported, and the Court will determine the lead plaintiff in light of the Class Period as alleged.

Francisco argues that Retirement System's claim to the largest financial interest is "entirely predicated on inclusion of unrecoverable losses in United Tech[nologies Corporation (UTX)] common stock[.]" (Doc. 23 at 5.) He asserts that the putative class does not include purchasers of pre-Merger UTX. *Id*. However, the *Norris* complaint seeks recovery on behalf of a class of those who purchased "or otherwise acquired" RTX securities between February 10, 2016 and October 27, 2020. The three institutional movants—Retirement System, Annuity Fund and FNY—had their UTX securities converted to RTX securities on the day of the Merger. As such, these movants "otherwise acquired" Raytheon securities as alleged in the *Norris* complaint. To one degree or another the three institutional movants interpreted the Notice as including UTX shareholder claims. The Court will not exclude holders of pre-Merger UTX securities from consideration as lead plaintiff.

Annuity Fund argues that Retirement System's "transactions in UTX stock before the [M]erger was announced [on June 9, 2019] are not tethered to the alleged wrongdoing and are therefore irrelevant to its financial interest in the relief sought by the putative class."

(Doc. 20 at 10.) Somewhat non-responsively, Retirement System explains that its loss calculation takes into account losses incurred in connection with shares it acquired "when its pre-Merger holdings of UTX and Raytheon Co. (RTN) stock converted to RTX stock by virtue of the [M]erger, as well as RTX securities that the Retirement System acquired on the market post-Merger." (Doc. 22 at 8.) The Court agrees with Annuity Fund that including UTX shares prior to the Merger announcement on June 9, 2019 likely inflates Retirement System's financial interest. However, Retirement System has made a showing that when its pre-Merger announcement UTX shares and in-and-out transactions are excluded, it has sustained the largest loss. *See* Doc. 22-5 at 3 (showing Retirement System suffered a LIFO loss of $7,813,4236; Francisco suffered a LIFO loss of $34,720; and Annuity Fund had a LIFO gain of $32,858). In other words, Retirement System has made a showing that it is the movant with the greatest financial interest even when its UTX holdings prior to the Merger announcement are excluded.

In sum, the Court determines that Retirement System is the movant with the largest financial interest. The Court will next examine whether Retirement System satisfies the applicable Rule 23 requirements.

### c. Rule 23, Fed. R. Civ. P., Requirements

The typicality and adequacy requirements[9] of Rule 23 are the only requirements relevant to the selection of a lead plaintiff. *Cavanaugh*, 306 F.3d at 730. If the would-be lead plaintiff establishes that it meets the typicality and adequacy requirements, other potential lead plaintiffs may try to rebut the presumption. *Tsirekidze*, 2008 WL 942273, at *2 (15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)). "This perplexing statutory scheme suggests that the initial determination on typicality and adequacy should be a product of the court's independent judgment, and that arguments by members of the purported plaintiff class … should be considered only in the context of assessing whether the presumption has been

_____

[9] The other Rule 23 requirements are examined after the lead plaintiff moves for class certification. *See Loomingkit v. Apollo Educ. Grp. Inc*., No. 2:16-CV-00689-PHX-DLR, 2016 WL 3345514, at *2 (D. Ariz. June 16, 2016). *See also, Pio*, No. 14-11191, 2014 WL 5421230, at *3 (a "more rigorous analysis of the first two" Rule 23 factors is delayed until the court's decision on whether to certify the matter as a class action).

- 10 -

rebutted." *Id*.

### i. The presumption that Retirement System's claims are typical has not been rebutted

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct […] not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Borteanu*, 2020 WL 7392795, at \*4 (citing *Loomingkit*, 2016 WL 3345514, at \*2). Retirement System contends it satisfies the typicality requirement because its claims are based on the same legal theory and arise from the same events and course of conduct as the putative class claims. (Doc. 18 at 12.) It "alleges, as do all [c]lass [m]embers, that Defendants violated the Exchange Act by making what they knew or should have known were false or misleading statements of material facts concerning Raytheon[] or [failed] to state material facts necessary to make the statements they did make not misleading." (Doc. 14 at 14.) It claims to have "purchased Raytheon securities during the Class Period at prices artificially inflated by Defendants' misrepresentation or omissions and was damaged upon the disclosure of those misrepresentations and/or omissions." *Id*. In light of Retirement System's representations, the Court finds that its claims are typical to those of the class.

Annuity Funds argues Retirement System should be disqualified from serving as lead plaintiff because it is a net seller and, as a result, it is subject to unique defenses that are not typical of other class members. (Doc. 20 at 11-13.) "In general, net purchasers have a greater interest in a securities lawsuit because a net purchaser was induced by the fraud to purchase shares and has been left 'holding the bag' when the fraud is eventually revealed." *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2011 WL 566814, at \*8 (N.D. Cal. Feb. 15, 2011) (citing *In re McKesson*, 97 F. Supp. 2d at 996–97)). "In contrast, a net seller arguably profits more from the fraud than suffers from it." *Id*. (citing *In re McKesson*, 97 F. Supp. 2d at 997). In this circuit,[10] courts have repeatedly

---

[10] Annuity Fund overwhelmingly relies on out of circuit case law in support of its argument. (Doc. 20 at 12 n.8.)

- 11 -

held that a net seller can be a lead plaintiff or class representative, as long as it has a recoverable loss. *See In re AudioEye, Inc. Sec. Litig.*, 2015 WL 13654027, at *5 (citing *In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *8-9 (S.D. Tex. Dec. 6, 2013) (rejecting challenge to plaintiff's typicality due to its 'net seller' status); *In re UTStarcom, Inc. Sec. Litig.*, No. C 04-04908 JW, 2010 WL 1945737, at *6 (N.D. Cal. May 12, 2010); *Hodges v. Immersion Corp.*, Nos. C-09-4073, -4118, -4561, -4774-MMC, 2009 WL 5125917, at *2 (N.D. Cal. 2009) ("[W]here a 'net seller' is a 'net loser,' the net seller has incurred a cognizable loss and is the presumptive lead plaintiff where its net losses exceed those of the other movants."); *Richardson v. TVIA, Inc.*, Nos. C 06 06304 RMW, 2007 WL 1129344, at *3 (N.D. Cal. April 16, 2007). ("In cases involving net sellers who are also net losers ... courts have held that a movant should have no trouble proving damages and, therefore, is qualified to serve as lead plaintiff.") (internal citations omitted)).

At this juncture, Retirement System has made a showing that it has a recoverable loss. *See* Doc. 22-5 at 2-4. The presumption that Retirement System's claims are typical of those of the class has not been rebutted on the grounds that it may also be a net seller.

### ii. The presumption that Retirement System is an adequate representative has not been rebutted

"The test for adequacy is whether: (1) the proposed lead plaintiff's interests are in common with, and not antagonistic to, those of the class; and (2) proposed lead plaintiff's counsel are qualified, experienced, and generally able to conduct the litigation." *Borteanu*, 2020 WL 7392795, at *4 (citing *Loomingkit*, 2016 WL 3345514, at *2). Retirement System asserts that it is an adequate representative because "there is no evidence of antagonism or conflict between the [its] interest and the interests of the class, and the significant losses incurred by [it] demonstrate that it has a sufficient interest in the outcome of this litigation." (Doc. 14 at 15.) It also asserts that as a "large and sophisticated investor with significant assets under management[,] … its service as [l]ead [p]laintiff would be consistent with the PSLRA's preference for appointment of institutional investors as class representatives in securities actions." *Id*. The Court agrees with Retirement System that it has made a

- 12 -

sufficient showing that it would be adequate lead plaintiff.

In an effort to rebut the presumption of Retirement System's adequacy to serve as lead plaintiff, FNY asserts that Retirement System's claims are antagonistic to the claims of class members that held UTX stock at the time of the Merger. It argues a separate class of UTX shareholders is necessary because UTX shareholders were disadvantaged in the Merger by the inflation of Raytheon's stock price and apparent value because the UTX shareholders' interest in RTX was proportionally reduced by the resulting exchange ratio. (Doc. 12 at 10-11.) FNY argues, "by revealing that [RTN] stock had been inflated for the past several years, as alleged in the [*Bajjuri* and *Norris* complaints], th[e] corrective disclosure further revealed that the negotiated Merger exchange ratio of shares of UT[X] common stock for each share of Raytheon Company [RTX] common stock was also artificially tilted in favor of legacy Raytheon Company [RTN] shareholders." *Id*.

According to FNY, the Merger agreement provided that RTN shareholders were to receive 2.3348 shares of RTX for each share of RTN common stock owned as of the closing of the Merger. (Doc. 12 at 9.) UTX shareholders would receive one share of RTX for each share of UTX common stock they owned at the closing of the Merger. *Id*. This structure resulted in an ownership ratio in RTX of approximately 57% former UTX shareholders (in aggregate) and approximately 43% for RTN shareholders (in aggregate). *Id*. FNY contends, therefore, that "every dollar of damage sustained by the UT[X] [c]lass is a dollar of fraudulent benefit received by [Raytheon Company] [RTN] holders." (Doc. 27 at 2.) It argues RTN shareholders—such as Retirement System and Annuity Fund—profited from the Merger by receiving a larger interest in RTX through an exchange ratio that was based on the allegedly fraudulently inflated value of RTN stock. It urges that UTX shareholders require separate representation because the complaints fail to articulate a theory of damages related to the Merger. (Doc. 12 at 12.)

Retirement System urges that separate representation for UTX shareholders is not warranted absent a "clear threat" that the presumptive lead plaintiff "would not adequately represent [certain] stockholders [because] creation of a subclass with a separate lead

- 13 -

plaintiff would undermine the PSLRA's goal of centralizing control over and responsibility for the ligation." (Doc. 18 at 17.) It asserts the complaints "clearly state that when the fraud was revealed by way of the announcement of the [DOJ's] criminal subpoena, shares of RTX declined by 7%." *Id*. at 18. It contends "[a]s the 'former UT[X] shareholders' had their shares automatically converted to RTX shares[] such former shareholders were by definition damaged when the share price of RTX declined upon the revelation of the fraud." *Id*.

FNY replies that "the injury to the UT[X] [c]lass occurred when its members exchanged their shares in the Merger on April 3, 2020—not when the stock price dropped on October 27, 2020." (Doc. 21 at 8.) Relying upon *In re Spectrum Brands Litigation*, 2021 WL 411445 (W.D. Wisc. Feb. 5, 2021), it claims that whether the alleged fraud may have also harmed certain current shareholders of RTX trading post-Merger is irrelevant to the injury suffered by UTX shareholders when UTX shares were exchanged in the Merger. *Spectrum* arose out of a merger of HRG Group, Inc. ("HRG") and Spectrum Brands Holdings, Inc. ("Spectrum Legacy"). 2021 WL 411445, at *1. Claims were brought on behalf of investors in the successor entity, Spectrum Brands Holdings, Inc. ("Spectrum"), HRG and Spectrum Legacy. *Id*. The same lead plaintiff and counsel were appointed to prosecute the claims of all parties. HRG stock purchasers objected to a proposed settlement of the claims of purchasers of pre-merger HRG stock. The court agreed that appointed lead plaintiffs were inadequate to represent the HRG stock purchasers where HRG stock purchaser's claims were "based on a contention that HRG stock prices were inflated by defendants' misrepresentations about the value of *Spectrum* stock." *Id*. at *2-3. (emphasis in original). The district court ordered the lead plaintiffs to either (1) re-notice the class and provide HRG investors with the opportunity to represent their own interests; or (2) exclude HRG investors from the class settlement. *Id*. at *4.

This case has some facts in common with *In re Spectrum*. As mentioned, the claims here arise out of the Merger between RTN and UTX. Upon completion of the Merger, UTX shares were exchanged for stock in the new Raytheon entity (RTX). Plaintiffs allege that

- 14 -

for years prior to and at the time of the Merger the price of RTN was inflated as a result of Defendants' alleged misstatements or omissions concerning their internal financial controls. Despite these similarities, however, the Court is not persuaded to follow *In re Spectrum* at this juncture.

"The appointment of lead plaintiffs occurring as it does in advance of class discovery, is not a final ruling on their appropriateness as Class Representatives." *In re Chiron Corp. Sec Litig.,* No. C 04-4293 VRW, 2007 WL 4249902, at *13 (N.D. Cal. 2007) (quoting *In re Oxford Health Plans, Ins*., 191 F.R.D. 369, 373 (S.D.N.Y. 2000) (citing *In re Party City Sec Litig*., 189 F.R.D. 91, 111 n.21 (D.N.J. 1999)). "The proposed class and Class Representatives are to be reviewed according to the standards of Rule 23, without any deference to the earlier determinations made in the appointment of Lead Plaintiffs." *In re Chiron Corp. Sec Litig.*, No. C 04-4293 VRW, 2007 WL 4249902, at *13 (quoting *In re Oxford Health Plans, Ins*., 191 F.R.D. 369, 373 (S.D.N.Y. 2000) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)).

It is true, as pointed out by FNY, that UTX-shareholders-turned-RTX-shareholders have a claim that they were damaged in the April 3, 2020 Merger as a result of RTN's allegedly inflated value and the structure of the Merger. It is also true, however, as pointed out by Retirement Systems, that these same shareholders have a claim for damages when the price of RTX declined on October 28, 2020 upon the news of the DOJ subpoena just as the RTN shareholders do. Retirement Systems points out that it held 705,858 shares of UTX stock at the time of the Merger, approximately three times the amount FNY held at the time of the Merger. Thus, at this juncture, the Court finds Retirement System has a sufficient incentive to aggressively pursue all potential claims and avenues of recovery against Defendants.

With the exception of *In re Spectrum*, FNY relies upon case law that addresses whether a plaintiff with a fundamental conflict can be appointed class representative for its argument that a separate lead plaintiff representing only UTX shareholders is necessary. *See, e.g., Brown v. Am. Airlines, Inc*., 285 F.R.D. 546, 558 (C.D. Cal. 2011) (A plaintiff is

not an adequate representative if a "fundamental conflict" exists among a class.). As mentioned above, appointment of a lead plaintiff appointment occurs in advance of class discovery and is not a ruling on the appropriateness of the lead plaintiff to be appointed class representative.

Furthermore, the terms of the RTN/UTX Merger have not been established at this initial stage. As a result, the Court declines to separate the proposed class into two shareholder groups—RTN and UTX—absent proof that the presumptive lead plaintiff does not satisfy the typicality requirement of Rule 23. *See In re Cavanaugh*, 306 F.3d at 729 n.2 ("That the presumption is rebuttable does not mean that it may be set aside for any reason that the court may deem sufficient. Rather, the statute provides that the presumption 'may be rebutted only upon proof … that the presumptively most adequate plaintiff' does not satisfy the adequacy or typicality requirements of Rule 23." (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II))).

Annuity Fund argues that Retirement System's omission of Raytheon bond transactions from its initial certification precludes it from serving as lead plaintiff. (Doc. 22 at 15.) On January 12, 2021, Retirement System submitted an Amended Shareholder Certification because its initial moving papers omitted class period transactions in Raytheon bonds. (Doc. 18-1 at 2, ¶ 3; Doc. 18-3 at 1-9.) Retirement System points out that both the *Bajjuri* and *Norris* complaints allege only that Raytheon's common stock declined in value on the news that Raytheon had been served with a criminal subpoena issued by the DOJ. (Doc. 18 at 14.) The complaints contain no allegations concerning Raytheon's bonds.

"Multiple district courts have held that 'minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement.'" *In re Solar City Sec. Litig.*, No. 16-CV-04686-LHK, 2017 WL 363274, at *6 (N.D Cal. 2017) (quoting *Niederklein v. PCS Edventures!.com, Inc.*, 2011 WL 759553, at *11 (D. Idaho Feb. 24, 2011)); (citing *Tai Jan Bao v. SolarCity Corp.*, 2014 WL 3945879, at *4 (N.D. Cal. Aug. 11, 2014) (finding presumptive lead plaintiff adequate and typical despite error

- 16 -

in claimed losses); *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 351 n.12 (S.D. Cal. 1998) ("The Court ... does not find the McKitty Group's computational and typographical errors to be so substantial as to overcome the statutory presumption in favor of the McKitty Group."); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 410–11 (D. Minn. 1998) (allowing plaintiff movant to supplement certifications in order to correct technical deficiencies in original filing)). The Court finds that Retirement System's submission of an Amended Shareholder Certification does not disqualify it from serving as lead plaintiff as explained herein.

Finally, Retirement Systems is an institutional investor, "which is precisely the kind of investor that Congress sought to encourage to assume a more prominent role in securities litigation with the enactment of the PSLRA's lead plaintiff provisions[.]" *In re AudioEye, Inc., Sec. Litig.*, 2015 WL 13654027, at *5. "Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with a small amount at stake." *Id.* (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 264 (3d Cir. 2001) (quoting H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733); *see, e.g., Vanamringe v. Royal Group Techs. Ltd.*, 237 F.R.D. 55, 57 (S.D.N.Y. 2006)) (internal quotations omitted)).

The Court finds that the adequacy showings of Retirement System's claims have not been rebutted. The Court concludes Retirement System is a suitable lead plaintiff at this juncture. As explained below, Retirement System will be appointed *interim* lead plaintiff.

## V.      NOTICE TO UTX SHAREHOLDERS

"A primary purpose of publication is to alert shareholders of their opportunity to serve as a lead plaintiff." *In re Spectrum Brands Litig.*, 2021 WL 411445, at *2 (citing 15 U.S.C. § 78u-4(a)(3)(A)(i)(II)). "By failing to publish an amended notice, plaintiffs deprived HRG stock purchasers […] of that opportunity." *In re Spectrum Brands Litig.*, 2021 WL 411445, at *2.

FNY asserts that over 800 million shares of UTX stock were exchanged in the

Merger. (Doc. 21 at 7.) As mentioned above, the Notice states, the "Rosen Law Firm … announces it has filed a class action lawsuit on behalf of purchasers of the securities of Raytheon Technologies Corporation f/k/a Raytheon Corporation Company (NYSE: RTX, RTN) between February 10, 2016 and October 27, 2020, inclusive (the 'Class Period'). The lawsuit seeks to recover damages for Raytheon investors under federal securities laws." (Doc. 11-5 at 2.) The Notice contains no reference to United Technologies Company, its shareholders (UTX shareholders), and fails to alert investors who "otherwise acquired" Raytheon securities as alleged in the *Norris* complaint.

"Where changes to a securities class action complaint 'make it likely that individuals who could now be considered potential lead plaintiffs would have disregarded the earlier notice,' courts in this district and elsewhere have ordered lead plaintiff to republish notice under the PSLRA." *Kipling v. Flex, Ltd.*, No. 18-CV-02706-LHK, 2019 WL 1472358, at *1 (N.D. Cal. 2019) (quoting *Kaplan v. S.A.C. Capital Advisors, L.P.*, 947 F.Supp.2d 366, 367 (S.D.N.Y. 2013)). In *Kipling*, an amended complaint expanded the putative class to include shareholders who owned exchange-traded options on flex common stock. The original complaint and PSLRA notice defined the class as only those who purchased ordinary shares of Flex stock. *Kipling,* 2019 WL 1472358, at *2. The district court determined that "[t]ogether, [the] changes to the amended complaint 'ma[d]e it likely that individuals who could now be considered potential lead plaintiffs would have disregarded the earlier notice.'" *Id.* (quoting *Kaplan*, 947 F.Supp.2d at 367).

In light of the allegations in the *Norris* complaint and the Court's consolidation of the *Bajjuri* and *Norris* actions, the Court finds that the failure of any reference to UTX shareholders in the Notice improperly deprives UTX shareholders of notice of the opportunity to seek to be appointed lead plaintiff. As explained below, depending upon the allegations in the consolidated amended class action complaint, the Court will direct interim lead plaintiff Retirement System to publish another PSLRA notice to provide notice to UTX shareholders of their opportunity to be appointed lead plaintiff.

…

…

## VI. RETIREMENT SYSTEM WILL BE APPOINTED INTERIM LEAD PLAINTIFF

The Court will proceed as follows. Using the broad class definition alleged in the *Norris* complaint and including UTX shareholders in the lead plaintiff determination, Retirement Systems will be appointed interim lead plaintiff. As interim lead plaintiff Retirement Systems will be directed to file an amended consolidated class action complaint that will become the operative complaint in this consolidated putative class action. If the amended consolidated class action complaint asserts claims on behalf of investors who "otherwise acquired" Raytheon Technologies securities—as the *Norris* complaint does— interim lead plaintiff Retirement System shall publish an amended notice in accordance with the PSLRA informing UTX, RTN and RTX shareholders of the opportunity to seek to be appointed lead plaintiff.

After publication of an amended notice motions to be appointed lead plaintiff may be filed in accordance with 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). <u>All movants seeking to be appointed lead plaintiff shall clearly and concisely set forth, separately identifying for RTN, UTX and RTX stock, (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period. Movants shall set forth their estimated loses using a last in first out methodology.</u>[11] Movants are encouraged to consider stipulating to facts relevant to the greatest financial interest determination where possible. If the amended class action complaint does not include claims of UTX shareholders, Retirement System shall become non-interim lead

---

[11] "[T]he weight of authority puts the most emphasis on the competing movants' estimated losses, using a 'last in, first out ('LIFO') methodology.'" *Malriat v. QuantumScape Corp.,* No. 3:21-CV-00058-WHO, 2021 WL 1550454, at *3 (N.D. Cal. Apr. 20, 2021) (quoting *Bodri v. Gopro, Inc.,* No. 16-CV-00232-JST, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016) (internal alteration and citations omitted); accord *Ali v. Intel Corp.,* No. 18-CV-00507-YGR, 2018 WL 2412111, at *2 n.7 (N.D. Cal. May 29, 2018); *Nicolow v. Hewlett Packard Co.,* No. 12-05980 CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013); *Bruce v. Suntech Power Holdings Co.,* No. CV 12-04061 RS, 2012 WL 5927985, at *2 (N.D. Cal. Nov. 13, 2012); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,* No. 5:11-CV-04003-LHK, 2012 WL 78780, at *4 (N.D. Cal. Jan. 9, 2012)).

plaintiff without further briefing on the lead plaintiff issue.

## VII. INTERIM LEAD COUNSEL APPOINTMENT

"The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "As stated by the Ninth Circuit, 'the district court has no authority to select for the class what it considers to be the best possible lawyer or the lawyer offering the best possible fee schedule.'" *Perlmutter*, 2011 WL 566814, at \*14 (quoting *In re Cavanaugh*, 306 F.3d at 733). "The decision of lead counsel belongs to the lead plaintiff." *Id.* (citing *In re Cavanaugh*, 306 F.3d at 734 n. 14).

Retirement System has selected the firm of Pomerantz which represents itself as highly experienced in the area of securities litigation and class actions. (Doc. 14-5.) The Court has reviewed the Pomerantz firm resume and finds Retirement System's choice of lead counsel appears to be qualified, experienced, and generally able to conduct the litigation. The Court will approve Retirement System's choice of lead counsel.

## VIII. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED CONSOLIDATING** Case Nos. 4:20-cv-00468-TUC-JCH and 4:20-cv-00543-TUC-JCH. Case No. 4:20-cv-00468-TUC-JCH will be the lead case. All future pleadings and papers submitted for filing shall bear the following complete case number: **4:20-cv-00468-TUC-JCH. All future pleadings and filings shall be filed only in the lead case**.

**IT IS FURTHER ORDERED GRANTING IN PART** Retirement System's motion (Doc. 14). Retirement Systems is appointed as interim lead plaintiff as set forth herein and its choice of lead counsel is approved. All other requests in Retirement System's motion are denied.

**IT IS FURTHER ORDERED GRANTING** the motions to file sur-replies (Docs. 24, 26). The Clerk of the Court shall file the document lodged at Doc. 25 and the document filed at Doc. 26-1. All remaining pending motions (Docs. 11, 12, 13) are **DENIED**.

- 20 -

**IT IS FURTHER ORDERED DIRECTING** interim lead plaintiff Retirement System to submit a memorandum within 30 days of the date of this Order: **(1)** advising the Court how Plaintiffs wish to proceed regarding the filing of an amended consolidated class action complaint, the publication of a new PSLRA notice, and the filing of additional or renewed motions for appointment of non-interim lead plaintiff; **(2)** identifying the steps interim lead plaintiff Retirement System believes are necessary to effect how Plaintiffs wish to proceed, the publication of another PSLRA notice and the filing of additional or renewed motions for appointment of non-interim lead plaintiff; and **(3)** proposing a schedule.

Dated this 27th day of July, 2021.

Honorable John C. Hinderaker
United States District Judge