UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF OMAHA POLICE AND
FIREFIGHTERS RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

                      Plaintiff,

       v.

COGNYTE SOFTWARE LTD., ELAD
SHARON, and DAVID ABADI,

                    Defendants.

Case No.  1:23-cv-01769-LGS

REPLY MEMORANDUM OF LAW: (1)
IN FURTHER SUPPORT OF MOTION OF
CLAL INSURANCE COMPANY LTD.,
CLAL PENSION AND PROVIDENT
LTD., AND ATUDOT PENSION FUND
FOR EMPLOYEES & INDEPENDENT
WORKERS FOR APPOINTMENT AS
LEAD PLAINTIFF AND APPROVAL OF
LEAD COUNSEL

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................ 1

    I.      CLAL INCURRED SIGNIFICANTLY LARGER LOSSES THAN OMAHA
          P&F ON ITS OPEN-MARKET PURCHASES OF COGNYTE STOCK ............. 1

    II.     CLAL DID NOT PROFIT FROM THE ALLEGED FRAUD .............................. 4

    III.   CLAL'S LOSSES INCURRED ON ITS SPIN-OFF SHARES ARE PART OF
          ITS FINANCIAL INTEREST IN THIS LITIGATION ......................................... 9

CONCLUSION ................................................................................................................... 10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Foley v. Transocean Ltd.*,
  272 F.R.D. 126 (S.D.N.Y. 2011) ...................................................................................1, 5

*In re Adelphia*,
  298 F. Supp. 2d 244 (S.D.N.Y. 2005)................................................................................10

*In re Bausch & Lomb Inc. Sec. Litig.*,
  244 F.R.D. 169 (W.D.N.Y. 2007).......................................................................................7

*In re Cavanaugh*,
  306 F.3d 726 (9th Cir. 2002) ..............................................................................................3

*In re Credit Suisse-AOL Sec. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008)...........................................................................................6

*Mayer v. Oil Field Sys. Corp.*,
  721 F.2d 59 (2d Cir. 1983)................................................................................................10

*Plymouth County Retirement System v. Apache Corporation*,
  566 F. Supp. 3d 712 (S.D. Tex. 2021) ................................................................................7

*Rathborne v. Rathborne*,
  683 F.2d 914 (5th Cir. 1982) ............................................................................................10

*Richman v. Goldman Sachs Grp., Inc.*,
  274 F.R.D. 473 (S.D.N.Y. 2011) ........................................................................................5

*Sallustro v. CannaVest Corp.*,
  93 F. Supp. 3d 265 (S.D.N.Y. 2015)...................................................................................1

**Statutes**

PSLRA ...............................................................................................................................1, 3, 4

**Rules**

Fed. R. Civ. P. 23...................................................................................................................7

Movant Clal[1] respectfully submits this reply memorandum of law in further support of its motion for appointment as Lead Plaintiff and approval of its selection of Pomerantz as Lead Counsel (Dkt. No. 23); and in opposition to the competing motion of Omaha P&F (Dkt. No. 20).

**ARGUMENT**

**I.      CLAL INCURRED SIGNIFICANTLY LARGER LOSSES THAN OMAHA P&F ON ITS OPEN-MARKET PURCHASES OF COGNYTE STOCK**

Omaha P&F urges the Court to disregard any losses that Clal incurred in connection with the shares it acquired via Cognyte's spin-off from Verint (the "Spin-Off") in assessing its financial interest. Although Clal's Spin-Off losses are indeed recoverable in this litigation, the question is ultimately irrelevant because, even adopting Omaha P&F's restrictive Class definition and considering only the movants' losses on Cognyte shares acquired via open-market purchases during the Class Period, Clal's loss is still significantly larger than Omaha P&F's as calculated under ***any*** rational methodology. In assessing financial interest for the purposes of lead plaintiff appointment, courts nearly universally calculate losses pursuant to either a FIFO or LIFO methodology. *See*, *e.g.*, *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 270 n.5 (S.D.N.Y. 2015). Indeed, Omaha P&F and its counsel in this litigation, Scott+Scott Attorneys at Law LLP ("Scott"), have both ***consistently*** endorsed the application of FIFO and LIFO methodologies for the purposes of Lead Plaintiff loss calculation in PSLRA actions. *See*, *e.g.*, *In re Edwards Lifesciences Corp. Sec. Litig.*, No. 8:13-cv-01463 (C.D. Cal. Sept. 18, 2013), Dkt. No. 39 at *4-*5 (Omaha P&F, represented by Scott, advocating for loss calculation pursuant to FIFO or LIFO methodologies); *City of Royal Oak Retirement System v. Juniper Networks, Inc. et al*, No. 5:11-cv-04003 (N.D. Cal. Aug 15, 2011)

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings as set forth in Clal's moving or opposition briefs. *See* Dkt. Nos. 25, 28.

Dkt. No. 37, at *4 n.1 (same); *Arkansas Teacher Retirement System v. Insulet Corporation et al.*, No. 1:15-cv-12345 (D. Mass. June 16, 2015) Dkt. No. 27 at *2 (same).

Both FIFO and LIFO are matching methodologies that are used in accounting for sales of fungible inventory, such as shares of stock. FIFO is "[a]n accounting method that assumes that goods are sold in the order in which they were purchased—that is, the oldest items are sold first." BLACK'S LAW DICTIONARY (11th ed. 2019). LIFO is "[a]n accounting method that assumes that the most recent purchases are sold [] first[.]" *Id.* Under a FIFO methodology, when a movant sells stock, the earliest acquired shares in the investor's inventory (*i.e.*, the "first-in") are presumed to be the shares sold, whereas under a LIFO methodology, the most recently acquired shares in the investor's inventory are presumed to be the shares sold. *Id.* Thus, in calculating its losses on a FIFO basis, Clal matched its first sales of Cognyte stock during the Class Period to the shares that it purchased ***earliest*** in time (its "first-in" shares) and then continued to match each subsequent sale to the next-earliest shares that it purchased. On this basis Clal's loss in connection with its open-market transactions in Cognyte stock is approximately ***$9.80 million***. *See* Dkt. No. 26-1. In calculating its losses on a LIFO basis, Clal matched its first sales of Cognyte stock during the Class Period to the shares that it purchased most ***recently*** (its "last-in" shares) and then continued to match each subsequent sale to the next-most-recent shares that it purchased. On this basis Clal's loss in connection with its open-market transactions in Cognyte stock is approximately ***$2.22 million***. *See id.*

In its opposition papers, Omaha P&F urges the Court to disregard these universally acknowledged methodologies in favor of a bizarre, non-chronological matching methodology that ***matches Clal's sales of Cognyte stock to purchases that only occurred after the sales in question***—that is, under Omaha P&F's accounting methodology, Clal is treated as having sold

2

shares of Cognyte stock *before it even purchased those shares*—*i.e.*, shares that it *did not even own at the time of the sales at issue*. The following example illustrates the obvious error in Omaha P&F's approach. Clal sold 101,900 Cognyte shares on February 2, 2021 at a price of $32.6779 per share. *See* Dkt. No. 26-1. Rather than match these shares to the earliest shares acquired by Clal (pursuant to FIFO), or to the most recent shares acquired by Clal (pursuant to LIFO), Omaha P&F instead matched the shares that Clal sold on February 2, 2021 with shares that Clal purchased on *March 5*, 2021—*nearly one month later*—at $27.4897 per share. *See* Dkt. No. 31-2. Although Omaha P&F misleadingly describes its methodology as "LIFO" (Dkt. No. 29 at 8), the shares it treats as sold were not even *in* Clal's possession at the time that the sales occurred, and thus cannot possibly have been the "last-in." Indeed, it would be more accurate to describe Omaha P&F's methodology as "*next*-in, first-out." Exhibit A to the Reply Declaration of Jeremy A. Lieberman ("Lieberman Reply Decl."), submitted herewith, lists several other instances of Omaha P&F's obvious violation of the universally accepted LIFO methodology. Only through such flagrantly incorrect accounting is Omaha P&F able to conjure a purported gain of $1.9 million in open market purchases for Clal.

While the PSLRA does not prescribe any single calculation methodology, it is well settled that courts should "select accounting methods that are both *rational* and consistently applied." *In re Cavanaugh*, 306 F.3d 726, 730 n.4 (9th Cir. 2002) (emphasis added). Here, Omaha P&F has offered no rational basis for its proposed methodology. Tellingly, it devotes a bare single paragraph of its opposition brief to the subject, with exactly *zero* citations to case law, accounting principles, or any other relevant authority. *See* Dkt. No. 29 at 8. Nor has Omaha P&F explained its radical departure from the FIFO and LIFO accounting methodologies that it and its counsel have consistently applied in prior PSLRA actions. *See*, *e.g.*, *Edwards Lifesciences*, Dkt. No. 39 at

3

*4-*5 (Omaha P&F, represented by Scott, arguing that "[u]nder the LIFO method, a plaintiff's stock sales during the class period are matched *first* against the plaintiff's *most recent*"—*i.e.*, not future—"purchases of a subject security" (emphases added)). It is fundamentally at odds with basic common sense to treat Clal as having sold shares of Cognyte stock that it did not even own at the time of sale. Accordingly, Omaha P&F's proposed loss calculation methodology is plainly *not* rational, and the Court should not adopt it.

## II.    CLAL DID NOT PROFIT FROM THE ALLEGED FRAUD

Fundamentally misapprehending the economic reality of the Spin-Off, pursuant to which Omaha P&F claims that "Clal received [Cognyte shares] at no cost" (Dkt. No. 29 at 1), Omaha P&F insists that Clal profited from its Class Period investments in Cognyte stock. Not so. Clal, like all Verint shareholders, received one share of Cognyte stock per each share of Verint stock that it held at the time of the Spin-Off. *See id.* In the Spin-Off, Verint separated its intelligence and cyber activities from its customer engagement activities, spinning off the former into the newly established Cognyte while maintaining the latter within Verint, which it touted "as a pure-play customer engagement vendor." *See* Dkt. No. 30-1. Clal's investment in Verint post-Spin-Off was thus an investment in an entity with significantly fewer assets than it had possessed prior to the Spin-Off. Omaha P&F's facile claim that Clal received its Cognyte shares for "free" thus ignores the economic reality of the Spin-Off.

Clal is far from the only investor who acquired Cognyte shares in the Spin-Off and incurred losses in connection with their acquisitions. Tens of millions of shares of Cognyte stock entered the market via the Spin-Off. Per the calculation of Clal's damages expert, more than 56% of the institutional investors who acquired Cognyte shares via the Spin-Off still held Spin-Off shares as of December 31, 2021—*i.e.*, just two weeks after the first alleged corrective disclosure of December 16, 2021—and nearly 50% of all such investors *still* held Spin-Off shares six months

4

later, at the end of the Class Period on June 28, 2022.    *See* Lieberman Reply Decl., Ex. B.

Moreover, of the total volume of Spin-Off shares held by institutional investors, nearly 58% of

those shares were still held as of December 31, 2021, and more than 30% were still held as of the

end of the Class Period.  *Id.*  In sum, millions of Spin-Off shares were held by numerous investors,

all of whom—like Clal—incurred losses on their investments as news of the Defendants'

malfeasance reached the market.  Yet Omaha P&F would, at the outset of this litigation, bar all of

these investors from pursuing recovery in this litigation—thereby significantly reducing the size

of the Class and its recoverable damages.  Indeed, as discussed further below, Omaha P&F not

only seeks to eliminate the recovery of a significant portion of the putative Class, it seeks to

**penalize** them for selling spinoff shares by treating the sales of such shares as a "gain" which

eliminate losses, thereby rendering a significant portion of the Class as "net gainers."

Similarly, Omaha P&F argues that "Clal is a 'net seller' that profited from the alleged

fraud, rendering it inadequate and unlike a typical Class member."  Dkt. No. 29 at 8.  Specifically,

Omaha P&F claims that because Clal "sold over five million shares [of Cognyte stock] during the

Class Period, yet purchased less than 900,000 shares[,]"—*i.e.*, was a "net seller" of Cognyte shares,

having purchase more shares than it sold—"there is no question that Clal profited as a result of the

inflated stock prices during the Class Period."  Dkt. No. 29 at 9.

Omaha P&F's argument is unavailing.  As a matter of law, courts in this District and

nationwide have repeatedly held that a net seller can serve as a lead plaintiff so long as it has

incurred a recoverable loss.  *See, e.g.*, *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 132 (S.D.N.Y.

2011) (appointing net seller after reviewing specific facts of transaction, finding that movant "did

not benefit from the fraud by selling at inflated prices."); *Richman v. Goldman Sachs Grp., Inc.*,

274 F.R.D. 473, 479 (S.D.N.Y. 2011) ("While there is wisdom in the rule that net sellers who are

5

also net gainers should not be lead plaintiffs; there is no good reason not to recognize losses which a net seller has incurred."); *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (in case involving corporate merger, finding that "Plaintiff's status a 'net seller' does not automatically render its claims atypical" where the plaintiff "submitted evidence that it suffered significant losses during the class period"). Here, as discussed at length above, under any rational FIFO or LIFO methodology, assessed with reference either to its Spin-Off acquisitions alone, its open-market purchases alone, or all of its acquisitions considered together, Clal plainly incurred millions of dollars in losses in connection with its Cognyte investments. It is not, as Omaha P&F suggests, a "net gainer" on its Class Period transactions.

Omaha P&F's argument also fails as a matter of logic. The rationale for declining to appoint a net seller in a securities class action is as follows: Securities fraud claims under the Exchange Act allege, *inter alia*, that investors purchased securities at prices artificially inflated by the Defendants' false and/or misleading statements (*i.e.*, by the Defendants' fraud). The period of time during which the securities at issue are alleged to have traded at artificially inflated prices— *i.e.*, the class period—is thus generally coextensive with the period of time during which the Defendants were misleading the investing public. Just as an investor can be harmed by the Defendants' fraud by purchasing shares at artificially inflated prices during the class period and selling them after the artificial inflation is removed from the stock via a corrective disclosure, an investor can also theoretically benefit (albeit inadvertently) by buying shares before the fraud occurred (*i.e.*, before the Class Period) when there was no artificial inflation and then selling them at artificially inflated prices during the class period. An investor who sells more shares than he purchased during the Class Period (*i.e.*, a net seller) might thus have potentially gained more than he lost from the alleged fraud, and on that basis might be an inadequate and/or atypical Class

6

representative under Rule 23.  *See, e.g.*, *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007) ("Courts have . . . rejected applications for lead plaintiff status made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices.") (collecting cases); *Plymouth County Retirement System v. Apache Corporation*, 566 F. Supp. 3d 712, 718-19 (S.D. Tex. 2021) ("Because 'net sellers' and 'net gainers' may have benefitted by selling shares purchased before the class period at allegedly inflated prices during the class period, they may have difficulty proving damages at trial and are subject to unique defenses that do not befall other class members.").

Yet the same logic plainly does not hold in cases where the Defendants' alleged fraud ***predates*** the Class Period.  Clal's alleged status as a "net seller" reflects the fact that it, like many class members, acquired Verint shares before the Class Period, which were converted into Cognyte shares via the Spin-Off, and then sold many of those Cognyte shares during the Class Period.  While the Class Period in this litigation begins on February 2, 2021, that merely reflects the date on which Cognyte shares began trading on the NASDAQ post-Spin-Off, and ***not*** the date on which false statements began.  Rather, the first (and only) false and/or misleading statement alleged in the Complaint (filed by Omaha P&F) occurred on January 14, 2021 (more than 2 weeks before Cognyte shares began trading on the NASDAQ), in an Amended Registration Statement filed with the SEC in connection with Cognyte's then-approaching Spin-Off from Verint, which contained allegedly "misleading statements and omitted material information about the Company's business, specifically with respect to the solutions and services it provided (and continues to provide) to customers."  *See* Dkt. No. 1 ¶ 15.  Yet the Amended Registration Statement was preceded by two Draft Registration Statements—filed with the SEC on September 25 and November 18, 2020, respectively—as well as a Registration Statement filed with the SEC on December 22, 2020—

each of which contained *precisely* the same alleged misstatements as the Amended Registration Statement.  *See* Lieberman Reply Decl., Exs. C-E.   Indeed, there is every indication that the conduct first disclosed to the market via Meta's "Threat Report" of December 16, 2021 had been ongoing well before the Spin-Off, while Cognyte's operations still comprised a business unit within Verint.   For example, the Threat Report refers to Cognyte as "formerly known as WebintPro," which was the name of a cyber surveillance company that Verint acquired in December 2019.  *See* Lieberman Reply Decl., Ex. F.  As such, the fraud inflated the Verint shares subject to the Spin-Off well before the start of the alleged Class Period.  There is thus no reason to conclude that Clal would be an inadequate or atypical Lead Plaintiff simply because it sold more of Cognyte stock than it purchased during the Class Period.  The rationale for declining to appoint a net seller as Lead Plaintiff does not apply here.

   *Bajjuri v. Raytheon Technologies Corporation*, 4:20-cv-00468-JCH (D. Ariz.) ("*Raytheon*"), is instructive.  There, the lead plaintiff movant claiming the largest financial interest, the State Teachers Retirement System of Ohio ("Ohio Teachers"), had automatically received a significant number of its Raytheon shares pursuant to a corporate merger during the class period.  Although Ohio Teachers was a net seller of Raytheon shares during the Class Period by virtue of its pre-Class Period holdings, it argued that based on the allegations of the Complaint, the Defendants' alleged misconduct obviously pre-dated the start of the Class Period, meaning that its pre-Class Period holdings had most likely been purchased at artificially inflated prices—that is, that despite being a net seller, it had *not* benefited by "selling into the fraud" during the Class Period.  As here, a competing movant argued that Ohio Teachers' merger-acquired shares should not count toward its financial interest in the litigation.  The Court ultimately rejected that argument and appointed Ohio Teachers as Lead Plaintiff, observing that the "complaint seeks recovery on

8

behalf of a class of those who purchased '*or otherwise acquired*'" their shares during the Class Period, and noting that "three institutional movants"—including Ohio Teachers—had "interpreted the Notice [of pendency of the action] as including" claims of shareholders who acquired their Raytheon shares in the merger.  *See Raytheon* Dkt. No. 30 at 9 (emphasis added) (submitted herewith as Lieberman Decl., Ex. G).  Moreover, the court held that the fact that Ohio Teachers was a net seller did not render it inadequate to serve as a Lead Plaintiff.

## III.    CLAL'S LOSSES INCURRED ON ITS SPIN-OFF SHARES ARE PART OF ITS FINANCIAL INTEREST IN THIS LITIGATION

In its opposition, Omaha P&F urges the Court to disregard the losses that Clal incurred on its acquisition of Cognyte shares pursuant to Spin-Off.  Omaha P&F claims that "these spin-off shares do not count toward damages because there is no possible recovery and because they fall outside the definition of the Class[,]" arguing that these shares "were not 'purchased' within the meaning of Section 10(b) of the Exchange Act, meaning there are no recoverable damages[,]" and that Clal's acquisition of shares from the Spin-Off on February 1, 2021 "occurred before the Class Period began [on February 2, 2021], requiring them to be excluded from the loss calculation.  *See* Dkt. No. 29 at 3-4, 7.

Clal's receipt of Cognyte shares via the Spin-Off *did* occur during the Class Period.  The Class Period begins on February 2, 2021, the date on which Cognyte shares began trading on the NASDAQ.  *See* Dkt. No. 1 ¶¶ 1, 14.  As Omaha P&F acknowledges, Cognyte shares were distributed to holders of Verint shares "*after* the close of business on February 1, 2021."  Dkt. No. 29 at 4 (emphasis added).  Given the timing of the distribution, Clal thus did not receive its Cognyte shares until the *following* day, February 2, 2021—the first day of the Class Period—as its sworn Certifications clearly state.  *See* Dkt. No. 26-3 at *4, *7, *10-*11.  Clal's acquisitions of Cognyte stock pursuant to the Spin-Off also qualified as "purchases" because "where a securities

transaction results in a fundamental change in the nature of a shareholder's investment, leaving the plaintiff with shares that represent a participation in a wholly new and different enterprise, the plaintiff may be considered a purchaser or seller." *Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982). *See*, *e.g.*, *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65-66 (2d Cir. 1983) (where investor was forced to exchange her previous ownership interests in LP for common stock in a new corporation pursuant to an exchange agreement, her investment had fundamentally changed). *See also Raytheon*, Dkt. No. 30 at 9 (finding class in securities fraud class action to include claims of investors who acquired securities via corporate merger).[2]

## CONCLUSION

For the foregoing reasons, and the reasons set forth in its moving and opposition briefs (Dkt. No. 25, 28), Clal respectfully requests that the Court issue an Order: (1) appointing Clal as Lead Plaintiff for the Class; and (2) approving Clal's selection of Pomerantz as Lead Counsel for the Class.

Dated: May 24, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
Thomas H. Przybylowski
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100

---

[2] The supposedly adverse authority that Omaha P&F cites is distinguishable. *See* Dkt. No. 28 at 9-10. Omaha P&F's reliance on *In re Adelphia*, 298 F. Supp. 2d 244 (S.D.N.Y. 2005), is misplaced. There, the court specifically found that when holders of Adelphia stockholders "received ABIZ stock in addition to the [Adelphia] stock they already held, . . . their investment in [Adelphia] remained unchanged. *Id.* at 260 n.12. Here, as discussed above, the investment of Verint shareholders (like Clal) **did** fundamentally change, because Verint lost a significant business unit as a consequence of the Spin-Off, meaning that Verint shareholders were left owning stock in a fundamentally different business enterprise, with different assets, than before.

Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

POMERANTZ LLP
Orly Guy
Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Clal Insurance Company Ltd., Clal Pension and Provident Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. and Proposed Lead Counsel for the Class*

11