UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                              :

CITY OF OMAHA POLICE AND           :
FIREFIGHTERS RETIREMENT SYSTEM,    :
                              :            23 Civ. 1769 (LGS)
                    Plaintiff,   :
                              :       **OPINION AND ORDER**

          -against-           :
                              :

COGNYTE SOFTWARE LTD, et al.,      :
                              :
                    Defendants.  :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff City of Omaha Police and Firefighters Retirement System ("Omaha"), on behalf of itself and all others similarly situated, brought this securities class action against Defendants Cognyte Software Ltd ("Cognyte"), Elad Sharon and David Abadi, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* (the "PSLRA").  Omaha requests appointment as lead plaintiff and of Omaha's attorneys as lead counsel, pursuant to Section 21D(a)(3) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3)(B), as amended by the PSLRA.

      "Clal" -- which comprises Clal Insurance Company Ltd., Clal Pension and Provident Ltd. and Atudot Pension Fund for Employees & Independent Works Ltd. -- is a putative class member and filed a competing motion for appointment as lead plaintiff and of Clal's attorneys as lead counsel.  For the reasons stated below, Omaha's motion is granted, and Clal's motion is denied.

## I.     BACKGROUND

      The Complaint alleges violations of the federal securities laws by Defendant Cognyte and two of its officers.  Cognyte is an Israel-based security analytics software company, which began

trading as an independent entity in February 2021 following a spin-off from Verint Systems Inc. ("Verint").

According to the Complaint, on December 4, 2019, Verint announced plans to separate into two independent companies, Cognyte, which would consist of Verint's cyber-intelligence business, and Verint, which would consist of Verint's customer engagement business.  On February 1, 2021, Cognyte and Verint completed the spin-off and related separation and distribution.  As a result, Cognyte became an independent, publicly traded company whose shares were, and continue to be, listed on the NASDAQ.

The putative class consists of "all purchasers of Cognyte common stock during the Class Period."  The class period starts on February 2, 2021, the day Cognyte's ordinary shares began trading, and ends on June 28, 2022 (the "Class Period").  Cognyte's registration statement allegedly made misleading statements and omitted material information about the company's business, specifically with respect to the solutions and services it provided to customers.  On December 16, 2021, after the market closed, Meta (the parent company of Facebook and Instagram) issued a "Threat Report," which included the results of its months-long investigation into the "surveillance-for-hire industry."  The report revealed for the first time that Cognyte, along with six private companies, allegedly targeted certain individuals, without their knowledge, to reveal information and/or compromise their devices and accounts, in violation of Facebook's community standards and Terms of Service.

Following this news, the price of Cognyte's common stock fell 5.11%, closing on December 17, 2021, at $18 per share, before declining another 5.5% the next trading day.  Cognyte thereafter filed its Annual Report on SEC Form 20-F for the period ended January 31, 2022, and reported financial results for fourth quarter 2021 and first quarter 2022.  The price of Cognyte's shares declined further, closing at $4.58 per share on June 28, 2022, the end of the Class Period.  The

Complaint alleges that the decline in the price of Cognyte stock was the "direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market."

## II.     DISCUSSION

### A.     Appointment of Lead Plaintiff

Omaha and Clal both seek appointment as lead plaintiff, on the basis that each purports to have the largest financial interest in the relief sought by the class.  Although the Court finds that Clal has the largest financial interest, Clal's status as a "net seller" and "net gainer" during the Class Period subjects it to unique defenses that disqualify it from adequately representing the class. Consequently, Omaha is appointed lead plaintiff.

The PSLRA directs the court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members" in securities class actions.  15 U.S.C. § 78u-4(a)(3)(B)(i).  Congress, in enacting the PSLRA, sought to "prevent lawyer-driven litigation, and to ensure that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs' counsel." *Somogyi v. Organogenesis Holdings Inc.*, 623 F. Supp. 3d 24, 29 (E.D.N.Y. 2022).[1]

The PSLRA prescribes a two-step inquiry to determine which individual or group is best suited to serve as lead plaintiff.  First, there is a rebuttable presumption that the most adequate plaintiff is the person or group of persons that "(aa) has either filed the complaint or made a motion in response to a notice . . . ; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  Second, this presumption may be rebutted "upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff -- (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

### 1.  Notice and Timely Filing

Under the PSLRA, a plaintiff who files a securities class action must publish: "in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class -- (I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class."  15 U.S.C. § 78u-4(a)(3)(A)(i).  Even though no one has objected to the adequacy of the notice in this case, "in deciding a motion for the appointment of lead plaintiff under the PSLRA, courts have an independent duty to scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA."  *Chitturi v. Kingold Jewelry, Inc.*, No. 20 Civ. 2886, 2020 WL 8225336, at *3 (E.D.N.Y. Dec. 22, 2020).

The notice provided here meets the PSLRA's requirements.  The notice was filed in AccessWire on March 1, 2023, the same date that the Complaint was filed.  The notice summarizes the allegations in the Complaint, defines the relevant class period and advises putative class members that, if they wish to apply to be lead plaintiff, "a motion on [their] behalf must be filed with the U.S. District Court for the Southern District of New York no later than May 1, 2023." Publication of the required notice in AccessWire is sufficient notice for the purposes of the PSLRA. *See, e.g.*, *Baldwin v. Net 1 UEPS Techs., Inc.*, No. 19 Civ. 11174, 2020 WL 1444937, at *2 (S.D.N.Y. Mar. 25, 2020); *Owen v. Elastos Found.*, 19 Civ. 5462, 2020 WL 2824624, at *1

(S.D.N.Y. May 26, 2020).  Both movants filed the instant motions by May 1, 2023, the relevant

deadline.  *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).  Accordingly, publication of the notice is sufficient,

and the movants' applications to serve as lead plaintiff are timely.

### 2.  Largest Financial Interest

The second statutory requirement for the presumption of most adequate plaintiff is whether

the movant, "in the determination of the court, has the largest financial interest in the relief sought

by the class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).  While the PSLRA does not say how to assess

whether a movant has the largest financial interest, courts in this circuit generally look to the four

so-called *Lax* factors:

> (1) the total number of shares purchased during the class period; (2) the net shares
> purchased during the class period (in other words, the difference between the number
> of shares purchased and the number of shares sold during the class period); (3) the
> net funds expended during the class period (in other words, the difference between
> the amount spent to purchase shares and the amount received for the sale of shares
> during the class period); and (4) the approximate losses suffered.

*Peacock v. Dutch Bros., Inc.*, No. 23 Civ. 1794, 2023 WL 4976814, at *3 (S.D.N.Y. Aug. 3,

2023) (citing *Lax v. First Merchs. Acceptance Corp.*, No. 97 Civ. 2715, 1997 WL 461036, at

*5 (N.D. Ill. Aug. 11, 1997)).  "Most crucial to the Court's determination is the fourth factor

-- the approximate financial loss suffered."  *Parot v. Clarivate Plc*, No. 22 Civ. 1371, 2022

WL 1568735, at *5 (E.D.N.Y. May 18, 2022); *accord Buhrke Fam. Revocable Tr. v. U.S.

Bancorp*, No. 22 Civ. 9174, 2023 WL 1879525, at *3 (S.D.N.Y. Feb. 10, 2023).

The Court finds that Clal has the largest financial interest in the relief sought by the

class.  The main disputes are (1) whether Clal's 4.36 million "spin-off" shares -- which Clal

received as a dividend from its Verint shares -- should be included in the number of shares

Clal "purchased" and (2) determining the proper accounting methodology to measure Clal's

losses.

### a.   Clal's Spin-Off Shares Received as a Dividend

Clal's "spin-off" shares (i.e., the shares it acquired as a dividend from Cognyte's spin-off from Verint) that Clal includes in its loss analysis were not "purchased" within the meaning of § 10(b) of the Exchange Act and therefore are not included in the net shares Clal purchased during the Class Period, or in the calculation of Clal's losses.

To state a claim under § 10(b), a plaintiff must allege a material misstatement or omission "in connection with the purchase or sale of a security."  15 U.S.C. § 78j; *see Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351-52 (2d Cir. 2022). Only a plaintiff who engages in a "purchase or sale" of securities has the right to bring a private damages action.  *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975); *accord Bos. Ret. Sys. v. Alexion Pharms., Inc.*, No. 16 Civ. 2127, 2023 WL 2932485, at *8 (D. Conn. Apr. 13, 2023).  Plaintiffs who receive stock as a dividend do not make a "purchase" within the scope of § 10(b) when "plaintiffs did not participate in any sort of investment decision" and "made no election whether or not to receive [the stock] (instead of a cash dividend), nor had any choice as to how much [of the stock] to receive in the dividend."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005); *accord In re Tronox, Inc. Sec. Litig.*, No. 9 Civ. 6220, 2010 WL 2835545, at *11 n.160 (S.D.N.Y. June 28, 2010); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 6243526, at *70 (S.D.N.Y. Oct. 20, 2015), *abrogated on other grounds by Berkshire Bank v. Lloyds Banking Grp. plc*, No. 20-1987-CV, 2022 WL 569819 (2d Cir. Feb. 25, 2022).  Such transactions are "not the type meant to be governed by § 10(b)," which "seeks to ensure that investors make decisions based on honest information and to prevent fraudulent information from impacting securities investment decisions."  *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F.

Supp. 2d at 260.  Plaintiffs who receive the stock as a dividend "cannot argue that

defendants' fraudulent or misleading statements prevented them 'from availing [themselves]

of an informed judgment' in deciding to enter into a securities transaction because those

plaintiffs never made an investment decision." *Id.* (quoting *Int'l Controls Corp. v. Vesco*,

490 F.2d 1334, 1345 (2d Cir. 1974)).

Here, the 4.36 million shares that Clal includes in its loss analysis were not

"purchased" within the meaning of § 10(b) of the Exchange Act.  They were distributed as a

dividend.  On January 15, 2021, Verint announced its plan to distribute Cognyte shares to

holders of Verint shares "[a]fter the close of business on February 1, 2021, the distribution

date for the spin-off."[2]  The Cognyte shares were distributed "as a pro rata dividend, one

Cognyte share for every Verint share held on the close of business on January 25, 2021, the

record date for the spin-off."  Verint shareholders did "not need to take any action to receive

Cognyte shares" and did "not need to pay any consideration or surrender or exchange Verint

shares."  Clal therefore made no "investment decision" to acquire -- i.e., "purchase" -- these

4.36 million shares.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F.

Supp. 2d at 260.

Clal's arguments to the contrary are unpersuasive.  First, Clal suggests that its

"acquisitions via the spin-off are plainly covered by the Class definition set forth in

[Omaha's] own Complaint," which alleges that "this [a]ction is on behalf of Class members

[who] purchased *or acquired* Cognyte common stock during the Class Period."  Clal quotes

the Complaint out of context.  The class definition expressly limits the putative class to

---

[2] Press Release, Verint Sys. Inc., Verint Announces Record Date and Distribution Date for Spin-Off
of Cognyte Software Ltd., Verint's Cyber Intelligence Solutions Business (Jan. 15, 2021),
https://www.businesswire.com/news/home/20210115005107/en/Verint-Announces-Record-Date-
and-Distribution-Date-for-Spin-Off-of-Cognyte-Software-Ltd.-Verint%E2%80%99s-Cyber-
Intelligence-Solutions-Business [https://perma.cc/2J2D-GBWJ].

"purchasers" of Cognyte stock.  In any event, the class definition has no bearing on § 10(b)'s "purchase" requirement.

Second, Clal argues that the spin-off shares qualify as purchases under the "fundamental change" doctrine.  Clal cites *Rathborne v. Rathborne*, 683 F.2d 914, 921 (5th Cir. 1982) ("[W]here a securities transaction results in a fundamental change in the nature of a shareholder's investment, leaving the plaintiff with shares that represent a participation in wholly new and different enterprise, the plaintiff may be considered a purchaser or seller."), and *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977) ("[T]here must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment."), *abrogated on other grounds by Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979).  But the spin-off in the instant case was not a "fundamental change" to Clal's investment.  Although Verint separated its intelligence and cyber activities from its customer engagement activity, Clal remained invested in both businesses.  "While [Clal] may have been left with new and different pieces of paper, the paper represented the same proportionate interest in the same assets and enterprises [Clal] had always held.  In the final analysis, this transaction presents a classic example of the choice between 'six of one and a half-dozen of the other.'  The [spin-off] left [Clal] neither richer nor poorer."  *See Rathborne,* 683 F.2d at 921.

### b. Accounting Methodology

Even excluding the 4.36 million spin-off shares from Clal's purchases, Clal has the largest financial loss counting only its open market purchases during the Class Period, using the appropriate accounting methodology.  Specifically, Clal purchased over 800,000 shares during the Class Period, and sold over 5 million shares, spending around $21 million, and earning around $86 million.  On its open market purchases Clal alleges a $2.2 million

investment loss during the Class Period using a "last in, first out" ("LIFO") methodology, or a $9.8 million investment loss using a "first in, first out" ("FIFO") methodology.  Omaha disputes that Clal had any loss, and proposes -- purportedly using a LIFO methodology -- that Clal had $1.9 million of investment *gains* on its open market purchases during the Class Period.  Omaha is incorrect.  Applying the better approach, Clal had a $2.2 million investment loss during the Class Period.

To approximate investment losses sustained by a proposed lead plaintiff in a securities class action, courts typically employ either LIFO or FIFO.  *See Rodriguez v. DraftKings Inc.*, No. 21 Civ 5739, 2021 WL 5282006, at *4 (S.D.N.Y. Nov. 12, 2021).  Because the PSLRA is silent on this issue, courts have discretion in selecting either method.  *See Gruber v. Gilbertson*, No. 16 Civ 9727, 2022 WL 17828609, at *13 (S.D.N.Y. Dec. 21, 2022).  Using LIFO to measure is the prevalent practice in this district and others.  *See City of Riviera Beach Gen. Emps. Ret. Sys. v. Macquarie Infrastructure Corp.*, No. 18 Civ 3608, 2019 WL 364570, at *5 n.8 (S.D.N.Y. Jan. 30, 2019) ("[C]ourts in this district and others have stated a preference for LIFO over FIFO in assessing loss for purposes of the appointment of lead plaintiff."); *Marquez v. Bright Health Grp., Inc.*, No. 22 Civ. 101, 2022 WL 1314812, at *5 (E.D.N.Y. Apr. 26, 2022) (collecting cases).  A LIFO analysis typically "assumes that the last stocks to be sold are the stocks purchased most recently *prior to that sale*."  *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*, 269 F.R.D. 291, 295 (S.D.N.Y. 2020) (emphasis added).  One benefit of such an approach is that "[b]y only matching sales to purchases made prior to the sale, the economic irrationality of matching sales to later-in-time purchases . . . is not a concern."  *Id.*

Neither party contests the use of LIFO to measure losses.  Rather, the parties dispute how to employ the LIFO methodology to measure losses.  Clal applies the approach

described above by matching sales only to purchases *prior* to the sale, beginning with the most recent.  Omaha, in contrast, matches sales to the most recent purchases during the Class Period even when the purchase occurred after the sale.  Clal's is the better approach by avoiding "the economic irrationality of matching sales to later-in-time purchases."  *See City of Monroe Emps.' Ret. Sys.*, 269 F.R.D. at 295.  Courts consistently apply LIFO such that "the first stocks to be sold are the stocks purchased most recently prior to that sale."  *See, e.g.*, *Somogyi*, 623 F. Supp. 3d at 30 n.2.

A second difference in Omaha's and Clal's methodologies is that Clal ignores its sales of shares that occurred before March 5, 2021, the date when Clal made its first open market purchase during the Class Period, because these sales ("pre-open market sales") were necessarily from Clal's spin-off shares.  Under Omaha's proposed LIFO analysis, Clal's open-market purchases are matched with *pre*-open market sales for the purpose of calculating approximate investment loss, which Omaha determines is actually a $1.9 million investment gain.  Because Clal's spin-off shares should be excluded from the analysis, Clal has the better approach.  Clal's proposed LIFO analysis properly matches open market purchases and sales in calculating its approximated $2.2 million of investment losses.

### c.  Other *Lax* Factors

As to the remaining *Lax* factors, the first weighs in favor of Clal, which purchased a greater total number of Cognyte shares during the Class Period -- over 800,000 by Clal compared to roughly 104,000 by Omaha.  The second and third factors, net shares purchased and net funds expended, weigh in favor of Omaha.  During the Class Period, Omaha was a net purchaser of roughly 94,000 net shares, with a net expense of around $2.1 million.  Clal, by contrast, was a net seller of over 4 million net shares, with net earnings of over $60 million.

Clal, based on its investment loss, arguably has the largest financial interest in the litigation of any putative lead plaintiff.  *See Parot*, 2022 WL 1568735, at *5 ("Most crucial to the Court's determination is the fourth factor -- the approximate financial loss suffered."). However, the second and third factors and Clal's status as a net purchaser and net gainer undermine Clal's ability to serve as lead plaintiff, as discussed below.

### 3.   Rule 23 Requirements

The Court must next determine whether the proposed lead plaintiff "otherwise satisfies the requirements of Rule 23."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc); *see Darish v. N. Dynasty Mins. Ltd.*, No. 20 Civ. 5917, 2021 WL 1026567, at *6 (E.D.N.Y. Mar. 17, 2021).  "In a PSLRA motion to appoint lead plaintiff, the Court considers only whether the proposed plaintiff has made a preliminary showing that two of Rule 23's requirements -- typicality and adequacy -- are satisfied."  *Yang v. Tr. for Advised Portfolios*, No. 21 Civ. 1047, 2022 WL 970772, at *3 (E.D.N.Y. Mar. 31, 2022); *accord Atanasio v. Tenaris S.A.*, 331 F.R.D. 21, 29 (E.D.N.Y. 2019).

"Lead plaintiffs' claims are typical where each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *In re Hebron Tech. Co. Sec. Litig.*, No. 20 Civ. 4420, 2020 WL 5548856, at *5 (S.D.N.Y. Sept. 16, 2020).  The adequacy requirement is satisfied where "(1) class counsel is qualified, experienced and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the [proposed lead plaintiff and] class [have] a sufficient interest in the outcome of the case to ensure vigorous advocacy."  *Yang*, 2022 WL 970772, at *4.

### a.   Clal -- Typicality and Adequacy

Even assuming that Clal makes the Rule 23 preliminary showing such that it is entitled to the rebuttable presumption of being the most adequate lead plaintiff, Clal's status as a "net seller" and "net gainer" during the Class Period subjects it to unique defenses that prevent Clal from adequately representing the class.  Clal sold more shares than it purchased and earned more proceeds than it spent during the Class Period.  "That status effectively disqualifies [Clal] from representing" the putative class, *see Born v. Quad/Graphics, Inc.*, No. 19 Civ. 10376, 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020), because "parties which are net sellers and net gainers, with respect to the relevant securities transactions during the class period, may have more trouble proving damages at trial." *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (collecting cases and noting that "[c]ourts have consistently rejected applications for lead plaintiff status made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices").

Clal argues in response that courts in this district and nationwide have repeatedly held that a net seller can serve as a lead plaintiff so long as it has incurred a recoverable loss, citing, e.g., *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 132 (S.D.N.Y. 2011).  But cases like *Foley* are distinguishable.  There, the court rejected the notion that "net sellers who are net losers" should be prevented from serving as lead plaintiffs, particularly when the net seller does not "benefit from the fraud by selling at inflated prices." *Id.*  Here, Clal is not only a net seller, but also a net gainer, which *Foley* acknowledged typically disqualifies a potential lead plaintiff. *See id.* ("[C]ourts have sensibly refused to appoint as lead plaintiff net sellers who are also net *gainers*.").

Clal also argues that it is not a "net seller" because Defendants' alleged fraud predates the Class Period. As such, "the fraud inflated the Verint shares subject to the Spin-Off well before the start of the alleged Class Period." Clal points to draft registration statements filed with the SEC on September 25 and November 18, 2020, as well as a registration statement filed with the SEC on December 22, 2020. The argument is unpersuasive because Clal had the burden of showing that it was the better candidate for lead plaintiff, yet did not provide factual information or analysis demonstrating that *its* shares of Verint were purchased at an inflated price, i.e., purchased after the earliest alleged material misstatement or omission. Because Clal is disqualified, the Court turns to Omaha as the movant with the next largest financial interest.

### b.  Omaha -- Typicality and Adequacy

Omaha meets both the Rule 23 typicality and adequacy requirements for purposes of qualification for lead plaintiff. Omaha's claims are typical because they arose from Omaha's purchase of publicly-traded Cognyte common stock during the Class Period when Defendants' alleged material misrepresentations and omissions improperly inflated the price of the securities. Of the 104,330 shares purchased during the Class Period, Omaha purchased a significant majority at inflated prices -- i.e., prior to any of the alleged corrective disclosures. Omaha retained 93,745 of those shares at the end of the Class Period, and its approximate losses are based on a lookback price of $4.75, significantly below any of its purchase price for shares before any corrective disclosure.[3] Such

---

[3] Because Omaha retained shares after the Class Period, in calculating their losses Omaha assumes proceeds from the retained shares at a lookback price of $4.75, which is the 90-day mean trading price for Cognyte from June 29, 2022 -- the first day after the Class Period. This approach for estimating losses has been approved in this district when not objected to because of the PSLRA's 90-day lookback period for calculating damages. *See Foley*, 272 F.R.D. at 130.

demonstration of investment loss "is all that is required to demonstrate typicality at this stage." *In re Hebron Tech. Co.*, 2020 WL 5548856, at *5.

Omaha also meets the adequacy requirement. First, Omaha's selected counsel, Scott+Scott Attorneys at Law LLP ("Scott+Scott") has demonstrated that it is qualified and has substantial experience litigating securities fraud cases and serving as lead counsel. Second, "[c]ourts find that a plaintiff's interests are not antagonistic to the class where, as here, the case is based on alleged violations of the Securities Act where class members are relying on the same statements or omissions as the factual basis of their claims, and where the financial losses are tied to the drop in value as a result of the false or misleading statements." *Skeels v. Piedmont Lithium Inc.*, No. 21 Civ. 4161, 2022 WL 1236797, at *6 (E.D.N.Y. Feb. 4, 2022). Third, Omaha will be motivated to pursue vigorously a recovery on behalf of all class members, as Omaha has the largest financial stake in the outcome of this litigation. *See Atanasio*, 331 F.R.D. at 30. At this stage, Omaha has made a sufficient showing of its adequacy to represent the proposed class.

Because Omaha has the otherwise largest financial interest and preliminarily satisfies the Rule 23 requirements as demanded by the PSLRA, Omaha is entitled to the PSLRA's rebuttable presumption of being the most adequate lead plaintiff. *See City of Sunrise Firefighter's Pension Fund v. Citigroup Inc.*, No. 20 Civ. 9132, 2021 WL 396343, at *6 (S.D.N.Y. Feb. 4, 2021). That presumption has not been rebutted.

### B.     Approval of Lead Counsel

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "The lead plaintiff's right to select and retain counsel is not absolute." *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Tr. Inc.*, No. 8 Civ. 1418, 2009 WL 10709107, at

*5 (E.D.N.Y. Mar. 9, 2009), *report and recommendation adopted*, 2009 WL 10750336 (E.D.N.Y. Mar. 16, 2009).  However, "[t]he Court generally defers to the plaintiff's choice of counsel, and will only reject the plaintiff's choice . . . if necessary to protect the interests of the class."  *Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 211 (E.D.N.Y. 2019); *see also Brady v. Top Ships Inc.*, 324 F. Supp. 3d 335, 352 (E.D.N.Y. 2018) ("Courts have correctly found that the PSLRA evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention.").  "In assessing a plaintiff's selection and retention to represent a purported class, courts give significant weight to counsel's experience."  *Darish*, 2021 WL 1026567, at *8; *accord Reitan v. China Mobile Games & Ent. Grp., Ltd.*, 68 F. Supp. 3d 390, 401 (S.D.N.Y. 2014).

Scott+Scott has substantial experience in the prosecution of securities fraud class actions, having served as lead or co-lead counsel in many securities class actions.  The record contains no reason why Omaha, as lead plaintiff, should not be accorded the usual deference in choosing its counsel, nor why the appointment of other counsel is necessary to protect the class.  Omaha's selection of Scott+Scott as lead plaintiff's counsel is approved.

## III.    CONCLUSION

For the foregoing reasons, Omaha's application for appointment as lead plaintiff and approval of lead plaintiff's counsel is **GRANTED**.  Clal's motion for the same is **DENIED**.  Omaha is appointed lead plaintiff, and Scott+Scott is appointed lead counsel.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 20 and 23.

Dated:  October 4, 2023
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**