UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CITY OF OMAHA POLICE AND FIREFIGHTERS RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| | : | 23-cv-01769 (LGS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COGNYTE SOFTWARE LTD, ELAD SHARON and DAVID ABADI, | : : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
## <u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Scott D. Musoff
Ian C. Lerman
Samuel G. Bieler
One Manhattan West
New York, NY 10001-8603
Phone: (212) 735-3000
Fax:    (212) 735-2000
scott.musoff@skadden.com
ian.lerman@skadden.com
samuel.bieler@skadden.com

*Counsel for Defendants Cognyte Software
Ltd., Elad Sharon and David Abadi*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT .........................................................................................................1

STATEMENT OF FACTS ..................................................................................................................3

      A.      Background ........................................................................................................3

      B.      Cognyte's Risk Disclosures During the Class Period ..............................................4

      C.      The Purported Corrective Disclosures ....................................................................6

ARGUMENT ....................................................................................................................................11

I.      Plaintiff Fails to Allege A Material Misrepresentation or Omission ................................11

      A.      Plaintiff Fails to Allege Any Misstatement or Omission in Connection
             With the Identity of Cognyte's Customers or Uses of Its Products ......................12

      B.      Plaintiff Fails to Allege Any Misstatement or Omission Related to
             Cognyte's Code of Conduct or Compliance With Export Control Laws ..............15

      C.      Plaintiff Fails to Allege Any Misstatement or Omission in Connection
             With the Meta Report ...........................................................................................19

II.      Plaintiff Fails to Allege A Strong Inference of Scienter ..................................................20

      A.      Plaintiff Fails to Allege Motive ...........................................................................20

      B.      Plaintiff Fails to Allege Conscious Misbehavior or Recklessness........................21

III.      Plaintiff Fails to Allege Loss Causation .........................................................................22

      A.      The Purported Corrective Disclosures Reflected the Materialization of
             Known Risks.........................................................................................................23

      B.      Declines in Cognyte's Stock Price Were Unrelated to the Purported
             Corrective Disclosures .........................................................................................23

CONCLUSION.................................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................3, 20

*In re Bayou Hedge Fund Litigation*,
    534 F. Supp. 2d 405 (S.D.N.Y. 2007)......................................................................21

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................11

*Board of Trustees of City of Ft. Lauderdale General Employees' Retirement System v.
    Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011)......................................................................21

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    506 F. App'x 32 (2d Cir. 2012) .................................................................11, 12, 20

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ...........................................................................18

*Born v. Quad/Graphics, Inc.*,
    521 F. Supp. 3d 469 (S.D.N.Y. 2021)......................................................12, 17, 21

*Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan
    Mortgage Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ...............................................................................23

*In re China Mobile Games & Entertainment Group, Ltd. Securities Litigation*,
    No. 14-cv-4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016).................12, 15, 20

*City of Brockton Retirement System v. Avon Products, Inc.*,
    No. 11-cv-4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)...........................16

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..............................................................................16, 19

*City of Westland Police & Fire Retirement System v. MetLife, Inc.*,
    129 F. Supp. 3d 48 (S.D.N.Y. 2015).......................................................................25

*Delfonce v. Eltman Law, P.C.*,
    No. 16-cv-6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 16, 2017) .....................3

*In re DraftKings Inc. Securities Litigation*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023)......................................................12, 13, 19

*In re Elan Corp. Securities Litigation*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)..............................................................................12

*Garnett v. RLX Technology Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022)..............................................................................18

*Greco v. Qudian Inc.*,
    No. 1:20-cv-577-GHW, 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ..........................22

*In re HEXO Corp. Securities Litigation*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)..............................................................................20

*In re ITT Educational Services, Inc. Securities & Shareholder Derivatives Litigation*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012).........................................................................16, 18

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)................................................................................................22

*Janbay v. Canadian Solar, Inc.*,
    No. 10-cv-4430(RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...........................24

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) ........................................................................................13

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..............................................................................................21

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................................23

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021)..............................................................................22

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d Cir. 2010)..............................................................................................11

*In re Neurotrope, Inc. Securities Litigation*,
    315 F. Supp. 3d 721 (S.D.N.Y. 2018)....................................................................12, 20, 21

*In re New Energy Systems Securities Litigation*,
    66 F. Supp. 3d 401 (S.D.N.Y. 2014).................................................................................23

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
    80 F.4th 158, 171 (2d Cir. 2023) ......................................................................................20

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..............................................................................................19

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)................................................................24

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)........................................................................................20

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)..............................................................................23

*Pena v. DePrisco*,
    432 F.3d 98 (2d Cir. 2005)..................................................................................1

*Perez v. Higher One Holdings, Inc.*,
    No. 14-cv-755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)..............................19

*In re PetroChina Co. Ltd. Securities Litigation*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)..................................................................23

*In re Renewable Energy Group Securities Litigation*,
    No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022)................................................2, 25

*In re Rockwell Medical, Inc. Securities Litigation*,
    No. 16-cv-1691 (RJS), 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018)..........................1, 17

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad, Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018)..................................................................25

*In re Seadrill Ltd. Securities Litigation*,
    No. 14-cv-9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016)......................17, 18

*In re ShengdaTech, Inc. Sec. Litig.*,
    No. 11-cv-1918 (LGS), 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ..........................22

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ..........................................................................22

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)..................................................................1, 11, 16

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)..................................................................22

*Stratte-McClure v. Morgan Stanley*,
    598 F. App'x 25 (2d Cir. 2015) ..........................................................................25

*In re Telefonaktiebolaget LM Ericsson Securities Litigation*,
    No. 22-cv-1167 (WFK) (LB), 2023 WL 3628244 (E.D.N.Y. May 24, 2023).......15, 18, 19

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................20

*Tseng v. De Vries*,
    No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023) ...............................................18

*In re UBS AG Securities Litigation*,
    No. 07-cv-11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ...........................19

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...................................................................................18, 24

## STATUTES

15 U.S.C. § 78u-4(b)(1) ................................................................................................................11

15 U.S.C. § 78u-4(b)(2)(A).........................................................................................................20

## RULES

Fed. R. Civ. P. 8...........................................................................................................................11

Fed. R. Civ. P. 9(b) ......................................................................................................................11

Defendants Cognyte Software Ltd. ("Cognyte," or the "Company") and Elad Sharon ("Sharon") (together with Cognyte, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 52) (the "Complaint") in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6) as well as Section 101(b) of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b)(2).[1]

## PRELIMINARY STATEMENT

As the Second Circuit has described, Plaintiff's attempt to plead securities fraud relies "on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and voila, you have alleged a prima facie case of securities fraud!" *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019). As in *Singh*, this attempt fails because "generic statements do not invite reasonable reliance . . . are not . . . materially misleading, and so cannot form the basis of a fraud case." *Id.* (emphasis omitted).

The Complaint here is even more deficient than that in *Singh* because Plaintiff does not and cannot point to any actual "significant regulatory violations." *Id.* Instead, Plaintiff proffers "banal and vague corporate statements" (*id.*) from February 2, 2021, to January 19, 2023 (the "Class Period"), which it reframes with its own gloss about the "defensive" nature of Cognyte's products and the customers with which it did business. To attempt to allege falsity, Plaintiff "stitch[es] together a patchwork of analyst and press reports . . . and proclaim[s] the result a tale of securities fraud." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16-cv-1691 (RJS), 2018 WL

---

[1] Though listed in the case caption, the Complaint includes no allegations about David Abadi. Therefore, if any claims are asserted against Abadi, they should be dismissed. *See Pena v. DePrisco*, 432 F.3d 98, 105 nn.5-6 (2d Cir. 2005).

1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (quoting *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991)).  This attempt to conjure fraud fails because "[c]onclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *Id.* at *8 (quoting *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008)).  Plaintiff simply cannot plead with particularity any false or misleading statements or any facts to infer that such statements were false or misleading when made.

Plaintiff's claims independently fail because the Complaint does not plead particularized facts that give rise to the requisite cogent and compelling "strong inference" of scienter.  Plaintiff does not even try to point to any motive or opportunity to defraud, and its allegations of conscious misbehavior or recklessness fail as Plaintiff simply relies on generic and conclusory allegations that "[t]here is a strong inference that Defendant Sharon knew" such statements were false and misleading based on his position within the Company.  (Compl. ¶¶ 90-92.)  Such "generalized allegations predicated on what the Defendants must have known [b]y virtue of their responsibilities and activities as a senior officer are precisely the kind of conclusory allegations that fail to satisfy the PSLRA's heightened pleading standard." *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022).

Finally, Plaintiff fails to causally connect losses to the alleged misrepresentations.  The purported corrective disclosures reflected the materialization of known risks and Plaintiff's loss causation theory is out of sync with the movement of Cognyte's stock price and ignores other market factors.

2

## STATEMENT OF FACTS[2]

### A.   Background

On December 4, 2019, Verint Systems Inc. ("Verint"), a publicly traded New York-based analytics company, announced plans to spin off its cyber intelligence business.  (Ex. A, Dec. 22, 2020 Form 20-F at 9.)  Verint retained the customer engagement component of its business and transferred its cyber intelligence business to Cognyte.  (*Id.*)  The spinoff was completed on February 1, 2021.  (*See* Ex. B, Apr. 5, 2022 Form 20-F at iii; Compl. ¶¶ 2, 13.)

Cognyte is an Israel-based global investigative analytics software company that began trading on the NASDAQ in February 2021 following its spinoff from Verint.  (Compl. ¶¶ 2, 13.)  Cognyte provides software solutions to governmental and other customers that help them accelerate and improve the effectiveness of investigations and decision-making by deriving insights with which they identify, neutralize and tackle threats to national security and address different criminal and terror activities.  (Compl. ¶¶ 17, 48.)  Cognyte spun off its situational intelligence solutions ("SIS") business and associated customer base on December 1, 2022.[3]

Defendant Elad Sharon has served as Cognyte's CEO and a member of its Board of Directors since the Company's spinoff from Verint.  (Compl. ¶ 14.)

Plaintiff City of Omaha Police and Firefighters Retirement System alleges that between February 2, 2021, to January 19, 2023, it bought or sold Cognyte common stock at artificially inflated prices and sustained losses therefrom.  (Compl. ¶ 12.)

---

[2] These facts reflect the well-pled allegations in the Complaint and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman L., P.C.*, No. 16-cv-6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 16, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Exhibits cited herein are attached to the accompanying Declaration of Scott D. Musoff, dated December 6, 2023.  All citations and internal quotation marks are omitted and all emphasis is added to such material unless otherwise indicated.

[3] *See* Press Release, Cognyte Software, Ltd., Cognyte Announces Third Quarter Results (Dec. 20, 2022), https://www.cognyte.com/news/cognyte-announces-third-quarter-results-2/; *see also infra* § III.B.

**B.**      <u>**Cognyte's Risk Disclosures During the Class Period**</u>

### 1.      Legal, Regulatory and Reputational Risks

Throughout the Class Period, Cognyte repeatedly disclosed to the public the legal, regulatory and reputational risks it faced as an investigative analytics software company. Cognyte's December 22, 2020 Registration Statement explicitly disclosed that it was subject to a "variety of regulatory requirements" and warned that while the Company

> ***endeavor[s]*** to implement policies, procedures, and systems ***designed to achieve compliance*** with . . . regulatory requirements, [it] ***cannot assure you*** that these policies, procedures, or systems will be adequate or that [it] or [its] personnel will not violate these policies and procedures or applicable laws and regulations,

potentially resulting in fines and reputational damage.  (Ex. A, Dec. 22, 2020 Form 20-F at 35.)[4]

The December 2020 Registration Statement also warned that Cognyte might

> experience ***negative publicity, reputational harm, or other adverse impacts*** on our business as a result of offering certain types of solutions or if we sell our solutions to ***countries or customers that are considered disfavored*** by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws.

(Ex. A, Dec. 22, 2020 Form 20-F at 32.)[5]

During the Class Period, Cognyte also disclosed the risk that it "***may be associated with other companies in our industry*** that engage with customers viewed as having poor human rights or democratic records or with companies that apply techniques that are generally viewed negatively."  (Ex. B, Apr. 5, 2022 Form 20-F at 4-5.)

### 2.      Risks Related to Social Media

Cognyte's Registration Statements and reports during the Class Period also warned of

---

[4]  The Company provided identical warnings in its amended Registration Statement (Ex. C, Jan. 13, 2021 Form 20-F at 34), annual report for the fiscal year ending January 31, 2021 (Ex. D, Apr. 29, 2021 Form 20-F at 11) and annual report for the fiscal year ending January 31, 2021 (Ex. B, Apr. 5, 2022 Form 20-F at 15).

[5]  An identical warning was contained in Cognyte's annual report for the fiscal year ending January 31, 2021.  (*See* Ex. D, Apr. 29, 2021 Form 20-F at 7.)

a potential risk that we may be named . . . in **claims made by companies in the social media sphere** or by providers of communication services alleging any one of a number of claims, due to **our products having been misused to obtain valuable information from users of, or participants in, those services**. There is a related risk of regulatory enforcement against us due to complaints of that kind. There have also been recent claims against companies in our field of operations for supposed damages caused by government collection of information through the use of products similar to ours.

(Ex. A, Dec. 22, 2020 Form 20-F at 36; Ex. C, Jan. 13, 2021 Form 20-F at 35; Ex. D, Apr. 29, 2021 Form 20-F at 11; Ex. B, Apr. 5, 2022 Form 20-F at 13.)

Indeed, Cognyte's annual report filed April 5, 2022, updated these warnings noting that some **had already materialized** and that it **had already** "been subject to negative publicity as a result of allegations regarding certain of [its] investigative analytics services" and that some of its solutions could be "subject to heightened scrutiny and criticism by the public opinion, privacy advocates, privacy NGOs, media outlets and others." (*See* Ex. B, Apr. 5, 2022 Form 20-F at 4-5.)

### 3.    Supply Chain Risk and Reduced Customer Spending

Cognyte's annual reports for the fiscal years ending January 31, 2021, and January 31, 2022, also disclosed the risk posed by its post-Covid supply chain, noting that if "suppliers . . . cease production or sale, or there is any other disruption in our supply . . . we will be required to locate alternative sources of supply . . . which would be likely to increase expenses, create delivery delays, and negatively impact our sales." (Ex. D, Apr. 29, 2021 Form 20-F at 8; Ex. B, Apr. 5, 2022 Form 20-F at 5.) In particular, Cognyte disclosed that its "**revenue was negatively impacted** by delays and reduced spending attributed to the impact of the COVID-19 pandemic on our customers' operational priorities and as a result of cost containment measures they have implemented." (Ex. D, Apr. 29, 2021 Form 20-F at 39.) Cognyte disclosed that these challenges continued to affect the company and constrain revenue in its annual report for the fiscal year ending January 31, 2022. (Ex. B, Apr. 5, 2022 Form 20-F at 2.)

5

**C.      The Purported Corrective Disclosures**

### 1.       The December 16, 2021 Meta Report and December 21, 2021 Haaretz Article

On December 16, 2021, Meta Platforms, Inc. ("Meta")—the parent company of social media platforms Facebook and Instagram—released its "Threat Report on the Surveillance-for-Hire Industry" (the "Meta Report"). (Ex. E, Meta Report.)  The Meta Report describes Facebook and Instagram's actions against Cognyte and six other companies that, according to Meta, provide "surveillance-for-hire" services. (*Id.* at 2, 8.)  In particular, Meta alleged that Cognyte provided a platform that allowed its customers to manage fictitious social media accounts, collect data and engage in social engineering in violation of Meta's community standards and terms of service. (*Id.* at 8.)[6]  The Meta Report also associated Cognyte with the company WebintPro, (*id.*), which was acquired by Verint on December 18, 2019 for $23.4 million (Ex. A, Dec. 22, 2020 Form 20-F at 52).  Neither the Meta Report nor Plaintiff's allegations identify any specific violations, when those violations occurred (or if the violations even occurred after the Cognyte spinoff) or if there was any involvement by Cognyte at all.  Nor does Plaintiff identify which Cognyte or WebintPro product or products were used by customers to commit the alleged violations.  The Meta Report announced that Meta had removed 100 social media accounts linked to Cognyte or its customers and prohibited the Company from using Meta's services. (Ex. E, Meta Report at 8, 11.)

Analyst reaction to the Meta Report was muted.  On January 14, 2022, Needham & Company LLC ("Needham") released an analysis (the "Needham Analysis") (Compl. ¶ 74) that acknowledged that while there was "potential for reduced effectiveness and customer appeal for the Web Intelligence use-case without data collected from Meta," the "Web Intelligence use-case

---

[6] The Meta Report acknowledged that it was unable "to discern the purpose or legitimacy of such targeting" and the report did not identify any examples of Cognyte's products being used in violation of Meta's community standards or terms of service. (*See id.* at 12.)

generate[d] *less than 5%* of Cognyte's Total Revenue, and the company *does not anticipate a significant impact to sales* in reaction to the news." (Ex. F, Needham Analysis at 4.) Despite the Meta Report's allegations, Needham rated Cognyte's stock a "Buy" and said it was undervalued. (*Id.* at 10.)

In the week before the Meta Report was released, Cognyte's stock declined by one to two percent per day. This trend continued after the release of the Meta Report: In the two days after the report's publication, Cognyte's stock dropped five percent each day for reasons, according to analysts, completely unrelated to the Meta Report. As the Needham Analysis noted, "Cognyte's near-term growth is likely impacted by customer-readiness, component shortages and travel restrictions / COVID – *all of which have been highlighted on recent earnings calls*." (Ex. F, Needham Analysis at 1.)

Five days after the Meta Report was released, Haaretz published an article (the "2021 Haaretz Article") on the Meta Report and its implications for Israeli companies. (*See* Ex. G, 2021 Haaretz Article). The article quoted the Meta Report and speculated that companies such as the ones discussed in the Meta Report might need to "close down." (Ex. G, 2021 Haaretz Article at 3.) As with the Meta Report, there was little reaction to the 2021 Haaretz Article. Cognyte's stock price—which had decreased on each of the five business days before its publication—continued to decline. (*See* Ex. H, Cognyte Stock Chart.) The Needham Analysis continued to consider Cognyte undervalued and attributed its issues to disclosed challenges with "customer-readiness, component shortages and travel restrictions / COVID." (Ex. F, Needham Analysis at 1.)

### 2. The April 5, 2022 Earnings Announcement and Analyst Response

On April 5, 2022, Cognyte issued its annual report and a press release on its fourth quarter earnings and held an earnings call the same day. (Compl. ¶ 77; Ex. I, Apr. 5, 2022 Analyst Call Transcript.) In the April 5, 2022 press release, Cognyte reported a "several million dollar[]

7

[revenue miss] below the midpoint of [its] guidance." (Compl. ¶ 77 (alterations in original).)  It also acknowledged that the Company continued to experience "supply chain issues, as well as, a lower conversion of [its sales] pipeline." (*Id.*)  Because of the Company's inability to forecast when and how these issues would be resolved it was "unable to provide FY23 guidance and long-term targets." (*Id.*)

Sharon acknowledged these challenges on the April 5, 2022 Analyst Call, noting that "supply chain issues" "affect[ed] [Cognyte's] ability to timely deliver backlog orders and impact[ed] [its] revenue."  (Ex. I, Apr. 5, 2022 Analyst Call Transcript at 3.)  He also acknowledged that "some customers [were] delaying placing new orders for other solutions until [the Company] deliver[ed] their prior orders." (*Id.*)  Cognyte's stock price fell from $11.66 per share on April 4, 2022, to $8.03 per share on April 5, 2022.  (Compl. ¶ 79.)

While the April 5, 2022 annual report acknowledged Meta's activities and its impact on Cognyte's products, (Ex. B, Apr. 5, 2022 Form 20-F at 4-5), analysts on the earnings call did not raise either the Meta Report or the 2021 Haaretz Article, (*see* Ex. I, Apr. 5, 2022 Analyst Call Transcript).  Instead, analyst questions during the April 5, 2022 Analyst Call focused on the deal pipeline and supply chain constraints.  (*Id.* at 6-7, 9.)  On April 6, 2022, Wedbush published an analysis (the "Wedbush Analysis") that also listed "execution shortfalls [and] longer sales cycles" as well as challenges related to the "timing of deals and the execution of the model transition to subscription" as the cause of Cognyte's poor performance.  (Ex. J, Wedbush Analysis at 1.)

### 3.    The June 28, 2022 Earnings Announcement and Analyst Response

Cognyte released its quarterly earnings and held another earnings call on June 28, 2022.  (*See* Ex. K, June 28, 2022 Press Release.)  In the June 28, 2022 Press Release, Sharon acknowledged that Cognyte was "disappointed with [its] first quarter results, which were impacted

by slow pipeline conversion and supply chain." (*Id.* at 1.) That day, Cognyte's stock price closed at $4.58, down from $6.42 the previous day. (*See* Ex. H, Cognyte Stock Chart.)

An analysis from William Blair and Company released on June 28, 2022 (the "William Blair Analysis") also identified "the low pipeline conversion" as a challenge. (Ex. L, June William Blair Analysis at 1.) The William Blair Analysis also noted that "***Cognyte's brand has been negatively impacted by increased scrutiny of the cyber intelligence industry and fellow Israel cyber surveillance firm NSO Group***." (Ex. L, June William Blair Analysis at 1.) This analysis further acknowledged that "[d]efense contractors' products are often vulnerable to ethical scrutiny" and that "Cognyte and its government customers must balance between data privacy and surveillance." (*Id*. at 2.) Neither analyst report attributed Cognyte's issues to any alleged fraud or unethical practices by the Company.

### 4.     The December 15, 2022 Norway Pension Fund Announcement

On December 15, 2022, the Executive Board of the central bank of Norway announced that it would exclude Cognyte from the Norwegian Government Pension Fund, citing concerns about the Company possibly contributing to human rights violations. (Compl. ¶ 83.) Following this announcement Cognyte's stock price declined over the next two trading days before rebounding to its pre-announcement price on the third trading day. The Complaint does not identify any reports from financial analysts that mentioned this announcement, nor does Plaintiff identify any previously concealed information identified therein.

### 5.     The January 15, 2023 Articles and NGO Report

On January 15, 2023, a series of reports and articles were published concerning the possible acquisition by Myanmar of certain Cognyte products. On January 15, 2023, the non-governmental organization Justice for Myanmar reported that "Cognyte Software Limited won a ***tender*** for the provision of lawful interception equipment to Myanmar in 2020"—before the military coup and

imposition of export restrictions on that country.  (Ex. M, Jan. 15, 2023 Justice for Myanmar Report at 1.)  Justice for Myanmar further reported that Myanmar "issued Cognyte with a *purchase order* for a fixed data lawful interception gateway in December 2020, with work *scheduled* for completion by early June 2021." (*Id.* at 1-2.)  The NGO also asserted in conclusory fashion that this purported sale was illegal under Israeli law and that the technology would facilitate human rights abuses by Myanmar's government.  (*Id.* at 2.)  The report did not assert that Cognyte sold or delivered products to Myanmar *after* the coup and imposition of export restrictions.  (*See id.*)

The same day, Haaretz published an article (the "2023 Haaretz Article") that purported to provide additional details about the transaction.  (*See* Ex. N, 2023 Haaretz Article.)  According to the article, Cognyte won the contract "about *a month before the junta seized power* in a coup." (*Id.* at 2.)  It also acknowledged that "[w]hile installation of the system was *scheduled* to be completed in June 2021, *it is not clear whether it was delivered or if it is operational*." (*Id.* at 3.) Haaretz reported that Israeli authorities had not stated whether the sale had been approved and noted that "the activists have also sent a letter to the [Israeli] Defense Ministry export-supervision arm, calling on it to cancel *Cognyte's permit export and marketing licenses to Myanmar*." (*Id.* at 4.)  The article also stated that activists sent a letter calling for investigations into Cognyte by Israeli law enforcement.  (*Id.*)  Reuters also published an article on January 15 (the "Reuters Article") discussing the same information as the 2023 Haaretz Article.  (Ex. O, Reuters Article.)[7] To be clear, Plaintiff does not and cannot allege that there actually have been any accusations of wrongdoing by the Israeli government or any other government let alone any findings that Cognyte violated any export laws.

---

[7] Plaintiff incorrectly states that the Reuters Article was published on January 18, 2023, but the article was originally published on January 15, 2023.  (*Compare* Compl. ¶ 85 & n.45, *with* Ex. O, Reuters Article.)  The Reuters Article was updated on January 18, 2023, but revealed no new information about Cognyte.  That day, Cognyte's stock price closed at $3.73 but returned to its pre-publication price within two days.

10

This news had no effect on Cognyte's stock price.  In fact, on January 13, 2023, the last trading date before the publication of these articles, Cognyte's stock price was $3.78.  On the next trading day after the articles were released, Cognyte's stock price *rose* to $3.85.

## ARGUMENT

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Plaintiff must allege, among other things, (1) a material misrepresentation or omission, (2) scienter and (3) loss causation.  *Singh*, 918 F.3d at 62. Plaintiff fails on each of these elements.  Plaintiff's failure to plead a primary violation of the securities laws precludes a claim for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

## I.   PLAINTIFF FAILS TO ALLEGE A MATERIAL MISREPRESENTATION OR OMISSION

Plaintiff's claims are subject to the heightened pleading requirements of Rule 9(b), which requires that plaintiffs "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that they "specify each misleading statement" and "set forth the facts on which [a] belief that a statement is misleading was formed."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (alteration in original); *see* 15 U.S.C. § 78u-4(b)(1).  Plaintiff fails to meet these heightened standards.[8] Dismissal of the Complaint is also warranted because Plaintiff fails to state a material misrepresentation or omission.  *See Singh*, 918 F.3d at 62 ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege . . . a material misrepresentation (or

---

[8]  Plaintiff's claims fail even under Rule 8 because their allegations are insufficient to "nudge[] their claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

omission).").[9]   A statement or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market.  *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 730 (S.D.N.Y. 2018) (Schofield, J.).

**A.      Plaintiff Fails to Allege Any Misstatement or Omission in Connection
With the Identity of Cognyte's Customers or Uses of Its Products**

The Complaint criticizes Cognyte for purportedly emphasizing the "defensive nature" of its solutions and for identifying sales to governments and corporations without identifying purported sales to so-called "bad actors."  (Compl. ¶¶ 47-52, 56-72, 95(a).)  These allegations about the use of Cognyte's products and the identity of its customers rely on statements that Cognyte did not even make, that are objectively true or that Plaintiff fails to support with particularized facts.  None is actionable.

A misstatement claim requires a literally untrue statement of material fact or a statement that is misleading in context.  *See In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*, No. 14-cv-4471 (KMW), 2016 WL 922711, at *3 (S.D.N.Y. Mar. 7, 2016).  To allege this, a plaintiff must plead "the reliability of [its] sources."  *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008); *see also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 153 (S.D.N.Y.

---

[9]  Plaintiff's Complaint does not specify which of the dozens of challenged statements are allegedly false or misleading and for which reasons.  Instead, Plaintiff copies large block quotes from Cognyte's disclosures and analyst calls on a sweeping range of subjects (*see* Compl. ¶¶ 43-72) and asserts that all of them were false or misleading for the reasons stated in another paragraph (*see* Compl. ¶¶ 51, 61, 68, 72; *see also* Compl. ¶ 45 (similar)).  Such puzzle pleading, without any effort to "demonstrate with specificity why and how each statement is materially false or misleading," is improper and alone warrants dismissal.  *Boca Raton Firefighters*, 506 F. App'x at 38 (rejecting securities pleading that failed to "identify or clearly cross-reference any facts" to any specific alleged misrepresentation); *see also Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478-79 (S.D.N.Y. 2021) (collecting cases and dismissing complaint that placed "the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").  This failure is made worse because several of the alleged misstatements are miscited in the Complaint.  (*See* Compl. ¶¶ 17 n.1, 20 n.6, 32 n.12.)

2023) ("The [complaint's] threadbare sourcing and the conclusory quality of these factual allegations and attributions are ultimately fatal to all of its § 10(b) or § 20(a) claims.").

Plaintiff's allegations about Cognyte's products and customers fail to meet this bar. The Complaint repeatedly criticizes Cognyte for misrepresenting the "the defensive nature of its software" by "repeating that the Company's solutions 'fuse[d], analyze[d] and visualize[d] disparate data sets at scale to help security organizations find needles in the haystacks.'" (Compl. ¶ 59 (alterations in original).) But Plaintiff's allegations do not identify a single statement in which Defendants characterized the Company's products as "defensive." Nor does Plaintiff allege that the actual statements were untrue as Plaintiff does not and cannot allege the Company's solutions do not actually "fuse, analyze and visualize disparate data sets at scale to help security organizations find needles in the haystacks." (*See id.*) That Cognyte's products may have been "***designed***" with defensive uses in mind does not suggest that they could never be used to "target politicians, journalists and other individuals." (Compl. ¶¶ 51, 61, 68, 72). *See DraftKings*, 650 F. Supp. 3d at 168 (complaint did not adequately plead falsity where company identified countries where the company legally operated but ***omitted*** countries where the company operated on the "black-market"). There is no obligation under the federal securities laws to pejoratively describe one's own business. *See, e.g.*, *Jones v. Perez*, 550 F. App'x 24, 26 (2d Cir. 2013) (noting that even "misguided optimism is not a cause of action, and does not support an inference of fraud").

In any case, Plaintiff's allegations about the use of Cognyte's technology do not show a misstatement even on Plaintiff's terms. Plaintiff implies that targeting journalists and politicians is per se illegitimate or non-defensive, but this is unsupportable in a world where supporters of violent governments or terrorist organizations may also hold themselves out as "politicians" or "journalists." Even the Meta Report admits that Meta was unable "to discern the purpose or

13

legitimacy of such targeting." (Ex. E, Meta Report at 12; *see infra* § I.C.) Moreover, while the Meta Report asserts that the product "enables" customers to engage in surveillance and social engineering, (Compl. ¶¶ 45-46), nothing in the Meta Report suggests that Cognyte has the ability to restrict the categories of persons its customers can target—or even that Cognyte had visibility into how its customers employed its solutions once they acquired the products. Moreover, the Meta Report lacks any specificity on timing and Plaintiff does not allege when the violations discussed in the Meta Report took place or whether the violations even occurred after the Cognyte spinoff. (Ex. E, Meta Report at 8.) Nor does Plaintiff identify which Cognyte or WebintPro product or products were used to commit the alleged violations. Thus, Plaintiff does not allege to what degree any alleged violations related to Cognyte or its products. As discussed below, Plaintiff's reliance on a 2023 Haaretz Article is similarly infirm as the article could not confirm "whether [Cognyte's product] was delivered [to Myanmar] or if it is operational," much less how it was used, if at all. (Ex. N, 2023 Haaretz Article at 3; *see infra* § I.B.)

Plaintiff also claims that certain statements were "materially false and misleading because they portrayed Cognyte's customer base as consisting of governments and corporate enterprise customers . . . when, in fact, Cognyte indiscriminately sold" its products to customers who allegedly misused them. (Compl. ¶ 51; *see also id.* ¶¶ 61, 68, 72.) Even accepting Plaintiff's gloss on Cognyte's disclosures, Plaintiff fails to allege that these statements were untrue or misleading. Nowhere in the Complaint does Plaintiff identify a Cognyte customer that is not a government or corporation, and while Plaintiff objects to Cognyte's sales to Myanmar, it does not suggest that Myanmar is not a government or that the customer Cognyte sold to—the then-democratic Myanmar government—even received let alone misused Cognyte's products. Plaintiff thus fails

14

to allege that these purported misstatements are "objectively false." *In re China Mobile*, 2016 WL 922711, at *3.

Plaintiff also fails to allege that these statements are misleading. Plaintiff asserts that Cognyte implied its business was "limited to assisting governments, governmental agencies and corporate enterprises" when its products actually facilitated "'surveillance-for-hire' activities on behalf of bad actors." (Compl. ¶ 95(a).) Aside from "bad actors" being in the eye of the beholder, Plaintiff does not allege that Cognyte had any ability to control how customers ultimately used its solutions once clients received the products. Moreover, while Cognyte stands behind its business ethics, it has never asserted or guaranteed that every one of its clients and their activities will satisfy any and all subjective assessments of "good" behavior. Nor can Plaintiff allege otherwise, when Cognyte warned it might "experience ***negative publicity, reputational harm, or other adverse impacts*** on our business as a result of offering certain types of solutions or if we sell our solutions to ***countries or customers that are considered disfavored*** by the media or by certain political or privacy organizations." (Ex. A, Dec. 22, 2020 Form 20-F at 32.) *See In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, No. 22-cv-1167 (WFK) (LB), 2023 WL 3628244, at *12 (E.D.N.Y. May 24, 2023) ("[T]he alleged misstatements . . . are unactionable because [the company] gave ubiquitous warnings.").

**B.    Plaintiff Fails to Allege Any Misstatement or Omission Related to Cognyte's Code of Conduct or Compliance With Export Control Laws**

Plaintiff also alleges that statements in Cognyte's Code of Conduct and Defendants' statements about its compliance with export control laws were false and misleading. (Compl. ¶¶ 43-46, 53-55, 95(c).) Not so.

"Disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v.*

15

*UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  In addition, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *Id.* at 183 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).  "Code of Ethics statements, which amount to general declarations about the importance of acting lawfully and with integrity, fall squarely within this category." *Singh*, 918 F.3d at 63; *see also City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *15-16 (S.D.N.Y. Sept. 29, 2014) ("Courts in this Circuit have found statements [in] . . . Ethics Codes and Corporate Responsibility Reports—general statements proclaiming compliance with ethical and legal standards—to be non-material . . . [because] a reasonable investor would not rely on the statements [therein] . . . as a guarantee that [the company] would, in fact, maintain a heightened standard of legal and ethical compliance.").

Even if Cognyte's aspirational statements in its Code of Conduct or its statements about compliance with export laws could be actionable under any set of facts, Plaintiff fails to plead facts showing that Cognyte ***actually violated*** any export control laws.  "[T]he Complaint itself never alleges that [Cognyte] was ever ***found to be in noncompliance*** at any point during the Class Period." *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012).  Plaintiff does not and cannot allege that Israeli or other government authorities have even accused Cognyte or its officers of violating any laws—let alone finding they did—stemming from the purported potential sales to Myanmar or from any other business activities. Rather, Plaintiff's basis for purported export violations is media reports noting that activists sent Israeli authorities a letter calling for investigations into Cognyte.  (*See* Ex. N, 2023 Haaretz Article

16

at 4.)  Any allegation that Cognyte actually violated export control laws "is pure speculation and is plainly insufficient to survive a motion to dismiss." *Born*, 521 F. Supp. 3d at 489.

To support its threadbare allegations, Plaintiff relies on "article[s that] provide[] no context or information about what else . . . may have [been] said about the sanctions that was not included in the article." *In re Seadrill Ltd. Sec. Litig.*, No. 14-cv-9642 (LGS), 2016 WL 3461311, at *10 (S.D.N.Y. June 20, 2016).  "[A] reasonable investor would not put much weight on [limited information] in a news article, where reporters and editors controlled what statements would be included and excluded, what words would be quoted or paraphrased, all in an environment of rapidly changing and escalating sanctions from U.S. and foreign regulators." *Id.*

Plaintiff does not even allege any violations of export laws.  The articles they cite expressly state that "***a month before*** the junta seized power in a coup," (Ex. N, 2023 Haaretz Article at 2), Cognyte "won a tender" and was issued "a purchase order" from the then-democratically elected Myanmar government, (Ex. M, Jan. 15, 2023 Justice for Myanmar Report at 1-2).  The 2023 Haaretz Article acknowledged that after the coup and the corresponding imposition of export controls it was "***not clear whether [Cognyte's product] was delivered or if it is operational***." (Ex. N, 2023 Haaretz Article at 3.)  The Justice for Myanmar Report claims that there was a "***possible*** breach of international and Israeli law," (Ex. M, Jan. 15, 2023 Justice for Myanmar Report at 1), and the 2023 Haaretz Article notes that private organizations called on the Israeli government to "cancel Cognyte's permit export and marketing licenses to Myanmar" without indicating what licenses it held or whether the products it sold actually required licenses, (Ex. N, 2023 Haaretz Article at 4).  The articles do not and cannot say that the Israeli government or any other government even accused Cognyte of, let alone found that Cognyte was, violating any export laws.  *See In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *8 ("Conclusory allegations

17

of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (quoting *In re Optionable Sec. Litig.*, 577 F. Supp. at 690)).

Even if Cognyte were found to have violated export control laws (it has not been), "Plaintiff's allegations of specific instances of unethical or fraudulent practices do not render Defendants' broad statements regarding [legal] compliance misleading." *ITT Educ. Servs.*, 859 F. Supp. 2d at 581; *see also Seadrill*, 2016 WL 3461311, at \*9 (noting statements such as "we have implemented procedures [to ensure compliance]" do not require "disclosure of the status" of those procedures "to avoid making a misleading statement").

Defendants also warned the market about legal and regulatory compliance risks, noting that Cognyte "***cannot assure you*** that these policies, procedures, or systems will be adequate or that we or our personnel will not ***violate these policies and procedures or applicable laws and regulations***."  (Ex. A, Dec. 22, 2020 Form 20-F at 35.)  *See Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 611 (S.D.N.Y. 2022) (no actionable misstatement or omission where disclosures "alerted potential investors that the regulatory outlook . . . was uncertain and carried risks to profitability, such that no reasonable investor could have concluded that [the company's] future financial condition was 'unattended by contingency'"), *aff'd sub nom. Tseng v. De Vries*, No. 22-2787, 2023 WL 8073087 (2d Cir. Nov. 21, 2023)*; Telefonaktiebolaget LM Ericsson*, 2023 WL 3628244, at \*12 ("[T]he alleged misstatements . . . are unactionable because [the company] gave ubiquitous warnings . . . regarding the possibility of future compliance failures and investigations.").[10]

---

[10]  To the extent Plaintiff challenges Defendants' "warning of ***potential*** risks" when the materialization of such risks "were ongoing and posed a clear risk of major damage" (Compl. ¶ 55; *see also* Compl. ¶ 65 (same)), none of the risk disclosures contains an "explicit or implicit representation that [the company] had ***not*** already experienced such issues." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (not misleading to warn that Tesla "may experience delays" when it already had); *see also Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir.

**C.**      **Plaintiff Fails to Allege Any Misstatement or Omission**
              **in Connection With the Meta Report**

Plaintiff also alleges that Cognyte violated social media companies' community standards and terms of service in a manner that "not only risked serious reputational harm, but also jeopardized both Cognyte's ability to continue accessing and operating on the social media platforms." (Compl. ¶ 95(b); *see also* Compl. ¶¶ 43-46.)[11]  But Cognyte explicitly and repeatedly warned of this risk when it disclosed "a potential risk that we may be named . . . in claims made by companies in the social media sphere . . . due to our products having been ***misused to obtain valuable information from users of, or participants in, those services***."  (Ex. A, Dec. 22, 2020 Form 20-F at 36; Ex. C, Jan. 13, 2021 Form 20-F at 35; Ex. D, Apr. 29, 2021 Form 20-F at 11; Ex. B, Apr. 5, 2022 Form 20-F at 13.)  *See Telefonaktiebolaget LM Ericsson*, 2023 WL 3628244, at *12 (risk adequately disclosed).

Nor were Defendants even ***required*** to make such disclosures.  "[A] corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or ***violations of a company's internal codes of conduct and legal policies***."  *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. UBS AG*, 752 F.3d 173.  (*See also supra* § I.B.)  By extension, a company has no duty to disclose violations of ***another company's*** terms of service.  *See Perez v. Higher One Holdings, Inc.*, No. 14-cv-755 (AWT), 2016 WL 6997160, at *15

---

2015) ("Risk disclosures . . . are inherently ***prospective*** in nature.  They warn an investor of what harms ***may*** come to their investment.  They are not meant to educate investors on what harms are currently affecting the company.").  Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

[11] Plaintiff appears to allege that Cognyte violated the community standards and terms of service of social media companies Twitter (now known as X), YouTube and VKontakte, along with Facebook and Instagram (Compl. ¶¶ 23-26, 73) but only attempts to plead facts based on the Meta Report—relating to Meta companies Facebook and Instagram.  *See DraftKings*, 650 F. Supp. 3d at 153 ("The [complaint's] threadbare sourcing and the conclusory quality of these factual allegations and attributions are ultimately fatal to . . . its § 10(b) or § 20(a) claims.").

19

(D. Conn. Sept. 13, 2016) ("Plaintiffs essentially allege that Defendants had a duty to disclose the existence of improper business practices *prior to any indication that those practices were under scrutiny*.  Such a general duty to disclose corporate mismanagement or uncharged criminal conduct has been rejected.").[12]

## II.    PLAINTIFF FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER

Plaintiff's claims should be dismissed because the Complaint fails to allege the requisite strong inference of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  "[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information." *Neurotrope*, 315 F. Supp. 3d at 735.  Rather, a plaintiff "must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  The inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*  Scienter may be pled through particularized factual allegations showing (i) a "motive and opportunity" to commit fraud or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  Plaintiff fails under either theory.

### A.    <u>Plaintiff Fails to Allege Motive</u>

Plaintiff does not attempt to allege any particularized motive to engage in the alleged fraud. To plead motive, Plaintiff must point to "concrete benefits that could be realized by one or more

---

[12] Plaintiff also challenges numerous (i) statements of inactionable puffery, (*e.g.*, Compl. ¶¶ 44, 48-50, 53, 57, 59-60, 63, 66, 71); *see also Boca Raton Firefighters*, 506 F. App'x at 37; (ii) statements of opinion, (*e.g.*, Compl. ¶¶ 57, 66, 70-71), which are inactionable because Plaintiff fails to plead they were both objectively false and disbelieved when made, *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015), that they contained embedded untrue facts, or that they contained omissions about the basis for the opinion that would mislead a reasonable investor, *New Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 171 (2d Cir. 2023); (iii) forward-looking statements, (*e.g.*, Compl. ¶¶ 57, 66-67, 71), that are protected under the PSLRA safe harbor and bespeaks caution doctrine, *see In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 303 (S.D.N.Y. 2021); and (iv) statements that are objectively true, (*e.g.*, Compl. ¶¶ 48-50, 53, 56-60, 63, 66-67, 69), *see also In re China Mobile*, 2016 WL 922711, at *3.

of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiff does not allege any suspicious stock sales, insider trading or other compensation contingent on the fruits of the supposed fraud—nor does the Complaint attempt to allege any non-economic motive. *See Neurotrope*, 315 F. Supp. 3d at 735 ("[E]ven though the Individual Defendants, by virtue of their senior positions and the Company's small size, may have had the opportunity to defraud investors about the results of the trial, the Complaint fails to allege motive to do so sufficient to plead scienter."). Accordingly, Plaintiff fails to allege motive.

## B.      Plaintiff Fails to Allege Conscious Misbehavior or Recklessness

Having failed to allege motive, Plaintiff must "produce a stronger inference of recklessness" to plead scienter. *Kalnit*, 264 F.3d at 143. Specifically, Plaintiff must "allege facts approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009). This requires particularized allegations that show Defendants had "knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142. Plaintiff "must specifically identify the reports or statements containing this information." *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 869 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Plaintiff fails to do so.

Plaintiff relies on conclusory allegations that Sharon "received direct reports . . . and/or had access to information about Cognyte's products and solutions" resulting in a "strong inference" that Sharon must have been aware of any supposed misstatements during the Class Period. (Compl. ¶¶ 89-91.) But courts routinely hold that "absent particularized allegations of *specific information* Defendants had at their disposal that rendered their statements false or misleading," allegations pointing only to the importance of information are insufficient to plead

21

scienter. *Born*, 521 F. Supp. 3d at 493; *see, e.g.*, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (rejecting argument that "senior officers ***must have known*** that the challenged statements were false" as "plainly insufficient to raise a strong inference" of scienter); *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (plaintiffs cannot "sufficiently plead[] scienter based on what [defendant] ***must have known***"); *Greco v. Qudian Inc.*, No. 1:20-cv-577 (GHW), 2022 WL 4226022, at \*26 (S.D.N.Y. Sept. 13, 2022) ("Scienter . . . cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they ***had access*** to the company's internal documentation as well as any adverse information."); *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-cv-1918 (LGS), 2014 WL 3928606, at \*9 (S.D.N.Y. Aug. 12, 2014) (Schofield, J.) ("[G]eneral allegations regarding a defendant's involvement in the 'core operations' of a business cannot serve as an independent basis for scienter.")  Plaintiff identifies no specific information that contradicts Defendants' public statements, nor does it identify any confidential witnesses who allege that Sharon had access to such information.

Because Plaintiff does not and cannot allege facts showing that Sharon had access to any specific information contradicting his or the Company's public statements, Plaintiff's attempt to establish what Sharon must have known based on his "deep familiarity with Cognyte's products and software," (Compl. ¶ 88), adds nothing to its inadequate scienter allegations.  Plaintiff's claims fail because its theory of fraud is neither cogent nor more compelling than competing inferences of non-fraudulent intent.  And because Plaintiff fails to allege scienter for any individual "whose intent could be imputed to [Cognyte]," the claims against Cognyte likewise fail.  *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 782 (S.D.N.Y. 2021).

### III.   PLAINTIFF FAILS TO ALLEGE LOSS CAUSATION

Dismissal is also warranted where, as here, "it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue." *In re State St. Bank*

*& Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011).  Plaintiff fails to allege loss causation because the purported corrective disclosures reflected the materialization of known risks, did not disclose new information to the market and are not plausibly connected to declines in Cognyte's stock price.

## A.     The Purported Corrective Disclosures Reflected the Materialization of Known Risks

The "materialization of a known risk, rather than the disclosure of a concealed one, is not a plausible theory of loss causation."  *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 n.33 (S.D.N.Y. 2014).  Cognyte explicitly disclosed the business, reputational, social media, legal and regulatory risks inherent in its business.  (*Compare* Compl. ¶¶ 95(a)-(c), *with supra* Facts §§ B.1 (compliance with "applicable laws and regulations"; "negative publicity, reputational harm"), B.2 ("social media").)  The materialization of such known and disclosed risks cannot provide a "plausible theory of loss causation."  *New Energy*, 66 F. Supp. 3d at 406 n.33; *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 367-68 (S.D.N.Y. 2015), *aff'd*, No. 15-2528 (2d Cir. Mar. 21, 2016).

## B.     Declines in Cognyte's Stock Price Were Unrelated to the Purported Corrective Disclosures

Plaintiff also fails to plausibly allege that declines in Cognyte's stock price were related to the purported corrective disclosures.  This requires misstatements or omissions that "concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).[13]  "Without a corresponding

---

[13] Corrective disclosures therefore cannot rely on repackaged information that had been previously disclosed to the market.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("[N]egative journalistic characterization[s] of previously disclosed facts do[] not constitute a corrective disclosure of anything but the journalists' opinions.").  (*See* Compl. ¶ 76 ("Haaretz, citing the [Meta] Report, raised the possibility that Cognyte and companies like it might not survive.").)

stock price decline, an announcement cannot establish loss causation." *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430(RWS), 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012).

Several purported corrective disclosures were either unaccompanied by a decline in stock price or saw a brief decline and quick rebound. (*See* Ex. H, Cognyte Stock Chart.) Following the January 15, 2023 articles and report, Cognyte's stock price ***increased*** from its pre-disclosure price. (*See supra* Facts § C.5.) Cognyte's stock returned to its pre-disclosure price within three trading days after the Norway Government Pension Fund's December 15, 2022 announcement. (*See supra* Facts § C.4.) *See Wochos*, 985 F.3d at 1198 ("The quick and sustained price recovery [over the week] after the modest October 9 drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price.").[14]

Plaintiff fails to casually connect the remaining disclosures to declines in Cognyte's stock price. Cognyte's stock price declined consistently throughout the Class Period, including during periods for which Plaintiff proffers no purported corrective disclosures. (*See* Ex. H, Cognyte Stock Chart.) For example, while Cognyte's stock price declined after the release of the Meta Report, it also declined all but four days of the preceding fourteen days. (*Id.*) Similarly, Cognyte's stock price declined in five of the seven days before the April 5, 2022 earnings announcement and three of the seven days before the June 28, 2022 earnings announcement. (*Id.*) *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503-04 (S.D.N.Y. 2013) (no loss causation where "company's stock price . . . fell consistently throughout the class period").

The few declines in stock price that are correlated with purported corrective disclosures stemmed not from the alleged fraud but from business challenges that were disclosed to investors.

---

[14] Plaintiff apparently recognized this flaw because it did not cite the original article published on January 15, 2023, but rather cited a January 18, 2023 update which revealed no new information to the market. In any event, Cognyte's stock price rebounded the day after the update. (*See supra* Facts § C.5.)

24

(*See* Ex. F, Needham Analysis at 1 ("Cognyte's near-term growth is likely impacted by customer-readiness, component shortages and travel restrictions / COVID."); Ex. J, Wedbush Analysis at 1 (identifying "execution shortfalls [and] longer sales cycles" and challenges related to "timing of deals" and "the model transition to subscription"); Ex. L, June William Blair Analysis at 1 (pipeline conversion issues and "increased scrutiny of the cyber intelligence industry"); Compl. ¶ 77 (press release citing similar issues); Ex. K, June 28, 2022 Press Release at 1 (similar); *see also supra* Facts §§ C.1-3.)  *See Stratte-McClure v. Morgan Stanley*, 598 F. App'x 25, 29 (2d Cir. 2015) ("[T]o establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the *cause* of the actual loss suffered.").

Plaintiff's allegations do not account for these issues, the business and customer impacts of Cognyte's SIS divestiture, (*see supra* Facts § A),[15] the challenges imposed by the COVID-19 pandemic or the general decline in Cognyte's stock during the Class Period.  These "alternative explanations" are "so obvious that they render plaintiff's inferences unreasonable" and disprove the simplistic correlation Plaintiff seeks to draw.  *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 177 (S.D.N.Y. 2018); *see also City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 85 (S.D.N.Y. 2015) (plaintiff failed to "disaggregate those losses caused by the [downgrade in the U.S. credit rating] from disclosures of the truth behind the alleged misstatements").

## CONCLUSION

For these reasons, the Complaint should be dismissed in its entirety with prejudice.[16]

---

[15] Plaintiff also makes much of Cognyte's customer base declining from 1,000 to 400 customers, (Compl. ¶ 20), but this loss of customers was an expected result of the SIS divestiture and the business impacts of that divesture were disclosed.

[16] *See In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *5 (affirming dismissal with prejudice where leave to amend would have been futile).

Dated:  New York, New York             Respectfully submitted,
      December 6, 2023


           /s/  Scott D. Musoff
           Scott D. Musoff
           Ian C. Lerman
           Samuel G. Bieler
           SKADDEN, ARPS, SLATE,
              MEAGHER & FLOM LLP
           One Manhattan West
           New York, NY 10001
           Phone: (212) 735-3000
           Fax:    (212) 735-2000
           scott.musoff@skadden.com
           ian.lerman@skadden.com
           samuel.bieler@skadden.com

           *Counsel for Defendants Cognyte Software*
           *Ltd., Elad Sharon and David Abadi*