**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF OMAHA POLICE AND FIREFIGHTERS RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v s .<br><br>COGNYTE SOFTWARE LTD, ELAD SHARON and DAVID ABADI<br>Defendants. | Civil Action No. 1:23-cv-01769<br><br>CLASS ACTION<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

RELEVANT FACTS ................................................................................................................ 2

    I.      Cognyte's Business Was Highly Regulated ............................................................. 2

    II.    Cognyte's Target Market And Potential Misuse of Its Products Were Key Areas of Investor Interest ................................................................................................. 3

    III.   Defendants Repeatedly Misrepresented that Cogntye's Products Were Being Sold to Address Terror Threats and Cyber Crime............................................................. 4

          A.    The Meta Report Reveals Cognyte's Customer Base Includes Cyber Mercenaries Engaged in Surveillance-For-Hire Activities......................... 6

          B.    Cognyte Provided Surveillance Software to Governments Responsible for Human Rights Abuses in Violation of Export Control Laws ..................... 7

    IV.   The Truth Begins to Emerge.................................................................................. 8

ARGUMENT............................................................................................................................ 9

    V.     Standard .................................................................................................................. 9

    VI.   Plaintiff Has Adequately Pled Material Misstatements and Omissions ............... 10

          A.    Plaintiff Has Pled Material Misstatements and Omissions with Respect to the Target Market for Cognyte's Products and How Customers Were Using Them.................................................................................................. 10

          B.    Plaintiff Has Pled Actionable Misstatements in Cognyte's Code of Conduct ............................................................................................ 14

    VII.  Plaintiff Has Adequately Pled Scienter.................................................... 19

    VIII. Plaintiff Has Adequately Pled Loss Causation ...................................... 21

CONCLUSION............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China Northeast Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)...................................................................................23, 24

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016).........................................................................................9

*Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014).......................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................9

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)................................................................................21, 22

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
  No. 11-cv-4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)..................15

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015).......................................................................24

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
  No. 17 CIV. 0917 (LGS), 2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) .........22, 24

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................................22

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)......................................................................................22

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................22

*Guevoura Fund v. Sillerman*,
  No. 15-cv-7192 (CM), 2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ....................9

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)......................................................................21

*In re BHP Billion Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)..........................................................................................17

*In re Braskem S. A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017).........................................................................................11

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) (Schofield, J.) ...................................................................24

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023)...................................................................................11, 13

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008).........................................................................................13

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).........................................................................................14

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  No. 10 Civ. 3461(PAC), 2014 WL 2815571 (S.D.N.Y. June 23, 2014) ..................................17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010)........................................................................................................10

*In re New Energy Sys. Sec. Litig.*,
  66 F. Supp. 3d 401 (S.D.N.Y. 2014)...........................................................................................23

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)........................................................................................................22

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015).........................................................................................17

*In re Providian Fin. Corp. Sec. Litig.*,
  152 F. Supp. 2d 814 (E.D. Pa. 2001) .........................................................................................12

*In re Revlon, Inc. Sec. Litig.*,
  No. 99 CIV. 10192(SHS), 2001 WL 293820 (S.D.N.Y. Mar. 27, 2001) ................................21

*In re Seadrill Ltd. Sec. Litig.*,
  No. 14-cv-9642 (LGS), 2016 WL 3461311 (S.D.N.Y. Jun. 20, 2016)......................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................................17

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
  No. 22-cv-1167, 2023 WL 3628244 (E.D.N.Y. May 24, 2023)................................................14

iii

*In re Teva Secs. Litig.*,
No. 3:17-cv-00558 (SRU), 2023 WL 3186407 (D. Conn. May 1, 2023) .................................23

*In re UBS AG Sec. Litig.*,
No. 07-cv-11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................................11

*In re Vale S.A. Sec. Litig.*,
1:15-cv-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017)......................................22

*In re Vale S.A. Sec Litig.*,
No. 19-cv-526, 2020 WL 2610979 (S.D.N.Y. May 20, 2020) ....................................15, 17, 18

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)..........................................................................11, 12, 14

*In re Veon Ltd. Sec. Litig.*,
No. 15-8672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).................................11, 17

*In re Virtus Investment Partners Inc. Sec. Litig.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................................11

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d (S.D.N.Y. 2022) ..............................................................................15, 16, 18

*Knipe v. Skinner*,
999 F.2d 708 (2d Cir. 1993)....................................................................................................19

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986).......................................................................................................25

*Malin v. XL Capital Ltd.*,
No. 03-civ-2001, 2005 WL 2146089 (D. Conn Sept. 1, 2005)..............................................24

*Menaldi v. Och–Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. Feb. 17, 2016)......................................................................11

*Meyer v, Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)........................................................................................14, 15, 16

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...............................................................................................10, 13

*Oklahoma Firefighters Pension & Retirement Systems v. Student Loan Corp.*,
951 F. Supp. 2d 479 (S.D.N.Y. 2013)....................................................................................24

*Perez v. Higher One Holdings, Inc.*,
No. 14-cv-755 (AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016)..................................11

*Rombach v. Chang,*
　355 F.3d 164 (2d Cir. 2004)........................................................................................14

*Roofer's Pension Fund v. Papa,*
　No. 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) .......................................23

*Sawabeh Info. Servs. Co. v. Brody,*
　832 F. Supp. 2d 280 (S.D.N.Y. 2011)......................................................................19

*Shash v. Biogen, Inc.,*
　84 F.4th 1 (1st Cir. 2023)........................................................................................23

*Sinay v. CNOOC Ltd.,*
　554 F. App'x 40 (2d Cir. 2014) ...............................................................................21

*Singh v. Cigna Corp.,*
　918 F.3d 57 (2d Cir. 2019)......................................................................................15

*Swanson v. Interface, Inc.,*
　20-CV-5518 (BMC), 2022 WL 2003990 (E.D.N.Y. Jun. 6, 2022) .......................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　551 U.S. 308 (2007)................................................................................................19

## Statutes, Rules & Regulations

Federal Rules of Civil Procedure
　Rule 8(a)(2) ..............................................................................................................22
　Rule 9(b) ..............................................................................................................9, 25
　Rule 12(b)(6)........................................................................................................9, 22
　Rule 15(a).................................................................................................................25

## Other Authorities

Oded Yaron, "Myanmar Acquired Spyware From Israeli Cyber-Intelligence Firm
　Cognyte, New Docs Reveal," HAARETZ, Jan. 15, 2023.............................................7

**INTRODUCTION**

This is a securities class action on behalf of all purchasers of Cognyte Software Ltd. ("Cognyte" or the "Company") common stock between February 2, 2021 and January 19, 2023, inclusive (the "Class Period"), against Cognyte and its Chief Executive Officer ("CEO") Elad Sharon for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

Cognyte is a company that sells powerful, but potentially dangerous, surveillance software and services. As a result, Cognyte's customer base, business ethics, and its compliance with applicable laws, including export control laws enacted to safeguard against misuse of the type of cyber intelligence technology the Company sold, were key areas of investor concern during the Class Period. Accordingly, Cognyte repeatedly emphasized its products' defensive capabilities to "prevent terror, crime and cyber threats" against corporate and government entities by "bad actors," and reassured investors that the Company was operating in an ethical manner and complying with all applicable laws in the jurisdictions in which it did business. These and similar representations made throughout the Class Period were materially false and misleading because, as was later revealed, Cognyte solicited customers and sold its products and services indiscriminately, including to autocratic regimes and cyber mercenaries, who used them to target journalists, politicians, and other individuals.

The truth began to come to light on December 16, 2021, when Meta Platforms Inc. ("Meta") issued a Threat Report on the Surveillance-for-Hire Industry (the "Meta Threat Report") (filed at ECF No. 56-5) after a months-long investigation disclosing that Cognyte was one of seven "cyber mercenary" companies that had indiscriminately targeted journalists, politicians, and dissidents using tactics that violated Meta's terms of service contrary to the entities' claims that

1

their "services only target criminals and terrorists."  Meta Threat Report at 2.  The report stated that Meta had removed approximately 100 accounts on Facebook and Instagram linked to Cognyte and its customers that had been used "to social-engineer people and collect data" and had banned Cognyte and the implicated customers from its platforms.  *Id*. at 8.

On this news, the price of Cognyte's common stock fell 5.11%, closing on December 17, 2021, at $18 per share, before declining another 5.5% the next trading day.  Cognyte's stock price continued to fall in the following days, weeks, and months as the Company disclosed that (i) it had to alter its products to comply with Meta's findings, making them less effective and attractive to customers; (ii) revenues and customer counts were declining in the wake of Meta's revelations; (iii) a large investor had informed the Company that it would no longer hold Cognyte stock citing concerns that the Company's indiscriminate sale of its products and software was contributing to serious human rights violations; and (iv) Cognyte had won a tender to sell intercept spyware to MPT, Myanmar's state-owned mobile operator, in violation of Israeli and other jurisdictions' laws. Altogether, Cognyte's stock price declined 87% from $28 per share on February 2, 2021, the day it began trading following its spin-off from Verint Systems, Inc. ("Verint"), to $3.57 per share on January 19, 2023, in the wake of the news that it had won the Myanmar tender.

For the reasons set forth herein, Plaintiff City of Omaha Police and Firefighters Retirement System ("Plaintiff") has stated a claim under §§10 and 20(a) of the Exchange Act and Defendants' Motion to Dismiss the Amended Complaint (the "AC") (ECF No. 52) should be denied in full.

## RELEVANT FACTS

### I.      Cognyte's Business Was Highly Regulated

Cognyte, which was spun off from Verint on February 1, 2021, describes itself as a global leader in security analysis, catering to national, regional, and local governments and governmental

2

agencies, as well as enterprise customers. ¶17.[1] Cognyte states that it provides corporations, law enforcement and counter terrorism agencies with software and related services to "identify, neutralize, and prevent terror, crime and cyber threats." *Id*.

Cognyte was required to abide by a host of laws, rules and regulations. Since Cognyte's software operates and collects information on social media platforms, such as Facebook and Instagram, Cognyte was required to abide by each platform's terms of service, which generally prohibit the use of bots or other automated means to collect information. ¶23. For example, Facebook's terms of service prohibit the use of automated means (such as harvesting bots, robots, spiders, or scrapers) to collect user content and information without prior permission. ¶24. The use of fake accounts was also prohibited. *Id*. Cognyte was also subject to Israeli and, in large part, U.S. export control regulations that limited the countries to which Cognyte could export its technology. ¶¶28-29.

## II.    Cognyte's Target Market And Potential Misuse of Its Products Were Key Areas of Investor Interest

The target market for Cognyte's products, and the potential for those products to be misused, were incredibly important to the value of Cognyte's stock and, therefore, material to investors. As an equity research report from William Blair stated:

> While we believe that there is value to cyber intelligence, we believe that it is important for investors and customers that there are rigid safeguards in place and high transparency to ensure that the software is used in an ethical manner.

¶3. Any suggestion that bad actors were using Cognyte's technology to conduct "surveillance-for-hire" activities in violation of relevant laws and terms of service governing social media platforms on which the products operated directly threatened Cognyte's brand and demand for its products.

---

[1]    All "¶_" cites are to the Amended Complaint for Violation of the Federal Securities Law, ECF No. 52 (Nov. 10, 2023) ("AC").

Indeed, in the wake of Meta's Threat Report, Cognyte's customer base shrank significantly, and modifications to Cognyte's products to comply with Meta's terms of service negatively impacted their effectiveness.  ¶¶20, 74.  In response to these revelations, investors fled the Company's stock, among them the Norwegian Government Pension Fund Global ("GPFG"), a large holder of Cognyte's shares, which announced on December 15, 2022, that it was divesting its holdings citing "an unacceptable risk that the company is contributing to serious human rights abuses."  ¶83; Ex. 1, June 17, 2022 Council on Ethics Recommendation, at 1.

**III.    Defendants Repeatedly Misrepresented that Cogntye's Products Were Being Sold to Address Terror Threats and Cyber Crime**

Throughout the Class Period, Defendants repeatedly characterized Cognyte's cyber security solutions as tools to assist government and corporate security organizations in preventing cyber-attacks, intrusions, and other wrongdoing by bad actors.  For example, on January 11, 2021, at an Analyst/Investor Day event held by Verint just weeks before the spin-off, Defendant Sharon touted Cognyte's software as enabling "*[l]eading government and enterprise security organizations around the world*" to stay ahead of "*criminals, terrorists and hackers all over the world*" and "*address complex security challenges.*"  ¶¶18, 19 (emphasis in original).  Defendant Sharon cited the SolarWinds hack[2] as an example of the type of intrusion that Cognyte's software was designed to prevent, noting that  "government agencies and commercial organizations" were "facing *[b]ad actors*" and "*well-funded organizations with very sophisticated technology,*"and *that the [i]nvestigative solutions that Cognyte provide[d] [were] becoming more important in analyzing cyber-attack vectors, mitigating severe damage*."  *Id.* (emphasis in original).

---

[2]    The cybersecurity breach of SolarWinds, a Texas-based network management software company, was one of the most widespread and sophisticated hacking campaigns ever conducted against the federal government and private sector.

Similarly, in Cognyte's January 15, 2021 Registration Statement, Defendant Sharon characterized Cognyte as "a global leader in security analytics software that ***empowers governments and enterprises with Actionable Intelligence for a safer world***" and provides tools "***to identify, neutralize, and prevent terror, crime, and cyber threats***." ¶48 (emphasis in original). Defendants repeated these critical assurances throughout the Class Period and never hinted that Cognyte was indiscriminately selling its products to regimes and cyber mercenaries who were using them to "target[] people across the internet to collect intelligence, manipulate them into revealing information and compromise their devices and accounts." Meta Threat Report at 3. *See*, *e.g.*, ¶56 (stating that "over 1,000 government and enterprise customers in more than 100 countries rely on [Cognyte's] solutions to . . . prevent national security, personal safety, business continuity and cyber threats."); ¶58 (highlighting a $10 million order from a "national security agency that was looking to shorten the time of security investigations" and "keep pace with emerging threats."); ¶60 (stating that "Governments and enterprise security organizations face a variety of security challenges, including threats from well-organized and well-funded . . . bad actors" and that "security analytics software can help security organizations . . . effectively address highly sophisticated security attacks."); *id*. (stating that Cognyte's software is designed to . . . successfully identify, neutralize, and prevent terror, crime and cyber threats."); ¶56 (same); ¶57 (same); ¶58 (representing that Cognyte received an order from "[a] national security agency that was looking to . . . keep pace with emerging threats."); ¶59 (same as ¶57); ¶60 (same); ¶66 (same); ¶67 (describing usage case where government used Cognyte products to fight "drug trafficking" and then expanded to "antiterrorism" and touting a recent innovation for "addressing cryptocurrency investigations"); ¶69 (describing anti "drug trafficking" and "human trafficking" uses); ¶70

5

(describing how Cognyte's products target "bad actors"); ¶71 (discussing the use of Cognyte products to target "illegal transactions" involving cryptocurrency).

The foregoing statements were false and misleading because, as discussed below, Cognyte was also selling its products to autocratic governments in violation of export control laws, which used them to surveil and target individuals through surreptitious means that violated the terms of service of Meta and other platforms. These undisclosed facts contradicted Defendants' narrative concerning the target market and usage profile for Cognyte's products and, as Defendants knew, meant that Cognyte was a far riskier investment than portrayed by Defendants' statements.

> **A.    The Meta Report Reveals Cognyte's Customer Base Includes Cyber Mercenaries Engaged in Surveillance-For-Hire Activities**

Following a months-long investigation, in December 2021, Meta issued the Threat Report identifying Cognyte as one of seven companies who claimed that their solutions were intended to focus on criminals and terrorists when, in fact, they were indiscriminately providing surveillance-for-hire services to target people across the internet, including journalists, dissidents, critics of authoritarian regimes, families of opposition members, and human rights activists, to collect intelligence, manipulate them into revealing information, and compromise their devices and accounts across the internet. ¶39. As documented in the Meta Threat Report, in order to gather data, Cognyte's products used "bots" that "scraped" information from social media platforms and fake accounts that were used to search and view profiles, to join groups and to follow or "friend" targets. ¶¶35-37. Cognyte's software also utilized social engineering tactics such as phishing and fictitious personas to establish contact with targets or persons close to them via email, phone calls, text messages, or direct messaging apps on social media in an effort to build trust, solicit information, and trick victims into clicking on links or downloading files that would allow their devices to be hacked. *Id.* These tactics violated Meta's terms of service. ¶38.

As a result of its investigation, Meta identified and removed approximately 100 accounts on Facebook and Instagram that were linked to Cognyte and customers of the Company in nine countries. ¶39. In addition, Meta banned Cognyte from using its platforms and issued Cease and Desist warnings to the Company. *Id*.

**B.     Cognyte Provided Surveillance Software to Governments Responsible for Human Rights Abuses in Violation of Export Control Laws**

In addition to the foregoing, Cognyte also provided its surveillance services and products to governments responsible for human rights abuses, in violation of export control and other laws the Company was bound to follow. ¶40. One notable example of this behavior involved the apparent sale of intercept spyware to MPT in violation of Israeli and other jurisdictions' export control laws, which banned sales of such technology to Myanmar. ¶41. On January 15, 2023, HAARETZ and the NGO, Justice for Myanmar, disclosed that, one month before the February 1, 2021 military coup in Myanmar, Cognyte "won a tender to provide an advanced cyber-intelligence system to be installed at the heart of the country's telecommunication network – in order to monitor and eavesdrop on users."[3] *Id*. The purchase order for the intercept technology was issued to Cognyte "by December 30, 2020," with a scheduled target installation completion date of the end of May/early June 2021. *Id.* Sales of technologies of this nature to Myanmar had been banned by Israel even prior to the military coup. *Id*.

Nor was Myanmar an isolated case. The Council on Ethics, on behalf of the GPFG, conducted an investigation into Cognyte and found "wide ranging" accusations "relate[d] to many different countries" that the company's products and services were "contributing to serious human rights abuses." Ex. 1 at 1. Significantly, in recommending divestment of Cognyte shares held by

---

[3]     Oded Yaron, "Myanmar Acquired Spyware From Israeli Cyber-Intelligence Firm Cognyte, New Docs Reveal," HAARETZ, Jan. 15, 2023.

the GPFG, the Council "attache[d] importance to the fact that the company must have known that some of its customers [were] guilty of extremely serious human rights violations." *Id.* at 11.

## IV.     The Truth Begins to Emerge

Following publication of the Meta Threat Report on December 16, 2021, after the close of trading, the price of Cognyte stock fell 5.11% on December 17, 2021, and another 5.5% the following day.  ¶¶73-75.  Then, on December 21, 2021, an article in HAARETZ, citing the Meta Threat Report, raised the possibility that Cognyte and companies like it might not survive.  On this news, the price of Cognyte's stock fell 7.70%, closing at $15.70 per share on December 21, 2021, before declining another 4.46% the next trading day.  ¶76.

In the wake of these disclosures, customers began to abandon Cognyte, inflicting a serious financial toll.  ¶77.  In this regard, on April 5, 2022, Cognyte announced its Q4 2021 results and reported a "several million dollar[] [revenue miss] below the midpoint of [its] guidance" for Q42021, and advised that it was "unable to provide FY23 guidance and long-term targets at this time." *Id.*  Defendants admitted that there was "a lower conversion of [Cognyte's] pipeline," and Cognyte's Annual Report on Form 20-F for the period ended January 31, 2022 (the "2021 Form 20-F"), also released that day, revealed that the Company had been forced to modify its solutions in response to the Meta Threat Report potentially impacting their utility.  *Id*.  This news caused Cognyte's stock price to plummet over 31% from the prior day's close on unusually high trading volume, closing at $8.03 per share on April 5, 2022.  ¶79.

Cognyte's Q1 2022 financial results released on June 28, 2022, also badly missed analyst estimates.  Cognyte's Q1 2022 revenue of $87 million represented a year-over-year decline of 25%.  Analysts attributed Cognyte's poor results to the reputational fallout from the Meta Threat Report and increased scrutiny of its business.  On this news, Cognyte's shares declined more than 28%. ¶¶80-82.  Then, on December 15, 2022, Norges Bank, the investment manager for the GPFG,

announced that based on the Council on Ethics' investigation, it had decided to exclude Cognyte from the GPFG's investment universe, citing concerns about the company contributing to serious human rights violations. ¶83. On this news, Cognyte's shares declined 7.04%, closing at $2.51 per share on December 15, 2022, before falling another 4.38% the next trading day. *Id*. Finally, between January 15-18, 2023, Myanmar's apparent acquisition of intercept spyware from Cognyte was disclosed and discussed in a report published by the NGO Justice for Myanmar, an in-depth exposé in HAARETZ, and an article published by Reuters. ¶85. In response, Cognyte's stock price declined 5.5% to close on January 19, 2023 at $3.57 per share.

## ARGUMENT

### I.    Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc*., 823 F.3d 51, 59 (2d Cir. 2016). To satisfy Rule 9(b), securities fraud plaintiffs "must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the role of the defendants," however, they may do so "in broad strokes" at the motion to dismiss stage. *Guevoura Fund v. Sillerman*, No. 15-cv-7192 (CM), 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016). Similarly, the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs

---

[4]    Unless otherwise indicated, citations are omitted and emphasis is added.

concerning false or misleading statements are based." *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000). As a result, courts focus "on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n.1.

## II. Plaintiff Has Adequately Pled Material Misstatements and Omissions

### A. Plaintiff Has Pled Material Misstatements and Omissions with Respect to the Target Market for Cognyte's Products and How Customers Were Using Them

When a company "makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). A duty to disclose is triggered when, upon "examination of 'defendants' representations, taken together and in context,'" the affirmative statements that were made were misleading. *Id*. Here, Plaintiff has adequately pled that Defendants misled investors when they repeatedly represented that Cognyte was succeeding by selling its cyber intelligence solutions to customers who were targeting "security threats" such as "terrorism," "human trafficking," and "cyber-attacks" by "bad actors" without disclosing that a significant reason for Cognyte's success was its willingness to provide its products to customers who used them to engage in surveillance-for-hire activities that indiscriminately targeted politicians, journalists, and minorities and to engage in serious human rights violations. *See supra* pp. 4-6; ¶¶5, 17, 19. Defendants' statements are actionable because they concealed and/or minimized the risk to Cognyte's brand, business, and reputation from its customers' use of the Company's products for these purposes. Under well-established case law in this District, such statements are actionable.

In an analogous context, courts have held that defendants have a duty to disclose uncharged wrongdoing when (1) "a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"; (2) "a

defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring"; and (3) "a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." *In re Virtus Investment Partners Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (quoting *Menaldi v. Och–Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. Feb. 17, 2016)). In *Virtus,* the court held it was misleading for defendants to attribute the success of Virtus' fund to "proper drivers of 'sales and net flows'" while omitting to disclose that part of the company's "strong performance" was derived from hypothetical back-tested performance history. *Id*. at 536-37. Likewise, in *In re Van der Moolen Holding N.V. Sec. Litig*., 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005), the court ruled that having put the source of the company's revenue at issue by lauding the Company's trading strategy, defendants' failure to disclose that some of the revenue had been generated by practices that violated NYSE rules was misleading. *Id*. at 400-01. Similarly, in *In re Braskem S. A. Sec. Litig*., 246 F. Supp. 3d 731, 758-60 (S.D.N.Y. 2017), the court found that it was misleading for defendants to recite the "benign" reasons the company received favorable pricing on raw materials without disclosing that the price had been favorably influenced by the payment of bribes. *Id.* at 758-60. And in *In re Veon Ltd. Sec. Litig*., No. 15-8672 (ALC), 2017 WL 4162342, *5-7 (S.D.N.Y. Sept. 19, 2017), the court held that statements attributing increased sales and subscribers in Uzbekistan to "sales and marketing efforts" triggered a duty to disclose that growth also was due to bribes paid to the daughter of the country's president.[5]

---

[5]    *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120 (S.D.N.Y. 2023), cited by Defendants, is distinguishable. There the court held that defendants' alleged failure to disclose DraftKings' operations in black market jurisdictions was not misleading because plaintiffs had failed to adequately allege that the company was, in fact, engaged in black market dealings. *Id*. at 170. In *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *28-31 (S.D.N.Y. Sept. 28, 2012), also cited by Defendants, the court held that having disclosed that UBS was subject to ongoing investigations and the subject matter of those inquiries, defendants had no duty to make additional disclosures. Finally, *Perez v. Higher One Holdings, Inc.*, No. 14-cv-755 (AWT), 2016 WL 6997160, at *15 (D. Conn. Sept. 13, 2016), merely states the general principle that there is no duty to disclose absent a legal duty

11

The factual allegations here fall squarely within the first two prongs of the *Virtus* framework and the foregoing cases applying it. First, Defendants' failure to disclose that Cognyte's success was also dependent on sales to autocratic regimes and cyber mercenaries rendered Defendants' repeated characterizations of Cognyte's customer base as consisting of government entities and corporations interested in "identify[ing], neutraliz[ing], and prevent[ing] terror, crime and cyber threats" (¶17) materially false and misleading. As Defendants themselves acknowledged, sales to such customers for such purposes risked damaging Cognyte's brand and reputation, a loss of business, as well as fines, damages and criminal sanctions against the Company and its employees (¶¶52-53) and, therefore, were material to investors. *See Van Der Moolen*, 405 F. Supp. 2d at 401 (quoting *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001)) ("[I]f [a defendant] puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'"). Second, the fact that Cognyte's public statements gave no hint that the Company's products were being sold and used for disfavored surveillance-for-hire activities could have been understood by a reasonable investor as a representation that such sales were not occurring.

Defendants' arguments for dismissal are meritless. First, Defendants complain that they never expressly stated that Cognyte's products were "defensive" in nature (MTD[6] at 13) but, as demonstrated above, ***all*** of Defendants' statements touted Cognyte's products' ability to protect against all manner of cyber threats by bad actors. Next, Defendants argue that it is not clear that the targeting of journalists and politicians was wrongful and that who is a "bad actor" is "in the

---

or affirmative statements that are rendered misleading by omitted facts. Here, unlike in *Perez*, Defendants' statements were misleading in light of the omitted facts.

[6]     Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws, ECF No. 55 (Dec. 6, 2023) ("MTD").

eye of the beholder." *Id.* at 14-15.  Even if such a fact-based argument was appropriate at the pleading stage (it is not), the argument that Cognyte could not have known how its customers intended to employ and were employing its technology fails in view of the long-term nature of the Company's contracts and the fact that several of its customers have been accused of extremely serious human rights abuses.[7]  *See* Ex. 1 at 7 ("The company has also signed several long-term contracts, which is normal in the security sector."); *see* 2022 Form 20-F at 29.  Moreover, contrary to Defendants' contention (MTD at 12-13), Plaintiff's allegations are based on reliable sources, including: (1) a report from Meta following a months-long investigation; (2) an investigation by the Council on Ethics on behalf of the GPFG over a one-year period that included written correspondence with the Company; and (3) reporting by HAARETZ, Israel's oldest and one of its most respected daily newspapers.  ¶¶38-39, 73, 76, 83, 85.[8]

Finally, Defendants argue for dismissal on the basis of their alleged "risk warnings" that Cognyte (i) "*may*" suffer harm in the event that it sold to a "disfavored" country, and (ii) "*may* be named as a defendant in claims made by companies in the social media sphere . . . alleging . . . claims, due to [its] products having been misused."  MTD at 15, 19.  Neither these statements of hypothetical risk nor any statement ever made by Defendants disclosed that such sales or misuse had, in fact, occurred.  Thus, Defendants' supposed risk disclosures were themselves misleading

---

[7]    The long-term nature of Cognyte's contracts also renders unavailing Defendants' complaint that the Amended Complaint does not allege "any specific timing" with respect to the violations in the Meta Threat Report and "whether the violations occurred after the Cognyte spin-off."  By Cognyte's own admission, existing customers supplied nearly all of the Company's revenues.  *See* Registration Statement at 65; 2020 Form 20-F at 30; 2021 Form 20-F at 33.

[8]    Defendants' authorities are inapposite.  In *DraftKings*, 650 F. Supp. 3d at 153, plaintiffs' allegations were based on a report premised on "unidentified and unspecified sources" issued by a short seller, who was economically motivated to drive down the company's stock price.  In *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187 (S.D.N.Y. 2008), the complaint was based on accounts of confidential witnesses who plaintiffs failed to "describe[] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source[s] would possess the information alleged."  *Id*. at 220-21 (quoting *Novak*, 216 F.3d at 314).

because they merely warned the market about a hypothetical risk that had ***already*** passed. *See Meyer v, Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (quoting *Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004)) (statements about possible future risk such as these do not "insulate from liability the failure to disclose that the risk has transpired."); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized"); *Van der Moolen*, 405 F. Supp. 2d at 400 ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit").

The decision cited by Defendants regarding risk disclosures, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, No. 22-cv-1167, 2023 WL 3628244 (E.D.N.Y. May 24, 2023), deals with a factually distinguishable misstatement. Specifically, the court found that a reasonable investor would not have relied on the company's statements about its compliance program because it had already disclosed that it was under investigation with regard to bribery in numerous countries and that it had entered into a deferred prosecution agreement that, by its terms, was critical of the company's compliance. *Id*. at \*12. By contrast, here, Defendants aggressively represented that Cognyte's success was based on its strategy of assisting governments and corporations in fighting crime and terrorism and never disclosed that the Company was offering its products to cyber mercenaries and authoritarian governments engaged in surveillance activities.

**B.      Plaintiff Has Pled Actionable Misstatements in Cognyte's Code of Conduct**

Plaintiff has also alleged that that it was false and misleading for Cognyte's Code of Conduct to represent that it "expect[ed] all of [its] employees and board of directors to act ethically" and that Cognyte "complie[d] with the law" in all jurisdictions where it operates in light

of the fact that Cognyte and its customers were violating the terms of service of Facebook and other platforms and Cognyte was not operating in compliance with export control laws. ¶¶43-46.

While the Second Circuit has cautioned that general statements in Codes of Conduct about the importance of complying with ethical norms are immaterial puffery that investors would not reply upon, *see, e.g., Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019), in contrast, statements that "g[i]ve comfort to investors that reasonably effective steps [a]re being taken to comply with applicable" laws are actionable. *Jinkosolar*, 761 F.3d at 251; *see also Cigna*, 918 F.3d at 63-64 (explaining that, in contrast to the generic statements in *Singh*, the Second Circuit has found detailed descriptions of compliance efforts actionable); *In re Vale S.A. Sec Litig.*, No. 19-cv-526, 2020 WL 2610979, at *11 (S.D.N.Y. May 20, 2020) (holding that "specific representations about [company's] then-existing practices for monitoring dam stability" were statements "that an investor could reasonably rely upon in assessing the strength of [company's] risk management practices and the risk of a dam collapse); *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *15-16 (S.D.N.Y. Sept. 29, 2014) (dismissing "generalized expressions of commitment to high corporate standard" in Ethics Code and Corporate Responsibility Report as immaterial puffery, but holding that statements describing "concrete steps that [company] ha[d] taken to ensure the integrity of its financial reporting" could not be held to be immaterial as a matter of law on a motion to dismiss). Thus, determining whether statements in Codes of Conduct are actionable depends on the context in which they are made. *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d, 381, 392 (S.D.N.Y. 2022). "[E]ven where a statement may be considered vague or comparative when viewed in isolation, and so could be considered aspirational on its own, it may still be a material misrepresentation when what 'was actually going on' at the company [was] wholly at odds with any reasonable interpretation of the

15

terms." *Id*. (quoting *Arkansas Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014)).  Thus, in *Karimi*, the court held that statements describing processes a bank purported to use to vet its clients and thereby comply with banking regulations were actionable when those "steps . . . [were] honored only in the breach" for certain clientele.  *Id*. at 393; *see also Jinkosolar*, 761 F.3d at 251 (failure to disclose that solar cell production plant was not disposing of hazardous waste in accordance with Chinese regulations rendered statements regarding company's efforts to comply with those regulations materially misleading).

Here, the statements in Cognyte's Code of Conduct provided investors with comfort that "reasonably effective steps" were being taken to comply with the law and were at odds with what was actually going on at the Company.  Therefore, they are actionable.  For example, the Code of Conduct expressly acknowledged that "economic sanctions and embargoes [might] restrict [Cognyte] from doing business with certain countries and groups throughout the world," and instructed that "[t]o ensure that Cognyte follows these laws when applicable, [employees] must check with the Legal Department prior to initiating any business relationship in a country in which Cognyte has not previously done business."  ¶44; Ex. 2, Cognyte Code of Conduct, at 45.  In addition, the Code of Conduct instructed that "'[p]roducts and services' should be thought of broadly in connection with export control laws" and "need[ed] to be considered when delivering software, services, patches, updates, maintenance or support via telephone, email, the Internet, our website, or other electric delivery mechanism."  *Id*.  "[Q]uestions regarding export compliance" were to be "directed to the Legal Department" because "[s]erious penalties are possible for failing to comply with export control laws," and employees were instructed that they "***must not*** take the action in question" if it violated any export control laws.  *Id*. at 45-46.

16

Notwithstanding the foregoing provisions in the Code of Conduct, however, during the Class Period, Cognyte was a party to long-term contracts with numerous questionable regimes known to be engaged in human rights abuses.  Thus, Cognyte's professed commitment to the law was false and misleading.  *See Veon*, 2017 WL 4162342, *8-9 (statement regarding internal controls actionable where plaintiff alleged that company "knowingly failed to implement adequate controls"); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) ("statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461(PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "'[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest'" actionable when company had "clear and egregious conflicts of interest").

Defendants' arguments concerning the statements in the Code of Conduct also fail because "[w]hile certain statements, 'viewed in isolation, may be mere puffery,' when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may be material to investors."  *In re BHP Billion Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (quoting *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)).  Because Defendants "repeatedly emphasized [Cognyte's] commitment" to complying with the law in all of the jurisdictions in which it operated in light of the serious consequences of failing to do so, Defendants "put the topic at issue such that [the Court] cannot say that, as a matter of law, investors would not find [certain] representations material."  *See Vale*, 2020 WL 2610979, at *12 (quoting *BHP*, 276 F. Supp. 3d at 80).  Indeed, that the statements in Cognyte's Code of Conduct were material to investors is evidenced by the fact that, in responding to the Council of Ethics' inquiry regarding whether the Company's products were

17

being used to facilitate human rights abuses, Defendants cited the Company's implementation of the Code following the spin-off from Verint as evidence of its commitment to conducting its business in accordance with high ethical standards and relevant laws. ¶92.

Defendants' fallback argument that Plaintiff has not adequately alleged that Cognyte violated export control laws (MTD at 16) fails as well. In this regard, Defendants argue that Plaintiff has not adequately alleged that Cognyte violated export control laws in connection with the sales of intercept technology to Myanmar because the Company won the tender a month before the military junta seized power and it was not clear whether the technology was ever delivered or became operational. *Id*. at 17. However, these arguments ignore that Cognyte's products were defense-related or "dual use," and ***at the time Cognyte won the tender to sell the intercept technology to MPT***, the transfer of defense equipment to Myanmar was already illegal in Israel. Ex. 3, January 15, 2023 Justice for Myanmar Report, at 1; *see also* Musoff Decl.[9] Ex. O at 1 (noting that exports of defense technology to Myanmar were banned by Israel in 2017).[10]

Finally, Defendants' citation to a risk disclosure warning that Cognyte could not assure investors that its "policies, procedures, or systems [would] be adequate or that [the Company] or [its] personnel [would] not violate [its] policies and procedures or applicable laws and regulations" is unavailing. As Judge Rakoff held in *Karimi*, 607 F. Supp. 3d at 381, "vague disclaimers that [a company] might fail to implement its policies cannot sufficiently cure the misinformation conveyed by descriptions of policies and procedures that [it] routinely fails to apply." *Id*. at 396.

---

[9]     Declaration of Scott D. Musoff in Support of Defendants' MTD, ECF No. 54 (Dec. 6, 2023) ("Musoff Decl.")

[10]     Defendants' reliance on this Court's decision in *In re Seadrill Ltd. Sec. Litig.*, No. 14-cv-9642 (LGS), 2016 WL 3461311 (S.D.N.Y. Jun. 20, 2016), is unavailing. In *Seadrill*, this Court held that defendants' failure to disclose the risk that significant contracts between Seadrill's majority-owned subsidiary and a Russian company would be thwarted by international sanctions following Russia's annexation of the Crimean Peninsula were not actionable because concerns about the impact of sanctions were disclosed and the individual defendant's statement that defendants were "not very worried" about the sanctions, which appeared as "a three-word quote in a news article," was both "vague" and an opinion that plaintiffs had not shown was not believed when made.

### III.    Plaintiff Has Adequately Pled Scienter

To plead scienter, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).  To qualify as strong, a complaint need only plead "an inference of scienter *at least as likely as* any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (emphasis in original); *see also Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) (if the scienter inference raised is as compelling as the competing inference, the "'tie . . . goes to the plaintiff'") (ellipsis in original).  As such, the inference "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  Instead, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original).

That the Amended Complaint adequately alleges Defendants' scienter is best demonstrated by Defendants' failure to address the most potent evidence of their conscious misbehavior or recklessness – the July 1, 2021 letter from the Council on Ethics, an advisor to the investment manager for the GPFG, *to Defendant Sharon himself*, concerning "the potential contribution to human rights abuse enabled by surveillance technology" sold by Cognyte and its predecessor in interest, Verint.[11] Ex. 4, July 1, 2021 Council on Ethics Letter, at 1.  The letter informed Defendant Sharon that based on information provided in Cognyte's and Verint's SEC filings, the Council understood "that Verint in February 2021 transferred all of its intelligence and cyber activities to Cognyte as a standalone public company, *including customers, business operations, contracts*

---

[11]    Because Defendants declined to address Plaintiff's allegation that the Council of Ethics letter (¶92) supports a strong inference of scienter they are unable to do so in their reply papers. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

19

*and staff*," and that "Cognyte [would] continue to provide products and services similar to" the surveillance technology Verint had previously provided to regimes in Azerbaijan, Bahrain, Indonesia and South Sudan that had been "used to implement repressive government policies targeting *i.a.* minorities, political activists and journalists." *Id.* at 1-2. The Council asked Defendant Sharon "to explain what steps Cognyte had taken to guard against its products' involvement in human rights abuse citing the risk warning in the Registration Statement . . . concerning the potential for reputational harm that could result." ¶92; Ex. 4 at 2.

Cognyte responded to the Council's letter on August 24, 2021. ¶92. While declining to discuss specific customers (citing "confidentiality obligations"), the letter "falsely implied that Cognyte was not selling its solutions to countries engaged in human rights abuses," and pointed to the adoption of the Code of Conduct and other steps the Company had purportedly taken since the spin-off from Verint "to address human rights risks associated with the potential misuse of [its] products and services." ¶92. Notwithstanding these assurances, Cognyte subsequently won a tender in December 2022 to provide the very surveillance technology the Council had inquired about to Myanmar.

Thus, contrary to Defendants' characterization, Plaintiff's allegations of Defendant Sharon's awareness of and access to information about the sale of Cognyte's technology in violation of export control laws is sufficiently specific and anything but "conclusory." Moreover, these specific allegations are further supported by Defendant Sharon's deep familiarity with Cognyte's products and software based on his work as CEO of Cognyte, *and in the division of Verint that became Cognyte*, and the broad range of management positions that Defendant Sharon previously held at Verint (¶88), all of which left him well-positioned to understand exactly to

20

whom the Company was selling its products and how those products were being misused.[12] Indeed, during conference calls with securities analysts, Defendant Sharon frequently commented on specific contract wins. ¶91. Furthermore, Cognyte's Code of Conduct required that Defendant Sharon be aware of and comply with "all applicable governmental laws, rules, and regulations that affect [Cognyte's] business . . . ." ¶91. Thus, there is a strong inference he knew that the sale of intercept technology to Myanmar violated the export control laws of several jurisdictions in which Cognyte operated, including Israel. *Id.*[13] Moreover, all of the allegations discussed above are bolstered by the core operations doctrine. *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) (court may infer that company and its senior executives are knowledgeable concerning core operations of business). In sum, when all of Plaintiff's allegations are assessed holistically, Plaintiff has pled more than a strong inference of Defendants' scienter.[14]

## IV.    Plaintiff Has Adequately Pled Loss Causation

"To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). "They may do so either by alleging (a) 'the

---

[12]    As Cognyte's CEO, Defendant Sharon received and/or had access to a wealth of information about Cognyte's products and solutions. ¶89.

[13]    Bolstering Defendants' scienter is the clear falsity of the misstatements identified in both the Code of Conduct and Cognyte's SEC filings discussed above in §III. When "information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined." *In re Revlon, Inc. Sec. Litig.*, No. 99 CIV. 10192(SHS), 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001).

[14]    The cases cited by Defendants (MTD at 22) are inapposite, as all involve situations where the only allegations supporting scienter were generalized ones based largely on executives' senior positions at their various companies and the importance of the relevant product offerings or magnitude of relevant events. It also bears noting that Defendants characterize *Sinay v. CNOOC Ltd.*, 554 F. App'x 40 (2d Cir. 2014), as standing for the broad proposition that plaintiffs **cannot** plead scienter based on what defendants must have known. In fact, *Sinay* recognized that there are instances where plaintiffs may plead scienter by showing that a defendant's conduct was "'so obvious that the defendant *must have been aware of it.*'" *Id.* at 42 (emphasis in original).

existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Id.* at 232-33 (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)).  "[T]he pleading rules for loss causation were 'not meant to impose a great burden upon a plaintiff,'" and thus "plaintiffs need only plead 'a short and plain statement,' pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005)).  "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Cohen v. Kitov Pharms. Holdings, Ltd.*, No. 17 CIV. 0917 (LGS), 2018 WL 1406619, at \*6 (S.D.N.Y. Mar. 20, 2018) (Schofield, J.) (quoting *Carpenters*, 750 F.3d at 233) (emphasis in *Carpenters*).  "Rather, if the complaint plausibly alleges that the alleged misrepresentations caused the plaintiffs' losses, the issue of whether 'the loss was caused by an intervening event ... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Vale S.A. Sec. Litig.*, 1:15-cv-9539-GHW, 2017 WL 1102666, at \*26 (S.D.N.Y. Mar. 23, 2017) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)) (ellipsis in original).

Defendants argue that Plaintiff has not sufficiently alleged loss causation "because the purported corrective disclosures reflected the materialization of known risks" and "declines in Cognyte's stock price were unrelated to the corrective disclosures." MTD at 23-25.  Each of these arguments fails.  First, Defendants point to the risk warnings discussed in §II.A, *supra*, and argue that the materialization of these risks cannot establish loss causation.  *Id*.  As explained above, however, each of these risk warnings was itself materially false and misleading because the

22

warned-of risk had already come to pass. *See* §II.A, *supra*. Defendants' cited authority is inapposite. *See In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 405–06 (S.D.N.Y. 2014) (risk was apparent after company's China-based subsidiary's amendment of Chinese filings revealing substantial inconsistencies between parent and subsidiary's financial statements months prior to stock drop). Moreover, Defendants' argument that the alleged corrective disclosures revealed information already known to the market is a truth-on-the-market defense routinely rejected by courts at the pleading stage. *See In re Teva Secs. Litig.*, No. 3:17-cv-00558 (SRU), 2023 WL 3186407, at *30 (D. Conn. May 1, 2023) (quoting *Roofer's Pension Fund v. Papa*, No. 16-2805, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018)) ("[T]ruth-on-the-market defense 'is intensively fact-specific and is rarely an appropriate basis for dismissing a [Section] 10(b) complaint.'") (second brackets in original).

Second, Defendants' contention that the alleged declines in Cognyte's stock price were unrelated to the corrective disclosures is based on improper fact-based arguments regarding the reasons for those price movements. For example, Defendants argue that the Company's stock price increased after the January 15, 2023 disclosures and "returned to its pre-disclosure price within three trading days of the GPFG's December 15, 2022 announcement. MTD at 24. However, there is no requirement that "a stock's price must drop immediately following a corrective disclosure for loss causation to be sufficiently pled." *Shash v. Biogen, Inc.*, 84 F.4th 1, 21 (1st Cir. 2023); *see Swanson v. Interface, Inc.*, 20-CV-5518 (BMC), 2022 WL 2003990, at *3 (E.D.N.Y. Jun. 6, 2022) (holding that "it [was] not fatal to plaintiff's case at [pleading stage] that [company's] stock fell one day after [corrective disclosure]"). Also, "the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation." *Acticon AG v. China Northeast Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012).

"[D]etermining why a stock's price rebounded after an initial drop requires the court to consider 'a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss.'" *Id*. (quoting *Malin v. XL Capital Ltd*., No. 03-civ-2001, 2005 WL 2146089, at \*4 (D. Conn Sept. 1, 2005)).

Defendants also characterize some price drops as continuations of a trend,[15] while arguing other drops were the result of other "business challenges" being disclosed to investors. MTD at 24-25. However, "a complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes." *Cohen*, 2018 WL 1406619, at \*6.[16] Here, the allegations in the Amended Complaint link events reflecting the materialization of risks, known to Defendants but concealed from and downplayed to the investing public, directly with declines in Cognyte's stock price. *See, e.g.*, ¶¶6-7, 73-75, 77-79, 80-82. Such allegations more than meet the standard for pleading loss causation and Defendants' factual arguments to the contrary are "for a later day and do[] not diminish the sufficiency of the Complaint." *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014) (Schofield, J.).

---

[15]    Citing *dicta* in *Oklahoma Firefighters Pension & Retirement Systems v. Student Loan Corp.*, 951 F. Supp. 2d 479 (S.D.N.Y. 2013), Defendants contend that there can be no loss causation when a company's stock price has fallen consistently throughout the class period. MTD at 24. However, in *Oklahoma*, the court found there was no loss causation because plaintiffs "ha[d] not established defendants' failure to disclose any information." *Student Loan Corp.*, 951 F. Supp. 2d at 503.

[16]    Defendants cite *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48 (S.D.N.Y. 2015) for the contrary proposition, but that case is easily distinguishable. The court in *Westland* took issue with the plaintiff's failure to disaggregate the losses from (or even mention) the fact that the drop following a particular disclosure "coincided also with S&P's decision to downgrade the credit rating of the United States ***for the first time in its history***." *See id.* at 85. There is nothing remotely similar here.

## CONCLUSION

As the Amended Complaint adequately pleads §§10(b) and 20(a) claims, Defendants' motion to dismiss must be denied in its entirety.  Should the Court grant Defendants' motion, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a).  *See Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend.").

DATED:  January 16, 2024

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/ Deborah Clark-Weintraub
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Donald A. Broggi
Mandeep S. Minhas
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
mminhas@scott-scott.com

*Counsel for Lead Plaintiff City of Omaha Police and Firefighters Retirement System and Lead Counsel for the Class*

25

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

s/ Deborah Clark-Weintraub
Deborah Clark-Weintraub