```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
CITY OF OMAHA POLICE AND                                    :
FIREFIGHTERS RETIREMENT SYSTEM,                             :
                                                            :
                              Plaintiff,                    :   23 Civ. 1769 (LGS)
                                                            :
              -against-                                     :   **OPINION AND ORDER**
                                                            :
COGNYTE SOFTWARE LTD, et al.,                               :
                                                            :
                              Defendants.   :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

Lead Plaintiff City of Omaha Police and Firefighters Retirement System, individually and on behalf of all other persons similarly situated, brings this putative class action against Defendants Cognyte Software Ltd. ("Cognyte"), Elad Sharon and David Abadi, alleging violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants move to dismiss the First Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted.

I. **BACKGROUND**

The following facts are taken from the Complaint and documents referenced in it, or are matters of which judicial notice may be taken, including public filings. *See Dixon v. von Blanckensee*, 994 F.3d 95, 101-02 (2d Cir. 2021); *United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 69 n.2 (2d Cir. 2010) (public filings).

A. **The Parties**

Cognyte is an Israeli security analytics company that provides software solutions for government and enterprise customers. Cognyte began trading on the NASDAQ Global Market

as a spin-off of the cyber intelligence business of Verint Systems, Inc. ("Verint") on February 2, 2021. Plaintiff purchased Cognyte stock during the proposed class period, which begins February 2, 2021, and ends January 19, 2023 (the "Class Period").

Defendant Sharon has served as Cognyte's Chief Executive Officer ("CEO") since the spin-off and throughout the Class Period. Previously, Defendant Sharon held various management roles in Verint's cyber intelligence solutions business after joining Verint in 1997, including serving as President of Verint's cyber intelligence solutions business from February 2016. During the Class Period, Defendant Sharon signed U.S. Securities and Exchange Commission ("SEC") public filings and made oral statements on public earnings calls with investors and analysts.

    **B.**    **The Alleged Fraud and Ultimate Disclosure**

The Complaint alleges that Defendants made false and misleading statements during the Class Period in Cognyte's Code of Conduct, in SEC filings and on earnings calls with investors and analysts. The Complaint alleges that Defendants' misstatements began on January 15, 2021, a few weeks before the beginning of the Class Period, when the SEC declared effective Cognyte's initial Form 20-F Registration Statement (the "Initial Registration Statement"). The Initial Registration Statement provides an overview of Cognyte's business and makes risk disclosures regarding potential reputational harms and possible difficulties with regulatory compliance.

On February 2, 2021, the first day of the Class Period, Cognyte began trading on the NASDAQ Global Market. The same month, Cognyte published its Code of Conduct, which applied to all of Cognyte's board members and employees and was posted on Cognyte's website throughout the Class Period. The Code of Conduct makes statements about legal compliance

such as, "we expect all of our employees and board of director members to act ethically and honestly in good faith and to comply with the law" and "[a]s a global company and good corporate citizen, Cognyte complies with the law in the jurisdictions in which we operate."

On April 29, 2021, Cognyte filed its Annual Report on Form 20-F for the 2020 fiscal year ended January 31, 2021 ("2020 Form 20-F"), and a corresponding press release announcing fourth quarter and fiscal year financial results. Form 20-F is an annual report filed with the SEC by foreign companies whose securities trade in the United States. Cognyte's 2020 Form 20-F and press release contain business descriptions and risk disclosures similar to those in the Initial Registration Statement. For example, the 2020 Form 20-F states, "Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats." Regarding risk disclosures, the 2020 Form 20-F contains, for example, the following statement about reputational risk:

> "We may experience negative publicity, reputational harm, or other adverse impacts on our business as a result of offering certain types of solutions or if we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws. The risk of these adverse impacts may also result in lost business opportunities that impact our results of operations."

Regarding risks related to regulatory compliance, the 2020 Form 20-F states:

> "While we endeavor to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, we cannot assure you that these policies, procedures, or systems will be adequate or that we or our personnel will not violate these policies and procedures or applicable laws and regulations. Violations of these laws or regulations may harm our reputation and deter government agencies and other existing or potential customers or partners from purchasing our solutions. Furthermore, non-compliance with applicable laws or regulations could result in fines, damages, criminal sanctions against us, our officers, or our employees, restrictions on the conduct of our business, and damage to our reputation."

On June 22, 2021, and September 20, 2021, Cognyte issued press releases announcing financial results from the first and second quarters of 2021 and held corresponding earnings calls with analysts. The press releases and Defendant Sharon's statements on the earnings calls included updates on business overview, performance and outlook that were similar to statements made in Cognyte's previous SEC filings.

On July 1, 2021, the Norwegian Government Pension Fund Global, an investor in Cognyte at the time, contacted Cognyte. In a letter addressed to Defendant Sharon, the investor, through its advisor the Council on Ethics, inquired about potential contributions to human rights abuses by Verint and asked Cognyte to respond. The letter was prompted by "allegations [in public sources] against Verint Systems Inc (Verint) i.a. in Azerbaijan, Bahrain, Indonesia and South Sudan, where the company or its subsidiaries are said to have sold surveillance products and services used to implement repressive government policies . . . ." On August 24, 2021, Cognyte's Vice President of Risk and Compliance, Ariel Sagee responded to the Council and disclaimed the allegations.

On December 16, 2021, Meta, the parent company of Facebook and Instagram, released a report titled, "Threat Report on the Surveillance-for-Hire Industry" (the "Meta Report"). The Meta Report details a months-long investigation into entities in the surveillance-for-hire industry and concluded that the software of Cognyte and six other companies had been used in violation of the Meta platforms' terms of service. The Meta Report announced that approximately one hundred Facebook and Instagram accounts linked to Cognyte had been removed for targeting journalists and politicians around the world. Specifically, the Meta Report found that accounts linked to Cognyte had reached the "Reconnaissance" and "Engagement" stages of surveillance, which involve the use of fake accounts to collect information about targets and communicate

with them in violation of the platforms' terms of service. On December 17, 2021, the day after the release of the Meta Report, the price of Cognyte's common stock fell $0.97 per share, or 5.11%, to close at $18.00 per share. On April 5, 2022, Cognyte issued its Form 20-F for the 2021 fiscal year ended January 31, 2022 ("2021 Form 20-F"). The 2021 Form 20-F notes that, in response to allegations in the Meta Report, Cognyte modified certain features of its offerings.

On January 15, 2023, news services *Reuters* and *Haaretz* published articles reporting that Cognyte had won a tender to sell intercept spyware to a Myanmar state-backed telecommunications firm in late 2020, shortly before Myanmar's February 2021 military coup. The *Reuters* article notes that since a 2017 ruling by Israel's Supreme Court, Israeli government officials had publicly stated that defense exports to Myanmar were banned. At the time of the articles' publication, Israel's Defense Ministry had not responded to inquiries seeking to confirm whether Cognyte had requested approval for the tender and whether such a request had been approved. Cognyte likewise did not respond to requests for comment. By January 19, 2023, two trading days after the publication of the articles and the last day of the Class Period, the price of Cognyte's shares had fallen $0.21 per share, or 5.56%, to close at $3.57 per share.

**II.   STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). To survive dismissal, a

5

complaint's "factual allegations must be enough to raise a right to relief above the speculative level." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 306 (2d Cir. 2022).[1]  On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016); *accord Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021).  However, a court does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon*, 994 F.3d at 101.

"A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). "Rule 9(b) requires litigants to state with particularity the circumstances constituting fraud." *Id.* "To do so, a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.*  "The PSLRA, in turn, requires a plaintiff alleging securities fraud to (1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a 'strong inference' that the defendant acted with scienter -- the required state of mind." *Id.* (citing 15 U.S.C. § 78u-4(b)(2)(A)).

### III. DISCUSSION

The Complaint asserts a claim of securities fraud under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5.  That rule makes it unlawful "[t]o make any untrue statement

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

6

of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  The Complaint also asserts a claim of control person liability under § 20(a) of the Exchange Act.

### A.     Section 10(b) Violation

To support a claim for securities fraud, "a plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022).  "The first two elements must be pled with heightened specificity pursuant to the Private Securities Litigation Reform Act of 1995 and Federal Rule of Civil Procedure 9(b)." *Id.* at 102-03.  Principally at issue on this motion is whether the Complaint sufficiently pleads three of the six elements of securities fraud -- a material misrepresentation or omission, scienter and loss causation.

As the Complaint contains no allegations against Defendant David Abadi, the claims against him are dismissed.

#### 1. Material Misrepresentations or Omissions

The Complaint alleges three categories of material misstatements -- (1) that Defendants were acting in an ethical matter as represented in its employee Code of Conduct, (2) that Defendants were selling their products solely to customers for defensive use against bad actors and (3) that Defendants were complying with all applicable laws.  The Complaint does not allege facts sufficient to show that Defendants made material misrepresentations or omissions during the Class Period.

A material misstatement or omission requires either (1) "an actual *statement*" that is "untrue outright," or (2) a half-truth, *i.e.*, a "representation[] that state[s] the truth only so far as it goes, while omitting critical qualifying information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016). "The statement must . . . be misleading, evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Even if "particular statements, taken separately, were literally true," they are actionable if "taken together and in context, [they] would have misled a reasonable investor about the nature of the [investment]." *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir.1990); *accord Fernandes v. Centessa Pharm. PLC,* No. 22 Civ. 8805, 2024 WL 3638254 (S.D.N.Y. Aug. 2, 2024).

### a. Pre-Class Period Statements

As an initial matter, Defendants' statements in the Initial Registration Statement are inactionable because they occurred before the Class Period. The Initial Registration Statement was declared effective by the SEC on January 15, 2021, while the alleged Class Period begins on February 2, 2021, when Cognyte's stock began trading. Generally, defendants are liable "only for those statements made during the class period." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *accord In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992, 2022 WL 976269, at *15 (S.D.N.Y. Mar. 31, 2022) (collecting cases). Courts in this district have applied the rule from *Lattanzio* even when "a stock . . . commences trading for the first time on the first day of the alleged class period." *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *16. The Second Circuit has suggested that there may be liability for statements made prior to the start of a class period if "a duty to update or correct them" arises during the class period. *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot.*

*Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015); *Lattanzio*, 476 F.3d at 154 (holding that a misstatement created by the duty to correct a pre-class period statement "was made (if at all) when a duty to correct arose"). There is no duty to correct statements that "refer[] only to past events or conditions and [do] not imply anything about future circumstances." *Royal Bank of Scot. Grp., PLC*, 783 F.3d at 390.

Here, Defendants had no duty to correct any alleged misstatements in the Registration Statement, which described conditions at the time of Cognyte's original public listing. The Registration Statement does not sufficiently "imply anything about future circumstances" for a duty to correct to arise. *Id.*

### b. Code of Conduct Statements of Ethical and Lawful Behavior

The Complaint alleges that, in Cognyte's Code of Conduct, Defendants made false statements that the company was operating in an ethical manner. These statements do not support a claim of securities fraud because they are mere puffery -- i.e., "statements that are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor. They are statements that lack the sort of definite positive projections that might require later correction." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245.

The alleged misstatements are that Cognyte "expected" its employees "to act ethically and honestly in good faith and to comply with the law"; that Cognyte "complies with the law"; that individuals acting on behalf of Cognyte "comply with all applicable governmental laws, rules, and regulations"; and that Cognyte "understand[s]" that its "products are subject to certain U.S. and non-U.S. export laws and regulations" and "understand[s] that economic sanctions and embargoes may restrict" its business. The Complaint alleges that these statements in the Code of Conduct were misleading because they speak to Cognyte's commitment to ethical behavior and

9

regulatory compliance, when in fact Cognyte was violating export control laws and social media platforms' terms of service.

These statements in the Code of Conduct cannot support a claim for securities fraud because they are generic statements that do "not invite reasonable reliance," and therefore are not "materially misleading." *See Singh*, 918 F.3d at 60 (emphasis omitted). The Second Circuit's decision in *Singh* is controlling. There the court held that general legal and ethical compliance statements in a corporate defendant's Code of Ethics were inactionable puffery. *Id*. at 63. The court explained that "general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." *Id*. The court described the statements in Cigna's Code of Ethics as a "textbook example of puffery" because they amount to "general declarations about the importance of acting lawfully and with integrity." *Id*. The alleged misstatements in Cognyte's Code of Conduct are similarly general and do not invite reliance. Moreover, the challenged statements and surrounding text read in context appear to be directives and instructions to employees rather than affirmative declarations about Cognyte's past conduct.

Plaintiff cites cases that are inapplicable because the challenged misstatements at issue in them were specific and detailed. For example, in *Meyer v. Jinkosolar Holdings Co.*, the alleged misstatements described compliance with environmental regulations in such detail that it was reasonable for investors to believe that "effective steps were being taken to comply with applicable environmental regulations." 761 F.3d 245, 251 (2d Cir. 2014). The Court in *Singh* similarly distinguished *Meyer*: "[W]e emphasized [in *Meyer*] that the company described its compliance mechanisms in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and its clean compliance record." *Singh*, 918 F.3d at 63;

*compare In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (finding detailed safety-related statements describing annual assessments, specific policies and reports on injury frequency to be actionable misstatements), *with City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (holding general statements of legal and ethical compliance to be inactionable, particularly when the statements did not guarantee the success of compliance efforts).  The securities fraud claim is dismissed to the extent it is based on false statements in the Code of Conduct.

### c. Statements Regarding Cognyte's Business and Customers

The Complaint challenges Defendants' statements that repeatedly "portrayed Cognyte's business as focused on assisting government and corporate security organizations in preventing cyber-attacks, intrusions, and other wrongdoing by bad actors."  These statements are alleged to be false or misleading because, as revealed in the Meta Report, Cognyte "was indiscriminately selling intrusive software tools and surveillance services to customers who used them to target people . . . including journalists [and] politicians" rather than bad actors.

The alleged misstatements are inactionable.  First, the alleged misconduct is Defendants' focus on assisting customers who were targeting bad actors, while failing to disclose that Cognyte also sold, or at least might sell, to customers who themselves may be considered bad actors.  A practical problem with this allegation is that the identification of a "bad actor" likely depends on the eye of the beholder.

Second, the alleged misstatements were neither untrue nor misleading by omission.  Defendants are not alleged to have represented outright that Cognyte sold exclusively to customers seeking to prevent wrongdoing by bad actors.  Nor did Defendants make material omissions.  As stated above, Section 10(b) and Rule 10b-5(b) require disclosure of material

information only when necessary to make statements "not misleading." *Matrixx Initiatives, Inc., v. Siracusano,* 563 U.S. 27, 44 (2011). However, "[c]ertain alleged misrepresentations in [an investment] offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002). That Defendants' business could include sales to unpopular customers was explicit in Defendants' risk warnings that it could sell "certain types of solutions" to "countries or customers that are considered disfavored by the media or by certain political or privacy organizations." Defendants' statements were not misleading because they "expressly warned of and included disclosures that directly related to the risk that brought about plaintiffs' alleged loss." *See Fernandes,* 2024 WL 3638254, at *22 (finding statements not misleading where investors "were specifically forewarned that" their investments may suffer harm "as a result of the exact problem the Registration Statement warned of"); *see also Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (summary order) ("Here, unlike in *Jinkosolar*, the materialized risks were disclosed in the Offering Documents. . . . Pinduoduo's statements 'suggest[] caution (rather than confidence) regarding the extent of [their] compliance.') (quoting *Singh*, 918 F.3d at 64).

Finally, the Complaint assumes that Defendants knew how their products would be used and to what end. Contrary to the Complaint's contention that firms like Cognyte typically manage accounts for customers, the Meta Report states, "[collection of information on social media platforms is] typically managed by the service provider for its clients, *or operated by the customers themselves through software provided by the surveillance-for-hire firm.*" (Emphasis added.) Without further allegations, the Complaint's contention that Cognyte managed the at-

12

issue accounts is conclusory.  The Complaint fails to plead that Defendants made actionable material omissions in the description of their business.

### d. Statements that Cognyte Was Complying With Applicable Law

The Complaint alleges that Defendants made false and misleading statements that they were complying with all applicable laws, when in fact, for example, the company was selling its products to Myanmar in violation of export laws of Israel and the United States.  The Complaint identifies three sources for these alleged misstatements.  The first two are the Initial Registration Statement and the Code of Conduct, which (as discussed above) do not give rise to actionable misstatements.  The Complaint identifies as the third source of misleading statements Cognyte's risk statements in public filings.  These warnings preclude liability rather than support it.

The Complaint asserts that Defendants' risk warnings in public filings are themselves misstatements, alleging that they "portrayed Cognyte as a Company that was actively seeking to comply with the law" "when, in fact, Cognyte's violation of . . . export control and other laws . . . [was] ongoing."  These warnings do not support a securities fraud claim because they explicitly state that Cognyte may not comply with the laws and regulatory requirements governing its business.

The Complaint cites three warnings, all of which were made in Defendants' Initial Registration Statement and 2020 Form 20-F.  The first, discussed above, says that Defendants may offer unpopular "solutions" or sell to unpopular customers, and that "even where such activities . . . are permissible under applicable laws," they may harm the company's reputation and business.  The focus of the statement is on unpopular but law-abiding business conduct.  It cannot be read to say that the company complied with all applicable laws.

The second warning states, "While we endeavor to [comply with applicable regulatory requirements], we cannot assure you that these policies, procedures or systems will be adequate or that our personnel will not violate these policies and procedures or applicable laws and regulations."  This warning expressly identifies applicable regulatory requirements "with respect to trade compliance, anti-corruption, information security, data privacy and protection, tax labor and government contracts."  The warning then explains that these violations could harm the company's reputation or business or result in "fines, damages, [or] criminal sanctions . . . ."  This warning cannot be read to say that Defendants were in compliance with all applicable laws, and in fact expressly describes how they may not be.

The third warning states specifically that the business "depend[s] largely on export and marketing license approvals from . . . Israel and . . . other countries," and that if the company fails to obtain or maintain such approvals, its business "could be interrupted, resulting in a material adverse effect on our business."  Like the second warning, this statement describes how Defendants may not be in compliance with regulatory restrictions.

Even considering the statements together, they, "[i]f anything, . . . seem to reflect [the company's] uncertainty as to the very possibility of maintaining adequate compliance mechanism in light of complex and shifting government regulations."  *Singh*, 918 F.3d at 64.  They do not describe "compliance mechanisms in confident detail," *id*., or assert that Cognyte unfailingly will be found to have complied with the law.  A reasonable investor would not rely on these warnings as "representations of satisfactory compliance."  *Id.* at 63.

Plaintiff's argument that Defendants' statements were misleading because they warned of hypothetical risks that had already materialized is incorrect.  While "cautionary words about future risks cannot insulate from liability an issuer's failure to disclose that the risk has, in fact,

14

materialized in the past and is virtually certain to materialize again," *Set Cap. LLC* 996 F.3d 64, 85-86, the Complaint does not allege with sufficient particularity that Defendants violated the law, much less that they had done so when the risk statements were made.

Facts showing a violation of law must be alleged with particularity when uncharged illegal conduct underlies an alleged securities fraud. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021); *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019). "Because [defendant's] statements were materially false or misleading *only to the extent that [illegal] conduct actually occurred*, appellants must plead sufficient -- though not exhaustive -- facts describing the essential elements of that underlying conduct." *Gamm*, 944 F.3d. at 464 (emphasis added).

The Complaint alleges that Cognyte was selling its products "in violation of export control and other laws the Company was bound to follow." The Complaint provides only one instance, "the apparent sale of intercept spyware to a Myanmar state-owned telecommunications company . . . in violation of Israeli and other jurisdictions' expert control laws, which banned sales of such technology to Myanmar's dictatorship." The Complaint lacks specifics about which particular law or regulation was violated, what the elements of such a violation are and that Cognyte's conduct satisfied those elements. The Complaint merely alleges that "Israel, the U.S. and EU, jurisdictions whose expert laws Cognyte was required to comply with, have banned sales of technologies of this nature to Myanmar due to its human rights violations." The Complaint also does not allege that the sale actually took place or that the Israeli authorities had charged Cognyte with any violation, or that such a risk would necessarily materialize. *Compare In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 07992, 2023 WL 2744029, at *20 (S.D.N.Y. Mar. 31, 2023), *aff'd sub nom. Gabelli Asset Fund v. Garrett Motion Inc.*, No. 23-668-CV, 2024

15

WL 1653451 (2d Cir. Apr. 17, 2024) (holding that defendant's risk disclosure was not misleading because plaintiffs did not show that the risk was "necessarily imminent . . . and therefore it was not necessarily misleading" for defendant to state the risk as hypothetical), *with Set Cap. LLC*, 996 F.3d at 85 (holding that defendants' risk disclosures were misleading where "the complaint allege[d] that . . . [defendants] knew with virtual certainty" that a risk would materialize). Defendants' statements and warnings regarding the company's compliance with applicable law are not actionable misstatements.

### 2. Scienter

The Complaint does not sufficiently plead scienter as to Defendants Sharon or Cognyte. The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "For an inference of scienter to be strong, a reasonable person must deem it cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (emphasis omitted). "In making this determination, the court must review all the allegations holistically." *Matrixx Initiatives, Inc.*, 563 U.S. at 48.

A plaintiff may satisfy the scienter requirement by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information [that it] had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794

F.3d 297, 306 (2d Cir. 2015); *accord Denny v. Canaan Inc.*, No. 21 Civ. 3299, 2023 WL 2647855, at *12 (S.D.N.Y. Mar. 27, 2023). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). "[C]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 350 (S.D.N.Y. 2015); *accord In re Lottery.com, Inc. Sec. Litig.*, No. 22 Civ. 07111, 2024 WL 454298, at *33 (S.D.N.Y. Feb. 6, 2024).

The Complaint fails to plead that Defendant Sharon acted with scienter. The Complaint does not attempt to plead motive and opportunity, but instead attempts to allege facts supporting a "strong inference" that Sharon knew that Cognyte's products were "operating on social media platforms in violation of their terms of service" and "that Cognyte was violating the export control and other laws of jurisdictions in which the Company did business." However, the allegations are conclusory and in substance allege only what Sharon must have known, given his experience and role as CEO in the company. This is insufficient to plead scienter. *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 493 (S.D.N.Y. 2021) ("[A]llegations of circumstantial evidence . . . such as the individual Defendants' senior positions . . . are not sufficient to plead scienter, even considered in their totality.").

The only document that allegedly evidences Sharon's knowledge of wrongdoing is the July 2021 letter from the Norwegian Pension Fund Global. The letter references public allegations about sales made by Cognyte's predecessor company prior to Cognyte's spin-off and does not identify any sale by Cognyte in violation of any export control law. Neither this document nor the Complaint's conclusory allegations support an inference, "at least as strong as

17

any opposing inference," that Sharon was aware of any violation of law or the terms of service of social media providers. *See ATSI Commc'ns, Inc*., 493 F.3d at 99.

As no individual defendant or other corporate officer is alleged to have acted with the requisite scienter, the Complaint does not sufficiently plead that Cognyte as a corporation acted with scienter. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) ("Where a defendant is a corporation, this requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").

### 3. Loss Causation

The Complaint does not adequately allege facts showing loss causation. Loss causation "is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI Commc'ns, Inc.* 493 F.3d at 106; *accord Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405 (S.D.N.Y. 2022). To plead loss causation, a complaint must allege "that the misstatement or omission [in question] concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005); *accord Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 325 (S.D.N.Y. 2024).

The Complaint fails to plead loss causation because it does not adequately allege that concealed information was disclosed or that the alleged disclosure caused a decline in Cognyte's stock price. The Complaint describes six disclosures that it alleges were related to drops in Defendants' stock price. All of the alleged disclosures were materializations of business and reputational risks that Defendants expressly disclosed in the risk warnings discussed above. Plaintiff cannot now point to the materialization of those known risks to show loss causation. *See In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 n.33 (S.D.N.Y. 2014)

18

("[M]aterialization of a known risk, rather than the disclosure of a concealed one, is not a plausible theory of loss causation.").

Even assuming Plaintiff could rely on the materialization of risks Defendants had previously disclosed, the Complaint also fails to plead sufficient causation between the alleged disclosures and the decline in Cognyte's stock price. For example, after several alleged disclosures, such as Defendants' potential sale of its product to Myanmar, Cognyte's stock price rose. *See generally Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 (2d Cir. 2012) ("We are entitled to take judicial notice of well publicized stock prices without converting the motion to dismiss into one for summary judgment."); *Buch v. Larregui*, No. 23 Civ. 8854, 2024 WL 2866991, at *5 (S.D.N.Y. June 4, 2024) (same). Plaintiff also "ignore[s] the history of the company's stock price, which fell consistently throughout the class period," including periods when no corrective disclosures are alleged. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503 (S.D.N.Y. 2013) (holding that plaintiffs' loss causation theory failed in part because of the "general downward trend of [defendant's] stock price prior to and during the class period").

The Complaint also fails to make plausible allegations that the stock price fell because of the alleged disclosure of previously unknown facts, particularly given that the Class Period occurred entirely within the period of the COVID-19 pandemic, a "marketwide phenomenon." *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 85 (S.D.N.Y. 2015) (finding no loss causation in part where alternative factors such as "the market upheaval caused by [the United States' credit rating downgrade] . . . render[ed] [plaintiffs'] allegations insufficiently plausible to withstand a motion to dismiss"). While Plaintiff need not "rule out other contributing factors or alternative causal explanations at the motion to dismiss stage, they

19

must still allege enough facts regarding their loss to support the inference that they would have been spared all or an ascertainable portion of that loss absent the fraud." *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 499 (S.D.N.Y. 2016) (finding no loss causation where plaintiff failed to allege facts to show "that Defendants' alleged fraud caused the drop in stock prices, rather than [other intervening factors]"). The Complaint fails to plead loss causation.

### B. Section 20(a) Violation

Section 20(a) imposes joint and several liability on control persons for underlying violations of the Exchange Act. *See* 15 U.S.C. § 78t. To state a claim under § 20(a), a plaintiff must allege both a primary violation of the Exchange Act and control over the primary violator. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Because the primary claim fails, the § 20(a) claim is dismissed as well.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.

Plaintiff has requested leave to replead in the event the motion is granted. If Plaintiff has additional facts that Plaintiff believes would cure the deficiencies identified in this Opinion, by **October 21, 2024**, Plaintiff shall file a letter not to exceed three pages single-spaced seeking leave to replead and explaining how the proposed amendments cure the deficiencies. Any letter shall be accompanied by a proposed Second Amended Complaint marked to show changes from the First Amended Complaint. Defendants shall respond, with the same page limitation, by one week after the filing of any letter from Plaintiff.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 54.

Dated: September 30, 2024
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE