DEBORAH + CLARK-WEINTRAUB

+ VIA ECF+

October 21, 2024

Hon. Lorna G. Schofield
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

  Re: *City of Omaha Police and Firefighters Retirement System v. Cognyte Software Ltd.*,
    No. 1:23-cv-01769

Dear Judge Schofield:

  We represent the Plaintiff in the above-referenced action.  We submit this letter-motion for leave to file a Second Amended Complaint pursuant to the Court's September 30, 2024 Opinion and Order dismissing the prior complaint with leave to replead.  ("Opinion," ECF No. 64 at 20.)  The Proposed Second Amended Complaint (the "SAC") is attached hereto as Exhibit A and an electronically generated redline comparison against the prior complaint is attached hereto as Exhibit B.  For the reasons stated below, Plaintiff respectfully submits that the Court should grant Plaintiff leave to file the proposed SAC.  In the Opinion, the Court dismissed Plaintiff's claims on the grounds that the prior complaint failed to allege material misrepresentations or omissions, scienter, and loss causation.  (Opinion at 7-20.)  Although Plaintiff respectfully disagrees with these conclusions, the proposed SAC contains additional allegations demonstrating that the alleged misstatements and omissions are actionable, the allegations of the SAC give rise to a strong inference of scienter, and Plaintiff has adequately alleged loss causation.

  *First*, although Defendants did not seek dismissal on this basis, the Court *sua sponte* dismissed the alleged misstatements in the Registration Statement, which was filed on January 13, 2021, as inactionable because they occurred before the start date of the class period defined in the prior complaint, *i.e.*, February 2, 2021.  (Opinion at 8-9.)  Although the Second Circuit follows the general rule that pre-class period statements are not actionable with limited exceptions (*id.*), as far as Plaintiff's Counsel is aware, the Second Circuit has not ruled on whether pre-class period statements are actionable under Section 10(b) in the precise circumstances presented here – where the class period is defined to begin on the date the shares begin as opposed to the date the Registration Statement was filed.  In analogous contexts, courts have recognized an exception to the

Hon. Lorna G. Schofield
October 21, 2024
Page 2

general rule that pre-class period statements are not actionable. *See*, *e.g.*, *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005) (Noting that "the purpose of defining a plaintiff class, through dates or otherwise, is to limit the class of plaintiffs to those ascertainable individuals who have standing to bring the action" and "is not a device for limiting the universe of actionable conduct."); *Borteanu v. Nikola Corp.*, No. CV-20-01797, 2023 WL 1472852 (D. Ariz. Feb. 2, 2023) (rejecting argument that pre-class period statements were not actionable reasoning that because "the class period is designed to limit the class to those individuals who have standing, the earliest possible date for the class period to begin is the day that the company's shares became publicly available"). The Opinion cites *In re Garrett Motion Inc. Sec. Litig.*, 20 Civ. 7992 (JPC), 2022 WL 976269, at *15 (S.D.N.Y. Mar. 31, 2022), as holding that pre-class period statements are inactionable even when "a stock . . . commences trading for the first time on the first day of the alleged class period." However, plaintiffs in *Garrett* "cite[d] no authority suggesting that the Court should find [the] general rule inapplicable when a stock first trades on the first day of the Class Period." 2022 WL 976269, at *16. Nevertheless, to address the Opinion's conclusion, the proposed SAC amends the start date of the class period to coincide with the date the Registration Statement was filed with the SEC, *i.e.*, January 13, 2021. Notwithstanding this change, the universe of Class members remains the same as Cognyte's shares, which were issued pursuant to the Registration Statement, did not begin to trade until February 2, 2021.

*Second*, the proposed SAC includes allegations demonstrating that the Code of Conduct statements, including that Cognyte "complie[d] with the law in jurisdictions in which [it] operates," which the Opinion dismissed as inactionable puffery, were highly material to investors. (¶¶48-51.)[1] These allegations include analyst commentary that for cyber intelligence companies like Cognyte, it was important to "investors and customers that there [we]re rigid safeguards in place and high transparency to ensure that [cyber intelligence] software [wa]s used in an ethical manner." Further, the proposed SAC includes allegations with respect to Defendants' response to the July 21, 2021 letter from the Norwegian Government Pension Fund Global, including the Company's citation to its adoption of the Code of Conduct following its spin-off from Verint Systems, Inc. ("Verint") as one of the steps Cognyte had taken to avoid involvement of its products and services in human rights abuses. *Id.*

*Third*, the proposed SAC contains additional facts supporting Plaintiff's allegation that Defendants made materially false and misleading statements about the nature of Cognyte's business and customer base. The prior complaint alleged that Cognyte portrayed its targeted customer base as consisting of governments and corporate enterprise customers seeking defensive solutions against cyber-attacks, intrusions, and other threats by terrorists and criminals and failed to disclose that selling Cognyte's surveillance technology to known bad actors engaged in human rights abuses, including Myanmar, was a key component of Cognyte's business. The Opinion held that these statements were not actionable because "the Complaint *assumes* that Defendants knew how their products would be used and to what end" and "the identification of a 'bad actor' likely depends on the eye of the beholder." (Opinion at 11-12.) (Emphasis added.) The proposed SAC now includes allegations detailing the requirements of Israel's Defense Export Control Law that make clear that Cognyte *was required* to know precisely "how [its] products would be used and to what end." (¶¶28-32.) In addition, the proposed SAC alleges that Cognyte intentionally sold its surveillance systems to Myanmar and Bangladesh, countries with abysmal human rights records that were undeniable

---

[1]     References in this letter to "¶__" refer to paragraphs of the proposed SAC.

Hon. Lorna G. Schofield
October 21, 2024
Page 3

"bad actors," evidencing that such sales were part and parcel of Cognyte's business case, not unintended aberrations. (¶¶44-47, 100-107.)

*Fourth*, the proposed SAC pleads facts demonstrating that Cognyte's risk warnings regarding hypothetical violations of export control laws were materially false and misleading because these violations were already occurring at the time the warnings were given. The Opinion held that the risk warnings were not actionable because the prior complaint "failed to allege with sufficient particularity that Defendants violated the law, much less that they had done so when the risk statements were made." (Opinion at 14-15.) The proposed SAC pleads: (1) details of Israeli, U.S., and EU law banning exports of dual-use technology such as Cognyte's surveillance systems to Myanmar, (2) evidence that Cognyte not only won the tender for the sale of the surveillance system to Myanmar but followed through with the sale after the military coup, and (3) that the sale occurred notwithstanding that Cognyte had not received the required defense export and marketing licenses from Israel's Defense Export Control Agency ("DECA"). (¶¶28-32, 33-35, 45, 104-105.)

*Fifth*, the Opinion held that the prior complaint's allegations of scienter, including the long association of Cognyte CEO Elad Sharon's long association with Verint's cyber intelligence business and the July 2021 letter from the Norwegian Pension Fund Global, were insufficient to support a strong inference that Sharon knew that Cognyte was selling its surveillance systems in violation of any export control law. The proposed SAC supplements these existing allegations with additional facts with respect to: (1) Verint's alleged ties to human rights abuses in South Sudan during the time Sharon served as President of Verint's cyber intelligence business, which demonstrate that such sales were an integral part of the business that became Cognyte, and (2) the provisions of Israel's Defense Export Control Law which make clear that Sharon, as Cognyte's CEO, was almost certainly one of the few individuals at Cognyte who was authorized to engage in defense marketing activities and participate in negotiations in connection with defense export transactions. (¶¶28-32, 99) In view of the foregoing, the inference that Sharon, as a decades long veteran of the industry, understood the requirements and prohibitions of the export control laws governing Cognyte's business and was aware of the sale of the intercept system to Myanmar is equally as strong, if not stronger, than the competing inference.

*Finally*, the Opinion held that the prior complaint failed to allege loss causation because "[a]ll of the alleged disclosures were materializations of business and reputational risks that Defendants expressly disclosed in the risk warnings" and even if this were not the case, the prior complaint did not allege sufficient causation between the alleged corrective events. In this regard, the Opinion noted that Cognyte's stock price generally declined throughout the class period, which "occurred entirely within the period of the COVID-19 pandemic," and that Cognyte's stock price rose after the sale to Myanmar was disclosed. (Opinion at 19-20.) Although there is no requirement that a stock's price must drop immediately following a corrective disclosure for loss causation to be sufficiently pled, *Shas v. Biogen*, 84 F.4th 1, 21 (1st Cir. 2023) (collecting cases), the proposed SAC contains additional allegations regarding Cognyte's stock price movements, trading volumes, and other news released on the alleged disclosure dates. (¶83-96, 111-20.) In addition, as the proposed SAC contains additional allegations demonstrating that Cognyte's risk warnings regarding hypothetical violations of export control laws were materially false and misleading as stated above, the later materializations of business and reputational consequences of these risks do not constitute the materialization of a "known risk."

Hon. Lorna G. Schofield
October 21, 2024
Page 4

Respectfully submitted,

SCOTT+SCOTT ATTORNEYS AT LAW LLP

*/s/ Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Donald A. Broggi
Mandeep S. Minhas
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile: 212-223-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
mminhas@scott-scott.com

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*