# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF OMAHA POLICE AND FIREFIGHTERS RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>COGNYTE SOFTWARE LTD, ELAD SHARON and DAVID ABADI<br><br><br>     Defendants. | Civil Action No. 1:23-cv-01769<br><br>CLASS ACTION<br><br>**[PROPOSED] SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CITY OF OMAHA POLICE AND
FIREFIGHTERS RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiff,

    vs.

COGNYTE SOFTWARE LTD, ELAD
SHARON and DAVID ABADI

                    Defendants.

———————————————————— x

   :  Civil Action No. 1:23-cv-01769

   :

   :  CLASS ACTION

   :  **AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Court-appointed Lead Plaintiff City of Omaha Police and Firefighters Retirement System ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts; and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Cognyte Software Ltd ("Cognyte" or the "Company"), press releases and other announcements by the Company, and media and analyst reports about the Company.  ̶Lead Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This is a securities class action on behalf of all purchasers of Cognyte common stock between January 13̶February 2, 2021 and January 19, 2023, inclusive (the "Class Period"), against Cognyte and its Chief Executive Officer ("CEO") Elad Sharon for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2.      Cognyte is an Israel-based security analytics software company, which began trading as an independent entity in February 2021 following a spin-off from Verint Systems Inc. ("Verint").  Cognyte's stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker CGNT.  According to Cognyte, its software "fuses, analyzes and visualizes disparate data sets at scale to help [its customers] successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats."  ̶Its customers include both national, regional, and local governments and governmental agencies, as well as enterprise customers.

3.      Because of the industry in which it operates, Cognyte's customer base, business ethics, and its compliance with applicable laws, including export control and other laws, enacted to safeguard against misuse of the type of cyber intelligence solutions the Company sold, were key areas of investor concern.   As an equity research report from William Blair stated:

> "While we believe that there is value to cyber intelligence, we believe that it is important for investors and customers that there are rigid safeguards in place and high transparency to ensure that the software is used in an ethical manner."[1]

4.      Throughout the Class Period, Cognyte repeatedly (i) represented that it was operating in accordance with its corporate Code of Conduct, which was referenced in the Company's Annual Reports filed with the SEC and posted on Cognyte's website throughout the Class Period, (ii) stated that it was~~an ethical manner,~~ complying with all applicable laws in the jurisdictions in which it operated and did business, and (iii) characterized its cyber intelligence solutions ~~as~~ designed to assist government and corporate actors in fending off cyber-attacks, intrusions and other wrongdoing by bad actors.   For example, Cognyte's Code of Conduct~~the Company's Code of Conduct, which was referenced in the Registration Statement and posted on Cognyte's website throughout the Class Period,~~ stated that the Company "expect[ed] all of [its] employees and board directors to act ethically and honestly in good faith and to comply with the law," and that "[a]s a global company and good corporate citizen, Cognyte complie[d]~~complies~~ with the law in jurisdictions in which [it] operate[d]."~~operates."~~   In addition, throughout the Class Period, Defendants repeatedly characterized Cognyte's products and software as designed to assist governments, governmental agencies and corporations in *"identify[ing], neutraliz[ing], and prevent[ing] terror, crime, and cyber threats."* [Emphasis added.]~~]~~

---

[1]      Louie DiPalma, CFA, "Cognyte Software Ltd.," William Blair (June 28, 2022).

5.      These and similar representations made throughout the Class Period were materially false and misleading because Cognyte was violating its Code of Conduct~~not acting in an ethical manner~~, was not complying with applicable laws, and was not selling its products and software solely to customers interested in neutralizing security threats.  Rather, as was later revealed, Cognyte solicited customers and sold its products and services indiscriminately, including reportedly to Myanmar's dictatorship, and allowed them to be used to target journalists, politicians and other individuals.  Among other means, Cognyte used dummy accounts on social media platforms to identify and track targeted individuals around the world and otherwise gathered data on social media platforms in violation of their terms of service.

6.      -The truth gradually came~~began to come~~ to light through a series of materializations of the undisclosed risks and partial disclosures.  First, on December 16, 2021, when Meta Platforms Inc. ("Meta") issued a Threat Report on the Surveillance-for-Hire Industry (the "Threat Report")[2] after a months-long investigation disclosing that Cognyte was one of seven "cyber mercenary" companies that had indiscriminately targeted journalists, politicians and dissidents using tactics that violated Meta's terms of service contrary to the entities' claims that their "services only target criminals and terrorists."[3]    In Cognyte's case, the report stated that Meta had removed approximately 100 accounts on Facebook and Instagram linked to Cognyte and customers of the Company located in 9 separate countries that had been used "to social-engineer people and collect data."[4]  In light of its findings, Meta announced that it had banned Cognyte and its customers from its platforms, issued Cease and Desist warnings, "shared [its] findings with security researchers,

---

[2]      Mike Dvilyanski, et al., THREAT REPORT ON THE SURVEILLANCE-FOR-HIRE INDUSTRY, META (Dec. 16, 2021), https://about.fb.com/wp-content/uploads/2021/12/Threat-Report-on-the-Surveillance-for-Hire-Industry.pdf.

[3]      Threat Report at 2-3.

[4]      Threat Report at 8.

other platforms and policymakers," and also alerted "people who [it] believe[d]believed were targeted to help them strengthen the security of their accounts."[5]

7.    On this news, the price of Cognyte's common stock fell $2.38 or 13.8% over three trading days, from $19.39 per share5.11%, closing on December 1517, 2021, to $17.01at $18 per share on December 20, 2021, before declining another 5.5% the next trading day.  Cognyte's stock price continued to plummet overin the course of the next 13following days, weeks, and months as more of the undisclosed risks materialized through the Company's disclosuresCompany disclosed that (i) it had to alter its products to comply with Meta's findings, making them less effective and attractive to customers; (ii) revenues and customer counts were declining in the wake of Meta's revelations; (iii) a large investor had informed the Company that it would no longer hold Cognyte stock citing concerns that the Company's indiscriminate sale of its products and software was contributing to serious human rights violations; and (iv) Cognyte had won a tender to sell intercept spyware to the brutal Myanmar dictatorship in violation of Israeli and other jurisdictions' laws prohibiting the sale of systems of this kind to that country in the wake of the military coup that had seized power.  Altogether, Cognyte's stock price has declined from $28 per share on February 2, 2021, the day it began trading following its spin-off from Verint, to $3.57 per share on January 19, 2023, in the wake of the news that it had won the Myanmar tender, a total decline of 87%.

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC")SEC (17 C.F.R. §240.10b-5).

---

[5]    Threat Report at 2, 6, 11.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this Jjudicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa). Cognyte common stock is listed on the NASDAQ, which is located in this District, and many of the acts and transactions giving rise to the violations of law complained of occurred here.

11.     In connection with the acts alleged in this Ceomplaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

11.

## THE PARTIES

12.     Lead Plaintiff, City of Omaha, as set forth in its certification (ECF No. 1-1), purchased Cognyte common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements alleged herein.

13.     Defendant Cognyte is incorporated under the laws of the State of Israel and maintains its principal executive offices at 33 Maskit, Herzliya Pituach, 4673333, Israel.   On December 4, 2019, Verint, a New York-based analytics company, announced plans to separate its business into two independent companies: Cognyte Software Ltd., which would consist of Verint's cyber intelligence solutions business, and Verint Systems, Inc., which would consist of Verint's customer engagement business. On February 1, 2021, Cognyte and Verint completed the spin-off and the related separation and distribution. As a result, Cognyte became an independent, publicly traded company with its shares listed on the NASDAQ under the ticker symbol "CGNT." Although

it is incorporated in Israel, Cognyte conducts business all over the world through subsidiaries in a host of countries including the U.S.

14.     Defendant Elad Sharon ("Sharon") has served as Cognyte's CEO and as a member of Cognyte's Board of Directors (the "Board") since February 1, 2021, the effective date of Cognyte's spin-off from Verint.   Previously, Defendant Sharon had served as the President of Verint's cyber intelligence solutions business, which became Cognyte, since February 2016.  After joining Verint in 1997, Defendant Sharon held a broad range of management positions in the cyber intelligence solutions business prior to becoming Verint's President~~CEO~~, including Senior Vice President of Products, R&D and Delivery, Senior Vice President of Strategic Programs, and Chief Operating Officer.   Throughout the Class Period, Defendant Sharon made statements in the Company's press releases, on earnings conference calls, and during other public events~~,~~ which, as alleged herein, were materially false and misleading and violated the federal securities laws. At all relevant times, Defendant Sharon made materially false and misleading statements with scienter.

15.     Defendants Cognyte and Sharon are referred to herein as "Defendants."

## RELEVANT FACTS

### ~~A.~~     Cognyte and Its Business

16.     In December 2019, Verint announced its intention to separate its customer engagement and cyber intelligence solutions businesses to create two companies.   Cognyte was formed in Israel in the second quarter of 2020 to serve as the holding company of the cyber intelligence business to be contributed by Verint in connection with the spin-off.   Cognyte became a standalone public company, independent of Verint, on February 1, 2021, and its common stock began trading on the NASDAQ the following day.

17.    Cognyte describes itself as a global leader in security analysis, catering to national, regional, and local governments and governmental agencies, as well as enterprise customers. According to Cognyte, its software is designed to "*identify, neutralize, and prevent terror, crime and cyber threats*."[6]    As of the date of the spin-off, Cognyte had subsidiaries in 13 separate countries including the U.S.

18.    Prior to and during the Class Period, Defendants portrayed Cognyte's business as focused on assisting government and corporate security organizations in preventing cyber-attacks, intrusions, and other wrongdoing by bad actors.  For example, on January 11, 2021, just weeks before the spin-off, in a discussion at an Analyst/Investor Day event moderated by Matthew H. Frankel, Verint's manager of Investor Relations and Corporate Development, Defendant Sharon and his future colleagues at Cognyte touted the capabilities of Cognyte's software as enabling its customers to stay ahead of "criminals, terrorists and hackers all over the world." [Emphasis added.]

19.    Similar statements emphasizing the defensive nature of Cognyte's solutions were repeated throughout the Company's presentation and in response to questions from securities analysts.    For example, in his prepared remarks, Defendant Sharon stated that "[l]eading government and enterprise security organizations around the world partner with Cognyte to address complex security challenges" and "rely on [its] security and analytics software every day to generate critical actionable intelligence" without which "they would be flying blind and more vulnerable to potential threats."[7] [Emphasis added.] Likewise, during the Q&A portion of the

---

[6]    Cognyte Software Ltd. Registration Statement (Form 20-F) (December 22, 2020) at 51.

[7]    Transcript at 10, Cognyte Software Ltd. Investor Day (Jan. 11, 2021).

event, Defendant Sharon cited the SolarWinds hack[8] as an example of the type of intrusion that Cognyte's software was designed to prevent:

> [T]he recent cyber-attack on government agencies and commercial organizations, by the way, is a really good example of the challenges and . . . complexity our customers are facing. Bad actors today [are], well-funded organizations with very sophisticated technology. Investigative solutions that Cognyte provides are becoming more important in analyzing cyber-attack vectors, mitigating severe damage. We believe an open security platform that can fuse very large amounts of data, analyze it and generate real-time intelligence is exactly what our customers need.

> Usually, after [a] high-profile security event, like SolarWinds, customers all over the world ask themselves if they are ready to deal with such an attack. And when the gaps are identified, they typically allocate budgets and look for modern technology that can help them get ready, and we are well positioned to help them exactly do that.[9]

1.    [Emphasis added.]

20.    Standalone financial statements for Cognyte included in the January 13~~14~~, 2021 amended registration statement on Form 20-F filed with the SEC on January 15, 2021 (the "Registration Statement") reported revenues of $433 million and $457 million ~~and $443 million~~ for the two most recent reported pre-spin-off fiscal years ended January 31, 2019~~20~~ ("FY2019") and 2020~~1~~ ("FY2020"), respectively.[10]  Although Cognyte managed to exceed these totals in its first year as a public company,[11] Cognyte suffered a significant reversal in fortune following the

---

[8]    The cybersecurity breach of SolarWinds, a Texas-based network management software company, was one of the most widespread and sophisticated hacking campaigns ever conducted against the federal government and private sector.  The Russian Foreign Intelligence Service ("RFIS") injected hidden code into a file that was included in software updates of SolarWinds Orion network management software.  This hidden code allowed the RFIS to remotely access infected computer systems.

[9]    Transcript, *supra* note 7, at 16.

[10]    Registration Statement   ~~Cognyte Software Ltd. Form 20-F~~ at F-4~~23~~.

[11]    Cognyte reported revenues of $474 million for the fiscal year ended January 31, 2022 ("FY2022~~1~~").  *See* Cognyte Software Ltd., Annual Report Pursuant to Section 13 or 15(d) (Form 20-F) (Apr. 5, 2022) at 46 (~~for the~~ fiscal year ended January 31, 2022) ("2022~~1~~ Form 20-F") ~~at 46~~.

publication of Meta's Threat Report on December -16, -2021.   For the year ended January 31, 2023 ("FY2023~~2~~"), the Company's revenue declined 34% to just $312 million as its customer base dwindled and private sector customers fled.[12]   Whereas ~~during~~ the Registration Statement ~~Class Period, Cognyte~~ reported that Cognyte~~it~~ had over 1,000 customers, only 400 of which were government entities,[13] ~~by the end of FY2022,~~ Cognyte's customers numbered only in the "hundreds" and were "primarily" in the government sector by the end of FY2023.[14]~~.~~~~15~~

21.    As detailed below, Cognyte's diminished revenues and customer base were a direct result of Meta's disclosure in its Threat Report that Cognyte was one of a handful of companies operating on its platforms that had provided intrusive software tools and surveillance services indiscriminately to customers "regardless of who they target or the human rights abuses they might enable."[16]   These and later disclosures detailed herein (*see* ¶¶83-96, 111-19, *infra*) contradicted Defendants' consistent portrayal of Cognyte's customer base~~services~~ as governments and corporate enterprise customers seeking defensive solutions~~in nature and designed~~ to cyber-attacks and intrusions by~~target~~ criminals and terrorists.

### ~~B.~~    Cognyte's Business Is Highly Regulated

22.    Because of the nature of Cognyte's business, the Company is required to abide by a host of laws, rules and regulations.    For example, since Cognyte uses social media platforms as a data source, Cognyte is required to abide by the terms of service of those social media platforms.

---

[12]    Cognyte Software Ltd., Annual Report Pursuant to Section 13 or 15(d) (Form 20-F) (Apr. 11, 2023) at 33, 47 (~~-~~for the fiscal year ended January 31, 2023) ("2023~~2~~ Form 20-F")~~.")~~ ~~at 33, 47.~~

[13]    Registration Statement at 1, 63~~64; 2021 Form 20-F at 28, 32~~.

[14]    2023 Form 20-F, *supra* note 12, at 29, 33.

[15]    ~~2022 Form 20-F at 29, 33.~~

[16]    Threat Report at 3.~~[https://about.fb.com/wp-content/uploads/2022/12/Threat-Report-on-the-Surveillance-for-Hire-Industry.pdf]~~

In addition, because Cognyte's products and services are considered defense-related or "dual-use," Cognyte is required to comply with the export control and other laws of Israel governing such products and services, as well as those of any jurisdiction to or from which it exported its products.

### ~~1.~~ **Cognyte Had to Comply with the Terms of Service of Social Media Platforms**

23.     Since Cognyte's software operates and collects information on social media platforms, such as Facebook, Instagram, Twitter, You~~T~~tube, and VKontakte,[17] Cognyte was required to abide by each platform's terms of service.   The terms of service for these platforms generally prohibit the use of bots or other automated means to collect information.

24.     For example, Facebook's terms of service provide:

> You may~~will~~ not access or collect data from our Products~~users' content or information, or otherwise access Facebook,~~ using automated means (~~such as harvesting bots, robots, spiders, or scrapers)~~ without our prior permission) or attempt to access data you do not have permission to access.[18]~~.~~

Instagram and VKontakte have similar prohibitions.[19]

25.     The terms of service of all of these social media platforms also clearly prohibited the use of fake accounts.  For example, VKontakte forbids users from "registering as the User on behalf of or instead of another person" or from "misleading other Users as to his/her identity[.]"[20] Likewise, Twitter (now X) forbids users from "pos[ing] as someone who doesn't exist to mislead

---

[17]     VKontate, known as VK, is a Russian online social media and social networking service based in Saint Petersburg.

[18]     Facebook Terms of Service §3(2)(3), https://www.facebook.com/terms.php?_rdr (last visited Oct. 21, 2024).

[19]     VK Terms of Service §6.3.9 (available at https://m.vk.com/terms?api_view=1&lang=en); Instagram Terms of Use (available at https://help.instagram.com/740480200552298/?helpref=uf_share) (last visited Oct. 21, 2024).

[20]     VK Terms of Service, supra note 19, §§6.3.1-6.3.2.

others" about who the user is or who the user represents.[21]  Facebook's community standards are even more detailed and specific.  Facebook expressly states that it "do[es] not allow people to misrepresent themselves on [Facebook],, [or] use fake accounts," and warns users not to use Facebook or Instagram to "mislead people or Facebook . . . about [i] the identity, purpose, or origin of the entity that they represent, . . . [ii] the purpose of an audience or community, . . . [or] [iii] the source or origin of content."[22] Facebook further prohibits users from engaging in the foregoing behaviors on behalf of a foreign or government actor.[23]

26.     Violations of the terms of service of any of these social media platforms risked removal of the responsible accounts, especially in cases of repeated or egregious violations, and significant reputational damage in the event the violations became known.

### 2. **Cognyte Had to Comply with Israel's Defense Export Control Laws**

27.     Cognyte and its subsidiaries[24] were required to abide by the export control regulations of any country from which they exported goods and services.   Depending on the circumstances, these controls could apply by virtue of the country in which the products were located or by virtue of the origin of the content contained in the products.

28.     Since Cognyte is headquartered in Israel, Israel's Defense Export Control Law regulatesdefense export policy regulated the sale of many of the systems and products the Company developed in Israel.   Under Israel's Defense Export Control Law, an Israeli citizen, resident or

---

[21]     *See* Misleading and deceptive identities policy, X (Apr. 2023), https://help.x.com/en/rules-and-policies/x-impersonation-and-deceptive-identities-policy (last visited Oct. 21, 2024).

[22]     *See* Inauthentic Behavoir, Meta, https://transparency.meta.com/policies/community-standards/inauthentic-behavior/ (last visited Oct. 21, 2024).

[23]     *Id*.

[24]     At the time of the spin-off, Cognyte had subsidiaries in Germany, India, Brazil, Canada, Mexico, the United Kingdom, Bulgaria, Taiwan, the Netherlands, Romania, Thailand, Cyprus and the United States.U.S.

corporation requireslaw, a defense marketing license to engage in defense marketing activity.[25] The Law defines "defense marketing activity" as "[a]n activity aimed at promoting a defense export transaction, including brokering activity towards a defense export transaction, whether in Israel or outside of Israel, in writing or orally or via any other means, directly or indirectly, in exchange for remuneration or not, whether transfer of defense know-how occurs or not, or the holding of negotiations towards such transaction."[26]  The Law further defines "brokering activity towards a defense export transaction" as any of the following activities:  "(1) Forging ties between parties to contract in a defense export transaction; (2) Participating in negotiations toward a contract between the parties involved in the defense export transaction; [or] (3) Representation of a party involved in a defense export transaction."[27]

29.    In addition, the Defense Export Control Law requires that a separate defensespecific export license is required to (1) exportfor defense equipment, (2) transfer "defense-related hardware, software, services, and know-how" through any means, including orally, exported from Israel to outside Israel, or in Israel to a person who is neither an Israeli citizen or an Israeli resident, or to a foreign corporation, or (3) provide a defense service.[28]  "Defense know-how" is broadly defined as "[i]nformation that is required for the development or production of defense equipmentunless a license exception or its use, including information referring to design, assembly, inspection, upgrade and modification, training, maintenance, operation and repair of defense equipment or its handling in any other way,"equivalent was obtained.  So-called "dual-use" items that are sold in the commercial market but are used in the defense market as well as

---

[25]    Defense Export Control Law, 5766-2007, Art. 14(a).

[26]    *Id*.

[27]    *Id*.

[28]    *Id*. at Art. 15(a).

certain "Controlled Dual-Use Equipment" including, but not limited to, "[d]ual-use equipment listed in the Wassenaar Arrangement Dual-Use Goods and Technologies list, as periodically updated, intended for a defense use."[29]are also regulated

30.    The Israeli Defense Export Control Agency (DECA) acts as the "authority for export control" on behalf of the Director General of the Ministry of Defense.[30]  Companies and their representatives wishing to obtain defense marketing and defense export licenses, must be registered with DECA.[31]  A corporate or company application for registration in the Defense Export Registry must be signed by an officer with authority within the meaning of Israel's Corporations Law, 5758-1999 (*i.e.*, a director, Chief Executive Officer, Chief Business Officer, Deputy Chief Executive Officer, Assistant Chief Executive Officer).[32]  A company applicant must designate as an Appointed Supervisor either the CEO or an employee of the entity who "reports directly to the CEO."[33]  Employees who will be engaged in defense marketing activities or the transfer of defense "know-how" on behalf of the company must be identified in the application.[34] All of the foregoing persons are required to undergo an extensive background check before being

---

[29]    The Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies is a multilateral export control regime established on July 12, 1996, to contribute to regional and international security and stability by promoting transparency and greater responsibility in transfers of conventional arms and dual-use goods and technologies.  To ensure that transfers of conventional arms and dual-use goods and technologies are carried out responsibly and in furtherance of international and regional peace and security, participating states voluntarily exchange information on transfers and denials of technologies identified on control lists agreed to by the participating states.  The control list of dual-use goods and technologies is composed of 10 categories including electronics, computers, telecommunications, information security, navigation and avionics. *See generally*  https://www.wassenaar.org/;  https://www.wassenaar.org/app/uploads/2023/12/List-of-Dual-Use-Goods-and-Technologies-Munitions-List-2023-1.pdf.

[30]    *See* Defense Exports Control Agency (DECA), Israel Ministry of Defense, https://english.mod.gov.il/Departments/Pages/DefenseExportsControlAgency.aspx (last visited Oct. 21, 2024).

[31]    Defense Export Control Law, Art. 3(a), 6(a), 8.

[32]    Explanatory Notes for Form 1.01:  Application for Registration/Renewal in the Defense Export Registry, at 5(F), (G).

[33]    *Id*. at 5(G)(2).

[34]    *Id*. at 5(D).

approved to engage in these activities.[35]  The names of those individuals who pass the background check and are approved to engage in controlled activities are included in the "Personal Annex" at the time of the company's registration in the registry.[36]  Additional individuals may be added to the Personal Annex only after completing the application and background check process.[37]  Upon information and belief, given these stringent requirements, relatively few officers and employees of company applicants apply to be registered and approved to engage in defense marketing and export activities.

28.31.  Israeli law albeit to a lesser extent.  Given that most of Cognyte's products were defense-related or dual-use, as the Company acknowledged in the Registration Statement,[38] both a defense marketing license and defense exporta license from Israeli authorities werewas generally required to initiate marketing activities for and export systems and products the Company sold.

32.    Any exporter requesting an export license from DECA is required to attach an "End Use/End User Certificate" (EUC) Form, which is an integral part of the initial application for an export license and a factor in considering whether the license request should be approved.[39]  The EUC must contain, among other information:  (1) the name of the Israeli supplier of the equipment for which the EUC is being provided; (2) the country where the ultimate end user is located; (3) the identity of the ultimate end user; (4) the details of the contract or purchase order signed between

---

[35]    *Id*. at 5(D), (G)(2).

[36]    *Id*. at 5(D).

[37]    *Id*. at 5(E).

[38]    Registration Statement at 67 ("We also must receive a specific export license for defense related hardware, software, services and know-how exported from Israel. Israeli law also regulates export of "dual use" items (items that are typically sold in the commercial market but that also may be used in the defense market), typically to a lesser extent than defense-related items.").

[39]    *See* Instruction for Form 8A: End Use/User Certificate, State of Israel – Ministry of Defense, Defense Export Control                                    Agency                                    (DECA), https://exportctrl.mod.gov.il/Documents/%D7%98%D7%A4%D7%A1%D7%99%D7%9D/Instruction%20for%20Form%208A%20End%20Use%20User%20Certificate.pdf.

the foreign customer and the Israeli supplier; and (5) declarations of the Israeli supplier and the end user regarding the intended use of the equipment for which the EUC is provided and, in the case of components, the systems in which those items are to be integrated must be specified.[40]

### Cognyte Was Required to Comply With Export Control Laws of Countries in Which Its Foreign Subsidiaries Operated

29.33. Countries in which Cognyte's foreign subsidiaries operated imposed similar controls on some of the Company's systems and products and, like Israel, required Cognyte to obtain specific permits and/or licenses in order to import or export defense-related and "dual-use" systems and products to or from these jurisdictions. For example, Cognyte subsidiary UTX Technologies Limited, is headquartered in Cyprus.[41] Underunder Cypriot law, the export of dual-use items is regulated by the Ministry of Energy, Commerce and Industry, which assesses all export license applications on a case-by-case basis, in compliance with the European Union Global Human Rights Sanctions Regime, as well as the European Union Dual-Use Regulation.[42]

30.34. Cognyte was also subject to U.S. export control laws administered by the U.S. Commerce Department's Bureau of Industry and Security and the U.S. State Department's Directorate of Defense Trade Controls. Prior to and during the Class Period, these agencies were particularly concerned with controlling the dissemination of cyber surveillance technologies to malicious actors. Indeed, in November 2021, the U.S. Department of Commerce added four surveillance development companies, including Israel's NSO Group and Candiru, to the Entity

---

[40] *Id*.; *see also* Defense Export Control Law, Art. 6(b).

[41] Cognyte Software Ltd., Annual Report Pursuant to Section 13 or 15(d) (Form 20-F) (Apr. 29, 2021) ("2021Form 20-F"), Ex. 8.1.

[42] Cyprus Response to PEGA Committee of Inquiry (Oct. 2022), https://www.statewatch.org/media/3650/ep-pega-committee-cyprus-response-to-questionnaire-10-22.pdf.

List[43] based on evidence that they developed and supplied spyware to foreign governments that used these tools to maliciously target government officials, journalists, businesspeople, activists, academics, and embassy workers.[44]   In announcing the Department's decision, the Secretary of Commerce, Gina Raimondo, released a statement stating that the U.S. was "committed to aggressively using export controls to hold companies accountable that develop, traffic, or use technologies to conduct malicious activities that threaten the cybersecurity of members of civil society, dissidents, government officials, and organizations here and abroad."[45]   Subsequently, in December 2021, the governments of the United States, Australia, Denmark, and Norway, among others, pledged to create guidelines to prevent the spread of technologies used to enable human rights abuses.[46]

31.35.  Cognyte was also subject to targeted restrictions applicable toimposed by jurisdictions in which it operates or conducts business on business and activities in certain countries and with certain persons imposed by jurisdictions in which it operates or conducts business, including the economic sanctions regulations administered by the U.S. Treasury Department's

---

[43]       The Entity List is made up of entities that the U.S. government has found there is reasonable cause to believe have been involved in, are involved in, or pose a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the U.S. government, and those acting on behalf of such entities.

[44]       *See* Press Release, U.S. Dept. of Commerce, Commerce Adds NSO Group and Other Foreign Companies to Entity List for Malicious Cyber Activities (Nov. 3, 2021), https://www.commerce.gov/news/press-releases/2021/11/commerce-adds-nso-group-and-other-foreign-companies-entity-list.  The Entity List is made up of entities that the U.S. government has found there is reasonable cause to believe have been involved in, are involved in, or pose a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the U.S. government, and those acting on behalf of such entities.

[45]       *Id*.

[46]       *See* Joint Statement on the Export Controls and Human Rights Initiative, White House Briefing Room (Dec. 10, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/10/joint-statement-on-the-export-controls-and-human-rights-initiative/.

Office of Foreign Assets Control.[47]  These restrictions included sanctions issued by the U.S. on February 11, 2021, in the wake of that country's military coup against numerous individuals and entities leading Myanmar's military and government and operating in its defense sector.[48]  At the beginning of 2018, following the military junta's brutal crackdown on the Rohingya minority in Myanmar, the Israeli Ministry of Defense and the Ministry of Foreign Affairs also prohibited Israeli military exports to Myanmar.[49]

32.36.  Finally, consistent with the foregoing and as explained below, Cognyte portrayed itself as committed to complying with its own  Code of Conduct, which explicitly represented that Cognyte "complies with the law in the jurisdictions in which we operate."[50]   Cognyte's Code of Conduct has been in force since Cognyte became a standalone public company in February 2021, and was referenced in the Registration Statement.[51]   Throughout the Class Period, the Code of Conduct was posted and available on Cognyte's website.

C.    Cognyte Was Materially Breaching the Terms of Service of Social Media Platforms and Violating Export Control Laws of Israel and Other Jurisdictions in Which It Operated**Relevant Law**

33.37.  Unbeknownst to investors, throughout the Class Period, Cognyte was materially breaching both the terms of service of the social media platforms which its products accessed and

---

[47]    *See* Basic Information on OFAC and Sanctions, Office of Foreign Assets Control https://ofac.treasury.gov/faqs/topic/1501 (No. 11. Who must comply with OFAC sanctions?) (last visited Oct. 21, 2024).

[48]    *See Blocking Property With Respect to the Situation in Burma*, U.S. Dep't of Treasury (2021), https://ofac.treasury.gov/media/54046/download?inline= (last visited Oct 21, 2024).

[49]    *See* O. Yaron, *Israeli Company Cognyte Sold Cyber-intel System to Myanmar Without License, State Attroney Says*, HAARETZ (Apr. 9, 2024); *see also* F. Potkin and P. McPherson, "Israel's Cognyte won tender to sell intercept spyware to Myanmar before coup," REUTERS (Jan. 15, 2023) ("Israel's government has publicly stated on numerous occasions that defense exports to Myanmar are banned.").

[50]    Cognyte Code of Conduct at 44.  https://www.cognyte.com/wp-content/uploads/2021/02/cognyte-code-of-conduct-final-2021-february-22.pdf

[51]    Cognyte Software Ltd. Registration Statement (Form 20-F) (January 31, 2021) at 112.

used, as well as the export control and other laws with which it was required to comply. In particular, as the Meta Threat Report and other media outlets revealed, the Company was indiscriminately selling intrusive software tools and surveillance services to customers who used them to target people across the internet, including journalists, politicians, and others, rather than hackers, criminals, and terrorists.

### 1. Cognyte Was Breaching Social Media Platforms' Terms of Service

34.38. As explained by Defendant Sharon during the Company's Q4 and FY 2021 earnings call, Cognyte's cyber intelligence solutions are "designed with several components at its core," including "data fusion technologies that aggregate and enrich structured data such as [ ] travel history, for example; and unstructured data such as images, video and social media, from different sources."[52]

35.39. With respect to social media, unbeknownst to investors, Cognyte, through the use of its Web Intelligence product, was breaching the terms of service of social media platforms in several ways.

36.40. First, Cognyte's software used prohibited automated means, including web crawlers or "bots,"" to "scrape" and collect data from social media platforms.[53]

37.41. Second, Meta's investigation revealed that Cognyte's Web Intelligence product collected information on targets using fake accounts that were used to search and view people's profiles, Facebook friends, and other publicly available information, to join groups and events on

---

[52] Cognyte Software Inc., Q4 and FY 2021 Earnings Call Transcript at 9, Refinitiv Streetevents Edited Transcript (Apr. 29, 2021) ("Q4 2021 Earnings Call Transcript").

[53] Threat Report See n.8, supra at 4.

Facebook, and to follow or "friend" targets.[54]   In addition, Cognyte's software utilized social engineering tactics such as phishing and fictitious personas to establish contact with targets or persons close to them via email, phone calls, text messages, or direct messaging apps on social media in an effort to build trust, solicit information, and trick victims into clicking on links or downloading files that would allow their devices to be hacked.[55]   As noted above *(see* ¶¶23-26, *supra*),~ these activities violated the terms of service of social media platforms that Cognyte's software solutions used and accessed, which prohibited the use of automated means such as bots to gather data and barred users from using fake accounts to hide their true identities and mislead other users.   Further, the targets of this activity identified by Meta – journalists and politicians around the world[56] – strongly suggested that at least some of Cognyte's customers were government entities, which constituted yet another violation of Meta's terms of service, which prohibit the use of fake accounts on behalf of foreign or government actors.[57]

38.42.  The fact that Cognyte's products and software were being sold and used for these types of cyber mercenary activities in violation of the terms of service of social media platforms remained undisclosed to investors until December 16, 2021, when Meta published the Threat Report detailing the findings of a months-long investigation it had conducted.   The Threat Report identified Cognyte as one of seven companies indiscriminately providing surveillance-for-hire services to target people across the internet, including journalists, dissidents, critics of authoritarian regimes, families of opposition members and human rights activists, to collect intelligence,

---

[54]      *Id.*

[55]      *Id.* at 5.

[56]      *Id.* at 8.

[57]      *See*      Facebook      Community      Standards,      Inauthentic      Behavior, https://transparency.meta.com/policies/community-standards/inauthentic-behavior/ (last visited Oct. 21, 2024).

21

manipulate them into revealing information, and compromise their devices and accounts across the internet.[58]

39.43.  As a result of its investigation, Meta identified and removed approximately 100 accounts on Facebook and Instagram, which were linked to Cognyte and customers of the Company in Israel, Serbia, Colombia, Kenya, Morocco, Mexico, Jordan, Thailand, and Indonesia, that had targeted journalists, politicians, and others.[59]    In addition, Meta banned Cognyte from using its platforms and issued Cease and Desist warnings to the Company.[60]

## 2.    Cognyte Was ViolatingBreaching Export Control Laws Of Israel and Other Jurisdictions

40.44.  Unbeknownst to investors, Cognyte was sellingalso providing its surveillance services and products to customers, including governments responsible for human rights abuses, in violation of export control and other laws the Company was bound to follow.

41.45.  One notable example of this behavior involved the apparent sale of intercept spyware to a Myanmar state-owned telecommunications company, Myanmar Posts and Telecommunications ("MPT") in violation of Israeli and other jurisdictions' export control laws, which banned sales of such technology to Myanmar's dictatorship.    On January 15, 2023, HAARETZHAARETZ and the NGO, Justice for Myanmar, disclosed that, one month before the military coup in Myanmar on February 1, 2021, Cognyte "won a tender to provide an advanced cyber-intelligence system to be installed at the heart of the country's telecommunication network

---

[58]    Threat ReportId. at 6.

[59]    Id. at 8.

[60]    Id. at 6.

– in order to monitor and eavesdrop on users."[61]  The purchase order for the intercept technology was issued to Cognyte "by December 30, 2020," with a scheduled target installation completion date of the end of May/early June 2021.  Intercept spyware "monitor[s] network activity, doing everything from locating mobile devices to eavesdropping on conversations, hacking into devices, and extracting text and encrypted messages."[62]  Indications that the installation occurred include (i) documentation obtained by Justice for Myanmar of an October 21, 2021 payment from Cognyte to Khine Thitsar Company, a Myanmar information technology business that is involved in surveillance and is a partner and vendor of Cognyte, evidencing that Cognyte was doing business in Myanmar after the February 2021 military coup;[63] (ii) a January 18, 2023 REUTERS report based on "[t]wo people with knowledge of Myanmar's intercept plans" that the Cognyte system was tested by MPT;[64] and (iii) a 2021 U.S. State Department country report on human rights in Myanmar, which found that Myanmar's "military employed invasive dual-use surveillance, hacking and forensic technologies to monitor and target critics and protesters" and that "[b]efore the coup, the military built an electronic warfare capability and bought surveillance technology, including cell phone-hacking tools to monitor pro-democracy activists."[65]  An April 9, 2024 article in HAARETZ reported that Cognyte sold the cyber-intelligence system to Myanmar without the

---

[61]    O. Oded Yaron, "Myanmar Acquired Spyware From Israeli Company Cyber-Intelligence Firm Cognyte Sold Cyber-intel System to Myanmar Without License, State Attorney Says, HAARETZ (Apr. 9, 2024)., New Docs Reveal," HAARETZ, Jan. 15, 2023.

[62]    *Id.*

[63]    *Israeli Surveillance Firm Cognyte's Business in Myanmar Exposed*, Justice For Myanmar (Jan. 15, 2023) (available at https://www.justiceformyanmar.org/stories/israeli-surveillance-firm-cognytes-business-in-myanmar-exposed).

[64]    Fanny Potkin and Poppy McPherson, Israel's Cognyte Won Tender to sell Intercept Spyware to Myanmar Before Coup, REUTERS (Jan. 18, 2023).

[65]    *Burma 2021 Human Rights Report*, United States Department of State, Bureau of Democracy, Human Rights and Labor (2021) at 14.

licenses required by Israeli law and in violation of a global arms embargo and Israel's declaration that it had stopped exporting weapons to the country.[66]  As noted herein (see ¶¶33-36, 105), however, Israel, the U.S., and the EU, jurisdictions whose export laws Cognyte was required to comply with, have banned sales of technologies of this nature to Myanmar due to its human rights violations.[67]

46.     Another example of Cognyte's violation of export control laws was the sale of a "Web Intelligence" system valued at $2 million and a cellular tracking system for military intelligence valued at $500,000 to Bangladesh's National Telecommunication Monitoring Center, an arm of the Bangladesh Interior Ministry responsible for tracking internet and social media use by Cognyte's subsidiary, UTX Technologies Limited, which is based in Cyprus.[68]  Israeli companies are formally banned from doing business with Bangladesh.[69]  Bangladesh does not recognize Israel and the two countries have no diplomatic relations.[70]

42.47.  In addition to violating the export laws of multiple jurisdictions in which it operated and did business, the foregoing conduct also violated Cognyte's own Code of Conduct which, as detailed below, required Cognyte's employees, including directors and officers, to be aware of, and compliant with, applicable laws in the jurisdictions in which it operated.

---

[66]     O. Yaron, Israeli Company Cognyte Sold Cyber-intel System to Myanmar Without License, State Attorney Says, HAARETZ (Apr. 9, 2024).

[67]     Id.

[68]     O. Yaron and Z. Saer Kahn, Israeli Spy Tech Sold to Bangladesh, Despite Dismal Human Rights Record, HAARETZ (Jan. 10, 2023).

[69]     Id.

[70]     Id.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[71]

### A.i.   Defendants' Materially False and Misleading Statements in Cognyte's Code of Conduct

43.48.   Defendants issued a Code of Conduct in February 2021 which was applicable to all Cognyte board members and employees, including employees of any subsidiary of Cognyte "no matter where in the world they [were] located."[72]   Each year, Cognyte's employees were required to "certify . . . that they ha[d] complied with the Code and that they were not aware of Code violations by others."[73]   In a letter to employees included in the Code of Conduct, Defendant Sharon stated that it was the responsibility "of each of us to understand and be familiar with the Cognyte Code of Conduct."[74]   The Code of Conduct was available on Cognyte's website throughout the Class Period.

44.49.   Among other things, the Code stated that:

- *Cognyte "expect[ed] all of [its] employees and board directors to act ethically and honestly in good faith and to comply with the law . . .;";[75]*
- 

- *"As a global company and good corporate citizen, Cognyte complies with the law in jurisdictions in which [it] operates;"[76]*

- *"It [was Cognyte's] policy that directors, officers, employees, and others acting on behalf of Cognyte comply with all applicable governmental laws,*

---

[71]    For the avoidance of doubt, the alleged false and misleading statements identified in this section are presented in bold and italics.  Additional text accompanying these statements are presented to place the statements in context.

[72]    Code of Conduct *See* n.11, *supra* at 5.

[73]    *Id.*

[74]    *Id.* at 1.

[75]    *Id.* at 3.

[76]    *Id*. at 4544.

*rules, and regulations that affect [its] business and the performance of their jobs;"*[77]

- *Cognyte "[understood] that economic sanctions and embargoes [might] restrict [it] from doing business with certain countries and groups throughout the world;"*[78]

- *Cognyte "[understood] that [its] products [were] subject to certain U.S. and non-U.S. export laws and regulations."*[79]

~~45.~~50. The foregoing statements were materially false and misleading because Cognyte was not conducting its business in an ethical manner and was not complying with applicable law. Rather, as revealed in Meta's Threat Report and articles in ~~other~~ media outlets, Cognyte and its customers were violating the terms of service of Facebook, Instagram, Twitter and other social media platforms that the Company's software accessed and operated on as described in ¶¶38-43~~23-26, 34-40~~ above, including by using fake accounts to mislead other users as to its or its customers' identities in order to obtain sensitive information from the users and/or target these individuals with malware to enable full-device digital surveillance. In addition, Cognyte was not operating in compliance with the export control and other laws of Israel or multiple other jurisdictions in which it did business, which prohibited sales of defense-related and dual-use cyber surveillance technologies to nations and actors that used them to violate individual and human rights as described in ¶¶27-36, 44-47, and 105 herein.~~32, 40-42 above.~~ Defendants' failure to disclose Cognyte's unethical and unlawful behavior concealed at least two risks that later materialized – first, that as a result of the Company's flouting of their terms of service, Cognyte risked being

---

[77]     *Id.*

[78]     *Id.* ~~at 45.~~

[79]     *Id.*

banned from the social media platforms that were central to its data gathering activities, thereby jeopardizing the quality and usefulness of its products and services and its ability to maintain and grow its customer base and revenues; and second, that its reputation would be severely harmed by the disclosure that it was conducting its business in an unethical and illegal manner, leading investors to abandon the Company and to a loss of customers and declining revenue.

46.51. The alleged misstatements in Cognyte's Code of Conduct were not purely aspirational statements of legal compliance that can be characterized as puffery.; Tthey were material statements of *present fact* concerning Cognyte's compliance with the law – *e.g.*, "[a]s a global company and good corporate citizen, Cognyte complies with the law in jurisdictions in which [it] operates" – something that analysts noted, something that was fundamental to the success of Cognyte's business, especially given its status as a public company in a heavily regulated industry involving dangerous technology that could enable human rights abuses if it fell into the wrong hands. Evidencing its importance to investors, the Code of Conduct was available on Cognyte's website and cited in its Annual Reports on Form 20-F filed with the SEC throughout the Class Period.[80]  In addition, its proscriptions were specifically cited by Cognyte in the Company's response dated August 24, 2021,[81] to a request for information from one of its largest investors, the Norwegian Government Pension Fund Global, a sovereign wealth fund that owned 1.3% of Cognyte's outstanding shares as of February 2, 2021, which was looking into the potential involvement of Cognyte and its predecessor in interest, Verint, in sales of surveillance products to repressive regimes who then weaponized them against minorities,

---

[80]    *See* 2021 Form 20-F at 67; 2022 Form 20-F at 69.

[81]    Letter dated August 24, 2021 from Ariel Sagee, VP Risk Compliance, Cognyte Software Ltd. To Ingrid Thornes, Senior Advisor, Council on Ethics, The Norwegian Pension Fund Global.

dissidents, political activists and journalists.[82]  Cognyte's August 24, 2021 response stated that the Company was "committed to complying with all applicable laws, rules, and regulations, and conducting [itself] in accordance with high ethical standards, *consistent with the Company's Code of Conduct*."[83]

### B.ii.   Defendants' Materially False and Misleading Amended Registration Statement

47.52.  On January 13, 2021, Cognyte filed the Registration Statement with the SEC, and it was declared effective on January 15, 2021.   The Registration Statement contained several materially false and misleading representations about the Company's customer base and solutions.

48.53.  For example, in a letter to Cognyte shareholders included in the Registration Statement, Defendant Sharon characterized Cognyte as "a global leader in security analytics software that *empowers governments and enterprises with Actionable Intelligence for a safer world*."  –[Emphasis added.] He further stated that Cognyte "provide[s] [its] customers with a powerful analytics platform with a rich set of analytics engines, artificial intelligence and machine learning models, workflows, data governance, and visualization tools, to accelerate the investigative process and *to identify, neutralize, and prevent terror, crime, and cyber threats*." [Emphasis added.]

49.54.  In addition, the Registration Statement stated that the security organizations of Cognyte's government and enterprise customers relied on the Company's solutions to "fuse[], analyze[] and visualize[] disparate data sets at scale *to . . . find needles in the haystack[,] . . .*

---

[82]      Letter dated July 1, 2021 from Ingrid Thornes, Senior Advisor, Council on Ethics, The Norwegian Pension Fund Global to Elad Sharon, CEO Cognyte Software Ltd.

[83]      Letter dated August 24, 2021 from Ariel Sagee, VP Risk Compliance, Cognyte Software Ltd. To Ingrid Thornes, Senior Advisor, Council on Ethics, The Norwegian Pension Fund Global.

*accelerate security investigations and connect the dots to successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats*."[84]  –[Emphasis added.]

50.55.  Further emphasizing the defensive nature of Cognyte's products and services, the Registration Statement contained the following descriptions of the "market trends . . . driving demand for [the Company's] security analytics software" and the solutions offered by Cognyte:

> *Security Threats are Becoming More Difficult to Detect and Mitigate. Governments and enterprise security organizations face a variety of security challenges, including threats from well-organized and well-funded entities. These threats are becoming increasingly more difficult to detect as bad actors take advantage of the latest technologies to avoid detection and mitigation.* Rapid threat detection and quick mitigation are critical to security organizations. Advanced security analytics software can help security organizations find the needles in the haystacks to quickly and effectively address highly sophisticated security attacks.*  As a result, market demand for such advanced software is on the rise.

> \* \* \*

> \* \* \*

> Our Solutions

> *Government enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and other threats.*  They seek analytics software to transform their security operations and drive more strategic outcomes.

> *Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.*

> \* \* \*

> \* \* \*

---

[84]    Registration Statement at 1, 60.

> ***The stakes are high.**– **An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public.** –*Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes.[85] [Emphasis added.]

51.56.  The foregoing statements in ¶¶53-5547 50 were materially false and misleading because they portrayed Cognyte's customer base as consisting of governments and corporate enterprise customers seeking defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals when, in fact, Cognyte indiscriminately sold its products and software in violation of export control and other laws of Israel and other applicable jurisdictions to customers who used them, including in ways that violated the terms of service of social media platforms, to target politicians, journalists and other individuals.  Thus, this is not a case in which bad actors were in the eye of the beholder or Cognyte's surveillance technology inadvertently found its way into the possession of repressive regimes.  Here, the bad actors were known because they had been identified by the relevant authorities in the jurisdictions in which Cognyte operated, and these jurisdictions had enacted export control laws prohibiting the sale of surveillance technologies such as Cognyte's solutions to them.  Cognytes sales in violation of these laws were purposeful.

57.    Importantly, nothing in the Registration Statement suggested, let alone disclosed, that part of Cognyte's business case was the marketing and sale of solutions to states with abysmal human rights records such as Bangladesh and the brutal military junta in Myanmar in violation of the export control laws of Israel and other jurisdictions in which it operated.  To the contrary, in the Registration Statement, Defendants falsely represented that Cognyte "endeavor[ed] to

---

[85]    Registration Statement at 60-61.

implement policies, procedures, and systems designed to achieve compliance" with the regulatory requirements of the jurisdictions in which it operated.

52.58. The Registration Statement also purported to warn about risks related to "reputational and political factors related to [Cognyte's] business or operations," stating in relevant part:

> *We may experience negative publicity, reputational harm, or other adverse impacts on our business as a result of offering certain types of solutions or if we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws.* The risk of these adverse impacts *may* also result in lost business opportunities that impact our results of operations. These risks *may* grow as we grow our business and our brand following the spin-off.[86]
>
> [Emphasis added.]
> *We may experience negative publicity, reputational harm, or other adverse impacts on our business as a result of offering certain types of solutions or if we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws.* The risk of these adverse impacts *may* also result in lost business opportunities that impact our results of operations. These risks *may* grow as we grow our business and our brand following the spin-off.[87]   [Emphasis added.]

59.     The foregoing risk warning was materially false and misleading because sales by Cognyte to "unpopular" or "disfavored" customers was not a mere possibility as the risk warning stated – "*if* we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations" [emphasis added] – but rather were ongoing and a fundamental part of Cognyte's business.  Irrespective of whether sales of Cognyte's systems to them violated export control laws, countries like Bangladesh and Myanmar had dismal human rights records and, therefore, news that Cognyte was selling its surveillance software to these

---

[86]     2021 Form 20-FRegistration Statement at 731.

[87]     Registration Statement*See* n.1, *supra* at 317.

regimes and others like them would have been deeply harmful to the Company's reputation, business and stock price.  Cognyte's spin-off from Verint coincided with a period of heightened scrutiny of the cyber intelligence industry and the potential abuse of such solutions, which led to the eventual blacklisting of the Israeli companies NSO and Candiru by the U.S. Department of Commerce (*see* ¶34, *supra*).  Thus, Defendants were motivated to and did omit this aspect of Cognyte's business from the Registration Statement and instead portrayed the Company as providing governments and corporate enterprise customers with defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals, and as "endeavor[ing] to implement policies, procedures, and systems designed to achieve compliance" with the regulatory requirements of the jurisdictions in which it operated.

53.60.  The Registration Statement also purported to warn about risks related to compliance with regulatory requirements stating in relevant part:

> Our business and operations are subject to a variety of regulatory requirements in the countries in which we operate or offer our solutions, including among other things, with respect to trade compliance, anti-corruption, information security, data privacy and protection, tax, labor and government contracts ….. . . . Regulatory requirements in one jurisdiction may make it difficult or impossible to do business in another jurisdiction.  We may also be unsuccessful in obtaining permits, licenses or other authorizations required to operate our business, such as for the marketing or sale or import or export of our products and services.
>
> *While we endeavor to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, we cannot assure you that these policies, procedures, or systems will be adequate or that we or our personnel will not violate these policies and procedures or applicable laws and regulations.*  *While we endeavor to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, we cannot assure you that these policies, procedures, or systems will be adequate or that we or our personnel will not violate these policies and procedures or applicable laws and regulations. Violations of these laws or regulations* __*may*__ *harm our reputation and deter government agencies and other existing or potential customers or partners from purchasing our solutions.  Furthermore, non-compliance with applicable laws or regulations* __*could*__ *result in* fines, damages, criminal sanctions

against us, our officers, or our employees, ***restrictions on the conduct of our business, and damage to our reputation***.[88]  [Emphasis added.]

The foregoing risk warning was materially false and misleading because it characterized violations of applicable laws and regulations as only possible when, in fact, they were then occurring.  Although the risk warning did not expressly state that Cognyte was in compliance with all applicable laws, it was materially false and misleading to assure investors that Cognyte "endeavor[ed] to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements" when it was then engaged in ongoing violations of applicable export control laws.
~~[Emphasis added.]~~
61.

~~54.~~62.  Finally, the Registration Statement also purported to warn about the risks of failing to obtain necessary export and license approvals from Israel and other countries stating in relevant part:

Some of the technologies that we develop, and that we rely upon in our products, are regulated. . . .  [D]ue to the regulations to which we are subject, our international sales . . . depend largely on export and marketing license approvals from the governments of Israel and other countries. ***If we fail to obtain material approvals in the future, or if material approvals previously obtained are revoked or expire and are not renewed due to factors such as changes in political, government policies or imposition of sanctions, or if existing or future approvals are conditioned on requirements or conditions that we are unable to meet or fulfill, then our ability to sell our products and services to customers outside the country in which they are developed and our ability to obtain goods and services essential to our business could be interrupted, resulting in a material adverse effect on our business, revenues, assets, liabilities and results of operations.***[89]  [Emphasis added.]

63.     The foregoing risk warning was materially false and misleading because it omitted to disclose that Cognyte ***was not then in compliance*** with export control laws of Israel and other jurisdictions in which the Company operated as detailed above (¶¶23-36, 44-47, 105) while warning of the risks to Cognyte's reputation and consequences for its businesses from ***potential future failures to comply with legal and regulatory requirements***.

---

[88]     Registration Statement at 34.

[89]     Registration Statement at 34.

**Defendants' False and Misleading Q4 and FY 2021 Press Release, Annual Report and Earnings Call**

64.    On April 29, 2021, Cognyte issued a press release announcing its financial results for Q4 and Fiscal Year ended January 31, 2021.  The press release touted "momentum from [Cognyte's] Security Analytics Platform," "significant gross margin expansion," and "multiple seven and eight figure orders," and reiterated that *"over 1,000 government and enterprise customers in more than 100 countries rely on [Cognyte's] solutions to accelerate security investigations and connect the dots to successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats*." [Emphasis added.]

65.    That same day, the Company held an earnings call with analysts.  During the call, Defendant Sharon touted Cognyte's "*brand reputation*" and stated that Cognyte was "well positioned to continue to win large deals from existing and new customers *based on [the] strength of our platform and our reputation for delivering value*."[90]  [Emphasis added.]  In addition, Defendant Sharon continued to characterize Cognyte's products and software as defensive in nature stating:

> *In recent years, security challenges become [sic] internally complex.  We all read in the newspapers that well-organized and well-funded illegal entities are becoming harder to detect as they take advantage of the latest technologies to hide in the shadows.*[91]  [Emphasis added.]

66.    During the call, Defendant Sharon highlighted a $10 million Q4 2021 order from *"[a] national security agency that was looking to shorten the time of security investigations*,"

---

[90]    Q4 2021 Earnings Call Transcript at 3

[91]    *Id*. at 9.

and stated that Cognyte had been selected by this customer due to the ability of its open analytics platform "*to keep pace with emerging threats*."[92] [Emphasis added.]

67.     Also on April 29, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the fiscal year ended January 31, 2021 (the "2021 Form 20-F"), which was signed by Defendant Sharon.  In the 2021 Form 20-F, Defendants again emphasized the defensive nature of its software repeating that the Company's solutions "fuse[d], analyze[d] and visualize[d] disparate data sets at scale *to help security organizations find needles in the haystacks*[,] . . . *accelerate security investigations and connect the dots to successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats.*"[93] [Emphasis added]

68.     In addition, the 2021 Form 20-F repeated many of the same materially false and misleading statements that had appeared in the Registration Statement about the Company's software solutions and the nature of the threats that they were designed to combat.  For example, the 2021 Form 20-F stated:

> *Security Threats are Becoming More Difficult to Detect and Mitigate. Governments and enterprise security organizations face a variety of security challenges, including threats from well-organized and well-funded entities.*
>
> *These threats are becoming increasingly more difficult to detect as bad actors take advantage of the latest technologies to avoid detection and mitigation. Rapid threat detection and quick mitigation are critical to security organizations. Advanced security analytics software can help security organizations find the needles in the haystacks to quickly and effectively address highly sophisticated security attacks.  As a result, market demand for such advanced software is on the rise.*
>
> \* \* \*
>
> *Our Solutions*
>
> *Government enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and*

---

[92]     *Id*. at 3.

[93]     *See* 2021 Form 20-Fn.1, *supra* at 26.

*other threats.  They seek analytics software to transform their security operations and drive more strategic outcomes.*

*Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.*

*** *

*The stakes are high.  An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public.  Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes*[94]
[Emphasis added.]

69.    The foregoing statements in ¶¶64-68 above were materially false and misleading because they portrayed Cognyte's customer base as consisting of governments and corporate enterprise customers seeking defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals when, in fact, Cognyte indiscriminately sold its products and software in violation of export control and other laws of Israel and other applicable jurisdictions to customers who used them, including in ways that violated the terms of service of social media platforms, to target politicians, journalists and other individuals.  As was the case with respect to the Registration Statement, nothing in the press release, earnings call and 2021 Form 20-F discussing Cognyte's Q4 and FY 2021 financial results suggested, let alone disclosed, that (i) part of Cognyte's business case was the marketing and sale of solutions to states with poor human rights records such as Bangladesh or known outlaw regimes such as the brutal military junta in Myanmar in violation of the export control laws of Israel and other jurisdictions in which it operated, or (ii) that such sales were ongoing at the time and had contributed to the Q4 and FY 2021 results reported by Cognyte. Given the admitted risks they posed to Cognyte's reputation and future financial prospects, if

---

[94]    2021 Form 20-F at 26-28.

known, these facts would have altered the total mix of information available to investors with respect to the risks of an investment in Cognyte.

70.     Like the Registration Statement, the 2021 Form 20-F also purported to warn about risks related to "reputational and political factors related to [Cognyte's] business or operations," stating in relevant part:

> *We may experience negative publicity, reputational harm, or other adverse impacts on our business as a result of offering certain types of solutions or if we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws*. The risk of these adverse impacts *ma*y also result in lost business opportunities that impact our results of operations. These risks *may* grow as we grow our business and our brand following the spin-off.[95] [Emphasis added.]

71.     The foregoing risk warning was materially false and misleading because sales by Cognyte to "unpopular" or "disfavored" customers was not a mere possibility as the risk warning stated – "*if* we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations" [emphasis added] – but rather were ongoing and a fundamental part of Cognyte's business.  Irrespective of whether sales of Cognyte's systems to them violated export control laws, countries like Bangladesh and Myanmar had dismal human rights records and, therefore, news that Cognyte was selling its surveillance software to these regimes and others like them would have been deeply harmful to the Company's reputation, business and stock price.  Cognyte's spin-off from Verint coincided with a period of heightened scrutiny of the cyber intelligence industry and the potential abuse of such solutions, which led to the eventual blacklisting of the Israeli companies NSO and Candiru by the U.S. Department of Commerce (*see* ¶34, *supra*).  Thus, Defendants were motivated to and did omit this aspect of

---

[95]     2021 Form 20-FRegistration Statement at 731.

Cognyte's business from the 2021 Form 20-F and instead portrayed the Company as providing governments and corporate enterprise customers with defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals. Further, this risk warning was all the more misleading given the context in which it was made. As noted above (*see* ¶51, *supra*), the Form 20-F cited to Cognyte's Code of Conduct, which falsely represented that "[a]s a global company and good corporate citizen, Cognyte complies with the law in jurisdictions in which [it] operates."

72. The 2021 Form 20-F also purported to warn about risks related to compliance with regulatory requirements stating in relevant part:

> Our business and operations are subject to a variety of regulatory requirements in the countries in which we operate or offer our solutions, including among other things, with respect to trade compliance, anti-corruption, information security, data privacy and protection, tax labor and government contracts …. Regulatory requirements in one jurisdiction may make it difficult or impossible to do business in another jurisdiction. We may also be unsuccessful in obtaining permits, licenses or other authorizations required to operate our business, such as for the marketing or sale or import or export of our products and services.
>
> *While we endeavor to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, we cannot assure you that these policies, procedures, or systems will be adequate or that we or our personnel will not violate these policies and procedures or applicable laws and regulations. Violations of these laws or regulations may harm our reputation and deter government agencies and other existing or potential customers or partners from purchasing our solutions. Furthermore, non-compliance with applicable laws or regulations could result in* fines, damages, criminal sanctions against us, our officers, or our employees, *restrictions on the conduct of our business, and damage to our reputation.*[96] [Emphasis added.]

73. The foregoing risk warning was materially false and misleading because it characterized violations of applicable laws and regulations as only possible when, in fact, they were then occurring. Although the risk warning did not expressly state that Cognyte was in

---

[96]   2021 Form 20-F *See* n.1, *supra* at 11.

compliance with all applicable laws, it falsely assured investors that Cognyte "endeavor[ed] to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements" when, in fact, the Company was engaged in ongoing violations of applicable export control laws.  This was especially true given that the 2021 Form 20-F cited to Cognyte's Code of Conduct which did expressly represent that the Company "complies with the law in jurisdictions in which [it] operates."

74.    Finally, the 2021 Form 20-F also purported to warn about the risks of failing to obtain necessary export and license approvals from Israel and other countries stating in relevant part:

> Some of the technologies that we develop, and that we rely upon in our products, are subject to regulation       Due to such regulation, our international sales and marketing . . . depend largely on export and marketing license approvals from governmental agencies in Israel and in other countries. ***If we fail to obtain material approvals in the future, or if material approvals previously obtained are revoked or expire and are not renewed due to factors such as changes in political, government policies or imposition of sanctions, or if existing or future approvals are conditioned on requirements or conditions that we are unable to meet or fulfill, then our ability to sell out products and services to customers outside the country in which they are developed and our ability to obtain goods and services essential to our business <u>could</u> be interrupted, resulting in a material adverse effect on our business, revenues, assets, liabilities and results of operations.***[97] [Emphasis added.]

~~[Emphasis added.]~~
~~1.~~

55.    ~~The  statements  in  ¶¶52-54,  above,  warning  of~~ ***potential*** ~~risks  to  Cognyte's reputation, consequences from the Company's failure to comply with legal and regulatory requirements, and the adverse consequences of failing to obtain required approvals to export its technologies  were  materially  false  and  misleading  because  they  portrayed  these  risks  as~~

---

[97]    2021 Form 20-F~~Registration Statement~~ at 3~~4~~.

hypothetical when, in fact, Cognyte's violation of social media platforms' terms of service and export control and other laws in jurisdictions in which Cognyte did business were ongoing and posed a clear risk of major damage to Cognyte's reputation and business. These statements were particularly misleading when read in the context of Cognyte's other misstatements, including its representations in the Code of Conduct concerning the Company's compliance with the law and its representations in the Registration Statement concerning the nature of the Company's customers. Taken together, Defendants portrayed Cognyte as a Company that was actively seeking to comply with the law and that was selling its service to governments and corporate leaders to address legitimate security risks. As described herein, these representations were materially false and misleading.

**C. Defendants' False and Misleading Q4 and FY 2020 Press Release, Annual Report and Earnings Call**

56. On April 29, 2021, Cognyte issued a press release announcing its financial results for Q4 and Fiscal Year ended January 31, 2021. The press release touted "momentum from [Cognyte's] Security Analytics Platform," "significant gross margin expansion," and "multiple seven and eight figure orders," and reiterated that "*over 1,000 government and enterprise customers in more than 100 countries rely on [Cognyte's] solutions to accelerate security investigations and connect the dots to successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats*." [Emphasis added.]

57.1. That same day, the Company held its Q42020 earnings call with analysts. During the call, Defendant Sharon touted Cognyte's "brand reputation" and stated that Cognyte was "well positioned to continue to win large deals from existing and new customers *based on the strength of our platform and our reputation for delivering value*." [Emphasis added.] In addition, Defendant Sharon continued to characterize Cognyte's products and software as defensive in nature stating:

*In recent years, security challenges become [sic] internally complex. We all read in the newspapers that well-organized and well-funded illegal entities are becoming harder to detect*

*as they take advantage of the latest technologies to hide in the shadows.*

[Emphasis added.]

58.    During the call, Defendant Sharon highlighted a $10 million Q42020 order from *"[a] national security agency that was looking to shorten the time of security investigations*," and stated that Cognyte had been selected by this customer due to the ability of its open analytics platform "*to keep pace with emerging threats*." [Emphasis added.]

59.    Also on April 29, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the fiscal year ended January 31, 2021 (the "2020 Form 20-F"), which was signed by Defendant Sharon. In the 2020 20-F, Defendants again emphasized the defensive nature of its software repeating that the Company's solutions "fuse[d], analyze[d] and visualize[d] disparate data sets at scale *to help security organizations find needles in the haystacks*[,] . . . *accelerate security investigations and connect the dots to successfully identify, neutralize, and prevent national security, personal safety, business continuity and cyber threats.*"[98] [Emphasis added]

60.    In addition, the 2020 Form 20-F repeated many of the same materially false and misleading statements that had appeared in the Registration Statement about the Company's software solutions and the nature of the threats that they were designed to combat. For example, the 2020 Form 20-F stated:

> *Security Threats are Becoming More Difficult to Detect and Mitigate. Governments and enterprise security organizations face a variety of security challenges, including threats from well-organized and well-funded entities. These threats are becoming increasingly more difficult to detect as bad actors take advantage of the latest technologies to avoid detection and mitigation. Rapid threat detection and quick mitigation are critical to security organizations. Advanced security analytics software can help security organizations find the needles in the haystacks to quickly and effectively address highly sophisticated security attacks. As a result, market demand for such advanced software is on the rise.*

---

[98]    *See* 2021 Form 20 Fn.1, *supra* at 26.

41

*  *  *

*Our Solutions*

*Government enterprise customers are responsible for addressing a broad range of security challenges such as crime, terror, cyber-attacks, financial crime and other threats. They seek analytics software to transform their security operations and drive more strategic outcomes.*

*Our broad security analytics software portfolio is designed to help customers find the needles in the haystacks, accelerate the investigative process, and successfully identify, neutralize, and prevent terror, crime and cyber threats.*

*  *  *

*The stakes are high.  An inability to conduct effective and timely security investigations can result in attacks that cost lives and cause significant damage and disruption to the public.  Therefore, case officers, security analysts and investigative teams are constantly looking for solutions that help them shorten the investigative cycle and drive a higher percentage of conclusive outcomes.*[99]

[Emphasis added.]

61.    The foregoing risk warning was statements in ¶¶56-60 were materially false and misleading because it omitted to disclose that Cognyte ***was not then in compliance*** with they portrayed Cognyte's customer base as consisting of governments and corporate enterprise customers seeking defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals when, in fact, Cognyte indiscriminately sold its products and software in violation of export control and other laws of Israel and other applicable jurisdictions in which the Company operated as detailed above (*see* ¶¶23-36, 44-47, 105, *supra*) while warning of the to customers who used them, including in ways that violated the terms of service of social media platforms, to target politicians, journalists and other individuals.

62.    Like the Registration Statement, the 2020 Form 20-F also purported to warn about

---

[99]    *See* n.1, *supra* at 27-28.

risks related to "reputational and political factors related to [Cognyte's] business or operations," stating in relevant part:

> We may experience negative publicity, reputational harm, or other adverse impacts on our business as a result of offering certain types of solutions or if we sell our solutions to countries or customers that are considered disfavored by the media or by certain political or privacy organizations, even where such activities or transactions are permissible under applicable laws. The risk of these adverse impacts may also result in lost business opportunities that impact our results of operations. These risks may grow as we grow our business and our brand following the spin-off.[100] [Emphasis added]

63. The Registration Statement also purported to warn about risks related to compliance with regulatory requirements stating in relevant part:

> Our business and operations are subject to a variety of regulatory requirements in the countries in which we operate or offer our solutions, including among other things, with respect to trade compliance, anti-corruption, information security, data privacy and protection, tax labor and government contracts. . . . Regulatory requirements in one jurisdiction may make it difficult or impossible to do business in another jurisdiction.  We may also be unsuccessful in obtaining permits, licenses or other authorizations required to operate our business, such as for the marketing or sale or import or export of our products and services.
>
> While we endeavor to implement policies, procedures, and systems designed to achieve compliance with these regulatory requirements, we cannot assure you that these policies, procedures, or systems will be adequate or that we or our personnel will not violate these policies and procedures or applicable laws and regulations.  Violations of these laws or regulations may harm our reputation and consequences for its businesses from deter government agencies and other existing or potential customers or partners from purchasing our solutions.  Furthermore, non-compliance with applicable laws or regulations could result in fines, damages, criminal sanctions against us, our officers, or our employees, restrictions on the conduct of our business, and damage to our reputation.[101]

1.

64. Finally, the Registration Statement also purported to warn about the risks of failing to obtain necessary export and license approvals from Israel and other countries stating in relevant part:

> Some of the technologies that we develop, and that we rely upon in our products,

[100] Registration Statement See n.1, supra at 317.

[101] 2021 Form 20-F See n.1, supra at 11.

are subject to regulation. . . .  Due to such regulation, our international sales and marketing, as well as our international procurement of skilled human resources, technology and components, depend largely on export and marketing license approvals from governmental agencies in Israel and in other countries. *If we fail to obtain material approvals in the* future*, or if material approvals previously obtained are revoked or expire and are not renewed due to factors such as changes in political, government policies or imposition of sanctions, or if existing or future approvals are conditioned on requirements or conditions that we are unable to meet or fulfill, then our ability to sell out products and services to customers outside the country n which they are developed and our ability to obtain goods and services essential to our business* could *be interrupted, resulting in a material adverse effect on our business, revenues, assets, liabilities and results of operations.*[102]

65.75.  The *failures* statements in ¶¶62-64, above, warning of potential risks to Cognyte's reputation, consequences from the Company's failure *to comply with legal and regulatory requirements.*, and the adverse consequences of failing to obtain required approvals to export its technologies were materially false and misleading because they portrayed these risks as hypothetical when, in fact, Cognyte's violation of social media platforms' terms of service and export control and other laws in jurisdictions in which Cognyte did business were ongoing and posed a clear risk of major damage to Cognyte's reputation and business.  These statements were particularly misleading when read in the context of Cognyte's other misstatements, including its representations in the Code of Conduct concerning the Company's compliance with the law and its representations in the Registration Statement concerning the nature of the Company's customers.  Taken together, Defendants portrayed Cognyte as a Company that was actively seeking to comply with the law and that was only selling its service to governments and corporate leaders to address legitimate security risks.  As described herein, these representations were materially false and misleading.

---

[102]    *See* n.1, *supra* at 3.

**D.     Defendants' Materially False and Misleading Q1 2022 Press Release2021 Financial Results and Earnings Call**

66.76.  On June 22, 2021, Cognyte issued a press release announcing its Q1 20221 financial results, reporting a "strong" first quarter as "a pure play security analytics public company."  In commenting on the quarter, the release quoted Defendant Sharon as touting Cognyte's success at securing "multiple seven-digit and eight-digit orders" and represented that Defendants "continue[d] to see strong market demand for security analytics," which he stated left Cognyte "well positioned for a strong quarter and full year."  During the Company's Q1 20221 earnings call with analysts held the same day, Defendant Sharon continued to emphasize that Cognyte's software solutions were designed to assist its customers in addressing "security challenges," stating:

> *Well-organized, well-funded entities are becoming harder to detect as they take advantage of the [latest] technologies to hide in the shadows.  At the same time, there is a growing volume and diversity of structured and unstructured data, and data is fragmented and spread across organization silos, making investigations more difficult.  Many customers* recognize that home-grown solutions cannot keep pace with these evolving security challenges and *have increasing[ly] sought . . . [s]olutions that [fuse] data [at] scale from different sources [and] generate high-quality insights faster to mitigate the [wide] range of security threats before they unfold*.[103]  [Emphasis added.]

[Emphasis added.]

77.     During the call, Defendant Sharon highlighted as an example of the successful execution of the Company's strategy a $40 million Q1 2022Q12021 order "*from a national law enforcement organization*" *that had initially deployed Cognyte's platform "in retail analytics for fighting drug trafficking" and was "now expanding [Cognyte's platform] to add [an] additional*

---

[103]     Q1 2022 Earnings Call Transcript at 4-5.

67. *use case for antiterrorism*."[104] In addition, Defendant Sharon touted a recent innovation the Company had developed for "*addressing cryptocurrency investigations*," stating:

> *Cryptocurrencies are being increasingly used for illegal activities, such as money laundering, extortion, drug transactions, terror funding and cyber-crime. Cryptocurrencies can be anonymous and borderless, and it's a challenge to find who is behind those illicit transactions.* Investigations with existing technologies [often] reach a dead-end when trying to determine who is responsible.
>
> *We are about to launch a new solution to help security organizations conduct investigations involving cryptocurrencies.* Our solution will be offered on a subscription basis and is designed to identify illicit transactions and suspects and generate optimal intelligence to successfully complete investigations. Blockchain analytics, as a challenge it poses to security organizations, are good examples of why the rapid pace of innovation is required for our customers to stay ahead of the curve. This is also a good example of how customers can easily deploy new solutions from our open analytics platform.[105] [Emphasis added.]

[Emphasis added.]

68.78. The statements referenced in ¶¶76-7766-67 above were materially false and misleading because they portrayed Cognyte's customer base as consisting of governments and corporate enterprise customers seeking defensive solutions against cyber-attacks, intrusions and other threats by terrorists and criminals when, in fact, Cognyte indiscriminately sold its products and software in violation of export control laws of Israel and other applicable jurisdictions to customers who used them, including in ways that violated the terms of service of social media platforms, to target politicians, journalists and other individuals. As was the case with respect to the Registration Statement, the Q4 and FY 2021 press release and earnings call, and the 2021 Form 20-F, nothing in the Q1 2022 press release and earnings call discussing Cognyte's Q1 2022 financial results suggested, let alone disclosed, that (i) part of Cognyte's business case was the

---

[104]    *Id*. at 5.

[105]    *Id*.

marketing and sale of solutions to states with poor human rights records such as Bangladesh or known outlaw regimes such as the brutal military junta in Myanmar in violation of the export control laws of Israel and other jurisdictions in which it operated, or (ii) that such sales were ongoing at the time and had contributed to the Q1 2022 results reported by Cognyte. Given the admitted risks they posed to Cognyte's reputation and future financial prospects, if known, these facts would have altered the total mix of information available to investors with respect to the risks of an investment in Cognyte.

**E.     Defendants' Materially False and Misleading Q2 2022 Press Release2021 Financial Results and Earnings Call**

69.79.  On September 20, 2021, Cognyte issued a press release announcing its Q2 20221 financial results.  During the Company's earnings call with analysts that same day, Defendant Sharon once again claimed that the Company's strategy was focused on "***empower[ing] security organizations with an open analytics platform to help them address many different security use cases***," and repeated the remarks he had made on the Q1 20221 earnings call regarding the security challenges facing Cognyte's customers.[106]  In addition, as in earlier calls, Defendant Sharon touted a few seven and eight figure orders received in Q2 20221 including (i) a $10 million order from "***an existing national law enforcement organization customer***" that had initially deployed Cognyte's platform for investigating drug trafficking and was "***now expanding [the] platform to investigate human trafficking***;" and (ii) a $7 million order "***from an existing homeland security customer that [was] using [the] platform to investigate cross-border smuggling of drugs and weapons***."[107]  [Emphasis added.]

---

[106]     Q2 2022 Earnings Call Transcript at 4-5.

[107]     *Id*. at 5.

70.80. In addition, Defendant Sharon also highlighted Cognyte's customers' purported

"growing interest in cybercrime," stating:

> *Cybercrime is becoming more frequent and the methods that are being used are becoming more and more sophisticated, making identifying the bad actors much more difficult.* Our customer mission is to identify the bad actors and prevent cybercrime activities that can lead to significant economic losses and security breaches.[108]
> [Emphasis added.]

71.81. During the Q&A portion of the call, Defendant Sharon commented on Cognyte's

new cryptocurrency use innovation that had been discussed during the prior quarter's earnings call

stating:

> [W]e discussed cryptocurrency in previous call. *We discussed that it's becoming very important for our customers to have this use case because illegal transactions are done in the cryptocurrency ecosystem*. It's another use case. Actually, our growth plan is relying on evolving the platform to support more and more use cases, and cryptocurrency is one of them. . . .
>
> [W]e launched it last quarter. . . . [W]e are running multiple POCs with customers, and the results so far are encouraging.[109] [Emphasis added.]

[Emphasis added.]

72.82. The statements in ¶¶79-81 69-71 above were materially false and misleading

because they portrayed Cognyte's customer base as consisting of governments and corporate

enterprise customers seeking defensive solutions against cyber-attacks, intrusions and other threats

by terrorists and criminals when, in fact, Cognyte indiscriminately sold its products and software

in violation of export control and other laws of Israel and other applicable jurisdictions to customers

who used them, including in ways that violated the terms of service of social media platforms, to

target politicians, journalists and other individuals. As was the case with respect to the Registration

---

[108]     *Id*.

[109]     *Id*. at 9.

Statement, the Q4 and FY 2021 press release and earnings call, the 2021 Form 20-F, and the Q1 2022 press release and earnings call, nothing in the Q2 2022 press release and earnings call discussing Cognyte's Q2 2022 financial results suggested, let alone disclosed, that (i) part of Cognyte's business case was the marketing and sale of solutions to states with poor human rights records such as Bangladesh or known outlaw regimes such as the brutal military junta in Myanmar in violation of the export control laws of Israel and other jurisdictions in which it operated, or (ii) that such sales were ongoing at the time and had contributed to the Q2 2022 results reported by Cognyte.   Given the admitted risks they posed to Cognyte's reputation and future financial prospects, if known, these facts would have altered the total mix of information available to investors with respect to the risks of an investment in Cognyte.  Indeed, Defendants knew this was the case.  Evidence of this is the July 1, 2021, letter from the Council on Ethics on behalf of the Norwegian Government Pension Fund Global, one of the Company's largest investors, to Defendant Sharon noting that the cyber intelligence business of Verint that had become Cognyte had previously been suspected of selling surveillance technology linked to oppression of minorities, politicians and journalists to countries with poor human rights records, including Azerbaijan, Bahrain, Indonesia and South Sudan, and requesting information with respect to the "steps," if any, Cognyte had "taken to address involvement in human rights abuse through [the Company's] operations, and if any guidelines or procedures ha[d] been developed to avoid involvement in such abuse."

### T̶T̶HE TRUTH BEGINS TO EMERGE

83.      The truth about Cognyte – *i.e.*, that it was ***not*** operating in accordance with its Code of Conduct or complying with all applicable laws and regulations in the jurisdictions in which it was operating and that customers to whom it sold cyber intelligence solutions were engaged in

terror, crime and other cyber threats rather than trying to neutralize such behavior, all of which made Cognyte a riskier investment than Defendants' public statements portrayed – slowly emerged through several partial corrective disclosures and events.

73.84.  On December 16, 2021, after the market closed, Meta, the parent company of Facebook and Instagram, issued the results of its "months long" investigation into the "surveillance-for-hire industry," revealing for the first time that Cognyte and six private companies had "regularly targeted, without their knowledge, journalists, dissidents, critics of authoritarian regimes, families of opposition members, and human rights activists around the world," and collected intelligence on these people by manipulating them to reveal information and/or by compromising their devices and accounts, in violation of Facebook's community standards and Terms of Service.[110]    With respect to Cognyte in particular, the Threat Report revealed that Cognyte "sells access to its platform which enables managing fake accounts across social media platforms including Facebook, Instagram, Twitter, YouTube, and VKontakte (VK), and other websites to social-engineer people and collect data."[111]    This conduct "violated multiple Community Standards and Terms of Service," and "given the severity of [its] violations," Meta disabled Cognyte's ability to use its platforms (removing about 100 accounts on Facebook and Instagram), shared its findings with security researchers, other platforms and policymakers, issued Cease and Desist warnings, and alerted the individuals who were believed to be targeted to help them strengthen the security of their accounts.[112]

74.    Cognyte's violation of Meta's terms of service had grave implications for

---

[110]    Threat Report*See* n.8, *supra* at 2-8.

[111]    *Id*. at 8.

[112]    *Id*. at 6-8.

Cognyte's business.   The disclosure that Cognyte had used fake accounts and bots on Meta's platformsMeta to assist customersbad actors in surveilling journalists, politicians and other targets directly revealed that Cognyte was *not* operating in accordance with its Code of Conduct or complying with all applicable laws and regulations, and that its business was not confined to a far riskier investment than the salepurveyor of defensive cyber security tools and software aimed at hackers, cyber criminals and terrorists asthat Defendants had portrayed the CompanyCognyte to be in their public statements. While Defendant Sharon sought to minimize the significance of the wrongdoing revealed in the Threat Report in remarks at the January 11, 2022 Needham Growth Conference, in a January 14, 2022 report, Needham's analysts stated that they believed without Meta's data, "the use case has potential for reduced effectiveness and customer appeal."

75.   Following release of the Threat Report, the price of Cognyte's common stock fell 5.11%, closing at $18 per share on December 17, 2021, before declining another 5.5% the next trading day.

76.85.  Then, on December 21, 2021, an article in HAARETZHAARETZ, citing the Threat Report, raised the possibility that Cognyte and companies like it might not survive.[113]  On this news, the price of Cognyte's stock fell 7.70%, closing at $15.70 per share on December 21, 2021, before declining another 4.46% the next trading day.

86.   Following release of the Threat Report, the price of Cognyte's common stock fell $2.38 or 13.8% over three trading days from $19.39 per share on December 15, 2021, to $17.01 per share on December 20, 2021, on extremely heavy volume.

---

[113]   Sagi Cohen, ""Cyber mercenaries": How Israel's spyware industry is getting slammed around the world, HAARETZ ("," HAARETZ, Dec. 21, 2021)..

87.    Then, on December 21, 2021, in response to the HAARETZ article, the price of Cognyte's stock declined to $15.70 per share from $17.01 on December 20, 2021, a decline of $1.31 or 7.7%, before falling another 4.8% across the next two trading days to $14.94 on December 23, 2021, on heavy volume.

88.    However, the truth was only partially revealed on December 16 and 21, 2021, and Cognyte's stock price continued to be artificially inflated because Defendants made statements minimizing the impact of Meta's actions on Cognyte's business.  In this regard, at the January 11, 2022, Needham Conference, Defendant Sharon dismissed the Threat Report as unimportant stating that it impacted a single solution offered by the Company that accounted for less than 5% of the Company's revenue.[114]   In addition, the foregoing disclosures did not reveal that Cognyte was selling its surveillance systems to repressive regimes engaged in human rights abuses in violation of export control laws and other regulations which it was required to follow.

77.89. In the wake of the foregoingthese disclosures,. the United States government reportedly pressured Israel to enforce its export laws and prevent the spread of harmful cyber technologies, and Cognyte's customer base began to shrink.  On. Customers also began to abandon Cognyte as evidenced by the Company's disappointing Q4 2021 financial and operating results and inability to provide guidance.  In this regard, on April 5, 2022, Cognyte reported a "several million dollar[] [revenue miss] below the midpoint of [its] guidance" for Q4 202**2**1, and advised that it was "unable to provide FY23 guidance and long-term targets at this time."– While Defendants blamed "*supply chain issues, as well as, a lower conversion of [Cognyte's] pipeline*," [e**E**mphasis added].] Cognyte's Annual Report on Form 20-F for the period ended January 31, 2022

---

[114]    Transcript of 24th Annual Needham Virtual Growth Conference (Jan. 11, 2022), at 6-7.

(the "2022~~1~~ Form 20-F"), also released that day, revealed that the Company had been~~was~~ forced to

modify its solutions in response to the Threat Report, stating in relevant part:

> Our solutions capture, fuse and analyze data collected from various sources, including from commercial web sources and social platforms. –Such sources and platforms may allege that our solutions and techniques for capturing and collecting data and information from such sources violate their terms of use or other propriety rights of such sources or of their users. –In December 2021, Meta Platforms Inc., or Meta, issued a report alleging that certain solutions offered by us that interface with Facebook and Instagram platforms violates their terms of use. –Concurrently with the issuance of the foregoing report, Meta announced that it had removed accounts that it claimed were associated with our solutions and requested we cease data collection from its social platforms. –***In response to Meta's allegations, we made modifications to certain features of our solutions, which impacted the manner our customers can use these solutions***. [Emphasis added.][115]

~~78.      The response from analysts to these disclosures was swift and negative, with many reducing their price targets, including Wedbush, who lowered its price target from $17 to $9 concluding:~~

> ~~[T]he Cognyte business model is turning into a debacle of [ ] epic proportions for investors that once believed in the story. Since the spin-off from Verint over the past year, the Cognyte story ha[s] been a nightmare for investors as the execution shortfalls, longer sales cycles, and myriad of challenges has created a perfect storm for the Street. Most troubling to us is that CGNT was unable to guide for 1Q23 and 2023, which means to us that management may not have their arms around the sales execution and headwinds in our opinion.~~

~~79.~~90.  The market responded immediately and harshly to these disclosures. Cognyte's

stock price plummeted over 31% on unusually high trading volume, closing at $8.03 per share on

April 5, 2022, which was down $3.63 per share from its April 4, 2022, close of $11.66 per share~~.~~,

before falling another 6.7% to $7.49 per share on April 6, 2022. Once again, however, the price

of Cognyte common stock remained inflated as none of the foregoing disclosures revealed that the

---

[115]      2022 Form 20-F at 4.

Company was selling its surveillance systems to repressive regimes engaged in human rights abuses in violation of export control laws and regulations it was required to follow.

80.91.  On June 28, 2022, before market open, Cognyte released its Q1 20232 financial results, which badly missed analyst estimates across the board.  Cognyte's Q1 20232 revenue of $87 million, for example, represented a year-over-year decline of 25%.  Analysts were expecting a decline of only 2%.  Once again, the Company blamed supply chain issues and slow pipeline conversion for the disappointing results.

81.92.  Analysts, however, attributed Cognyte's poor results to the reputational fallout from the Threat Report and increased scrutiny of its business.   For example, William Blair, downgraded Cognyte to "market perform" and concluded that Cognyte's "low pipeline conversion" issues were related to the negative brand impact caused by scrutiny of its actions and those of other cyber surveillance companies, rejecting the Company's many excuses for the sales decline, including purported supply constraints arising from the pandemic:

> ***Cognyte's management attributed its sales decline to supply chain constraints, a low pipeline conversion, and customer budget uncertainty related to the Russian war.  In our view, the low pipeline conversion is a symptom of a broader issue. Cognyte's brand has been negatively impacted by increased scrutiny of the cyber intelligence industry and fellow Israel cyber surveillance firm NSO Group. Last fall, the U.S. government blacklisted the NSO Group after a multitude of reports surfaced that its software was being used inappropriately by governments to spy on citizens with dissenting views. While we believe there is value to cyber intelligence, we believe that it is important for investors and customers that there are rigid safeguards in place and high transparency to ensure that the software is used in an ethical manner.*** [Emphasis added.][116]

82.93.  On this news, Cognyte's shares declined $1.84, or over 28.66%, from $6.42 per share to close at $4.58 per share on June 28, 2022.  Once again, however, the price of Cognyte

---

[116]    *Supra* note 1.

common stock remained inflated as none of the foregoing disclosures revealed that the Company was selling its surveillance systems to repressive regimes engaged in human rights abuses in violation of export control laws and regulations it was required to follow.

83.94.  On December 15, 2022, the Executive Board responsible for overseeing the investments of the Norway Government Pension Fund Global announced it was excluding Cognyte from the fund's investment universe *citing concerns about the company contributing to serious human rights violations*.   The decision was based on a recommendation from the Council of Ethics dated June 17, 2022.   [Emphasis added.]

84.95.  On this news, Cognyte's shares declined 7.04% from $2.70 on December 14, 2022, to%, closing at $2.51 per share on December 15, 2022, before falling another 6.4% over 38% the next two trading days (December 16 and 19, 2022) on heavy volume.  Once again, however, the price of Cognyte common stock remained inflated as none of the foregoing disclosures revealed that the Company was selling its surveillance systems to repressive regimes engaged in human rights abuses in violation of export control laws and regulations it was required to follow.day.

85.96.  Finally, between January 15-18, 2023, Myanmar's apparent acquisition of intercept spyware from Cognyte was disclosed and discussed in a report published by NGO Justice for Myanmar, an in-depth expose in HAARETZ, and an article published by Reuters.[117]  In response, Cognyte's stock price declined 5.5% from $3.78 on January 13, 2023, the last trading day before the Justice for Myanmar report and HAARETZ article were published on Sunday, January 15, 2023, in the middle of the Martin Luther King Jr. Day weekend, to $3.57 per share on January 19, 2023,

---

[117]      *See Israeli Surveillance Firm Cognyte's Business in Myanmar Exposed*, Justice For Myanmar (Jan. 15, 2023), https://www.justiceformyanmar.org/stories/israeli-surveillance-firm-cognytes-business-in-myanmar-exposed; Oded Yaron, *Myanmar Acquired Spyware From Israeli Cyber-intelligence Firm Cognyte, New Docs Reveal*, HAARETZ (Jan. 15, 2023); Fanny Potkin and Poppy McPherson, *Israel's Cognyte Won Tender to sell Intercept Spyware to Myanmar Before Coup*, REUTERS (Jan. 18, 2023).

the day after the REUTERS article appeared and reported for the first time that "[t]wo people with knowledge of Myanmar's intercept plans separately told REUTERS the Cognyte system was tested by [Myanmar Posts and Telecommunications]."[118]  This disclosure directly revealed that Cognyte was providing its surveillance software to customers engaged in human rights abuses in violation of its Code of Conduct and laws and regulations in the jurisdictions in which it was operating, thereby subjecting the Company to reputational harm and significant adverse business consequencesHAARETZ, and an article published by Reuters.[119]  In response, Cognyte's stock price declined 5.5% to close on January 19, 2023, at $3.57 per share.

## ADDITIONAL EVIDENCE OF SCIENTER

86.97.  The unethical and illegal conduct anddetailed in ¶¶33-42 above, and the alleged material misstatements and omissions set forth in ¶¶43-72 above, occurred at Defendant Sharon's direction and with his knowledge.

87.98.  At all relevant times, Sharon was CEO and a member of the Board of Directors of Cognyte.   Defendant Sharon, because of his position in the Company, possessed the power and authority to control the contents of Cognyte's filings with the SEC, press releases and presentations to securities analysts, and the Company's disclosures to the market.   Defendant Sharon was provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to or shortly after their issuance and had the ability and opportunity to

---

[118]     Fanny Potkin and Poppy McPherson, Israel's Cognyte Won Tender to sell Intercept Spyware to Myanmar Before Coup, REUTERS (Jan. 18, 2023).

[119]     See "Israeli Surveillance Firm Cognyte's Business in Myanmar Exposed," Justice For Myanmar, Jan. 15, 2023 (available at https://www.justiceformyanmar.org/stories/israeli-surveillance-firm-cognytes-business-in-myanmar-exposed); Oded Yaron, "Myanmar Acquired Spyware From Israeli Cyber-intelligence Firm Cognyte, New Docs Reveal," HAARETZ, Jan. 15, 2023; Fanny Potkin and Poppy McPherson, "Israel's Cognyte Won Tender to sell Intercept Spyware to Muanmar Before Coup," REUTERS, Jan. 18, 2023.

prevent their issuance or cause them to be corrected.    Defendant Sharon also personally made many of the materially false and misleading statements to the market as alleged herein.

88.99.  Defendant Sharon had a deep familiarity with Cognyte's products and software based on his many years of work at Cognyte and in the division of Verint that became Cognyte. Defendant Sharon had served as the President of Verint's cyber intelligence solutions business, the division of Verint that was spun-off to create Cognyte, from February 2016 to the date of the spin-off.  Prior to serving as President of Verint's cyber intelligence solutions business, Sharon had held a broad range of management positions in that business, including Senior Vice President of Products, R&D and Delivery, Senior Vice President of Strategic Programs, and Chief Operating Officer.  In 2021, Amnesty International reported that from at least March 2015 to February 2017, a period during which Defendant Sharon was President of Verint or held another senior management position, Verint supplied South Sudan, including its infamous National Security Service (NSS), with communications interception equipment and annual support services which the NSS used to engage in unchecked and unlawful surveillance of and terrorize government critics, activists and journalists.[120]

100.    In addition, as CEO of Cognyte, upon information and belief, as CEO of Cognyte, Sharon was one of the small group of Cognyte employees registered with DECA and able to engage in defense marketing activities and negotiate defense export transactions.  Thus, Sharon knew and/or had access to information about Cognyte's defense export customers, products and solutions, including to whom those products and solutions were sold, and how those products and

---

[120]    *South Sudan: "These walls have ears": The chilling effect of surveillance in South Sudan*, Amnesty International (2022), https://www.amnesty.org/en/documents/afr65/3577/2021/en/ (last visited Oct 21, 2024).

solutions were to be used by the customer, information that was necessary to complete the required EUC Form to obtain a defense export license under Israel's Defense Export Control Law.

89.101.    Defendant Sharon also~~As CEO of Cognyte, Defendant Sharon~~ received direct reports from Sharon Chouli, Cognyte's Head of Customers, Gil Cohen, Cognyte's Head of Product, Amir Barel, Cognyte's Chief Technology Officer, and Marom Menahem, Cognyte's Head of Europe and Africa, and frequently discussed Cognyte's pipeline and contract wins during the Company's quarterly earnings calls,  demonstrating that he had access to and reviewed this information.~~.  Consequently, Defendant Sharon received and/or had access to information about Cognyte's products and solutions, including where those products and solutions were sold, to whom, and how those products and solutions operated.~~

90.102.    In view of the foregoing, there~~There~~ is a strong inference that Defendant Sharon knew that Cognyte's software was accessing and operating on social media platforms in violation of their terms of service.  Indeed, Defendant Sharon's public comments about Cognyte's Web Intelligence product at the January 11, 2022 Needham Virtual Growth Coonference evidence his familiarity with how it operated.  In addition, according~~According~~ to the Meta Threat Report, fake accounts such as those associated with Cognyte and its customers which were used to target journalists, politicians and others, are typically managed by the service provider for its clients.[121]

91.103.    Similarly, there is a strong inference that Defendant Sharon knew that Cognyte was violating the export control and other laws of jurisdictions, including Israel, the U.S. and the EU, in which the Company did business including by selling intercept spyware to Myanmar.  Defendant Sharon ~~in which the Company did business 58ncluding by providing intercept spyware to Myanmar.  Defendant Sharon's remarks during the Company's quarterly~~

---

[121]    Threat Report at 4.

~~earnings calls frequently touched upon Cognyte's pipeline and contract wins during the quarter demonstrating that Defendant Sharon had access to and reviewed this information.  Moreover, there is a strong inference that Defendant Sharon knew that the Myanmar transaction violated the export control and other laws of several jurisdictions in which Cognyte did business because, for example, Defendant Sharon, a Cognyte employee and director,~~ was obligated to comply with Cognyte's Code of Conduct, which required awareness of and compliance with "all applicable governmental laws, rules, and regulations that affect [Cognyte's] business and the performance of [his] job[]."[122]  In addition, as CEO of Cognyte and, upon information and belief, one of the small group of individuals at Cognyte registered with DECA and able to engage in defense marketing activities and negotiate defense export transactions, Sharon necessarily was familiar with the laws and regulations governing the export of Cognyte's dual-use solutions and services and aware that the sale of the intercept system to Myanmar and the sale of the cellular tracking system to Bangladesh violated those laws and regulations.

104.    During the Class Period, Cognyte sold spyware in violation of Israel's export control laws.

(a)      As the Registration Statement acknowledged and as detailed above under Israeli law, exports of defense and dual-use systems such as the Intercept System sold to Myanmar require an export license and must be "consistent with Israeli governmental policy."[123] However, the sale was *not* consistent with Israeli government policy.  At the beginning of 2018, following a 2017 ruling of Israel's High Court of Justice, Israel's Ministry of Defense and

---

[122]      Code of Conduct at 45.

[123]      Registration Statement at 67.

Ministry of Foreign Affairs decided to halt all Israeli military exports to Myanmar.[124]  In addition, the Intercept System was sold to Myanmar without the legally required export control and marketing licenses.[125]

(b)  In 2021, Cognyte also sold a cellular tracking system for military intelligence valued at $500,000 to Bangladesh, a country that does not recognize Israel and with which Israel has no diplomatic relations.  Israeli companies are formally banned from doing business with Bangladesh.[126]

105.  Likewise, Cognyte's sale of the Intercept System to Myanmar also violated U.S. and EU export control laws.  Since the early 1990s, the U.S. and the EU have each maintained a continuous arms embargo of Myanmar.  Among other things,

(a)  Exec. Order. No. 14014, 86 Fed. Reg. 28 (2021) issued by President Biden on February 10, 2021 provides that "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any foreign person determined by the Secretary of the Treasury, in consultation with the Secretary of State: (i) to operate in the defense sector of the Burmese economy . . . (ii) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, any of the following: (A) actions or policies that undermine democratic processes or institutions in Burma; (B) actions or

---

[124]  O. Yaron, *Israel Sold Arms to Myanmar Even After the 2021 Coup*, HARRETZ (Sept. 5, 2023).

[125]  O. Yaron, *Israeli Company Cognyte Sold Cyber-intel System to Myanmar Without License, State Attorney Says*, HARRETZ (Apr. 9, 2024).

[126]  O. Yaron and Z. Saer Kahn, *Israeli Spy Tech Sold to Bangladesh, Despite Dismal Human Rights Record*, HAARETZ (Jan. 10, 2023).

policies that threaten the peace, security, or stability of Burma; (C) actions or policies that prohibit, limit, or penalize the exercise of freedom of expression or assembly by people in Burma, or that limit access to print, online, or broadcast media in Burma; or (D) the arbitrary detention or torture of any person in Burma or other serious human rights abuse in Burma."[127]

(b)    Likewise, EU Council Regulation 2018/647 (April 26, 2018) prohibits (1) the sale, supply, transfer or export, directly or indirectly, of dual-use goods and technology . . . whether or not originating in the Union, to any natural or legal person, entity or body in Myanmar/Burma or for use in Myanmar/Burma, if those items are or may be intended, in their entirety or in part, for military use, military end user or the Border Guard Police; (2) the sale, supply, transfer or export, directly or indirectly, of telecommunication or internet monitoring equipment to any person, entity or body in Myanmar/Burma or for use in Myanmar/Burma unless the relevant EU member state has given its prior authorization.[128]  In addition, the regulation prohibits providing any telecommunication or internet monitoring or interception services of any kind to, or for the direct or indirect benefit of, Government of Myanmar/Burma, public bodies, corporations and agencies or any person or entity acting on their behalf or at their direction.[129]

92.106.    Furthermore, during the Class Period, Defendant Sharon was personally apprised of issues concerning Cognyte's illicit and/or illegal conduct and the potential fallout therefrom. For example, on July 1, 2021, the Council on Ethics sent a letter to Defendant Sharon on behalf of the Norwegian Government Pension Fund Global, a sovereign wealth fund that owned 1.3% of Cognyte's outstanding shares as of February 2, 2021. The Council on Ethics apprised

---

[127]    Exec. Order No. 14014, 86 Fed. Reg. 28 (2021), §14014(1)(a)(i-ii).

[128]    EU Council Regulation 2018/647 (April 26, 2018), Art. 3a(1), 3b(1).

[129]    *Id*. at Art. 3c(1)(c).

Defendant Sharon that it had learned about "allegations against Verint Systems Inc (Verint) i.e. in Azerbaijan, Bahrain, Indonesia and South Sudan, where the company or its subsidiaries are said to have sold surveillance products and services used to implement repressive government policies targeting minorities, political activists and journalists." Defendant Sharon was aware of these sales by virtue of his position as President of Verint's cyber intelligence solutions business, which became Cognyte. In light of the spin-off, the letter asked Defendant Sharon to explain what steps Cognyte had taken to guard against its products' involvement in human rights abuse citing the risk warning in the Registration Statement (*see* ¶58~~52~~, *supra*) concerning the potential for reputational harm that could result. Cognyte sent the Council a response on August 24, 2021, signed by the Company's Vice President of Risk and Compliance, Ariel Sagee. Although the letter stated that Cognyte was unable to respond to the Council's inquiries about specific customers citing "confidentiality obligations," the letter falsely implied that Cognyte was not selling its solutions to countries engaged in human rights abuses stating that Cognyte (i) "recognize[d] its role to respect internationally recognized human rights," (ii) was "committed to complying with all applicable laws, rules, and regulations, and conducting [itself] in accordance with high ethical standards, consistent with the Company's Code of Conduct," (iii) had taken the opportunity since the spin-off to "enhance its compliance organization and guidelines," and (iv) was "address[ing] human rights and other risks through internal vetting processes, policies, training and awareness, contractual undertakings, and an independently operated Ethics Helpline that [was] available to internal and external stakeholders." The facts that the Council was a large shareholder and its letter had been addressed to Defendant Sharon give rise to a strong inference that Defendants Sharon was aware of and approved Cognyte's misleading response to the Council's inquiries.

93.107.    ~~Cognyte's scienter can be imputed from Defendant Sharon's.~~  Cognyte's scienter is also evidenced by the widespread nature of the misconduct alleged herein, all of which contradicted the alleged misstatements alleged herein.

## LOSS CAUSATION

94.108.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and members of the Class.   During the Class Period, Lead Plaintiff and Class members purchased Cognyte common stock at artificially inflated prices caused by Defendants' misconduct as alleged herein.   The price of Cognyte's common stock declined significantly when the material risks concealed by Defendants materialized and Defendants' material misstatements and omissions were revealed to the market causing investors' losses.

95.109.    Before the end of the Class Period, on January 19, 2023, investors had been unaware of the following material facts about Cognyte that had been known to Defendants throughout the Class Period:

(a)    Cognyte's business was not limited to assisting governments, governmental agencies and corporate enterprises in combatting hacking, cyber-crimes and terrorists, but also included "surveillance-for-hire" activities on behalf of bad actors and selling surveillance systems to repressive regimes engaged in human rights violations in violation of export control laws and regulations that risked enormous reputational and business harm, including lost customers and revenue, if they became known.~~;~~

(b)    Cognyte was violating the terms of service of Facebook, Instagram and other social media platforms by using bots and fake accounts to gather data and/or

establish contact with targets or people close to them in an effort to build trust, solicit information, and trick them into clicking on links or downloading files that would allow their devices to be hacked.  These activities not only risked serious reputational harm, but also jeopardized both Cognyte's ability to continue accessing and operating on the social media platforms if the violations were discovered, and the effectiveness of its solutions in the event they needed to be modified in order to comply with the social media platforms' terms of service; and

(c)      Cognyte was violating the export control and other laws of Israel and other jurisdictions in which it did business, including the U.S., by selling its products and software, many of which were defense-related or "dual-use," to prohibited~~bad~~ actors, including the military dictatorship ruling Myanmar, which used Cognyte's technology to surveil journalists, politicians, and other vulnerable individuals without their knowledge and engage in human rights abuses.  These activities risked serious reputational harm if they became known.

~~96.~~110.       Defendants' misrepresentations and omissions, as alleged above, misrepresented and concealed the true adverse facts from the market during the Class Period, leading investors to wrongly believe that Cognyte was selling cyber intelligence solutions that were defensive in nature and in an ethical manner consistent~~that complied~~ with all relevant laws, regulations and the Company's own Code of Conduct.

~~97.~~111.       As alleged above, the truth concealed by Defendants' material misrepresentations and omissions was partially revealed to investors for the first time on December 16, 2021, and was not fully revealed until January 19, 2023.  ~~For example:~~

~~(a)~~       ~~For example, on~~On December 16, 2021, Meta released the Threat Report (i)

identifying Cognyte as a "cyber mercenary" engaged in "surveillance-for-hire" activities in ways that violated Meta's terms of service, and (ii) announcing that it had banned the Company from its platforms, issued Cease and Desist letters, and removed approximately 100 fake accounts associated with Cognyte and its customers from its platforms. Then, on

(b) 112. On December 21, 2021, a media report[130]s issued in the wake of the Threat Report raised the possibility that Cognyte and companies like it might not be able to survive.

113. In response to these disclosures, the price of Cognyte common stock declined. Whereas on December 15, 2021, the price of Cognyte's common stock closed at $19.39 per share with 288,643 shares changing hands, just slightly above the average trading volume for December to that point, the following day, December 16, 2021, the date the Threat Report was released, Cognyte's stock price declined to $18.97 per share and continued to decline further to $18.00 on December 17, 2021, an aggregate decline of $1.39 or 7.2% on heavy volume. This decline in Cognyte's share price was significantly larger than the average daily decline in Cognyte's share price in the 14 trading days preceding the publication of the Threat Report, which was just $0.26. In addition, trading volume on December 16 and 17, 2021 was orders of magnitude greater than on any prior date in December 2021 and all of November 2021. On December 16 and 17, 2021, 1,185,741 and 3,070,987 Cognyte shares, respectively, changed hands. In contrast, the average daily trading volume during the entire Class Period was 593,670. The foregoing data plausibly alleges a causal relationship between publication of the Threat Report and media reports discussing its ramifications for Cognyte's business and the declines in Cognyte's stock price on December 15

---

[130]    Sagi Cohen, *Cyber mercenaries: How Israel's spyware industry is getting slammed around the world*, HAARETZ (Dec. 21, 2021).

and 16, 2021. Importantly, no other significant news regarding Cognyte was released on December 15 and 16, 2021.

114. Likewise, on December 21, 2021, the price of Cognyte common stock declined to $15.70 per share from $17.01 per share on December 20, 2021, a decline of $1.31 or 7.7% on heavy trading volume of 2,275,049 shares. The decline in response to the December 21, 2021 disclosure was the largest single-day decline in Cognyte's stock price in percentage terms to that point in Q4 2022. Further, although the HAARETZ article discussing the negative ramifications of the Threat Report for Cognyte's business was published on the same day that Cognyte released its results for the third quarter ended October 31, 2021, Cognyte's revenues and EPS for the quarter came in ahead of consensus estimates and the Company raised its FY 2022 (ending January 31, 2022) guidance for gross margin to 73% from 72%. Although Cognyte also announced that it was reducing its non-GAAP revenue and diluted EPS guidance for FY 2022 by $10 million and $0.02 at the midpoint to $480 million and $0.80, respectively, these adjustments were attributed to temporary, pandemic-related factors affecting the timing of deployments – "new travel restrictions in certain countries related to a worsening of the pandemic [and] recent shortages of third-party components required to deliver certain of [Cognyte's] software solutions" – rather than fundamental issues threatening the survival of Cognyte's business. Thus, the foregoing data plausibly alleges a causal relationship between the disclosure of the negatives ramifications of the Threat Report for Cognyte's business and the declines in Cognyte's stock price on December 15 and 16, 2021.

(c)115. As detailed above (¶¶89-90), onOn April 5, 2022, Defendants disclosed that Cognyte had missed its revenue guidance for Q4 2022Q42021 due in part to lower conversion of its pipeline and that, in response to the allegations in the Meta Report, it had made modifications

to certain features of its solutions, which impacted the manner in which its customers could use them.  In response, Cognyte's share price plummeted $3.63 or 31% from $11.66 per share on April 4, 2022 to $8.03 per share on April 5, 2022 and fell further to $7.49 per share on April 6, 2022 on unprecedented volume.  The decline in Cognyte's share price from April 4, 2022 through April 6, 2022, was significantly larger than the average daily decline in Cognyte's share price in the 14 trading days preceding the announcement that Cognyte had missed its Q4 2022 revenue guidance, which was just $0.20.  In addition, on April 5 and 6, 2022, 5,484,864 and 2,792,503 shares, respectively, changed hands. The foregoing data plausibly alleges a causal relationship between publication of Cognyte's disappointing Q4 2022 financial results, which were the materialization of the concealed risks, and the declines in Cognyte's stock price on April 5 and 6, 2022.;

(d)116. As detailed above (¶¶91-93), on On June 28, 2022 , Cognyte disclosed financial results for Q1 2023Q12022 that badly missed analyst estimates and again blamed slow pipeline conversion.  However., which analysts concluded that the poor results were surmised was related to the negative brand impact of the disclosures in the Threat Report.  In response, that Cognyte's share price declined from $6.42 per share on June 27, 2022solutions were being used inappropriately by governments to $4.58 per share on June 28, 2022 on heavy volume.  A total of 4,942,058 shares changed hands on June 28, 2022.  The foregoing data plausibly alleges a causal relationship between publication of Cognyte's disappointing Q1 2023 financial results, which were the materialization of the concealed risks, and the decline in Cognyte's stock price on June 28, 2022.spy on their own citizens;

(e)117. On December 15, 2022, investors learned for the first time that one of the Company's largest shareholders, the Norway Government Pension Fund Global, after communicating with the Company in July 2021 about possible misuses of Cognyte's solutions by

countries engaged in human rights abuses, hand decided to exclude Cognyte from the Ffund's investment universe because of its concerns that Cognyte's products and software were contributing to serious human rights violations.  On this news, Cognyte's shares declined 7.04%, from $2.70 per share on December 14, 2022 to $2.51 per share on December 15, 2022, before falling another 6.4% over the next two trading days (December 16 and 19, 2022) on heavy volume. On these three days (December 15, 16 and 19, 2921), 928,767, 1.407,026 and 1,437,253 Cognyte shares changed hands, respectively, far in excess of the average trading volume of 478,852 shares between December 9 and December 14, 2022.  Moreover, although the price of Cognyte common stock rebounded on December 20, 2022, to within a few pennies of its December 14, 2022 price of $2.70, this followed the Company's Q3 2023 earnings release which portrayed the Company's financial outlook as stabilizing in Q4 2023 with Defendants projecting 5% revenue growth for FY 2024 and breakeven cash flow, prompting Imperial Capital to conclude that Cognyte's outlook was "improving," its technology was "strong," and its stock price was "undervalued."[131]; and

118.    Finally, from January 15-18, 2023, investors learned of Cognyte's apparent sale of intercept spyware to the brutal military dictatorship controlling Myanmar.  In response, Cognyte's stock price declined 5.5% from $3.78 per share on January 13, 2023, the last trading day before the Justice for Myanmar report and HAARETZ article were published on Sunday, January 15, 2023, in the middle of the Martin Luther King Jr. Day weekend, to $3.57 per share on January 19, 2023, the day after the REUTERS article appeared and reported for the first time that "[t]wo people with knowledge of Myanmar's intercept plans separately told Reuters the Cognyte system was tested by [Myanmar Posts and Telecommunications]."[132]  This disclosure directly revealed that Cognyte

---

[131]    Brian Ruttenbur, "Cognyte Software Ltd.," Imperial Capital (Dec. 21, 2022).

[132]    Fanny Potkin and Poppy McPherson, *Israel's Cognyte Won Tender to sell Intercept Spyware to Myanmar Before Coup*, REUTERS (Jan. 18, 2023).

had provided its surveillance software to a customer in violation of the export control laws of Israel and other jurisdiction in which it operated contrary to Defendants' representations detailed above that Cognyte endeavored to comply with and indeed was in compliance with such laws. Accordingly, there is a direct causal link between these disclosures and the declines in Cognyte's stock price on the foregoing dates.

(f)    Disclosures of the~~From January 15-18, 2023, investors learned of Cognyte's~~ ~~apparent sale of intercept spyware to the brutal military dictatorship controlling Myanmar.~~

~~98.~~119.    ~~The~~ damage to Cognyte's reputation and brand from the Meta Threat Report and Meta's decision to ban Cognyte from accessing and using its platforms, Cognyte's poor financial performance following issuance of the Threat Report, the detrimental modifications to the Company's solutions to address Meta's allegations, the decision of Norway's Government Pension Fund Global to exclude Cognyte from the fund's investment universe, and the harm to Cognyte's reputation and brand from the disclosures about its ~~reported~~ sale of intercept spyware to Myanmar directly revealed and/or were the materialization of the risks concealed by the materially false and misleading representations and omissions detailed above.

~~99.~~120.    The market reacted swiftly and negatively to these disclosures as shown in ¶¶83-96~~73-85~~ above.

## CLASS ACTION ALLEGATIONS

~~100.~~121.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Cognyte common stock during the Class Period (the "Class").   Excluded from the Class are Defendants and their families.

101.122.     The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties, Class members and the Court.   Cognyte common stock is owned by hundreds, if not thousands, of persons.

102.123.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)     Whether the Exchange Act was violated by Defendants;

> (b)     Whether Defendants omitted and/or misrepresented material facts;

> (c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

> (d)     Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

> (e)     Whether the prices of Cognyte common stock were artificially inflated; and

> (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

103.124.     Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

104.125.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.   Lead Plaintiff has no interests which conflict with those of the Class.

105.126.    Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF THE FRAUD-ON-THE-MARKET
## PRESUMPTION OF RELIANCE

106.127.    The market for Cognyte common stock was open, well-developed, and efficient at all relevant times.   As a result of Defendants' materially false and misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.   Lead Plaintiff and other members of the Class purchased the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Cognyte.   Lead Plaintiff and Class members have been damaged thereby.

107.128.    During the Class Period, the artificial inflation of the value of Cognyte common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's common stock, causing Lead Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

108.129.    At all relevant times, the market for Cognyte common stock was efficient for the following reasons, among others:

> (a)    Cognyte stock met the requirements for listing and it was listed and

71

actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Cognyte filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Cognyte regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Cognyte was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

109.130.     Based on the foregoing, during the Class Period, the market for Cognyte common stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Cognyte stock.  —Under these circumstances, the market for Cognyte common stock was efficient during the Class Period and, therefore, investors' purchases of Cognyte common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

110.131.     In the alternative, Lead Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## NO SAFE HARBOR

111.132.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.  To the extent that statements alleged to be false or misleading are characterized as forward- looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## COUNTS

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

Lead Plaintiff incorporates and realleges each and every allegation contained above as if fully set forth herein.

133.     Lead Plaintiff incorporates and realleges each and every allegation contained above as if fully set forth herein.

134.    This Count is asserted on behalf of all members of the Class against Defendants for violations of §10(b) of the Exchange Act (15 U.S.C. §78(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

112.

113.135.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.136.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder in that they:

> (a)    employed devices, schemes and artifices to defraud;

> (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Cognyte common stock during the Class Period.

137.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for Cognyte's common stock.  Such reports, filings, releases, and statements were materially false

and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cognyte's business and operations.

138.    By virtue of his position at Cognyte and his prior positions at Verint Inc., Defendant Sharon had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Lead Plaintiff and the other members of the Class or, in the alternative, Defendant Sharon acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him.  Said acts and omissions of Defendant Sharon were committed willfully or with reckless disregard for the truth.  In addition, Defendant Sharon knew, or recklessly disregarded, that material facts were being misrepresented or omitted, as described above.

139.    Further information showing that Defendants acted knowingly, or with reckless disregard for the truth, is peculiarly within Defendants' knowledge and control.  As CEO of Cognyte and the former President of Verint's cyber intelligence business which became Cognyte, Defendant Sharon had knowledge of the details of Cognyte's internal affairs.

140.    Defendant Sharon is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Defendant Sharon was able to, and did, directly or indirectly, control the content of the statements of Cognyte.  As an officer and director of a publicly held company, Defendant Sharon had a duty to disseminate timely, accurate, truthful, and complete information with respect to Cognyte's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Cognyte's common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning

Cognyte's business and financial condition, which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased, or otherwise acquired Cognyte's common stock, at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or statements disseminated by Defendants, and were damaged thereby.

141.    During the Class Period, Cognyte's common stock was traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Cognyte's common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased, or otherwise acquired, said common stock, or would not have purchased or otherwise acquired shares at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Cognyte's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Cognyte's common stock declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiff and Class members.

142.    By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating materially false and misleading statements to the

investing public and/or the occurrence of events that constituted the foreseeable consequence and materialization of the risks concealed by Defendants' materially false and misleading statements.

115. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cognyte common stock. Lead Plaintiff and the Class would not have purchased Cognyte common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' materially false and misleading statements and omissions.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Defendant Sharon

116. Lead Plaintiff incorporates and realleges each and every allegation contained above as if fully set forth herein.

144. Defendant Sharon acted Lead Plaintiff incorporates and realleges each and every allegation contained above as if fully set forth herein.

145. During the Class Period, Defendant Sharon participated in the operation and management of Cognyte and conducted and participated, directly and indirectly, in the conduct of Cognyte's business affairs. Because of his senior positions as the Company's CEO and a member of the Company's Board of Directors, and his prior position as President of Verint's cyber intelligence division which became Cognyte, Defendant Sharon knew of the materially false and misleading information alleged herein.

146. As an officer and director of a publicly owned company, Defendant Sharon had a duty to disseminate accurate and truthful information, with respect to Cognyte's business practices,

and promptly correct any public statements issued by Cognyte that had become materially false or misleading.

147.  Because of his position of control and authority as CEO and a member of the Company's Board of Directors, Defendant Sharon was able to, and did, control the contents of the various reports, press releases, and public filings that Cognyte disseminated in the marketplace during the Class Period concerning the Company's business and operations.  Throughout the Class Period, Defendant Sharon exercised his power and authority to cause Cognyte to engage in the wrongful acts complained of herein.  Defendant Sharon, therefore, was a "controlling person" of Cognyte within the meaning of §20(a) of the Exchange Act.  In this capacity, Defendant Sharon participated in the unlawful conduct alleged herein that artificially inflated the market price of Cognyte's common stock.

148.  Defendant Sharon, therefore, acted as a controlling person of Cognyte within the meaning of §20(a) of the 1934 Act.  ~~By reason of his position with the Company, Defendant Sharon had the power and authority to cause Cognyte to engage in the wrongful conduct complained of herein.~~  By reason of his position with the Company, Defendant Sharon had the power and authority to direct the actions of, and exercised the same, to cause Cognyte to engage in the wrongful conduct complained of herein.

149.  As set forth above, Cognyte and Defendant Sharon each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged in this Complaint.

~~117.~~  By reason of such conduct, Defendant Sharon is liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of Defendant Sharon's wrongful conduct, Lead Plaintiff and the other members of the Class have suffered damages in connection with their purchases of the Company's securities.

150.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff, on Lead Plaintiff's own behalf and on behalf of the Class, prays for relief and judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, certifying Lead Plaintiff as representative of the Class, and designating Lead Plaintiff's counsel as Class Counsel;

B. Awarding Lead Plaintiff and the other members of the Class compensatory damages;

C. Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D. Awarding Lead Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiff demands a trial by jury on all issues so triable.

DATED: October 21, 2024 November 10, 2023        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

s/*Deborah Clark-Weintraub*

Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Donald A. Broggi
Mandeep S. Minhas
Claire Sheridan (*Pro Hac Vice Forthcoming*)
Jonathan M. Zimmerman (*Pro Hac Vice Forthcoming*)
The Helmsley Building
230 Park Avenue, 2417th Floor
New York, NY 10169
Telephone: 212-2233-6444
Facsimile: 2122236334212-233-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
mminhas@scott-scott.com tlaughlin@scott-scott.com
dbroggi@scott-scott.com
csheridan@scott-scott.com
jzimmerman@scott-scott.com

*Counsel for Lead Plaintiff City of Omaha Police and Firefighters Retirement System and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to the email addresses denoted on the Electronic Mail Notice List.

                                        s/ Deborah Clark Weintraub

Deborah Clark Weintraub